IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS, <br><br> *Plaintiffs*, <br><br> v. <br><br> THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health, <br><br> *Defendants*. | Case No.: _____ <br><br><br> **COMPLAINT** |

Plaintiffs Brooklyn Center for Independence of the Disabled, José Hernandez, Anita Cameron, Self-Initiated Living Options, Inc., Independent Living Center of the Hudson Valley, Regional Center for Independent Living, Not Dead Yet, United Spinal Association, Not Dead Yet,

National Council on Independent Living, and Institute for Patients' Rights (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against the Honorable Kathy Hochul (in her official capacity as Governor of the State of New York), the New York State Department of Health (the "Department" or "Department of Health"), the Honorable James V. McDonald, M.D. (in his official capacity as Commissioner of the Department), the New York State Board for Medicine ("Medical Board for Licensure"), the Honorable Amit M. Shelat, D.O. (in his official capacity as Chair of the Medical Board for Licensure), the New York State Office of Mental Health ("OMH"), the Honorable Ann Marie T. Sullivan, M.D. (in her official capacity as Commissioner of the OMH) (collectively, "Defendants"), averring as follows:

### NATURE OF ACTION

1. New York's Medical Aid in Dying Act, N.Y. Pub. Health Law § 2899-d, *et seq.* (the "Act"), is scheduled to go into effect on August 5, 2026, and will allow providers to prescribe drugs—not to alleviate pain or suffering—but to cause the death of the patient and intentionally facilitate suicide.

2. Plaintiffs, people with life-threatening disabilities and organizations that represent and advocate for people with life-threatening disabilities, belong to a class of protected individuals who are at imminent risk of harm if the Act is allowed to go into effect. To protect themselves from this fast-approaching threat, Plaintiffs bring this action to stop the Defendant government officials from putting in place a deadly and discriminatory system that steers people with life-threatening disabilities away from necessary lifesaving and preserving mental health care, medical care, and disability supports, and toward death by suicide under the guise of "mercy" and "dignity" in dying.

3. Throughout the country, a state-endorsed narrative is rapidly spreading that threatens people with disabilities—erasing disabilities, and people with disabilities, is being touted

2

as a common-sense objective. Congress recently passed legislation that cuts over $1 trillion in federal Medicaid spending over ten years, which in turn will have a devastating impact on states' abilities to provide medical care for people with life-threatening disabilities.[1] The State of New York has also recently shifted towards a single fiscal intermediary for its Consumer Directed Personal Assistance Program, making it more difficult for people with disabilities to access essential medical benefits and long-term care.[2] These changes are a part of a growing trend—not limited to but including the expansion of assisted suicide laws around the country and world with increasingly limited access to medical care, alternatives, and fewer safeguards.

4. The Act's passage presents yet another looming threat in this daunting landscape for people with life-threatening disabilities in New York. The new law only requires that a patient be evaluated for "decision-making capacity" but does not require a mental health professional to even consider a patient's psychiatric or psychological condition or how that may affect their suicidality, which is necessary for informed consent and a truly autonomous choice, before the lethal prescription is written. The provider need not have expertise with the patient's specific illness or condition, and need not be trained on mental health symptoms or side effects associated with the patient's illness or treatment. Although the provider is supposed to discuss "feasible" alternatives to suicide, including available treatment options and the foreseeable risks and benefits of each, the provider is not required to do anything to help the patient obtain access to these frequently difficult-to-obtain services, nor are insurers required to cover them.

---

[1] Rhiannon Euhus, *et al*., Allocating CBO's Estimates of Federal Medicaid Spending Reductions Across the States: Enacted Reconciliation Package, KFF (Jul. 23, 2025).

[2] New York State Senate, Senator Steve Rhoads Stands Up for New Yorkers with Disabilities – Urges Action to Fix CDPAP (Mar. 8, 2025), https://www.nysenate.gov/newsroom/press-releases/2025/steven-d-rhoads/senator-steve-rhoads-stands-new-yorkers-disabilities.

5.     Assisted suicide under the Act violates federal disability rights laws and the federal and state constitutional guarantees of due process and equal protection which protect people with disabilities from discrimination, exclusion, and life-threatening state action.  Under federal and state law, a public entity may not withhold services or make services available on unequal terms based on disability, which is exactly what the Act does.  The New York government agencies and officials named in this action fund, oversee, and operate public health, social services, and medical profession regulations to provide protective services for people who express suicidality, and to prevent medical professionals, caregivers, and family members from taking advantage of, or encouraging, a person's impulse for self-harm or suicide.  Through the Act, however, the default protective network of services—offering suicide prevention—has been withdrawn from Plaintiffs' members and constituents solely based on a provider's prediction that they will die within six months.

6.     This creates a two-tiered medical system in which people who are suicidal receive radically different treatment responses by their providers and protections from the state government depending on whether the patient has what the provider deems to be a "terminal illness or condition," *i.e.*, based on disability.  The State of New York is heavily dependent on federal funding for its medical services, including its suicide prevention services.  With changes in federal funding and the increasing costs of health care, the Act poses a grave risk of harm to all persons who rely on the support of public health and social services, as well as on the objectivity and integrity of the medical profession.

7.     The Act discriminates against people with life-threatening disabilities by arbitrarily depriving them of protections afforded to others in violation of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Section 1557 of

4

the Affordable Care Act ("ACA"). The Plaintiff organizations represent members who have disabilities within the meaning of the ADA, Section 504, and the ACA, and as such are protected by those statutes. The state government funds and provides mental health care, supportive services, and other suicide prevention measures to non-disabled people who express a wish to die, but the Act, by default, will channel and steer persons with disabilities, including people with eating disorders, spinal cord injuries, and other life-threatening or terminal disabilities, toward assisted suicide instead.

8. The Act does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering and violates the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 11 of the New York State Constitution by treating people with life-threatening disabilities differently compared to others who express suicidality to their medical provider. There is no rational basis for the Act's "terminal" classification given that medical professionals often misdiagnose some patients as having terminal illnesses, physicians' prognoses of six months to live are often fallible, and the "terminal" classification includes people who can live a longer life span with treatment and supports, including individuals who have eating disorders, spinal cord injuries, and other disabilities, such as diabetes, that are treatable. The Act's very purpose and core requirement—providing an early death to someone who will die from a terminal illness or condition within six months—is irrational, unreliable, and discriminatory, in violation of both the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, as well as Article I, Section 6 of the New York State Constitution.

9. The Act violates the Due Process Clause of the Fourteenth Amendment and Article I, Section 6 of the New York State Constitution because it lacks the safeguards needed to protect people with life-threatening disabilities from self-inflicted death caused by impaired judgment,

depression, and undue influence by others. Despite established medical knowledge that those with life-threatening disabilities are at greater risk of depression and suicidal ideation, there is no requirement for a mental health evaluation or any oversight to ensure that judgment is not impaired at the time of ingestion.

10. Plaintiffs ask the Court to declare the Act to be in violation of federal disability law and the United States and New York State Constitutions and to preliminarily and permanently enjoin Defendants from allowing the practice of assisted suicide under the Act to go into effect on August 5, 2026.

<strong>JURISDICTION AND VENUE</strong>

11. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

12. This Court has jurisdiction over Plaintiffs' claims arising under the United States Constitution and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

13. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under Article I, Section 6 and Article I, Section 11 of the New York State Constitution, which is so related to Plaintiffs' claim under the Fourteenth Amendment that they form part of the same case or controversy under Art. III of the United States Constitution.

14. This Court has jurisdiction over Plaintiffs' claims arising under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act, and the regulations promulgated thereunder, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

15. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C. §§ 12101 et seq., 29 U.S.C. § 794 and by the general legal and equitable powers of this Court.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because at least one of the Plaintiffs resides in this district, one or more of the Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**PARTIES**

**A.     Plaintiffs**

17.     Plaintiff Brooklyn Center for Independence of the Disabled ("BCID") is a non-profit, grassroots organization based in Brooklyn, NY that was founded in 1956 and is operated by and for people with disabilities.  BCID became an independent living center in 1981 and serves the entire borough of Brooklyn.  The organization has about 15 staff members.

18.     BCID provides a wide range of services to people with disabilities, including benefits counseling, getting people out of nursing homes, and helping people avoid going into nursing homes.  The mission of BCID, like other CILs, is to help ensure people with disabilities can live as independently as possible and not be institutionalized.  BCID also engages in advocacy on behalf of people with disabilities.  BCID also operates a "warmline," which is intended to be a phone number people with disabilities can call if they are feeling overwhelmed.

19.     BCID has been injured as a direct result of Defendants' actions and omissions alleged herein.  BCID has a personal stake in challenging the Act as its core business activity is assisting people with disabilities to live independently in the community.  People with disabilities call BCID frequently in despair—whether it is because they are in need of housing or are having trouble retaining their home health aides due to changes in New York law.  Once the Act is in place, assisting those individuals will become much more urgent, and counseling members through options will be much more time-intensive as there are more factors that BCID and its members must consider to navigate the post-Act context.

20. As a direct result of the Act, BCID must consider additional outreach to people with disabilities who may not be aware of the options on how to stay alive and stay living in the community, and may turn toward physician assisted suicide.

21. The Act interferes with BCID's core business activities because it will contribute to an increase in time, resources, and urgency to counsel members. Anything that diverts BCID from its main mission and work, which is to help people with disabilities live independently, will lead to fewer people with disabilities in Brooklyn getting BCID's help in other ways.

22. Plaintiff José Hernandez is a 46-year-old citizen and resident of the State of New York. He lives in Rochester with his partner and son. He is an advocacy and policy associate for the New York Association on Independent Living.

23. Over thirty years ago, Mr. Hernandez experienced a C5 spinal cord injury. As a result, he is paralyzed from the neck down with limited movement in his arms and no movement below his shoulders. As a result of this disability, he requires assistance with dressing, showering, brushing my teeth, toileting, cooking, and eating. Without assistance with these tasks, he would not be able to do any of these things and would die from starvation.

24. Mr. Hernandez has experienced medical discrimination and misdiagnosis. At one point, he was in an emergency room for a toe injury. The medical provider treating him suggested amputating his toe since he was not using it. Mr. Hernandez had to push back against this so-called treatment and seek other help. A spinal cord specialist later gave him an ointment that resolved the issue in a week with no surgery. This incident still informs his lack of trust in medical professionals.

25. Mr. Hernandez qualifies and is eligible for physician-assisted suicide pursuant to the Act because he would die within six months without medical support.

26. Mr. Hernandez has been injured as a direct result of Defendants' actions and omissions alleged herein. He has a personal stake in challenging the Act. As a result of the Act, Mr. Hernandez, as a seriously disabled person, is at imminent risk of harm of being placed into an inferior tier of medical care due to the passage of the Act.

27. Plaintiff Anita Cameron is a 60-year-old citizen and resident of the State of New York. She lives in Rochester with her wife and their two cats. She is a disability advocate who serves on the Board of Directors for Center for Disability Rights, a not-for-profit, community-based advocacy and service organization for people with all types of disabilities. She also designs and leads trainings regarding emergency and disaster preparedness for people with disabilities.

28. Ms. Cameron has been involved in the disability rights movement since before the passage of the ADA, and even participated in the Capitol Crawl, a landmark disability rights protest in 1990, where activists abandoned their mobility devices to crawl up the U.S. Capitol steps.

29. Ms. Cameron is a person living with multiple disabilities, including multiple sclerosis and congenital cerebellar ataxia, both of which are degenerative. Ms. Cameron is a wheelchair user and is almost completely blind. Ms. Cameron also has high blood pressure, type 2 diabetes, high cholesterol, and a number of other health concerns her doctors had been treating before she lost her health insurance.

30. Ms. Cameron requires assistance to live outside of a nursing home. Her wife helps her, but if her wife is unavailable, she is homebound.

31. As a Black woman with multiple disabilities, Ms. Cameron faces medical discrimination and bias. Doctors treat her as though she is drug-seeking and do not keep her

informed about her medical conditions. She avoids going to the hospital unless her chronic pain is at an all-time high, which causes her blood pressure to go up.

32. Ms. Cameron qualifies and is eligible for physician-assisted suicide pursuant to the Act because she would die within six months without medical support.

33. Ms. Cameron struggles with mental health symptoms as well. She has depression, dysthymia, and seasonal affective disorder. Like all people with mental health issues, she experiences days when she feels more depressed than others. She fears that with the passage of the Act, she will go to the doctor or hospital during a low point and will be steered into physician-assisted suicide.

34. She would never request assisted suicide in a right state of mind, but she is worried that as her health declines and she continues to lose treatment and support, she will be hospitalized or placed in a nursing facility. If this happens, she is concerned that doctors will tell her there is nothing more they can do for her, which could leave her vulnerable to feeling like she has no other choice than to take assisted suicide.

35. Ms. Cameron has been injured as a direct result of Defendants' actions and omissions alleged herein. Ms. Cameron has a personal stake in challenging the Act. As a result of the Act, Ms. Cameron, as a seriously disabled person, is at imminent risk of harm of being placed into an inferior tier of medical care due to the passage of the Act.

36. Plaintiff Self-Initiated Living Options, Inc. ("SILO") is a 501(c)(3) non-profit based in Medford, New York, that has provided services by and for people with disabilities in Suffolk County since 1985. SILO has recently expanded its range of services to include Nassau County. The organization currently has eight board members and 67 staff members, primarily people with disabilities, and is one of 42 CILs in the State of New York. SILO comes into contact

with around 20,273 clients each year, including people with all types of disabilities and in all age groups.

37. SILO provides a wide range of services to people with disabilities, including independent living training; a housing subsidy program; an employment center; the New York Connect Program, which connects people with a variety of long-term services; a program assisting with obtaining technology and medical equipment; and referral services to hospitals, clinics, and mental health treatment programs. SILO also assists people in obtaining New York State's Nursing Home and Transition Diversion Waiver and Traumatic Brain Injury Waiver, which serves people with severe physical or mental disabilities. SILO believes in a holistic approach to its disability services.

38. SILO has been injured as a direct result of Defendants' actions and omissions alleged herein. SILO has a personal stake in challenging the Act, as its core business activity is to enable people with disabilities to gain effective control and direction of their lives. One component of this mission is to discourage people with disabilities, especially those with life-threatening disabilities, from committing suicide. The passage of the Act directly conflicts with this mission. As a result of the Act, many SILO members are afraid that they will be denied necessary medical care and instead steered towards assisted suicide. This is especially true given the additional profit motive that has been inserted into the health care system through the managed care system, which has increased SILO's clientele by over sixfold due to the closure of many State programs.

39. In response, SILO is required to expend significant time, money, volunteers, and other resources to avoid imminent risk of harm for its clients. SILO already has started educating people with disabilities regarding the Act and is coming up with a comprehensive plan and budget in order to combat the harmful effects of the Act on people with disabilities. As a result of the

Act's passage, SILO will have to hire at least two additional staff members in order to account for the increased workload caused by having to educate with people with disabilities regarding their options besides assisted suicide. Upon information and belief, SILO's clientele will continue to increase as people with life-threatening disabilities are not provided with necessary medical care for their disabilities, further straining SILO's financial and human resources.

40. Plaintiff Independent Living Center of the Hudson Valley ("ILCHV") is a 501(c)(3) non-profit based in Troy, NY that was founded in 1987 and provides services by and for people with disabilities in over 19 counties in Central and Upstate New York. The organization currently has ten board members and around 35 to 40 core staff members, primarily people with disabilities, and is one of 42 CILs in the State of New York. ILCHV works with around 900 to 1,000 consumers each year.

41. ILCHV provides a wide range of services to people with disabilities, including information and referral, peer counseling, independent living skills and training, transition services, housing services, individual and system advocacy, consumer-directed personal assistance, and veteran care. ILCHV assists consumers with applying for benefits, including Medicaid and Medicare. ILCHV also assists people in obtaining New York State's Nursing Home and Transition Diversion Waiver and Traumatic Brain Injury Waiver, which serve people with severe physical or mental disabilities.

42. ILCHV has been injured as a direct result of Defendants' actions and omissions alleged herein. ILCHV has a personal stake in challenging the Act as its core business activity is assisting people with disabilities to live independently in the community. One component of this mission is to discourage people with disabilities, especially those with life-threatening disabilities, from committing suicide. The passage of the Act directly conflicts with this mission. ILCHV's

consumers, people with disabilities, are already not getting the services that they need or to which they are legally entitled. As a result of the Act, many of these consumers will be categorized by doctors as "terminal." Several ILCHV consumers who would be considered terminal already have felt like they cannot go on living due to the lack of services they receive; the Act will facilitate suicide for these individuals by further steering them away from necessary medical care. Upon information and belief, the State's managed care system and recent shift towards a single fiscal intermediary for consumers will incentivize health care providers towards assisted suicide for consumers who are seen as a fiscal burden on the health care system. The Act devalues disabled persons' lives by making them seen as worth less and consciously or subconsciously encouraging people to end their own lives.

43. As a result of the Act, ILCHV is required to expend significant time, money, and other resources to avoid imminent risk of harm for its consumers. ILCHV is required to divert time, money, and resources to educate its members about the Act and their rights to health care services as a result of the Act. When the Act goes into effect, ILCHV staff will also be required to spend time and resources that could be used on other critical services to advocate for and assist people in obtaining alternatives to assisted suicide. This is in part because the Act does not require providers to actually obtain alternatives to assisted suicide for patients. ILCHV is further harmed because it is required to increase its budget and staffing to provide these additional services but it is also put in a difficult position where it is unable to foresee the scope of these services.

44. Plaintiff Regional Center for Independent Living ("RCIL") is a 501(c)(3) non-profit based in Rochester, New York that provides services by and for people with disabilities. RCIL was founded in 1966 and is an independent living center under the Center for Disability Rights. There are 42 CILs in the State of New York. The organization provides support and assistance to

13

people with disabilities and seniors in Monroe, Wayne, Ontario, Yates, and Livingston counties and has over 5,000 members from across the state. RCIL currently has approximately [120] staff members, a majority of who are also people with disabilities.

45. RCIL provides a wide range of services to people with disabilities, including information and referral services, including for health insurance and other benefits; peer support services; consumer-directed personal assistance services; housing services for those who are transitioning out of nursing facilities or are at risk of institutionalization; individual advocacy for members at healthcare appointments and other appointments; community habilitation services for people with developmental disabilities; deaf services; and interpretative referral services. RCIL also coordinates services plans for people with disabilities under New York State's Nursing Home Transition and Diversion Waiver and Traumatic Brain Injury Waiver, including access to health insurance, personal assistance, durable medical equipment, and home modifications. Finally, RCIL has a supplemental pool trust program that assists people with disabilities in qualifying for Medicaid.

46. RCIL has been injured as a direct result of Defendants' actions and omissions alleged herein. RCIL has a personal stake in challenging the Act as its core business activity is to promote independence of people with all types of disabilities, enabling choice in living setting, full access to the community, and control of their life. Many of RCIL's members already struggle to receive personal assistance and other independent living services for their disabilities, especially after New York transitioned to a managed care insurance model that increases the profit motive in health care and incentivizes reduction in health care services. As a result of the Act, RCIL members who are frustrated with lack of medical support may express to health care professionals that they rather not be alive, believing that death is their only option an "easy way out." Upon

14

information and belief, at least some medical professionals will support assisted suicide under the Act instead of offering medical support due to its cheaper cost.

47. In response, RCIL is required to expend significant time, money, volunteers, and other resources to avoid imminent risk of harm for its members. RCIL already is developing training for staff members to learn how to navigate conversations with members who view assisted suicide as their only option as well as with medical providers. RCIL is also working on educational materials for people who are recently disabled who are prone to considering assisted suicide. Staff members at RCIL are being charged with additional outreach to members in order to act as a safety net for people who may consider assisted suicide. RCIL also created the Live On Campaign, which counters the insidious message that disabled people should simply "give up." The Live On Campaign costs more than $100,000. RCIL also plans on hiring at least one additional full-time staff member in order to account for the increased work involved in addressing the harmful effects of the Act on its members.

48. Plaintiff United Spinal Association ("United Spinal") is a national 501(c)(3) nonprofit membership organization based in Fort Totten, New York that was founded by paralyzed veterans in 1946. United Spinal is run by a Board of Directors, the majority of whom are people with disabilities, and staff that includes people with spinal cord injuries. United Spinal is dedicated to empowering and advocating for people living with spinal cord injuries and diseases ("SCI/D") and all wheelchair users, including veterans, to obtain greater independence and quality of life. United Spinal has a personal stake in challenging the Act as its core business activity is to advance opportunities, social equity, and disability rights for all people living with a spinal cord injury or disease. This includes work on issues such as increasing access to quality, affordable health care

15

and independent living services, enhancing and reforming government benefit systems, and preserving social security benefits—including in New York.

49. United Spinal has approximately 70,000 members nationally, many of whom reside in New York and access United Spinal's services. United Spinal also works directly with specialized rehabilitation hospitals that serve New York residents, such as Burke Rehabilitation Hospital, Garnet Health Medical Center, Helen Hayes Hospital, James J. Peters VA Medical Center, NYU Langone Medical Center, St. Charles Hospital, St. Mary's Hospital for Children, Strong Memorial Hospital of the University of Rochester, and Sunnyview Rehabilitation Hospital.

50. Spinal cord injuries are often unexpected and initially devastating to the newly injured and their family members. Newly injured members of United Spinal have faced and will continue to face significant possible challenges, including loss of some independence, depression, isolation, loss of self-confidence, and anxiety about what the future will bring. Many have initially had suicidal thoughts on occasion. Many have also been depressed after injury and while living in the community. In response to these needs, United Spinal operates a peer mentor support program that brings together people who have experience living with spinal cord injuries with others who are navigating similar challenges. United Spinal's peer mentors provide information and support to members about their personal empowerment and suicide prevention.

51. While United Spinal helps its members live independently and effectively in the community, some members are unable to do so because of systemic problems in the healthcare and benefits systems, as well as discrimination based on disability. Many of United Spinal's members have directly experienced discrimination by medical professionals and others, including denial and delay of necessary medical services, by being told that their quality of life is poor and

that if they had to live like them, they would kill themselves, as well as by being delayed or denied basic services and supports necessary for living at home with paralysis.

52. People with spinal cord injuries generally consider themselves to have a static disability, one that can be addressed with the right care, services, and supports. Some members have been told by doctors that their condition is "terminal," and that they may have a shortened amount of time to live—yet the dire predictions are often proved wrong.

53. As a result of being perceived and labeled as terminally ill by their medical care providers, some of United Spinal's members will qualify for assisted suicide under the Act and are particularly vulnerable to being steered towards assisted suicide in a state of despair or depression. Upon information and belief, United Spinal members in New York have discussed and considered accessing lethal medications and/or committing suicide by means of the Act. The Act places United Spinal's members at risk of dying by offering the option of assisted suicide during a period of treatable depression and difficulty while withdrawing necessary medical services. United Spinal brings this action on behalf of its members because the interests at stake are germane to United Spinal's purpose of empowering and advocating for people living with spinal cord injuries and diseases to obtain greater independence and a higher quality of life.

54. United Spinal and its membership have been injured as a direct result of Defendants' actions and omissions alleged herein. In addition to placing United Spinal members at risk of both discrimination and premature death by assisted suicide, Defendants' actions and omissions have injured the organization's core business activity of empowering and advocating for people with spinal cord injuries to obtain a better quality of life and greater independence. United Spinal has a personal stake in challenging the Act because its passage requires United Spinal to expend significant time, money, volunteers, and other resources to avoid imminent risk

of harm for its members and constituents who are at risk of being denied necessary medical services as a result of being steered toward assisted suicide. United Spinal already has had to expend resources on education and outreach campaigns targeted at addressing assisted suicide in other states. This includes publishing a position statement opposing assisted suicide and a message from the organization's CEO about the dangers of the practice in other states. United Spinal has held public information discussions to inform its members concerning assisted suicide laws and their impact on equality, dignity, and access to care for people with disabilities. United Spinal is unable to devote these resources to its other critical programs. By steering people with spinal cord injuries towards assisted suicide, the Act impedes United Spinal's core business activity of supporting its members in obtaining a greater quality of life.

55.     Plaintiff Not Dead Yet ("NDY") is a national disability rights organization formed in 1996 to articulate and organize the disability rights opposition to the legalization of assisted suicide, to oppose public policies that allow the involuntary withholding of life-sustaining medical treatment, and to advocate for equal protection of the law in cases of homicides of disabled persons. NDY is headquartered in Rochester, New York and operates under the fiscal sponsorship of The Center for Disability Rights, Inc., a non-profit, community-based advocacy and service organization for people with all types of disabilities. NDY also has engaged in training, community organizing, legislative meetings, and providing testimony on the impact of physician-assisted suicide in the State of New York.

56.     NDY has a personal stake in challenging the Act. Over the last year, NDY has been actively engaged in outreach conveying disability rights perspectives on topics related to assisted suicide and the medical ethics associated with assisted suicide. NDY also provides input to policy makers in a variety of contexts, such as commenting on proposed regulations, urging appropriate

action by public or private decision-makers, agencies, governmental or quasi-governmental bodies, and joining in policy letters with other disability rights organizations.

57. NDY's core activity is to advance the rights of people with disabilities to live free from pressure from a medical care system grounded in the stigma that people with disabilities are leading lives that are not worth living. Its work includes ensuring that the withholding or withdrawal of life-sustaining medical treatment is truly voluntary and based on informed consent with meaningful alternatives, including long-term services and supports to live in the community; opposing futility policies involving unilateral or involuntary health care provider decisions to withhold or withdraw life-sustaining medical treatment; and advocating for equal protection of the law in homicide cases when the victim is old, ill, or disabled.

58. NDY is injured as a direct result of Defendants' actions and omissions alleged herein. Defendants' actions impede its core business activities of protecting persons with disabilities from involuntary withholding of life-sustaining medical treatment and medical rationing based on policies such as Quality Adjusted Life Years ("QALY"), ensuring that persons with disabilities receive equal protection of the law in cases of homicides of disabled persons, and protecting persons with disabilities from the expansion of assisted suicide schemes to additional jurisdictions and the removal of the few safeguards provided in existing schemes. The Act harms NDY's core business activities by exposing persons with disabilities to a State-sponsored system of premature death by suicide, exclusively for persons with disabilities, in the case of so-called "terminal" disabilities, including such treatable problems as eating disorders.

59. Plaintiff National Council for Independent Living ("NCIL") is a national 501(c)(3) nonprofit membership organization and the longest-running national, cross disability, grassroots organization run by and for people with disabilities. NCIL works to advance independent living

and the rights of people with disabilities. NCIL's membership comprises centers for independent living ("CILs"), state independent living councils ("SILCs"), people with disabilities, and other disability rights organizations. There are 42 CILs in the State of New York.

60. NCIL has a personal stake in challenging the Act as it must expend significant time, money, volunteers, and other resources to avoid imminent risk of harm for its members and other people who it serves who are placed at imminent risk of harm. NCIL provides support to a network of CILs and SILCs across the United States, who in turn provide, among other things, peer support, individual and systems advocacy, and independent living skills training. CILs are community-based, cross disability, non-profit organizations that are designed and operated by people with disabilities. CILs are unique in that they operate according to a strict philosophy of consumer control, wherein people with all types of disabilities directly govern and staff the organization.

61. CILs provide direct services and systems advocacy to ensure that the rights of people with disabilities are protected. Even with the passage of the Americans with Disabilities Act, people with disabilities often find that advocacy and support from the disability community and the disability rights movement is an essential element in enforcement of the civil rights law. People with disabilities are not problems to be solved—they are individuals who seek only the same human dignity and civil rights afforded to everyone else.

62. Defendants' promotion of physician assisted suicide through the Act poses a serious threat both to the core business activities of NCIL and to the well-being of the individuals and communities that NCIL serves. The Act has labeled persons with life-threatening disabilities as "terminal," and has made physician assisted suicide readily available to anyone who is "terminal." The label of "terminal"—which squarely implicates and stigmatizes persons with life-threatening disabilities—is highly suspect. Persons with life-threatening disabilities often lead long lives so

long as they receive proper care. The passage of the Act denies persons with life-threatening disabilities, including NCIL's members, from equal access to necessary medical care as a result of being instead steered towards assisted suicide.

63. Plaintiff Institute for Patients' Rights ("IPR") is a national, 501(c)(3) organization based in New York, New York that conducts and supports research and public education on healthcare disparities in the context of end-of-life issues. IPR advocates to protect individuals' rights in numerous healthcare contexts, including by providing information about the discriminatory effects of assisted suicide laws and the dangers those laws pose to vulnerable individuals; opposing discriminatory crisis standards of care put in place during the COVID-19 pandemic that placed people with disabilities at risk of harm; advocating against the use of the QALY metric, which discriminates against and diminishes the value of the lives of people with disabilities; educating the public about disparities in healthcare access and outcomes, including those based on race, age, and/or disability; and advocating for improvements to the quality of hospice and palliative care services, as well as for expanded access to these key services. IPR staff and board members regularly give presentations on these issues and engage with the press to raise awareness and educate the public on these topics.

64. IPR is injured as a direct result of Defendants' actions and omissions alleged herein. IPR has a personal stake in challenging the Act as its core business activity is to help persons with disabilities get the care they need from the medical care system without the discriminatory barriers described above. The Act adds a new barrier by licensing medical provides to facilitate premature death in lieu of treatment. To address the harms of this new barrier, IPR has to develop new courses and materials to address the ways in which the scheme stigmatizes people with disabilities and steers its constituents away from quality health care, and toward early death through

prescription of lethal medications.  By expending time, money, and resources on these and other Act-specific activities, IPR is unable to devote these resources to its other critical programs addressing the impact of discriminatory healthcare policies.

65.    IPR is a sister organization of non-party Patients' Rights Action Fund ("PRAF"), a national, non-partisan single-issue 501(c)(4) organization that protects the rights of patients, people with disabilities, older adults, and economically disadvantaged people from deadly harm and discrimination inherent in assisted suicide laws.  PRAF lobbies and advocates in state legislatures and Congress for patient access to high-quality multidisciplinary end-of-life care and works against efforts that devalue and deprioritize healthcare for vulnerable people-such as QALYs and assisted suicide.

**B.     Defendants**

66.    Defendant Governor Kathy Hochul ("Governor Hochul") is sued in her official capacity as Governor of the State of New York.  She is vested with the supreme executive power of the State of New York (the "State") and has the duty to see that the State's laws are faithfully executed.  Governor Hochul possesses the authority to supervise and assign functions among executive officers and agencies, other than elective officers and agencies administered by elective officers.  Governor Hochul is tasked with appointing the Commissioner of the New York State Department of Health, the Commissioner of the New York State Office of Mental Health, and the Chair of the State Board for Professional Medical Conduct.[3]  She signed into law the Act, which dramatically increases the danger of death by suicide to Plaintiffs, their members and constituents, and all people with disabilities in New York.

---

[3] *See* N.Y. Pub. Health Law § 230.

67. Defendant New York State Department of Health (as previously defined, "Department" or "Department of Health") is a cabinet-level department. The Department's mission is to "protect and promote health and well-being for all, building on a foundation of health equity."[4] The Department pursues its mission through promoting the prevention and control of disease and environmental health; supervising local health boards; overseeing reporting and vital records; conducting surveillance of hospitals; performing medical and public health research; and administering health insurance programs and institutions.

68. Under the Act, the Department would be required to facilitate assisted suicide, *inter alia*, by adopting regulations establishing reporting requirements for physicians under the Act, adopting regulations for disposal of unused medication under the Act, collecting and reviewing a sample of the documentation submitted by medical providers pursuant to the Act, publishing a report annually based on the information collected, and making available forms and other resources provider utilize under the Act.[5] The Department receives federal funds and previously received such funds at all times relevant to this complaint. The agency's recommended 2026 budget includes $2.6 billion in federal funding, which constitutes 69% of the Department's total funding.[6] Upon information and belief, the federal funding that the Department receives will be used for the Act related programs prior to and after the Act goes into effect.

69. The Office of Professional Medical Conduct ("OPMC") is a government agency within the Department that investigates complaints about physicians, physician assistants and

---

[4] New York State Department of Health, About, https://www.health.ny.gov/about.

[5] N.Y. Pub. Health Law § 2899-q; N.Y. Pub. Health Law § 2899-o; N.Y. Pub. Health Law § 2899-f.

[6] *See* New York State Division of the Budget, Department of Health, https://www.budget.ny.gov/pubs/archive/fy26/ex/agencies/appropdata/HealthDepartmentof.html.

specialist assistants and monitors practitioners who are subject to Orders of the State Board for Professional Medical Conduct ("Medical Board for Professional Conduct").[7] The Medical Board for Professional Conduct is comprised of at least 18 physician members and seven lay members appointed by the Commissioner of the Department of Health.[8] The Medical Board for Professional Conduct has the power to conduct disciplinary proceedings against licensed physicians and other medical professionals; censure, suspend, limit, revoke, and annul licenses; impose fines; and require a licensee to pursue education or public service. The Medical Board for Professional Conduct also has the power to refer cases to law enforcement and prosecute criminal violations in conjunction with the Director of the OPMC.[9] Licensure is mandatory to practice medicine in New York and to treat New York patients.

70. Under the Act, the Medical Board for Professional Conduct is prohibited from subjecting a health care provider to civil, administrative, or criminal liability or penalty or professional disciplinary action for acting in reasonable good faith under the Act. In addition, the Medical Board for Professional Conduct is prohibited from subjecting a health care provider to employment, credentialing, or contractual liability or penalty for acting in reasonable good faith under the Act.[10] As a result of the Act, the Medical Board for Professional Conduct discriminates against persons with life-threatening disabilities because it eliminates patient protections for these individuals.

---

[7] New York State Department of Health, Physician and Physician Assistants Disciplinary and Other Actions, https://www.health.ny.gov/professionals/doctors/conduct.

[8] N.Y. Pub. Health Law § 230.

[9] N.Y. Pub. Health Law § 230.

[10] N.Y. Pub. Health Law § 2899-l.

71.     Defendant Commissioner James V. McDonald, M.D., M.P.H. ("Commissioner McDonald") is sued in his official capacity as Commissioner of the Department. In this position, he has control over the Department and is appointed by the Governor to oversee the Department's responsibilities in enforcing the Act. Under the Act, Commissioner McDonald would be required to facilitate assisted suicide, *inter alia*, by adopting regulations establishing reporting requirements for physicians under the Act, adopting regulations for disposal of unused medication under the Act, reviewing a sample of the documentation submitted by medical providers pursuant to the Act, and publishing a report annually based on the information collected.[11] Commissioner McDonald is also tasked with appointing the members of the Medical Board for Professional Conduct.

72.     Defendant New York State Board for Medicine (as previously defined, "Medical Board for Licensure") is a government agency within the New York State Department of Education. The Medical Board for Licensure is appointed by the Board of Regents on recommendation of the Commissioner of Education for the purpose of assisting the Department of Education on matters of professional licensing. The Medical Board for Licensure is composed of at least twenty physicians licensed in this state for at least five years, including two doctors of osteopathy, and two physician assistants.[12] Licensure is mandatory to practice medicine in New York or to treat New York patients.

73.     Under the Act, the Medical Board for Licensure is prohibited from subjecting a health care professional to censure, discipline, suspension, loss of license, loss of privileges, loss of membership, or other penalty for participating in accordance with the Act. In addition, the Medical Board for Licensure is prohibited from subjecting a physician to professional discipline

---

[11] N.Y. Pub. Health Law § 2899-q; N.Y. Pub. Health Law § 2899-o; N.Y. Pub. Health Law § 2899-f.

[12] N.Y. Educ. Law § 6523.

or criminal prosecution if the physician is present when a qualified patient self-administers medication.[13] As a result of the Act, the Medical Board for Licensure discriminates against persons with life-threatening disabilities because it eliminates patient protections for these individuals.

74. Defendant Amit M. Shelat, D.O. ("Dr. Shelat") is sued in his official capacity as Chair of the Medical Board for Licensure. His duties include administering the licensing, regulatory, and disciplinary functions of the Medical Board for Licensure. In this capacity, Dr. Shelat oversees and enforces the Medical Board for Licensure's elimination of patient protections for people with life-threatening disabilities.

75. Defendant New York State Office of Mental Health (as previously defined, "OMH") is a cabinet-level department. The OMH's mission is to "promote the mental health of all New Yorkers, with a particular focus on providing hope and recovery for adults with serious mental illness and children with serious emotional disturbances."[14] The OMH oversees 23 psychiatric centers and the Nathan S. Kline and New York Psychiatric Institutes, and regulates more than 6,500 mental health related programs operated by local government and nonprofit agencies. The OMH receives federal funds and previously received such funds at all times relevant to this complaint.

76. The OMH is also the parent agency of the Suicide Prevention Office ("SPO") and the Suicide Prevention Center of New York ("SPCNY"). Upon information and belief, the federal funding that the OMH receives is used for the State's suicide prevention services. Under the Act, Defendant OMH discriminates against people with life-threatening disabilities by withholding suicide prevention services that it otherwise offers to people without disabilities.

---

[13] N.Y. Pub. Health Law § 2899-l.

[14] New York State Office of Mental Health, About Us, https://omh.ny.gov/omhweb/about.

77.     Defendant Commissioner Ann Marie T. Sullivan, M.D. ("Commissioner Sullivan") is sued in her official capacity as Commissioner of the OMH.  In this position, she has control over the OMH and the SPCNY's suicide prevention services.

**FACTS**

**A.     Suicide**

78.     Suicide is death caused by injuring oneself with the intent to die.  Death from suicide "is highly prevalent in already marginalized and discriminated groups of society."[15]  The Centers for Disease Control and Prevention ("CDC") reports that suicide is "[o]ne of the 10 leading causes of death in the United States."[16]  Between 2001 and 2021, national suicide rates increased in most years.[17]

79.     Legal responses to suicide have evolved since the founding of the United States. Suicide itself was a crime at the nation's founding, with "punishments" exacted against the property of the decedent.  By the end of the 19th century, most U.S. states had changed their laws so that suicide itself was no longer a crime.  Reformers sought to decriminalize suicide itself as part of a recognition that suicide was caused by mental illness.  Removing the criminal penalties against suicide reduces social stigma, helps remove barriers to obtaining adequate mental health care, increases access to emergency medical services, fosters suicide prevention activities, improves the well-being of people vulnerable to suicidal behaviors, and contributes to more

---

[15]     World Health Org., Preventing Suicide: A Global Imperative 3 (2014), https://apps.who.int/iris/bitstream/handle/10665/131056/9789241564779_eng.pdf?sequence=1.

[16] U.S. Surgeon General & Nat'l Action Alliance for Suicide Prevention, The Surgeon General's Call to Action to Implement the National Strategy for Suicide Prevention 11 (2021), https://www.hhs.gov/sites/default/files/sprc-call-to-action.pdf.

[17] Cheryl Platzman Weinstock, *Decades of National Suicide Prevention Policies Haven't Slowed the Deaths*, KFF HEALTH NEWS (Sept. 16, 2024), https://kffhealthnews.org/news/article/national-suicide-prevention-strategy-action-plan-rising-rates-deaths.

accurate monitoring of suicidal behaviors. The act of assisting suicide, however, remains criminalized in most states, as it has been since the founding of this country.[18] Intentionally causing or aiding another person to attempt suicide remains a Class E felony in the State of New York.[19] Under the Act, however, the act of assisting suicide does not qualify as assisted suicide.[20]

80. In the United States, 26% of all adults, and 43.8% of adults over 65, reported a functional disability in 2018.[21] People with disabilities are significantly more likely than those without disabilities to report suicidal ideation, suicide planning, and suicide attempts.[22] Among persons with any disability, those with cognitive impairments and impairments involving self-care and/or independent living tasks have the highest risk of suicidal thoughts, suicide planning, and suicide attempts.[23]

81. In 2022, the most recent year for which data is publicly reported by the State Health Connector, the total number of suicide deaths in New York was 1,749. The suicide rate increased from 8.4 to 9.1 per 100,000 people from 2020 to 2022 (about 8.3 percent).[24] Suicide is the second-leading cause of death for people under the age of 35.[25]

---

[18] *Washington v. Glucksberg*, 521 U.S. 702, 715 (1997) ("By the time the Fourteenth Amendment was ratified, it was a crime in most States to assist a suicide.").

[19] N.Y. Penal Law § 120.30.

[20] N.Y. Pub. Health Law § 2899-n.

[21] Nicole M. Marlow, Zhigang Xie, Rebecca Tanner, Ara Jo, & Anne V. Kirby, Association Between Disability and Suicide-Related Outcomes Among U.S. Adults, 61 AM. J. PREVENTATIVE MED. 852, 854 (2021).

[22] *Id.*

[23] Nicole M. Marlow, *et al.*, *Association Between Functional Disability Type and Suicide-Related Outcomes Among U.S. Adults with Disabilities in the National Survey on Drug Use and Health, 2015-2019.* 153 J. PSYCHIATR. RES. 213 (2022).

[24] New York State Department of Health, New York State Health Connector, Suicide and Self-Harm, https://nyshc.health.ny.gov/web/nyapd/suicides-in-new-york.

[25] American Foundation for Suicide Prevention, Suicide Data: New York, https://www.datocms-

### B. New York's Suicide Prevention Programs

82. The State of New York offers and provides extensive suicide prevention programs and services. In 1927, the Department of Mental Hygiene was established as part of a restructuring of the New York State government.[26] In 1978, the Department of Mental Hygiene was reorganized into the Office of Mental Health, Office for People with Developmental Disabilities, and Office of Addiction Services and Supports.[27] The OMH is charged with assuring the development of plans, programs, and services in the areas of research and prevention of suicide, to reduce suicidal behavior and suicide through consultation, training, implementation of evidence-based practices, and use of suicide surveillance data. Every other year, the OMH prepares and submits a written report to the Governor, the Speaker of the Assembly, and the President of the Senate that sets forth the OMH's progress in the development of suicide prevention plans, programs, and services, including those addressing the needs of high-risk groups. The OMH reviews suicide prevention programs established by the office to ensure that the needs of individuals at risk of suicide are being met and recommends improvements to these programs.[28]

83. In 2014, the Suicide Prevention Office (as previously defined, "SPO") was created to coordinate all OMH-sponsored suicide prevention activities. The SPO aims to strengthen suicide safer care across health care settings, starting with behavioral health, followed by primary care, emergency rooms, and substance use disorder settings, while continuing to support and strengthen the existing community-based infrastructure. SPO's efforts focus on collaboration across the OMH system, including licensing, state-operated facilities, and field offices; review of

---

assets.com/12810/1747084227-new-york_2025-state-fact-sheet.png.

[26] Chapter 426, p. 981, N.Y. Laws 1927.

[27] N.Y. Ment. Hygiene Law § 5.01.

[28] *Id.* § 7.07.

suicide deaths of individuals serviced by OMH; development of a statewide suicide surveillance system; and establishing a learning collaborative to provide technical assistance to early adopter provider systems interested in implementing current best practices of the Zero Suicide model.[29]

84.     Founded in 2009 by the OMH, the Suicide Prevention Center of New York is the community-based presence for suicide prevention within the State.  SPCNY's mission is to "promote, coordinate, and strategically advance suicide prevention across the state with the aim of reducing attempts and deaths among New Yorkers."  The SPCNY leads state and federally funded initiatives that strengthen clinical care, expand community-driven prevention, increase support in schools, and advance work focused on populations at higher risk.[30]  SPCNY's work is divided into four main areas: (1) zero suicide in health and behavioral health settings; (2) suicide safer communities; (3) suicide safer schools, colleges, and universities; and (4) surveillance and data-informed suicide prevention.[31]

85.     In 2016, SPCNY at OMH released *1700 Too Many: New York State's Suicide Prevention Plan* ("Suicide Prevention Plan" or "Plan").  The Suicide Prevention Plan highlighted three main strategies: (1) prevention in health and behavior healthcare settings; (2) prevention across the lifespan in competent, caring communities; and (3) surveillance and data-informed suicide prevention.  The Plan committed the OMH to treating suicidal ideation and behavior as a "separate comorbid illness" with suicide-specific evidence-based treatments (i.e. treating the underlying mental illness represents substandard care for suicidal individuals), recognizing that

---

[29] OMH Suicide Prevention Office, *1700 Too Many: New York State's Suicide Prevention Plan 2016-17* (Sept. 2017).

[30] Suicide Prevention Center of New York, About Us, https://www.preventsuicideny.org/about-us.

[31] Suicide Prevention Center of New York, Our Work, https://www.preventsuicideny.org/our-work.

many individuals may be "one acute stressor away" from suicide. The Plan also focuses on addressing "upstream" risk, recognizing that "suicidal behavior can be reduced by successful interventions that promote emotional, social and behavioral health."[32]

86. The Department of Health and OMH partner with the New York State Incident Management Reporting System ("NIMRS") and National Violent Death Report System ("NVDRS") to track suicide-related incidents.[33] Suicide data is publicly available on the Department's website.[34] Under the Act, the Department and OMH will exclude assisted suicide from these datasets.[35] As a result, the Department and OMH will provide false and inaccurate information to the NIMRS and NVDRS, as it will knowingly exclude suicides by persons provided lethal prescriptions under the Act.

87. The OMH and Department, in their implementation and enforcement of the Act, deprive people with life-threatening disabilities of the protections of programs and services designed to identify and protect persons who are at risk of suicide, fail to investigate and accurately report on actual deaths of persons under the Act, and knowingly permit inaccurate information to be collected and reported about prescriptions and deaths by suicide under the Act. The Act does not allow physician-assisted death under the Act to be treated as suicide, assisted suicide, attempted suicide, promoting a suicide attempt, euthanasia, mercy killing, or homicide "for any purpose." N.Y. Pub. Health Law § 2899-n. This mandate directs that the cause of death on a patient's death certificate must be falsely reported as the underlying "terminal illness or condition"

---

[32] OMH Suicide Prevention Office, *1700 Too Many: New York State's Suicide Prevention Plan 2016-17* (Sept. 2017).

[33] *Id.*

[34] New York State Department of Health, New York State Health Connector, Suicide and Self-Harm, https://nyshc.health.ny.gov/web/nyapd/suicides-in-new-york.

[35] N.Y. Pub. Health Law § 2899-n; N.Y. Pub. Health Law § 2899-p.

rather than the proximate cause—death by suicide.  N.Y. Pub. Health Law § 2899-p.  Neither the OMH, the Department, nor any other State governmental agency is charged with investigating the circumstances of these deaths, other than reviewing a sample of attending physician documentation and death certificates, to assess whether the theoretical protections in the law were followed in practice.  *See* N.Y. Pub. Health Law § 2899-q.

**C.      New York's Medical Aid in Dying Act**

88.      The Act was signed into law by Governor Kathy Hochul on February 6, 2026, and will become effective on August 5, 2026.  Once in effect, the law will allow dispensing lethal drugs five days after a patient makes an oral request (or similar request using an alternative method of communication) and a written request to their attending provider.  N.Y. Pub. Health Law § 2899-e; N.Y. Pub. Health Law § 2899-f.  If a provider determines that a patient has less than five days to live, the Act permits same day dispensing of lethal drugs.  N.Y. Pub. Health Law § 2899-f.  Before providing the lethal drugs, the provider must confirm that the patient has an "incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months," that the patient has "decision-making capacity," and that the patient has made an "informed decision" of their "own volition and without coercion."  N.Y. Pub. Health Law § 2899-d; N.Y. Pub. Health Law § 2899-f.

89.      The attending provider is supposed to refer the patient to a consulting provider to confirm the terminal diagnosis, decision-making capacity, and that the patient is making an informed decision of their own volition and without coercion.  N.Y. Pub. Health Law § 2899-h.

90.      The Act requires a mental health professional to evaluate whether a patient has "decision-making capacity to make an informed decision" before the attending physician prescribes medication to the patient.  N.Y. Pub. Health Law § 2899-i.  The Act defines "decision-making capacity" as the ability to understand and appreciate the nature and consequences of health

care decisions, and to reach an informed decision, but does not provide any standards to guide the mental health professional in making these observations. N.Y. Pub. Health Law § 2899-d. Mental health professionals are required *only* to evaluate a patient's "decision-making capacity," and are not required to even consider a patient's psychiatric or psychological condition or how that may affect their suicidality. N.Y. Pub. Health Law § 2899-i. The Act assumes that a request for assisted suicide is not an indication of a mental disorder, when other New York laws make precisely the opposite assumption for virtually everyone else, and those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition, which Plaintiffs do not condone, but which is both law and standard of care in other circumstances, showing the inherent irrationality of the Act.[36]

91. The Act allows providers to prescribe lethal drugs to patients based on their "reasonable medical judgment" that an illness or condition will "produce death within six months, whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d. People who would otherwise survive beyond six months will still be eligible for assisted suicide if treatments or supports are denied by their insurance company, refused, or otherwise not available. As a result, conditions that would not otherwise be considered "terminal" with treatment—such as spinal cord injuries, diabetes, complications from falls, hernias, eating disorders, and kidney disorders requiring dialysis—can and will qualify for assisted suicide under the Act.

92. In addition, the law permits a patient to make themselves eligible for assisted suicide by declining available medical treatment that would likely extend their lives, such as a known medical treatment for their disease, kidney dialysis, insulin, or even food and water.

---

[36] Plaintiffs support voluntary mental health treatment and services that are comprehensive, community-based, recovery-oriented, and culturally and linguistically competent. Nothing in this complaint should be construed as recommending or supporting involuntary treatment of any kind.

VSED—Voluntary Stopping Eating and Drinking—is the practice of hastening death by foregoing food and water. There are providers who will certify a patient as "terminal" within six months based on a patient's having begun VSED, regardless of whether there is an underlying medical condition. These providers advocate for the use of VSED as a "bridge" to qualify for lethal drugs under the Act for conditions that would otherwise not be considered terminal.[37]

93. The attending and consulting providers need not even ever see the suicidal patient in person, as the Act does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely if they determine, within reasonable medical judgment, that an in-person examination would cause the patient "undue pain or suffering, or would necessitate extraordinary expense or logistical burden for medically-necessary transportation." N.Y. Pub. Health Law § 2899-f.

94. The Act fails to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including concurrent or additional treatment options, comfort care, palliative care, hospice care, and pain and symptom management, that are ostensibly included among the "feasible alternatives" that New York providers are supposed to discuss with persons who seek assisted suicide. The Act fails to require the provision or exhaustion of the State's suicide prevention programs, which are expressly designed to address the underlying concerns that drive people to suicidal thoughts and deter people from taking uninformed, untreated, or otherwise preventable suicidal actions. The Act directs

---

[37] *See* Thaddeus Mason Pope & Lisa Brodoff, *Voluntary Stopping Eating and Drinking As a Bridge to Medical Aid in Dying*, 1 J. OF AID-IN-DYING MEDICINE 76 (2023), https://heyzine.com/flip-book/2ce721e795.html#page/77. In this article, proponents present the case of Cody Sontag, a woman in Oregon in the early stages of Alzheimer's disease, who started VSED on February 8, 2023; on day five, Sontag's physician qualified her for assisted suicide on the grounds that she was dying from dehydration and therefore had a prognosis of six months or less. Sontag died by assisted suicide, not VSED, on day eight.

providers to "offer to refer" the patient to "other appropriate treatment options," but does not require the provider to actually refer the patient to such options nor to ensure that meaningful options are in fact available to the patient. N.Y. Pub. Health Law § 2899-f.

95. The Act permits provider shopping, such that if one provider finds the person ineligible, the person can contact additional providers until they get approval for assisted suicide. The Act lacks any independent oversight for the decision to grant an assisted suicide request (i.e., review by a probate court, as with civil commitments). The ability to "shop" providers combined with the lack of oversight enables easy evasion of the Act's supposed safeguards against duress, neglect, and abuse.

96. The Act requires that the patient self-administer the drugs but does not provide for oversight at the time of administration. *See* N.Y. Pub. Health Law § 2899-l. There are no witness requirements at time of ingestion, no requirements that the attending provider be present or informed of the person's death, and no obligation to inform authorities of the true manner or cause of death. There is no way of knowing whether the drugs were administered voluntarily or without coercion, whether the patient's judgment was impaired at the time of ingestion, whether the patient is still "terminal" at the time of ingestion, or if they pursued treatment or cured their condition but chose to ingest the drugs anyway. The Act does not require any evidence that the person ingested the lethal drugs themselves, that is, whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, physician, other healthcare provider, or friend) administered the medication or physically assisted the person. The time that the person ingests the lethal drugs may be days, weeks, months, or even years after the request for assisted suicide was approved.

97.     The Act then compels coroners to falsify the cause of death:  rather than accurately identify the cause of death as suicide, a coroner is statutorily required to instead list the putative "underlying terminal illness or condition."  N.Y. Pub. Health Law § 2899-p.  In addition to compelling coroners to falsify official records, this provision is designed to hide information regarding the occurrence and rate of assisted suicide by ensuring such information never exists.  Under the Act, assisted suicide "shall not be construed for any purpose to constitute suicide, assisted suicide, attempted suicide, promoting a suicide attempt, euthanasia, mercy killing, or homicide under the law, including as an accomplice or accessory or otherwise."  N.Y. Pub. Health Law § 2899-n.

98.     New York laws contain protections for older people, dependent adults, and persons with disabilities, acknowledging "[e]ndangering the welfare of a vulnerable elderly person, or an incompetent or physically disabled person" as a Class D felony (or Class E felony in the second degree).  N.Y. Penal Law § 260.34.  However, these laws will not be enforced against providers who prescribe assisted suicide to people with life-threatening or "terminal" disabilities—even if their doctor prescribes drugs that result in a distressing or botched suicide attempt or are ultimately administered by another person.  The Act does not "limit professional discipline of civil liability" resulting from intentional or negligent conduct in violation of the Act but does not require anyone to report violations or require any state agency to investigate or any law enforcement agency to prosecute criminal violations.  *See* N.Y. Pub. Health Law § 2899-r.

99.     Physicians in New York have a duty to provide health care that falls within what is known as the "standard of care."  The standard of care requires physicians to exercise "that reasonable degree of learning and skill that is ordinarily possessed by physicians" in their locality, and which is "ordinarily regarded by those conversant with the employment as necessary to qualify

[the physician] to engage in the business of practicing medicine."[38]  For persons without life-threatening disabilities, New York law imposes a standard of care requiring providers to respond to suicidal wishes in a way that protects the person's life.  However, under the Act, providers cannot be subject to civil or criminal liability or professional disciplinary action if they meet the exceptionally low standard of acting in "reasonable good-faith."  N.Y. Pub. Health Law § 2899-l.

100.    Under the Act, the Department is required to annually review a sample of attending physician documentation and death certificates and prepare a report containing relevant data regarding utilization and compliance with the Act.  N.Y. Pub. Health Law § 2899-q.  Upon information and belief, and based on the experiences of other U.S. states with assisted suicide laws, the State will not adequately review records collected under the Act to ensure assisted suicides conform to the requirements set out in the Act.  The information collected by the Department is also not available as a public record or for public inspection.  N.Y. Pub. Health Law § 2899-q.

101.    The purported safeguards in the Act are illusory, and will be frequently disregarded and/or circumvented in ways that will harm and discriminate against people with life-threatening disabilities.

**D.    People with Life-Threatening Disabilities**

102.    All people in New York who will qualify for the Act by having a "terminal illness or condition" will have conditions that qualify as disabilities under the ADA and Section 504. Under the Act, "terminal illness or condition" means "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided."  N.Y. Pub. Health Law § 2899-d(1)(17).  All "terminal illness or conditions" under the Act are also disabilities under the

---

[38] *Pike v. Honsinger*, 155 N.Y. 201, 209 (1898).

ADA and Section 504 because they are physical impairments that substantially limit major life activities including operation of major bodily functions, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. § 12102(2)(B). These conditions also substantially limit people in other major life activities including caring for oneself, performing manual tasks, eating, sleeping, walking, and breathing as defined in 42 U.S.C. § 12102(A). The Act will thus be available only to people with disabilities.

### (1) Spinal Cord Injuries

103. As the term suggests, a spinal cord injury involves damage to the spinal cord.[39] Depending on the location and severity of the spinal cord damage, spinal cord injuries can result in loss of feeling and movement in the legs, pelvis, trunk, and arms. Spinal cord injuries can also result in spasms, loss of bladder control, pain, changes in sexual function, and trouble breathing, coughing, or clearing secretions from the lungs.

104. Spinal cord injuries are not ordinarily considered "terminal" given available treatments, but many spinal cord injuries can and do qualify for assisted suicide. Patients with spinal cord injuries qualify as "terminal" because their injury will often result in death without surgery and/or supportive services. Furthermore, some spinal cord injuries result from other terminal conditions such as cancer.

105. People with spinal cord injuries are at a greater risk of suicide relative to the general population, especially when first adjusting to living with a spinal cord injury. Many newly injured individuals experience depression and suicidal thoughts as they navigate adapting to a new future.

---

[39] Spinal Cord Injury – Symptoms and Causes, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-cord-injury/symptoms-causes/syc-20377890#:~:text=Overview,the%20site%20of%20the%20injury (last visited June 8, 2026).

Additionally, people with visible disabilities such as spinal cord injuries are more likely to be perceived as terminally ill and therefore particularly vulnerable to being steered towards assisted suicide in a state of initial despair or depression shortly after their original injury.

### (2) Eating Disorders

106. Eating disorders may involve avoiding or restricting intake of food (anorexia), and/or taking measures to expel ingested calories, such as inducing vomiting (bulimia). People with eating disorders are persons with disabilities under the ADA and Section 504 because eating disorders involve mental and physical impairments that substantially limit not only the major life activity of eating itself, but all of the other major life activities that depend on a reasonable level of nutrition.

107. A projected 1.72 million, or nine percent, of New Yorkers will have an eating disorder in their lifetime.[40] Health organizations declared a national emergency in 2021 due to the increase in prevalence of mental health disorders in young people, including eating disorders.[41]

108. Eating disorders are themselves a form of mental illness detailed in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV).[42] Co-morbidity between eating disorders and other mental illnesses is high, with over half of the people with anorexia meeting the criteria for anxiety disorders, mood disorders, impulse control disorders, or substance use disorders.[43] The

---

[40] Harvard School of Public Health, *Social & Economic Cost of Eating Disorders in New York*, https://hsph.harvard.edu/wp-content/uploads/2024/11/State-Report_New-York.pdf (last visited June 8, 2026).

[41] Lakshmi Radhakrishnan, *et al.*, *Pediatric Emergency Department Visits Associated with Mental Health Conditions Before and During the COVID-19 Pandemic – United States, January 2019 – January 2022*, Centers for Disease Control and Prevention, Feb. 25, 2022, https://www.cdc.gov/mmwr/volumes/71/wr/mm7108e2.htm.

[42] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 381-92 (5th ed. text rev. 2022).

[43] National Institute of Mental Health, *Eating Disorders*, https://www.nimh.nih.gov/health/

Academy for Eating Disorders considers anorexia nervosa and bulimia nervosa as well as their variants to be "biologically based, serious mental illnesses (BBMI) that warrant the same level and breadth of health care coverage as conditions currently categorized in this way (e.g., schizophrenia, bipolar disorder, depression, obsessive-compulsive disorder)."[44]

109.    Decision-making in patients with eating disorders is significantly altered.[45]  One of the hallmark symptoms of an eating disorder is "[t]he delusional level of cognitive distortions regarding food and body image [which] is the irrational lens through which the decision to refuse treatment and to seek MAiD [Medical Aid in Dying, a euphemism for assisted suicide] is filtered."[46]    Individuals almost always regain decisional capacity with weight restoration. Treatments for eating disorders include psychotherapy, medical care and monitoring, nutritional counseling, and medications.[47]

110.    People with eating disorders are at a higher risk of suicide and suicide is a leading cause of death for people with anorexia.[48]  A guide to best practices for medical care for eating disorders, authored by the Academy for Eating Disorders instructs medical professionals to

statistics/eating-disorders (last visited June 8, 2026).

[44] Kelly L. Klump, *et al.*, *Academy for Eating Disorders Position Paper: Eating Disorders Are Serious Mental Illnesses*, 42 INT'L J. EATING DISORDERS 97 (2009), https://evelyntribole.com/wp-content/uploads/AED-Eating-Disordrs.Mental-Illness.pdf.

[45] S. Guillaume, *et al.*, *Impaired decision-making in symptomatic anorexia and bulimia nervosa patients: a meta-analysis*, 45 PSYCHOLOGICAL MEDICINE 3377 (2015), https://pubmed.ncbi.nlm.nih.gov/26497047/.

[46] Patricia Westmoreland, *et al.*, *"Terminal Anorexia": An Invalid Construct That Does Not Justify Medical Aid in Dying*, PSYCHIATRIC TIMES (Oct. 11, 2023), https://www.psychiatrictimes.com/view/terminal-anorexia-an-invalid-construct-that-does-not-justify-medical-aid-in-dying.

[47] National Institute of Mental Health, *Eating Disorders: What You Need to Know* (2024), https://www.nimh.nih.gov/health/publications/eating-disorders#:~:text=Commoneating disordersincludeanorexia,differentbutsometimesoverlappingsymptoms (last visited June 8, 2026).

[48] *Id*.

"[a]lways assess for psychiatric risk, including suicidal and self-harm thoughts, plans and/or intent."[49]

111. The concept of "terminal anorexia" first emerged in a journal article in 2022.[50] Since then, other eating disorder experts have criticized the diagnosis as an invalid construct that cannot be adequately defined.[51] First, the diagnosis of terminal anorexia is precarious given the inherent nature of the illness and its treatability. People can, and frequently do, recover from anorexia, and there is no clinical evidence to indicate who will recover and who will not. Further, the ambivalence or complete opposition to treatment that is common with individuals with eating disorders indicates that many individuals will not have engaged with treatment options before turning to assisted suicide. Prescribing life-ending drugs to a person with severe anorexia without a mental health assessment is tantamount to "colluding with the disease itself."[52] A person with anorexia described the impact of this shift as follows: "When I was diagnosed with anorexia, the prognosis was bleak—I was told full recovery was near impossible. I began researching methods to take my own life, including countries that had legalized euthanasia and medical aid in dying. I

---

[49] Academy for Eating Disorders, *Eating Disorders: A Guide to* Medical *Care 18* (4th ed. 2021), https://higherlogicdownload.s3.amazonaws.com/AEDWEB/27a3b69a-8aae-45b2-a04c-2a078d02145d/UploadedImages/Publications_Slider/2120_AED_Medical_Care_4th_Ed_FINAL.pdf.

[50] Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal anorexia nervosa: three cases and proposed clinical characteristics*, J Eating Disorders, (Feb. 15, 2022) at 1, https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3.

[51] Patricia Westmoreland, et al., *"Terminal Anorexia": An Invalid Construct That Does Not Justify Medical Aid in Dying*, Psychiatric Times (Oct. 11, 2023), https://www.psychiatrictimes.com/view/terminal-anorexia-an-invalid-construct-that-does-not-justify-medical-aid-in-dying (citing a longitudinal study finding that two-thirds of individuals with anorexia nervosa recovered after 22 years).

[52] *Id.*

can only imagine if my diagnosis had included the word 'terminal.' Only I don't imagine. I know. I would be dead."[53]

112. In Colorado, where assisted suicide laws have been in effect since 2016, state record-keeping lists seventy-five deaths from 2017 to 2024 as falling in the "other illnesses/conditions" category and state officials have "noted a growing number of cases for which the terminal condition was identified as 'severe protein calorie malnutrition.' Thirty cases were reported between 2021 and 2024—including eighteen in 2024 alone—compared to zero cases in previous years."[54]

113. Under Colorado's assisted suicide laws, Jane, a twenty-nine-year-old woman, was provided with lethal drugs while in the midst of a mental health crisis. Jane was diagnosed with an eating disorder at age fourteen and received treatment for most of her life. During one of Jane's hospitalizations, Jane's parents were informed that Jane's providers had placed her on hospice care and had participated in the process of providing lethal drugs to Jane under the assisted suicide laws. Jane's father intervened as legal guardian, and a probate court ordered the medications removed from Jane's possession. Jane was subsequently discharged from hospice and recovered. Notably, at the time Jane was approved as eligible for assisted suicide, she was being discharged from hospice due to the fact that she was no longer eligible for hospice services, and while in hospice, the hospice had also not considered her competent. Regardless, she was still found eligible for assisted suicide. But for the intervention of her parents and the probate court, she may have

---

[53] Chelsea Roff and Dr. Catherine Cook-Cottone, *The Dangers of Assisted Suicide To Those With Eating Disorders*, https://tinyurl.com/2f4yj97s (last visited June 8, 2026). (last visited June 8, 2026).

[54] Colorado End-of-Life Options Act, 2024 Data Summary, with 2017-2024 Trends and Totals, Center for Health and Environmental Data, Colorado Department of Public Health and Environment, https://cdphe.colorado.gov/center-for-health-and-environmental-data/registries-and-vital-statistics/medical-aid-in-dying#Annual (last visited June 8, 2026).

ended her life.  She lived independently for two years, working as an Occupational Therapist, purchasing a home, travelling on vacation, and making new friends.  She died in May 2024 of severe shock while being treated for a heart condition.

114.    Under the Act, people with eating disorders could be prescribed life-ending medication if a doctor diagnoses them with "terminal anorexia."  Upon information and belief, the doctor who first introduced the concept of "terminal anorexia" is licensed to practice medicine in the state of New York and could diagnose and prescribe life-ending medication to someone with anorexia in New York under the Act.

### (3)    Terminal Illnesses and the Dying Process

115.    Persons who may not have been disabled before their terminal illness will, unless they die suddenly, become disabled as their illness and treatment impair their ability to perform major life activities such as caring for oneself, eating, sleeping, walking, and bathing.  The onset and progression of terminal illnesses are themselves causes of suicidal ideation.  Persons approaching death are understandably concerned about pain, loss of independence and loss of dignity as others take on their intimate care.  All of these concerns can be addressed by palliative medicine and quality end-of-life care.  Palliative medicine and good end-of-life care, however, are expensive and difficult to access for many individuals.  Persons approaching death are as deserving of suicide prevention services as are those without terminal illnesses.  Many people facing imminent death suffer from depression, which is treatable even in the presence of late-stage illness.[55]  In the words of one study on the topic:

> Few requests are more confusing or anxiety-provoking for a physician than a dying patient's request to hasten his or her own death. Physicians should recall that such a request is typically a means for a patient to communicate some form of distress

---

[55] Gay Maytal, Theodore A. Stern, The Desired for Death in the Setting of Terminal Illness:  A Case Discussion, PRIM. CARE COMPANION, J. CLIN. PSYCHIATRY 2006; 8(5) at 299, 304.

to his or her doctor; rarely is it a declaration of suicide intent. By inquiring about this distress, a physician can begin to address its underlying cause and to improve the quality of life for the terminally ill patient.[56]

116. The Act diverts persons approaching death away from suicide prevention services and effective palliative care, and to state-sponsored suicide in a way that would be unthinkable for persons without terminal illnesses. It does so solely on the basis of disability.

**(4) Medical Care for People with Life-Threatening Disabilities**

117. The Act fundamentally changes the manner in which physicians and other healthcare professionals provide treatment for people with life-threatening disabilities. The Act will detract from the time and resources spent treating patients who do not wish to die by assisted suicide. Because the Act does not require the prescribing provider to be the patient's primary provider—or any previous provider relationship—experts believe that, after the law goes into effect, the Act will become a medical specialty.

118. One such expert is Dr. Diane Meier, MD, FACP, FAAHM, a resident of Manhattan, New York, who treats patients who qualify for assisted suicide under the Act. Dr. Meier practices internal and hospital medicine and is a preeminent expert in geriatric and palliative medicine. She is Director Emerita and Strategic Medical Advisor of the Center to Advance Palliative Care, an organization devoted to increasing access to quality health care for people living with serious illnesses. Under her leadership, palliative care programs in U.S. hospitals have more than tripled in the last 15 years.

119. Because Dr. Meier's entire career is centered around providing care to persons who would likely be eligible for the Act, the Act will seriously undermine Dr. Meier's work and limit her practice. Currently, when a patient of hers expresses a desire to stop living, this is considered

---

[56] *Id.*

a medical emergency.  Dr. Meier and her team turn over every rock looking for a solution to address the root cause of the patient's despair.  Solutions could include bringing the patient food, a visitor, improved pain management, or even placement in mental health inpatient care.  However, under the Act, the patient expressing suicidal ideation could die shortly thereafter, undermining all of Dr. Meier's training and practice to treat people with life-threatening disabilities.

120.    Dr. Alan Carver, MD is also a resident of New York City, New York who treats persons who would qualify for assisted suicide under the Act.  Dr. Carver practices neurology and palliative care medicine at Memorial Sloan Kettering Cancer Center.  His practice is focused on the neurological complications of cancer and caring for patients who are not expected to live a long period of time.

121.    Dr. Carver has treated patients who have asked him to kill them, but once his team has given the patient state-of-the-art treatment to address what is driving their interest in suicide, patients tell him they no longer want to die.  For Dr. Carver, this calls into question the quality of care individuals with serious disabilities are receiving and raises a concern that his patients may die by assisted suicide merely because they have a treatment need that cannot be easily met.  Dr. Carver also knows that prognoses are inaccurate, as he and every doctor he knows has been wrong before.

122.    Ultimately, the Act undermines the entire medical profession, which is built on a foundation that doctors are always going to be on the side of the patient's life.  The Act removes that presumption and is counter to the fiduciary duty that is essential to the practice of medicine.

**E.**   **Defendants Deny People with Life-threatening Disabilities Equal Access to State-Based Programs and Services, in Violation of the ADA, Section 504, and Equal Protection Clause.**

   **(1)**   **Defendants Administer an Unequal Two-Track System of Suicide Prevention Services, with One Track for People with Certain Disabilities and a Separate Track for All Others.**

123.   Defendant Department of Health receives federal funds to administer suicide prevention initiatives in New York and is responsible for providing suicide prevention services, including by providing resources to counties for suicide prevention trainings and programs, as well as by connecting individuals in crisis to immediate assistance.

124.   New York law provides that a person who appear to be mentally ill and conduct themselves in a manner likely to result in serious harm to the person or others may be immediately transferred to a psychiatric emergency program, hospital, or connected with other emergency services. N.Y. Ment. Hygiene Law § 9.41. When a person in New York who does not have life-threatening disabilities expresses suicidal intentions to a physician, the standard of care requires the above suicide prevention programs, services, and/or activities to be made available to the person. If that person does not pursue those resources and maintains an interest in suicide, the standard of care is not to help the patient kill himself or herself, nor to leave him or her to their own devices. Instead, an entire system of prevention measures is deployed around the person, including emergency behavioral health services and/or inpatient programs.

125.   Defendants are aware of the heightened risk factors associated with a person having a life-threatening disability and requesting assisted suicide—including the fact that such a person likely has depression that impairs the person's ability to make informed decisions—yet Defendants fail to ensure that the suicide prevention programs in place are equally available to those individuals. Under the Act, Defendants permit the withholding of suicide prevention services and interventions when the person has a life-threatening disability. In a 2019 letter to the U.S.

Department of Health and Human Services, the National Council on Disability described this situation as "a double standard in suicide prevention efforts" given that people with life-threatening disabilities "are not referred for mental health treatment when seeking assisted suicide, while people without disabilities receive such referrals."[57]

126.     By relegating people with life-threatening disabilities to a less effective, unequal, and separate program for people expressing suicidal ideation, the Act: (1) "den[ies] qualified individual[s] with [] disabilit[ies] the opportunity to participate in or benefit from" behavioral health programs, including suicide prevention, hospitalization, and medication services, in violation of 28 C.F.R. § 35.130(b)(1)(i); (2) affords qualified individuals with disabilities an opportunity "that is not equal to that afforded others" or that is not as "effective in affording equal opportunity to … gain the same benefit … as that provided to others," in violation of 28 C.F.R. § 35.130(b)(1)(ii)-(iii); and (3) provides "different or separate aids, benefits, or services" to people with disabilities in a manner that does not "provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others," in violation of 28 C.F.R. § 35.130(b)(1)(iv).

**(2)     The Department of Health and its Commissioner Deny People with Life-Threatening Disabilities the Medical Licensing and Regulatory Protections Available to Others**

127.     The U.S. Supreme Court recognizes that the State "has an interest in protecting the integrity and ethics of the medical profession."[58]     Defendants Department of Health,

---

[57] Letter from Neil Romano, Chairman, Nat'l Council on Disability, to Roger Severino, Director, Off. C.R., U.S. Dep't of Health and Human Servs. (Dec. 11, 2019), https://web.archive.org/web/20250523013336/https://www.ncd.gov/letters/2019-12-11-ncd-letter-to-hhs-on-assisted-suicide-medical-futility-and-qalys-reports/.

[58] *Glucksberg*, 521 U.S. at 731 (citing American Medical Association, Code of Ethics § 2.211 (1994) ("[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer.").

Commissioner McDonald (in his official capacity as Commissioner of the Department), Medical Board for Licensure, and Dr. Shelat (in his official capacity as Chair of the Medical Board for Licensure) are charged with protecting health care consumers through the licensing and regulation of providers carried out by the Medical Board for Professional Conduct and Medical Board for Licensure (jointly, the "Medical Boards"), as well as by ensuring quality medical care through these licensing and regulatory functions. By law, the highest priority of the Medical Boards is their regulatory and disciplinary functions is the protection of the public. The Act, however, eliminates these patient protections for people with life-threatening disabilities.

128. The Department of Health (through the OPMC and Medical Board for Professional Conduct) and Commissioner McDonald are charged with conducting disciplinary proceedings against licensed physicians and other medical professionals who engage in professional misconduct, as well as referring cases to law enforcement or prosecuting criminal violations related to professional misconduct. N.Y. Pub. Health Law § 230. The Medical Board for Licensure and Dr. Shelat are charged with protecting public health and patient safety by ensuring that only qualified individuals practice medicine and through the regulation of the standards of medical practice. See N.Y. Educ. Law § 6520, et seq.

129. Under the Act, Plaintiffs and other individuals with life-threatening or "terminal" disabilities are denied the equal benefit of the Medical Boards' protections. The Act prohibits the Medical Boards from imposing any discipline on or otherwise regulating providers who prescribe lethal drugs under the Act, even though the provider knows that the patient is suicidal. N.Y. Pub. Health Law § 2899-r. Once the person is identified as having a life-threatening or "terminal" disability, the disciplinary and regulatory safeguards provided by New York law are eliminated.

**F.  The Act Unlawfully Steers People with Life-Threatening Disabilities Toward Suicide**

130.  The Act unlawfully and irrationally discriminates by steering people with life-threatening disabilities towards assisted suicide and all others towards life-preserving suicide prevention treatment services.

131.  Steering has the further effect of subjecting people with life-threatening disabilities to coercion and undue influence, depriving individuals of a truly voluntary and informed waiver of their right to live. When under the influence of depression and decreased decision-making capacity, a person evaluating assisted suicide will be highly influenced by others' opinions about whether they should go forward with the act.  Insurers, hospitals, nursing homes, physicians, other healthcare providers, and even family members all have their own perspectives and unique, conflicting incentives that inevitably help shape the person's ultimate decision.  People with life-threatening disabilities are particularly susceptible to undue influence from these stakeholders, who may directly or indirectly pressure them to obtain assisted suicide for the stakeholder's own convenience, financial gain, or other interests at odds with keeping the person alive.

132.  Most people in the elder community will experience a chronic disability or disease at the end of their lives and require extra care to safely remain in their homes.  But if that care is not made available and an individual's only alternatives to assisted suicide are waiting for a nursing home placement, burned-out or unavailable family care, or suffering in isolation, assisted suicide can become a seemingly preferable option.

133.  The Act presents a false choice between obtaining end-of-life care or assisted suicide.  The system is rigged to make assisted suicide the only viable option.  Life-sustaining treatment, long-term supportive services, in-home nursing services, palliative care, and hospice may be unavailable (or denied) due to a variety of reasons—including Defendants' system of

setting health care priorities. The Act does nothing to require that sufficient long-term care is available to the person, and/or exhausted or knowingly rejected, so that they can make an informed choice between assisted suicide and continuing to live with some semblance of independence. Assisted suicide reduces pressure on Defendant State agencies and actors to supply support services that enable people with life-threatening disabilities to make a meaningful choice between options that exist. True autonomy presupposes having access to real options and being empowered to choose from among them.

134. The Act extends personal "freedom" only to the decision to die by assisted suicide. Defendants fail to ensure the availability of any of the "feasible alternatives" the attending provider is supposed to review with the patient and is only required to "offer to refer" the patient. See N.Y. Pub. Health Law § 2899-f. Under the Act, there is no requirement that such services be actually provided, or even made available, as a less restrictive alternative to death prior to providing the patient with lethal medication.

135. The Act purports to prohibit insurance steering. It disallows the "sale, procurement, or issuance of a life insurance or annuity policy or third-party health care payer policy or coverage, or the rate charged for a policy or coverage" from being "conditioned upon or affected by a patient making or rescinding a request" for life-ending medication. It specifies that a person and their beneficiaries "shall not be denied benefits under a life insurance policy" for actions taken under the Act. Finally, it states that "no third-party health care payer may deny coverage for any service or item that would otherwise be covered by the policy because the patient has or has not chosen to request or use medication" under the Act. N.Y. Pub. Health Law § 2899-n.

136. Despite these provisions, the Act does nothing to ensure that insurers do not deny or delay approval of life-saving or life-extending therapies, supportive services, and access to

necessary assistive devices, while at the same time covering the costs of assisted suicide. Direct coercion is not necessary where "patients are denied necessary life-sustaining health care treatment, or even if the treatment they need is delayed[;] many will, in effect, be steered toward assisted suicide."[59]

137.   Having one's own doctor encourage or even agree with the choice to use assisted suicide is a powerful factor in support of that decision.[60]  Research has shown that doctors' own discomfort with people with life-threatening disabilities can influence the person's request to hasten death.  A study from Georgetown University's Center for Clinical Bioethics found a strong link between cost-cutting pressure on physicians and their willingness to prescribe lethal drugs to patients.[61]  For hospitals, nursing homes, hospices, and insurers, it is much less expensive to assist a person's suicide than it is to provide for care.

138.   Healthcare providers' subjective value judgments about their patients' quality of life also lead to recommendations of assisted suicide as a way to address perceived low quality of life.  Some healthcare providers possess a "false empathy" towards their patients, believing that a person with a life-threatening disability is better off dead than alive, without inquiring into the quality of life available with adequate supportive services or even the barriers to accessing supportive services.   Moreover, physicians often receive little training in quality-of-life interventions that can make continued life more desirable.[62]

---

[59] DREDF, *Why Assisted Suicide Must Not Be Legalized* section I(C)(1) (Oct. 12, 2012), https://archive.is/jA8yh.

[60] *See*, *e.g.*, Steven H. Miles, *Physicians and Their Patients' Suicides*, 271 JAMA 1786 (1994).

[61] DREDF, *supra* n.42 (citing Daniel P. Sulmasy, *et al.*, *Physician resource use and willingness to participate in assisted suicide*, 158 JAMA INTERN. MED. 974, 978 (1998)).

[62] Nat'l Council on Disability, *The Danger of Assisted Suicide Laws* 10, 30-31 (Oct. 9, 2019), https://www.utas.edu.au/__data/assets/pdf_file/0003/1434054/Submission-18_Marion-Harris_-attachment-1.pdf.

139. People who die by assisted suicide often cite the burden on family caregivers as a contributing factor. Family members and other caregivers involved in decisions about assisted suicide have tremendous influence and can distort patient choice, based in part on their own anxiety, depression, and burnout from caring for a person with a life-threatening disability. Family members who find it difficult to accept functional impairments in a loved one and/or are motivated by a desire to end perceived or actual suffering may—intentionally or unintentionally—convey the idea that everyone would be better off if the patient were to accept assisted suicide.

140. Some people who die by assisted suicide identify the financial implications of treatment as a reason for requesting lethal drugs. The high cost of continuing medical care for people with cancer and other life-threatening disabilities can drain a family's savings, even with insurance.[63] People with life-threatening disabilities may experience overt pressure from family members concerned about mounting bills, as well as their own internalized guilt that they will be incapable of leaving sufficient money or property to their next of kin, or worse, saddling them with unpaid healthcare costs.[64]

### G. The Act Draws an Irrational Distinction Between People with Life-Threatening Disabilities and Everyone Else

#### (1) There Is No Rational Basis for the Act's "Terminal Illness or Condition" Classification

141. The Act does not reasonably advance its claimed purposes of enabling autonomous choices in dying and relieving suffering. The Act does not grant all New Yorkers the freedom and

---

[63] John G. Cagle, *et al.*, *Financial burden among US households affected by cancer at the end of life*, 25 PSYCHO-ONCOLOGY 919 (2016), https://onlinelibrary.wiley.com/doi/abs/10.1002/apon.3933.

[64] Ezekiel J. Emanuel et al., *Understanding Economic and Other Burdens of Terminal Illness: The Experience of Patients and Their Caregivers*, 132 ANNALS INTERNAL MED. 451 (2000), https://www.acpjournals.org/doi/10.7326/0003-4819-132-6-200003210-00005.

liberty to die by assisted suicide, and there is no rational relationship in the Act between autonomy and certain physical disabilities with unreliable prognoses. The only other justification proffered by the law's author is to ease suffering. But the fit between suffering and those with "terminal" disabilities is also poor. For example, many non-terminal people suffer from pain but will be ineligible for assisted suicide under the Act. Likewise, many non-terminal people fear losing autonomy, dignity, control of bodily functions, becoming a burden on caregivers, and/or the financial costs associated with continued living—but fall outside of the Act. Those struggling with disabilities, however, come within the Act—making the distinction irrational.

142. Some people with life-threatening disabilities have impaired judgment and yet express a wish to die. Their status is incompatible with autonomy and personal decision-making. When people with life-threatening disabilities are provided lethal drugs, there is a potential for exposing individuals to deadly mistakes and abuses. The Act fails to contain safeguards sufficient to justify treating people with life-threatening disabilities differently from others and, as discussed further herein, violates the rights of people with such disabilities to equal protection under the law.

**(2) The Act's Definition of "Terminal Illness or Condition" is Arbitrary and Includes People with Life-Threatening Disabilities Who Can Live for Years with Adequate Treatments and Supports**

143. The six-month survival estimate embodied in the Act's definition of "terminal illness or condition" is not rationally related to the Act's stated purposes. There is no connection between suffering and the six-month mark. Palliative care and pain control do not stop working six months before death. In addition, people without a terminal illness or condition can also suffer from pain.

144. Physicians are not trained, equipped, or otherwise capable of predicting with a high degree of reliability that a particular person with a particular condition will likely die within six months. The overwhelming research and clinical information demonstrate that predictions of

death six months out from the event are inherently unreliable, that physicians are not particularly good prognosticators, and that any such prediction is deeply tainted by impermissible stereotypes and discriminatory biases. A mistakenly grim prognosis may drive people to assisted suicide when they could otherwise live long lives with (or without) treatment. Spinal cord injury survivors are at times suicidal immediately following their initial injury and qualify as "terminal" because their injury will often result in death without surgery and/or supportive services, but they can and often do live long, happy lives. Individuals with anorexia or other eating disorders regularly recover and live long lives. So too with a myriad of disabilities, which, without treatment, rehabilitation, and/or long-term services and supports, are life-threatening, *i.e.*, "terminal" under the Act. Inaccurate end-of-life predictions are common and dangerous when combined with biases present in the medical profession and in society at large that devalue disabled lives.

### H. The Act Unconstitutionally Deprives People with Life-Threatening Disabilities of Due Process Protections

145. The Act lacks sufficient safeguards and unconstitutionally deprives people with life-threatening disabilities of protections for their right to live. The Act fails to ensure adequate due process for people who waive this constitutional right. The Act fails to require the consideration, exhaustion, and/or knowing rejection of less restrictive alternatives to assisted suicide. The Act affirmatively places people with life-threatening disabilities in danger by acting with deliberate indifference to the known, obvious, and foreseeable dangers of making assisted suicide available to those with the highest risk factors for suicide. Through their acts and omissions, Defendants fail to ensure that people who die by assisted suicide are provided their constitutional due process rights.

146. The Act lacks safeguards to protect people from impulsively dying by suicide. Risk for depression and suicidality is often present immediately after a traumatic injury or grave

diagnosis, including a spinal injury. A 2023 study of over 16 million people with cancer in the U.S. found that the "highest suicide risk occurred in the first 6 months after diagnosis, during which individuals diagnosed with cancer bore more than 7 times the suicide risk of the general population."[65]

147. Despite this, the Act provides for a waiting period of only five days. The likelihood that depression or another disorder that impairs judgment will resolve itself within five days is low. If the Act goes into effect, New Yorkers will be able to make an oral and written request to an attending provider; have their diagnosis, prognosis, and capacity confirmed by a consulting provider and mental health professional (who do not have to meet with the patient in person); and five days after the first request, ingest lethal drugs prescribed by the attending provider. If a provider determines within their "reasonable medical judgment" that an individual has 5 days or less to live, the prescription for the lethal drugs may be filled sooner than the five-day waiting period—within hours or even minutes of the first request.[66] Such a short timeline cannot possibly provide the due process protections required when such a fundamental right—the right to live and exist in the world—is at stake. It is in part for these reasons that the American College of Physicians and the American Medical Association oppose physician-assisted suicide, stating that: "Physician-assisted suicide is fundamentally incompatible with the physician's role as healer, would be difficult or impossible to control, and would pose serious societal risks."[67] The purported

---

[65] Xin Hu, *et al.*, *Suicide Risk Among Individuals Diagnosed With Cancer in the US*, 2000-2016, 6 JAMA NETWORK OPEN 1, 9 (2023).

[66] N.Y. Pub. Health Law § 2899-f.

[67] *See* Lois Snyder Sulmasy & Paul S. Mueller, *Ethics and the Legalization of Physician-Assisted Suicide: An American College of Physicians Position Paper*, 167 ANNALS INTERN. MED. 576 (2017), https://www.acpjournals.org/doi/full/10.7326/M17-0938. On June 9, 2025, the American Medical Association reaffirmed its long-standing opposition to assisted suicide, https://patientsrightsaction.org/ama-reaffirms-opposition-to-assisted-suicide/.

safeguards are illusory, will be frequently disregarded, and/or will be circumvented in ways that harm and discriminate against people with life-threatening disabilities. The newly enacted assisted-suicide system constitutes a State-created danger of death for persons considering suicide who could otherwise survive their immediate crisis and enjoy years of life.

**(1)   The Act's Vague Definition of "Terminal Illness or Condition" Fails to Ensure an Adequate Process to Determine Assisted Suicide Eligibility**

148.   The statutory definition of "terminal illness or condition" is overbroad and encompasses the class of persons who have medical conditions that would result in death within six months without medical care, but who can live for more than six months with medical care. By leaving this key term vague and unclear, the Act fails to define the class of persons eligible for assisted suicide with precision and fails to provide adequate guidance to the State's healthcare providers eligible to prescribe life-ending drugs under the Act as to how to determine whether a patient's condition meets the principal eligibility criteria. The category of people with "illness or condition" is inherently ambiguous and unstable.

149.   Physicians are notoriously poor prognosticators regarding the timing of their patients' deaths. By failing to rely on any criteria or methodology to determine length of remaining life with any level of precision, and by failing to provide any guidance to the State's physicians as to how to determine whether a particular person's condition will or will not "result in death within six months" (with or without medical care), the Act will sweep in untold numbers of individuals whose conditions will (and do) not result in death within six months.

150.   The lack of clarity surrounding the process for determining who is eligible for State-sanctioned assisted suicide places individuals' lives at great risk from the unaccountable discretion and potential biases of individual doctors, and risks depriving individuals without decision-making capacity of the due process required by the U.S. Constitution.

### (2) No Meaningful Mental Health Assessment or Treatment Is Required Under the Act

151. The Act's lack of safeguards with respect to people with life-threatening disabilities, people who are already at a heightened risk of suicide, deprives people of life without due process of law.

152. Depression plays an enormous role in assisted suicide deaths. It is well known that depressed individuals who express a desire to die are indirectly asking for, and benefit from, help in dealing with the depression and accompanying concerns common to all people involved in challenging circumstances, particularly those persons nearing the end of their natural lives.

153. Reduced decision-making capacity also plays an enormous role in deaths pursuant to the Act. A study published in the American Journal of Geriatric Psychiatry in 2018 "revealed high rates of decisional impairment in terminally ill participants," and found that although "[m]ost terminally ill participants were able to express a treatment choice (85.7%), … impairment was common on the Understanding (44.2%), Appreciation (49.0%) and Reasoning (85.4%) subscales."[68]

154. While the Act contains a requirement that a mental health professional must evaluate whether a patient has decision-making capacity, defined as the ability to understand and appreciate the nature and consequences of a particular health care decision and to reach an informed health care decision, it does not provide any standards to guide the mental health professional in making these observations. *See* N.Y. Pub. Health Law § 2899-f. In a study of Oregon's assisted suicide law, more than half of psychiatrists surveyed reported that they were

---

[68] Elissa Kolva, Barry Rosenfeld, & Rebecca Saracino, *Assessing the decision making capacity of terminally ill patients with cancer*, 26 AM J GERIATRIC PSYCHIATRY 5, 523-31 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6345171/.

"not at all confident that they could, in the context of a single consultation, determine if a mental disorder or depression impaired the judgment of a person requesting assisted suicide."[69]

155.    In suicide prevention, the standard of care when someone expresses suicidal ideation is to treat the underlying psychiatric or psychological condition causing the suicidal ideation.  However, the Act assumes that a request for assisted suicide is not an indication of a mental disorder, when other New York laws make precisely the opposite assumption for virtually everyone else, and those laws require interventions up to and including involuntary hospitalization to test the assumption and diagnose the condition.  Under the Act, the mental health professional's inquiry is limited solely to determining whether the individual has "decision-making capacity to make an informed decision," not whether the individual has a psychiatric or psychological condition causing the suicidal ideation that requires alternative treatment.  N.Y. Pub. Health Law § 2899-f.  The error-prone nature of such an evaluation, along with the failure to even consider a patient's psychiatric or psychological condition, rather than simply their "decision-making capacity," falls squarely below the required standard of care.

156.    The Act's procedures are insufficient for differentiating between people who have adequate decision-making capacity and those who do not.

### (3)    The Act Fails to Include Any Safeguards to Ensure that People Are Not Judgment-Impaired or Unduly Influenced at the Time of Death

157.    Once a prescription for assisted suicide drugs is provided to the patient, there are no requirements whatsoever in the Act to ensure that the necessary predicates for the provider prescribing the lethal medication remain true at a later time when the person may actually decide

---

[69] Linda Ganzini, *et al.*, *Evaluation of Competence to Consent to Assisted Suicide: Views of Forensic Psychiatrists*, 157 AM. J. PSYCHIATRY. 595, 595 (2000), https://ajp.psychiatryonline.org/doi/epdf/10.1176/appi.ajp.157.4.595.

to ingest the medication: is the person under duress, capable of making medical decisions, suffering from a mental disorder that impairs judgment, still deemed to have a "terminal illness or condition," and capable of understanding feasible alternatives?  Ingestion may occur days, weeks, months, or even years after the request for assisted suicide was approved, during which a predicate's existence may have changed.

158.    There are no witness requirements at the time of ingestion, no requirements that the attending provider be present or informed of the person's death, and no obligation to inform authorities of the true manner or cause of death.[70]  There are no requirements that the drugs be used within days, weeks, months, or years, and neither the Act nor Defendants do anything to ensure that the drugs are safely stored prior to consumption.  The Act requires that the medication be properly disposed of should the person not take the medication, but it contains no reporting requirements and takes no other steps to ensure that relevant parties comply with this requirement. This places the requester and other people in the home—including children—at risk of suicide, misuse, or accidental ingestion of the drugs.

159.    The Act does not require any evidence that the person ingested the lethal drugs themselves, that is, whether the person self-administered the lethal drugs as required by the Act or whether anyone else (family member, nurse, provider, other medical provider, or friend) administered the medication or physically assisted the person.  Anything other than self-

---

[70] In fact, the Act requires that coroners misrepresent the cause of death and omit suicide.  The Act states that assisted suicide "shall not be construed for any purpose to constitute suicide, assisted suicide, attempted suicide, promoting a suicide attempt, euthanasia, mercy killing, or homicide under the law, including as an accomplice or accessory or otherwise."  N.Y. Pub. Health Law § 2899-n.  The Act further requires that the cause of death on a patient's death certificate be falsely reported as the underlying "terminal illness or condition" rather than the proximate cause—death by suicide.  N.Y. Pub. Health Law § 2899-p.

administration is a violation of the Act, but Defendants are not required to do anything to determine whether this critical line between suicide, active euthanasia, or even murder is ever crossed.

**(4)     The Act Fails to Provide Viable Alternatives to Suicide, Fails to Require Consideration or Exhaustion of Less Restrictive Alternatives to Suicide, and Lacks Independent Oversight**

160.    The Act requires the attending provider to inform the patient of the "the feasible alternatives and appropriate treatment options, including but not limited to (1) information and counseling regarding palliative and hospice care and end-of-life options appropriate to the patient, including but not limited to: the range of options appropriate to the patient; the prognosis, risks, and benefits of the various options; and the patient's legal rights to comprehensive pain and symptom management at the end of life; and (2) information regarding treatment options appropriate to the patient, including the prognosis, risks, and benefits of the various treatment options." N.Y. Pub. Health Law § 2899-f.  But the Act includes no requirements or guidance regarding how in-depth or comprehensive this discussion must be, and Defendants fail to provide any.  Upon information and belief, alternatives to assisted suicide will be routinely under-emphasized or not discussed in any meaningful way, and Defendants will fail to ensure that any of these alternatives are actually available.

161.    The Act fails to require that people meaningfully consider, exhaust, and/or knowingly reject less restrictive, truly viable alternatives to assisted suicide, including concurrent or additional treatment options, comfort care, palliative care, hospice care, and pain control, that are ostensibly included among the "feasible alternatives" that New York providers are supposed to discuss with persons who seek assisted suicide.  The Act fails to require the provision or exhaustion of the State's suicide prevention programs, which are expressly designed to address the underlying concerns that drive people to suicidal thoughts and deter people from taking uninformed, untreated, or otherwise preventable suicidal actions.

**(5) Prescribing Providers Often Lack a Patient-Provider Relationship with the People for Whom They Prescribe Lethal Drugs**

162. The Act contains no safeguards to ensure that the provider who prescribes lethal drugs have any preexisting relationship with the patient or knowledge of their illness and treatment history. The attending and consulting providers need not even ever see the suicidal patient in person, as the Act does not prohibit providers from examining, evaluating, and prescribing lethal drugs to patients remotely, via telehealth consult, when requiring an in-person visit would result in "extraordinary hardship" to the patient. The term "extraordinary hardship" is defined to encompass "circumstances in which an in-person examination would cause the patient undue pain or suffering, or would necessitate extraordinary expense or logistical burden for medically-necessary transportation." N.Y. Pub. Health Law § 2899-f.

163. The Act operates on the fiction that, on the basis of one in-person visit, or even just telehealth consults, over five days (or less under some circumstances), providers can: (1) make the "terminal" prognosis, (2) ensure the patient is not acting under impaired judgment or duress, (3) evaluate whether a patient has "decision-making capacity" to make an informed decision, and (4) counsel the patient on their options and alternatives. The lack of an ongoing clinician-patient relationship requirement, moreover, facilitates provider-shopping, by which the patient seeks out a second provider, and in some cases, a third and a fourth "opinion," until one of them eventually agrees to write the prescription. Defendants are not required to track or restrict this practice, allowing easy evasion of the "safeguards" against duress, neglect, and abuse.

**(6) What Safeguards Exist Are Likely to Be Stripped From the Act After Enactment**

164. Across the United States and the globe, the enactment of assisted suicide laws has been followed by the methodical removal of statutory safeguards. Post-enactment amendments have eliminated requirements to meet with a physician in person before choosing assisted suicide,

shortened waiting periods to receive lethal drugs, lifted requirements that assisted suicide patients be residents of the state where they receive lethal drugs, allowed non-physicians to prescribe lethal drugs, and made patients whose natural deaths were not reasonably foreseeable eligible to die by assisted suicide. Such changes expedite the process of steering people with terminal disabilities toward death, rather than conforming to the standard of care for suicide prevention when they express a desire to kill themselves.

165. Canada offers a striking example of this trend. When Canada passed its assisted suicide statute in 2016, it included restrictive eligibility requirements. Assisted suicide was available only to mentally competent adult patients with a "serious and incurable illness, disease or disability" who were in an "advanced state of irreversible decline in capability" and who had "enduring physical or psychological suffering" that was "intolerable." Their natural deaths also had to be "reasonably foreseeable."[71] In 2021, Canada modified its statute, making patients whose deaths were not "reasonably foreseeable" eligible to die by assisted suicide.[72] This change made Canadians with conditions as varied as quadriplegia, multiple sclerosis, blindness, and chronic back pain eligible to die by physician assisted suicide.[73] In March 2027, Canada will further expand eligibility to die by assisted suicide to patients whose sole underlying medical condition is a mental illness.[74] A joint parliamentary committee on assisted suicide and euthanasia has also

---

[71] Canada Crim. Code, R.S.C., 1985, c. C-46, s. 241.1 (2016).

[72] Canada Crim. Code, R.S.C., 1985, c. C-46, s. 241.1 (2021).

[73] Katie Engelhart, *Five Things to Know About Assisted Dying in Canada*, N.Y. TIMES (June 1, 2025), https://www.nytimes.com/2025/06/01/magazine/medically-assisted-dying-canada-takeaways.html.

[74] Health Canada, *The Government of Canada introduces legislation to delay Medical Assistance in Dying expansion by 3 years*, Gov. of Canada (Feb. 1, 2024), https://www.canada.ca/en/health-canada/news/2024/02/the-government-of-canada-introduces-legislation-to-delay-medical-assistance-in-dying-expansion-by-3-years.html.

recommended to Canada's Parliament to make assisted suicide available to minors.[75]  With such expansions, it is often easier for patients to access physician-assisted suicide than necessary medical and mental health care.[76]

166.    Within the U.S., post-enactment removal of assisted suicide statutes' safeguards also creates conditions where it is easier to get physician assistance to end one's life than to access supports to continue living.  In line with this trend, Vermont amended its assisted suicide law to remove the requirement that patients meet in person with their physician before choosing assisted suicide.[77]  Colorado has expanded the definition of "proscribing provider" beyond medical doctors, enabling non-M.D.s to prescribe lethal drugs.[78]  Oregon and Colorado have each amended their assisted suicide statutes to allow same-day dispensing of lethal drugs in some cases, while California has shortened waiting periods to 48 hours.[79]  Oregon and Vermont have also amended their assisted suicide statutes to allow non-residents to receive lethal prescriptions, making them destination states for assisted suicide.[80]

167.    The trend is clear—after assisted suicide laws are enacted, minimal safeguards that were used to justify the practice are eliminated to ensure that people with life-threatening

---

[75] Elaina Plott Calabro, *Canada is Killing Itself*, THE ATLANTIC, Aug. 11, 2025, at 28.

[76] *See, e.g.*, Kate Dubinski, *New report shows who is getting medical help with dying despite not being close to natural death*, Canadian Broad. Corp. (Oct. 28, 2024), https://www.cbc.ca/news/canada/london/new-report-shows-who-is-getting-medical-help-with-dying-despite-not-being-close-to-natural-death-1.7363801 (describing trends in assisted suicide patient population).

[77] H. 190, 2023 Gen. Assem., Reg. Sess. (Vt. 2023).

[78] 2024 Colo. Legis. Serv. Ch. 406 (S.B. 24-068).

[79] *See* ORS 127.850 §3.08(2); Colo. Rev. Stat. Ann. § 25-48-104(1)(b); Cal. Health & Safety Code § 443.3(a) (effective June 9, 2016, Amended by Stats. 2021, Ch. 542, Sec. 2. (SB 380) Effective January 1, 2022).

[80] *See* H.B. 2279, 82nd Legis. Assem., Reg. Sess. (Or. 2023); H. 190, 2023 Gen. Assem., Reg. Sess. (Vt. 2023).

disabilities are promptly provided the means to die rather than the standard of care for suicide prevention when they express a desire to kill themselves.

## CAUSES OF ACTION

### COUNT ONE
**Violation of Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203**
**(Against All Defendants)**

168.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination."  42 U.S.C. § 12132. A "public entity" includes State and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

169.    Defendants are public entities and/or officers of public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.  Defendants provide suicide prevention services and regulate the medical profession in New York.  Suicide prevention services are programs, services, and activities within the meaning of the ADA.  The Medical Boards' regulation of the medical profession and enforcement of rules and laws applicable to medical professionals are also programs, services, and activities within the meaning of the ADA.

170.    The ADA defines "a qualified individual with a disability" as a person who has a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2).  The ADA Amendments Act of 2008 clarified the definition of "major life activities" to also include: "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory,

endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "The definition of 'disability' … shall be construed in favor of broad coverage … to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A).

171. Plaintiffs Cameron and Hernandez are qualified individuals, and Plaintiff organizations have members or constituents who are qualified individuals with disabilities as defined in the ADA and ADA Amendments Act of 2008. Plaintiffs are qualified because they are or represent people with life-threatening disabilities who both will qualify to use the Act's procedures to end their lives and to use Defendants' suicide prevention services. People with eating disorders who will qualify to use the Act all have disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act. Under the Act, "terminal illness or condition" means "means an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided." N.Y. Pub. Health Law § 2899-d. Eating disorders are also disabilities under the ADA and Section 504 because they are mental or physical impairments that substantially limit major life activities of eating and caring for oneself and the operation of major bodily functions including digestive, bowel, endocrine, and bladder functions. *See* 42 U.S.C. § 12102(2)(A)-(B). People with spinal cord injuries who will qualify to use the Act, such as Plaintiff José Hernandez, all have disabilities within the meaning of the ADA and Section 504 of the Rehabilitation Act. All spinal cord injuries that arguably satisfy the definition of "terminal illness or condition" under the Act are also disabilities under the ADA and Section 504 because they are mental or physical impairments that substantially limit major life activities of walking, standing, lifting, bending, and/or caring for oneself. *See* 42 U.S.C. § 12102(2)(A). Plaintiff Anita Cameron also has disabilities under the ADA and Section 504 because she has mental or physical

impairments, including limited mobility, blindness, and degenerative medical conditions, that substantially limit her major life activities, such as walking, standing, seeing, and caring for herself. Plaintiffs are therefore entitled to the protections of the ADA.

172. Through administering the Act, Defendants exclude persons with life-threatening disabilities, including but not limited to people with serious eating disorders and people with spinal cord injuries, from participation in and deny them the benefits of New York's suicide prevention services, programs, and activities and the benefits of the programs, services, or activities of the Medical Boards' regulation of the medical profession and enforcement of laws applicable to medical professionals. Such exclusion and denial of benefits constitute discrimination based on disability in violation of 42 U.S.C. § 12132.

173. Congress directed the Department of Justice to promulgate regulations to implement Title II's anti-discrimination provisions. 42 U.S.C. § 12134. The regulations provide further clarity regarding what it means to exclude a person from participation in and/or deny a person the benefits of a program, service, or activity. Such denial and exclusion can take the form of affording persons with disabilities with services that are not equal to those provided to others, 28 C.F.R. § 35.130(b)(1)(ii), or are less effective, id. § 35.130(b)(1)(iii), or that are separate unless such separation is necessary to provide an equally effective service, id. § 35.130(b)(1)(iv).

174. The Act operates in all these forms to harm persons with life-threatening disabilities. The Act's rapid pathway to death is a separate, unequal, and less effective way of responding to suicidality, compared with New York's ordinary suicide prevention programs. The Act channels persons with life-threatening disabilities into this separate, unequal, and less effective way of responding to suicidality, hastening deaths that could be avoided for decades, as well as diverting persons from necessary palliative care at the very end of their lives.

175. Furthermore, by carving out physician participation in the Act from requirements that otherwise apply to physicians responding to suicidal patients and by failing to investigate any physicians for violating the Act, Defendants deny people with life-threatening disabilities the benefits of Defendants' programs, services, and activities of regulation of the medical profession and quality of medical care. Accordingly, Defendants exclude Plaintiffs from participation in, and deny them the benefits of, or otherwise discriminate against them in, Defendants' suicide prevention programs and services in violation of the ADA.

176. Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs Cameron and Hernandez and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will be discriminated against, denied equal access to the suicide prevention programs and services operated and overseen by Defendants, and die an unnatural, premature death by suicide. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. §§ 12101 and 12205.

177. Plaintiffs seek both declaratory relief that the Act violates the Americans with Disabilities Act, 42 U.S.C. §§ 12132 and 1220, and preliminary and permanent injunctive relief barring enforcement of the Act.

**COUNT TWO**
**Violation of Rehabilitation Act, 29 U.S.C. § 794**
**(Against All Defendants)**

178. Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

179. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Section 504 is interpreted similarly to the ADA and applies to any entity that receives federal funds.

180. At all times relevant to this action, Defendants are and have been recipients of federal financial assistance within the meaning of the Rehabilitation Act.

181. An "individual with a disability" is defined under the statute, in pertinent part, as "an individual [who has] a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Qualified" means, with respect to services, a person who meets the essential eligibility requirements for the receipt of such services. 28 C.F.R. § 41.32.

182. Plaintiffs Hernandez and Cameron are qualified individuals, and Plaintiff organizations have members or constituents who are qualified individuals with disabilities as defined in Section 504 as they have disabilities that substantially limit one or more major life activities and will meet the essential eligibility requirements of both the Act and Defendants' suicide prevention services. All conditions that arguably satisfy the definition of "terminal illness or condition" under the Act, including but not limited to serious eating disorders and spinal cord injuries, are also disabilities under Section 504 because they are mental or physical impairments that substantially limit major life activities. *See* 42 U.S.C. § 12102(2).

183. Section 504 defines "program or activity," in relevant part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b)(1).

184. Defendants' suicide prevention services in New York are programs or activities within the meaning of Section 504 of the Rehabilitation Act and must comply with Section 504's antidiscrimination requirements. The Medical Boards' regulation of the medical profession and enforcement of rules and laws applicable to the medical profession are programs, services, or activities within the meaning of Section 504 of the Rehabilitation Act.

185. The U.S. Department of Health and Human Services has issued regulations implementing Section 504 of the Rehabilitation Act applicable to medical care. These regulations prohibit discrimination on the basis of disability in medical treatment. 45 C.F.R. § 84.56(a). These regulations specifically prohibit covered entities from "[providing] a medical treatment to an individual with a disability where it would not provide the same treatment to an individual without a disability, unless the disability impacts the effectiveness, or ease of administration of the treatment itself, or has a medical effect on the condition to which the treatment is directed." Id. § 84.56(b)(3). This prohibition applies to offers to provide treatment as well as to instances where treatment is actually provided. Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 89 F.R. 40066, 40083 ("§84.56(a)'s prohibition on discrimination on the basis of disability can encompass instances where a recipient offers [...] treatment.").

186. Defendants violate HHS's regulations implementing Section 504 by offering purported medical "treatment"—assisted suicide—to people with life-threatening disabilities on the basis of disability, that they do not offer to others. None of the exceptions to the prohibition on offering medical treatment to only people with disabilities applies to the provision of assisted suicide to people with life-threatening disabilities. Life-threatening disabilities do not impact "the effectiveness" of assisted suicide drugs, and such disabilities do not make it easier to administer

69

assisted suicide drugs. "Terminal" or life-threatening disabilities also do not have "a medical effect on the condition to which" assisted suicide drugs are "directed" because assisted suicide drugs are not directed at treating any specific conditions. These drugs are instead directed at terminating life.

187. The United States DOJ is charged under Executive Order 12250 with coordinating the implementation of Section 504. 28 C.F.R. § 41.1. Pursuant to this mandate, the DOJ has also issued regulations defining forms of discrimination prohibited by Section 504. The regulations prohibit schemes that offer aids, benefits, or services to people with disabilities that are "not equal to that afforded others," 28 C.F.R. § 41.51(b)(1)(ii)), not as effective as those afforded to others, *id.* § 41.51(b)(1)(iii), that are "different or separate" from those provided to others unless the separateness is necessary to provide equally effective services, *id.* § 41.51(b)(1)(iv), that limit a person's enjoyment of rights, privileges, advantages or opportunities enjoyed by others, *id.* § 41.51(b)(1)(vii), that are administered through criteria or methods that have the effect of discriminating on the basis of disability, id. § 41.51(b)(3)(i). The Act operates in all of these forms to harm persons with life-threatening disabilities. The Act's rapid pathway to death is a separate, unequal, and less effective way of responding to suicidality, compared with the State of New York's ordinary suicide prevention programs. The Act channels persons with life-threatening disabilities into this separate, unequal, and less effective way of responding to suicidality, hastening deaths that could be avoided for months, years, or even decades, as well as diverting persons from necessary palliative care at the very end of their lives.

188. Defendants thus exclude Plaintiffs from participation in, and deny them the benefits of, or otherwise discriminate against them in, Defendants' suicide prevention programs and activities in violation of Section 504 of the Rehabilitation Act.

189.    Furthermore, by carving out physician participation in the Act from requirements that otherwise apply to physicians responding to suicidal patients, Defendants deny people with life-threatening disabilities the benefits of Defendants' programs, services, and activities of regulation of the medical profession and quality of medical care in violation of Section 504 of the Rehabilitation Act.

190.    Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs Cameron and Hernandz and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will be discriminated against and denied equal access to the program or activity operated and overseen by Defendants.  Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 29 U.S.C. § 794(a).

191.    Plaintiffs seek both declaratory relief that the Act violates the Rehabilitation Act, 29 U.S.C. § 794, and preliminary and permanent injunctive relief barring enforcement of the Act.

**COUNT THREE**
**Violation of Affordable Care Act Section 1557, 42 U.S.C. § 18116**
**(Against All Defendants)**

192.    Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

193.    Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under … section 794 of title 29 [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794,

or such Age Discrimination Act shall apply for purposes of violations of this subsection." 42 U.S.C. § 18116(a).

194. Defendants operate health programs or activities receiving federal financial assistance for purposes of Section 1557. Such health programs or activities include but are not limited to health programs or activities operated by Defendant Department of Health, including—once the Act is in effect—the collection and review of documents submitted by providers under the Act, as well as the suicide prevention programs facilitated by the Suicide Prevention Office and its parent agency, Defendant OMH.

195. An "individual with a disability" is defined under the statute, in pertinent part, as "an individual [who has] a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Qualified" means, with respect to services, a person who meets the essential eligibility requirements for the receipt of such services. 28 C.F.R. § 41.32.

196. Because Plaintiffs Cameron and Hernandez are qualified individuals and Plaintiff organizations have members or constituents who are qualified individuals with disabilities as defined in Section 504, as set forth above, they are also qualified individuals with disabilities under Section of the ACA.

197. Defendants' suicide prevention services in New York are health programs or activities within the meaning of Section 1557 of the ACA and must comply with Section 1557's antidiscrimination requirements. The Medical Boards' regulation of the medical profession and enforcement of rules and laws applicable to medical professionals are health programs or activities within the meaning of Section 1557 of the ACA.

198. Defendants violate Section 1557 of the ACA by offering purported medical "treatment"—assisted suicide—to people with life-threatening disabilities on the basis of disability that they do not offer to others. The Act's rapid pathway to death is a separate, unequal, and less effective way of responding to suicidality, compared with New York's ordinary suicide prevention programs, and hastens deaths that could be avoided for months, years, or even decades.

199. Defendants thus exclude Plaintiffs from participation in, and deny them the benefits of, or otherwise discriminate against them in, Defendants' suicide prevention programs and activities in violation of Section 1557 of the ACA.

200. Furthermore, by carving out participation in the Act from requirements that otherwise apply to physicians responding to suicidal patients, Defendants deny people with life-threatening disabilities the benefits of Defendants' health programs and activities of regulation of the medical profession and quality of medical care in violation of Section 1557 of the ACA.

201. Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs Cameron and Hernandez and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will be discriminated against and denied equal access to the program or activity operated and overseen by Defendants. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to Section 1557 of the ACA.

202. Plaintiffs seek both declaratory relief that the Act violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, and preliminary and permanent injunctive relief barring enforcement of the Act.

**COUNT FOUR**
**Violation of 14th Amendment Equal Protection, 42 U.S.C. § 1983, and
Article I, Section 11 of the New York State Constitution
(Against All Individual Defendants in Their Official Capacities)**

203.     Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

204.     The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of the laws.

205.     Article I, Section 11 of the New York State Constitution also provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

206.     The Act is unconstitutional because it treats people with life-threatening disabilities on unequal terms with similarly situated people without a rational basis or compelling interest.

207.     The Act discriminates against those with life-threatening disabilities, denying protections and safeguards, without any rational basis.  This undermines and interferes with the State's interest in suicide prevention by sanctioning the act of helping someone else kill themselves based on arbitrary designations applied inconsistently.  There is no compelling or even rational basis to treat the lives of people with life-threatening disabilities any different from other groups of people ineligible to participate in the Act who nevertheless share similar concerns as those with such disabilities.  However, under the application of the Act as enacted, those without life-threatening disabilities are not counseled to, and assisted with, killing themselves, but those with such disabilities are.

208.     Further, terminal diagnoses are inherently uncertain.  Those with life-threatening disabilities, deemed "terminal" under the Act, can make full recoveries, heightening the uncertainty of a terminal diagnosis.

209. Because the Act implicates a fundamental right-the right to live-the discrimination warrants a heightened level of review.

210. Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs Cameron and Hernandez and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will be discriminated against through the application of the Act by Defendants. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1983.

211. Plaintiffs seek both declaratory relief that the Act violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and Article I, Section 1 of the New York State Constitution and that the Act is unconstitutional, and preliminary and permanent injunctive relief barring enforcement of the Act, together with attorneys' fees.

**COUNT FIVE**
**Violation of 14th Amendment Due Process, 42 U.S.C. § 1983, and**
**Article I, Section 6 of the New York State Constitution**
**(Against All Individual Defendants in Their Official Capacities)**

212. Plaintiffs reallege and hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

213. The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution provides that no State shall deprive any person of life, liberty, or property without due process of law.

214. Article I, Section 6 of the New York State Constitution also provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws."

215. Substantive Due Process: Plaintiffs Cameron and Hernandez and Plaintiff organizations' constituents and members have a fundamental right under the Due Process Clause

and the New York State Constitution's Due Process Clause to protections and security for their right to live, and this fundamental right cannot be waived without due process. This fundamental right of protection of life is grounded in the nation's history and legal traditions, which have punished or otherwise disapproved of assisting suicide and generally rendered such assistance as a crime. The U.S. Supreme Court recognized in *Washington v. Glucksberg*, 521 U.S. 702, 732 (1997), that assisted suicide laws pose a "risk of harm [that] is greatest for the many individuals in our society whose autonomy and well-being are already compromised by poverty, lack of access to good medical care, advanced age, or membership in a stigmatized social group." The Supreme Court grounded this traditional protection against assisted suicide in "over 700 years" of common law tradition. *Id.* at 711-18.

216. The Act violates the Due Process Clause and the New York State Constitution's Due Process Clause by denying the fundamental interest in the preservation of life to individuals whose doctors diagnose them with life-threatening disabilities and prescribe lethal drugs on that basis.

217. Here, Plaintiffs do not assert a substantive due process right to state-provided suicide prevention. To the contrary, Plaintiffs assert a right to be free from a state-created system that increases the risk of death by suicide through the licensing of medical providers to prescribe lethal medications under a system that withdraws all of the protections that the state normally provides against dangerous medical practices. By enacting and enforcing the Act, Defendants have and will create a danger of state-endorsed suicide by lethal drugs, targeted specifically at the groups of persons with life-threatening disabilities, putting Plaintiffs Cameron and Hernandez and Plaintiff organizations' constituents and members at substantial risk of serious, immediate, and proximate harm. Defendants have acted recklessly and with conscious disregard of the risks of

harm created by the Act's newly enacted system of state-endorsed medical suicide, in a manner that shocks the conscience.

218.    Procedural Due Process: Defendants also violate the Due Process Clause, as elucidated by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Goldberg v. Kelly*, 397 U.S. 254 (1970), and the New York State Constitution's Due Process Clause by failing to include in the Act sufficient safeguards to prevent even the deaths that the Act purports to prevent—those caused by impaired judgment, depression, coercion, undue influence, or fear of medical impoverishment.  Procedural due process considers how much process must be afforded depending on the extent of grievous loss to be suffered and whether the interest in avoiding that loss outweighs the governmental interest.  *Goldberg*, 397 U.S. at 262-63.  *See also* Art. I, § 6 of the New York State Constitution (providing that "[n]o person shall be deprived of life, liberty or property without due process of law").

219.    Here, the private interest is avoidance of suicide caused by impaired judgment, depression, coercion, undue influence, or fear of medical impoverishment.  Such suicides would be "erroneous" under the Act's framework for purposes of due process.  Defendants violate procedural due process because the Act does not do enough to prevent erroneous suicides by (1) allowing a patient to make a request to kill themselves five days in advance (or less in some cases), (2) not requiring an evaluation of a patient's psychiatric or psychological condition, other than their decision-making capacity, despite the strong nexus between life-threatening disabilities, eating disorders, and spinal cord injuries, on the one hand, and depression and suicidality on the other, (3) not making clear whether the prognosis of six months or less takes into account alternative treatment options given that life expectancy prognoses for people with "terminal" disabilities can be inaccurate, for example given that eating disorders are fully treatable, and, with

77

medical treatment, physical therapy, mobility aids, and other supports, people with spinal cord injuries can live long lives and obtain substantial independence and autonomy, (4) requiring a provider to "discuss" alternative options, but not requiring them, the insurer, or the State to make any available to the patient, and (5) not requiring any oversight at the time of ingestion that would confirm whether the patient was coerced, suffering from impaired judgment at the time of ingestion, or whether the patient was even still eligible at the time of ingestion, given the unreliability of life expectancy prognoses.

220. Plaintiffs have no adequate remedy at law, and unless the relief herein is granted, Plaintiffs Cameron and Hernandez and Plaintiff organizations' constituents and members will suffer irreparable harm in that they will continue to be deprived of due process by Defendants. Consequently, Plaintiffs are entitled to injunctive relief and attorneys' fees pursuant to 42 U.S.C. § 1983.

221. Plaintiffs seek both declaratory relief that the Act violates the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution and Article I, Section 6 of the New York State Constitution and that the Act is unconstitutional, and preliminary and permanent injunctive relief barring enforcement of the Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants and each of them, as follows:

A. Declaring that the Act violates Title II of the Americans with Disabilities Act on its face and as applied to people with life-threatening disabilities generally;

B. Declaring that the Act violates Section 504 of the Rehabilitation Act on its face and as applied to people with life-threatening disabilities generally;

C. Declaring that the Act violates Section 1557 of the Affordable Care Act on its face

and as applied to people with life-threatening disabilities generally;

D.      Declaring the Act unconstitutional under the Fourteenth Amendment's Equal

Protection Clause and Article I, Section 11 of the New York State Constitution on

its face and as applied to people with life-threatening disabilities generally;

E.      Declaring the Act unconstitutional under the Fourteenth Amendment's Due Process

Clause and Article I, Section 6 of the New York State Constitution on its face and

as applied to people with life-threatening disabilities generally;

F.      Preliminarily and permanently enjoining Defendants from enforcing the Act; and

G.      Granting such other and further relief as this Court may deem just and proper,

including an award to Plaintiffs of the costs of this suit and reasonable attorneys'

fees and litigation expenses.

Dated:  New York, New York
        June 11, 2026

**ROSEN BIEN GALVAN & GRUNFELD LLP**

Michael W. Bien*
Ernest Galvan*
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Phone:  (415) 433-6830
Email: mbien@rbgg.com |
egalvan@rbgg.com

**HALLORAN FARKAS + KITTILA LLP**

<u>/s/  *Theodore A. Kittila*</u>
Theodore A. Kittila
Jeffrey M. Greilsheimer
600 Third Avenue, 2d Floor
New York, New York  10016
Phone:  (302) 257-2025
Fax:  (302) 257-2019
Email tk@hfk.law | jg@hfk.law

-and-

William E. Green, Jr.*
Timothy S. Spangler, III*
5722 Kennett Pike
Wilmington, Delaware 19807
Phone:  (302) 257-2011
Email:  wg@hfk.law | ts@hfk.law

*Attorneys for Plaintiffs*

*Motion for Admission *pro hac vice* to be filed