IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, NOT DEAD YET, UNITED SPINAL ASSOCIATION, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs*,

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants*.

Case No. ______________

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR**
**<u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

**ROSEN BIEN GALVAN & GRUNFELD LLP**
101 Mission Street, 6th Floor
San Francisco, California 94105

**HALLORAN FARKAS + KITTILA LLP**
600 Third Avenue, 2d Floor
New York, New York 10016

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 5

LEGAL STANDARD .......... 7

ARGUMENT .......... 8

A. Plaintiffs Are Likely to Succeed on the Merits .......... 8

1. The Act Violates the ADA, the Rehabilitation Act, and the ACA .......... 9

2. The Act Violates the Equal Protection Clauses and the Due Process Clauses of the United States Constitution and the New York State Constitution .......... 12

B. Plaintiffs Will Suffer Irreparable Harm if the Act Goes Into Effect .......... 18

C. Public Interest and Balance of Hardships Strongly Favor Plaintiffs .......... 22

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)....................18, 22

*Am. C.L. Union v. Clapper*,
804 F.3d 617 (2d Cir. 2015)....................8

*Arkansas Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987)....................16

*City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985)....................12

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
497 U.S. 261 (1990)....................15

*Doran v. Salem Inn, Inc.*,
422 U.S. 922 (U.S. 1975)....................8

*Goldberg v. Kelly*,
397 U.S. 254 (1970)....................17

*Hamilton v. Westchester Cnty.*,
3 F.4th 86 (2d Cir. 2021) .................... 9-10

*Hejmej v. Peconic Bay Med. Ctr.*,
2022 WL 5429675 (E.D.N.Y. July 5, 2022)....................10

*Heller v. Doe by Doe*,
509 U.S. 312 (1993)....................13

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....................17

*Massachusetts Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976)....................17

*Nken v. Holder*,
556 U.S. 418 (2009)....................8

*Obergefell v. Hodges*,
576 U.S. 644 (2015)....................16

*People v. LaValle*,
817 N.E.2d 341 (N.Y. 2004)....................16

*Reno v. Flores*,
507 U.S. 292 (1993) .......... 16

*Tardif v. City of New York*,
991 F.3d 394 (2d Cir. 2021) .......... 9-10

*Under 21 v. City of New York*,
482 N.E.2d 1 (N.Y. 1985) .......... 12

*Unicon Mgmt. Corp. v. Koppers Co.*,
366 F.2d 199 (2d Cir. 1966) .......... 8

*Vacco v. Quill*,
521 U.S. 793 (1997) .......... 15-16

*Vega-Ruiz v. Montefiore Med. Ctr.*,
2019 WL 3080906 (S.D.N.Y. Jul. 15, 2019) .......... 10

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......... *passim*

**Federal Constitution, Statutes and Rules**

42 U.S.C. § 12101, *et seq.* .......... *passim*

U.S. Const. amend. XIV, § 1. .......... *passim*

Fed. R. Civ. P. 65 .......... 1, 7-8

**New York Constitution and Statutes**

N.Y. Const. art. I, § 6, 11. .......... *passim*

N.Y. Public Health Law § 2899-d, *et seq.* .......... *passim*

N.Y. Mental Hygiene Law § 9.39 .......... 6

N.Y. Mental Hygiene Law § 9.37 .......... 11

**Other Authorities**

*Governor Hochul Signs Medical Aid in Dying Act into New York State Law*, New York State (February 6, 2026), https://tinyurl.com/yke27cp9 .......... 14

Jennifer L. Gaudiani, *Listening and Learning: The Need for a Compassionate and Patient-Centered Approach for Longstanding AN*, 13 J. of Eating Disorders 81 (2025), https://tinyurl.com/4fyd6ekh .......... 13-14

Jennifer L. Gaudiani et al., *Terminal Anorexia Nervosa: Three Cases and Proposed Clinical Characteristics*, 10 J. of Eating Disorders 23 (2022), https://tinyurl.com/yyhb9axf ........ 13-14

*Suicide Prevention*, Office of Mental Health, https://tinyurl.com/3c3c6kfd (last visited June 2, 2026) ........................................................................................................................11

*Unified Court System of New York State*, HigherGov, https://tinyurl.com/ms3c8epy (last visited June 2, 2026) ........................................................................................................12

Plaintiffs submit this opening brief in support of their Motion for a Temporary Restraining Order (the "Motion") pursuant to Fed. R. Civ. P. 65 seeking to enjoin Defendants from further implementing and enforcing New York's Medical Aid in Dying Act, N.Y. Public Health Law § 2899-d, *et seq.* (the "Act"). The Act—which is scheduled to go into effect on August 5, 2026—violates the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), Section 1557 of the Affordable Care Act ("ACA"), and the Equal Protection Clauses and the Due Process Clauses of the U.S. and New York State Constitutions. As described herein, unless enforcement of the Act is enjoined, Plaintiffs and Plaintiff organizations' constituent members will be placed in immediate risk of irreparable harm.

## **PRELIMINARY STATEMENT**

Plaintiffs José Hernandez and Anita Cameron—two of the ten Plaintiffs in this suit—are disabled New Yorkers. Mr. Hernandez experienced a C5 spinal cord injury, and as a result is paralyzed from the neck down with limited movement in his arms and no movement below his shoulders. *See* Declaration of Plaintiff José Hernandez in Support of Plaintiffs' Motion for Temporary Restraining Order ("Hernandez Dec.") at ¶ 2.[1] His disabilities limit his capacity for breathing, and he has no control of his diaphragm. *Id.* at ¶ 4. This makes coughing very difficult for him. *Id.* Mr. Hernandez states that when he is congested, "it can make me like I am drowning." *Id.* Mr. Hernandez needs 24-hour daily care, and he needs help dressing, showering, brushing his teeth, toileting, cooking, and eating. *Id.* at ¶ 5. Without help with these tasks, he would not be able to do any of these things, and he would die of starvation. *Id.*

[1] Declarations from each of the Plaintiffs—Anita Cameron ("Cameron Dec."), Brooklyn Center for Independence of the Disabled ("BCID Dec."), United Spinal Association ("United Spinal Dec."), National Council on Independent Living ("NCIL Dec."), Not Dead Yet ("NDY Dec."), and Institute For Patients' Rights ("IPR Dec."), Self-Initiated Living Options, Inc. ("SILO Dec."), and Independent Living Center of Hudson Valley ("ILCHV Dec.")—are submitted herewith.

Plaintiff Anita Cameron has been diagnosed with degenerative multiple sclerosis, degenerative congenital cerebellar ataxia, spinal stenosis, type-2 diabetes, high blood pressure, high cholesterol, lung masses, autism, depression, dysthymia, and seasonal affective disorder. Cameron Dec. ¶ 2. She has noted that as a black woman with disabilities, she has experienced significant medical discrimination and has suffered from some of the worst medical treatment possible. *Id.* at ¶ 5. She has depression and has considered suicide in the past, and she worries that she will be forced into a nursing home and coerced into assisted suicide once the law goes into effect. *Id.* at ¶ 8.

Mr. Hernandez has similar concerns: based on discrimination that he has experienced, Mr. Hernandez has stated, "I know that I have be on guard and always ready to advocate for myself. A scenario where I am unable to advocate for myself—either from depression or otherwise—terrifies me." Hernandez Dec. ¶ 6. As Ms. Cameron stated, "I fear I will be denied care by my insurance or steered into physician-assisted suicide because it is cheaper or more efficient for me to simply not receive adequate care.… The Act devalues people like me. I have led a full life despite my disability. The Act tells people like me that they should qualify for suicide help, not suicide prevention." Cameron Dec. ¶¶ 8-9.

The Act is scheduled to go in effect in less than two months. The Act will allow New York physicians to prescribe New York patients drugs—not to alleviate pain or suffering—but to cause the patient's death and intentionally facilitate suicide. The Act does not require any treatment by a mental health professional for serious mental illness, depression, or treatable suicidality, all of which are necessary for informed consent and a truly autonomous choice before the lethal prescription is written. To the contrary, the Act pays lip service to the concern that vulnerable people are at risk by only requiring that a mental health professional evaluate whether the patient

can provide consent, not for the purpose of assessing the underlying but treatable mental health conditions driving the request. Moreover, the physician need not have expertise with the patient's specific illness or condition and need not be trained on mental health symptoms or side effects associated with the patient's illness or treatment. Instead, the patient simply needs to have what the physician determines is a "terminal" condition to qualify for physician-assisted death.

The Act, on its face, is inherently discriminatory. Plaintiffs, people with life-threatening disabilities and organizations that represent and advocate for people with life-threatening disabilities, belong to a class of protected individuals who are at immediate risk of irreparable harm if the Act is allowed to go into effect. Under the Act, persons who have a "terminal illness" (defined at N.Y. Public Health Law § 2899-d(17), as "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided") satisfy the precondition for access to assisted suicide under New York law. Such persons are, by definition, disabled.

The impact on Plaintiffs is profound: The Act creates a bifurcated scheme where Plaintiffs Hernandez and Cameron, and organizational Plaintiffs' constituent members, as well as similarly-situated persons, are automatically qualified for assisted suicide, whereas the non-disabled are presumptively not qualified for assisted suicide. Plaintiffs' constituent members are immediately imperiled by the Act. Assisted suicide under the Act violates federal disability rights laws and federal and state constitutional guarantees of due process and equal protection. These laws protect people with disabilities from discrimination, exclusion, and life-threatening state action. Even though a public entity may not withhold services or make services available on unequal terms based on disability, the Act does just that—placing persons with disabilities in a highly vulnerable position.

Defendants fund, oversee, and operate public health, social services, and medical regulations to provide protective services for people who express suicidality, and to prevent medical professionals, caregivers, family members, and others from taking advantage of, or encouraging, a person's impulse for self-harm or suicide. The Act poses a grave risk of harm to all persons who rely on the support of public health and social services, as well as on the objectivity and integrity of the medical and nursing professions.

The Act violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and Article I, Section 11 of the New York State Constitution, New York's Equal Protection Clause, by treating people with life-threatening disabilities differently from everyone else who expresses a wish to die to their physician. The Act also violates the Due Process Clause of the U.S. Constitution and the New York State Constitution. Even though the Act cannot survive strict scrutiny, the law would not pass muster even if the Court were to apply rational basis scrutiny (which it should not). The Act does not reasonably advance a legitimate state interest, much less its claimed purposes of enabling autonomous choices in dying and relieving suffering. The Act's "terminal" classification is arbitrary and inconsistent with medical reality, given that medical professionals often misdiagnose patients as having terminal diseases, physicians' prognoses of six months to live are often fallible (as are most guesses) and the "terminal" classification includes people who can live a longer life span with treatment and support. This includes individuals who have spinal cord injuries, eating disorders, and other disabilities, such as diabetes, that are treatable, yet who would be labeled as having a "terminal" condition under the Act. The Act's very purpose and core requirement—providing an early death to someone who is predicted to die from a terminal illness within six months—is irrational, unreliable, and discriminatory.

Finally, the Act lacks the safeguards needed to protect people with life-threatening disabilities from self-inflicted death caused by impaired judgment, depression, and undue influence by others. Despite established medical knowledge that those with life-threatening disabilities are at greater risk of depression and suicidal ideation, there is no requirement for a mental health evaluation or any oversight to ensure judgment is not impaired at the time of ingestion. The TRO must issue.

## STATEMENT OF FACTS

The Act will become effective on August 5, 2026. Once in effect, the law will allow the dispensing of lethal drugs to a patient who makes one oral request and one written request to the patient's attending physician. N.Y. Public Health Law § 2899-e. Before providing the lethal drugs, the physician must confirm the patient has a "terminal illness," which is "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided" (N.Y. Public Health Law § 2899-d(17)), the patient has "voluntarily" requested the drugs, the patient has "decision-making capacity," and the patient has made an informed decision. N.Y. Public Health Law § 2899-f. The Act always requires that the patient must be referred to a mental health profession for a competency determination. N.Y. Public Health Law § 2899-i. The attending physician is supposed to refer the patient to a consulting physician to confirm the patient's terminal diagnosis and to a mental health professional to determine whether the patient possesses decision-making capacity, and that the patient is making a voluntary, informed choice. N.Y. Public Health Law § 2899-h. The attending and consulting physicians need not even ever see the patient in person, as the Act does not prohibit physicians from examining, evaluating, and prescribing lethal drugs to patients remotely.

While the Act does require that a person seeking assisted suicide must be evaluated by a

mental health professional, the Act does not require a full mental health assessment for the patient seeking assisted suicide. The mental health professional's role is limited to a capacity determination. N.Y. Public Health Law § 2899-i. The Act assumes a request for assisted suicide is not itself an indication of a mental disorder, despite the fact that other New York laws make precisely the opposite assumption for virtually everyone without a terminal illness. *See, e.g.*, N.Y. Mental Hygiene Law § 9.39 (defining "Likelihood to result in serious harm" to include "threats of or attempts at suicide").

In determining whether a person's condition meets the definition of "terminal illness," the Act has no requirement that the attending or consulting physician consider the efficacy of treatments, counseling, or other supports on survivability. N.Y. Public Health Law § 2899-d(17). People who would otherwise survive beyond six months if provided treatment or other supportive services are eligible for assisted suicide regardless of whether those treatments or supports are denied by their insurance company, refused, or are not available. As a result, patients with conditions that would not be considered "terminal" if treated—such as spinal cord injuries, diabetes, complications from falls, hernias, eating disorders, and kidney disorders requiring dialysis—qualify for assisted suicide under the Act. In addition, the law permits patients to qualify for assisted suicide by declining treatment that would likely extend their lives, such as kidney dialysis, insulin, or even food and water. The Act goes so far as to permit a patient with no physical illness to qualify for assisted suicide, such as a person with "terminal" anorexia who refuses food and water.

The Act fails to require that Defendants provide and that prospective patients meaningfully consider, exhaust, or knowingly reject less irrevocable alternatives to assisted suicide, such as suicide prevention services, palliative or hospice care, medical and nursing support services, or

any other personal support services. Although the Act directs physicians to advise the patient of alternative treatment options, the requirement is only to "discuss[]" what is "feasible," not to actually offer options other than suicide. N.Y. Public Health Law § 2899-f(1)(e). Similarly, the Act requires physicians to advise the patient of the risks and results associated with taking the lethal drug(s), and to confirm the patient's decision is not the result of coercion or undue influence, but the Act sets forth no uniform standard to determine what constitutes coercion or undue influence. *Id.*

The Act mandates a system of bad incentives that make it impossible to deter abuse. For example, the Act permits "physician shopping," such that if one physician deems the patient ineligible, the patient is free to contact other physicians until they find one who will deem them qualified for assisted suicide. The Act lacks any independent oversight for a physician's decision to approve an assisted suicide request. Moreover, while the Act requires that the patient self-administer the drugs, it does not require independent oversight at the time of administration. N.Y. Public Health Law § 2899-l. The Act then compels coroners to falsify the cause of death: rather than accurately identify the cause of death as suicide, a coroner is statutorily required to instead list the putative "terminal illness." In addition to compelling coroners to falsify official records, this provision is designed to hide information regarding the occurrence and rate of assisted suicide by ensuring such information never exists. To ensure that abuse is never discovered or deterred, assisted suicide "shall not be construed for any purpose to constitute suicide, assisted suicide, attempted suicide, promoting a suicide attempt, euthanasia, mercy killing, or homicide." N.Y. Public Health Law § 2899-n(1)(b).

## LEGAL STANDARD

A temporary restraining order ("TRO") may be granted without notice where it is "clearly show[n] that immediate and irreparable injury, loss, or damage will result to the movant before the

adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction. *See Am. C.L. Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015). In determining whether the entry of a TRO is warranted, Plaintiffs must demonstrate:

> (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest

*Id.* (numbering added). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

No one factor will determine whether the Court will enter a TRO; all of the elements must be weighed. *See Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2d Cir. 1966). Under this sliding scale, the greater balance of the harms tips in favor of the moving party, the less strongly the moving party must show its likelihood of prevailing on the merits. *See id.* Further, the threat of irreparable harm does not automatically trigger injunctive relief. But irreparable harm may warrant injunctive relief if harm threatens to moot a case, because "otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (U.S. 1975). The severity and permanence of the injury are very relevant to the balance of the harms analysis. Where a TRO is the only way to prevent the death of a party, failure to grant the injunction threatens to moot the case and make any future remedy, no matter how extreme, insufficient to remedy the party's irreparable harm.

## ARGUMENT

### A. Plaintiffs Are Likely to Succeed on the Merits.

The first factor of the TRO analysis requires Plaintiffs to establish their likelihood to succeed on the merits. As discussed below, the Act violates the ADA, the Rehabilitation Act, the

ACA, the Equal Protection Clauses of the Fourteenth Amendment and the New York State Constitution, and the Due Process Clauses of the U.S. Constitution and the New York State Constitution. Any of these violations alone are sufficient for a finding that Plaintiffs are likely to succeed on the merits.

**1. The Act Violates the ADA, the Rehabilitation Act, and the ACA.**

The ADA provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination." 42 U.S.C. § 12132. The ADA defines "a qualified individual with a disability" as a person who has a "physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §§ 12102(1)(A), (2)(A), 12131(2). The ADA further defines "major life activities" to include: "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). "The definition of 'disability' . . . shall be construed in favor of broad coverage . . . to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. § 12102(4)(A). Similar to the ADA, the Rehabilitation Act provides "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …."

To state a claim under either the ADA or the Rehabilitation Act, plaintiffs must demonstrate: "(1) that she is a qualified individual with a disability; (2) that she was excluded from

participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021)). Claims under either the ADA or the Rehabilitation Act are analyzed similarly, except under the Rehabilitation Act, the plaintiff must also show that the program in question received federal dollars. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) ("Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, "we treat claims under the two statutes identically.'"). Disability-discrimination claims under the Affordable Care Act " are typically analyzed identically to Rehabilitation Act Section 504 claims" unless the relevant regulations relevant to the claims differ. *Hejmej v. Peconic Bay Med. Ctr.*, 2022 WL 5429675, at *9 (E.D.N.Y. July 5, 2022) (citing *Vega-Ruiz v. Montefiore Med. Ctr.*, 2019 WL 3080906, at *3, n. 3 (S.D.N.Y. Jul. 15, 2019)).

As described in the accompanying declarations, Plaintiffs José Hernandez and Anita Cameron and other Plaintiff organizations' members are qualified individuals with disabilities. *See* Compl. ¶¶ 17-65. In addition to Plaintiffs Hernandez and Cameron, Plaintiffs Brooklyn Center for Independence of the Disabled ("BCID"), United Spinal Association ("United Spinal"), National Council on Independent Living ("NCIL"), Not Dead Yet ("NDY"), Institute for Patients' Rights ("IPR"), Regional Center for Independent Living ("RCIL"), Self-Initiated Living Options, Inc. ("SILO"), and Independent Living Center of Hudson Valley ("ILCHV") are similarly disability rights organization who likewise have members or represent persons having disabilities that substantially limit one or more major life activities including the operation of a major bodily function, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,

standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *See* BCID Dec. ¶¶ 3, 8; Hernandez Dec. ¶¶ 2, 4; Cameron Dec. ¶ 2; United Spinal Dec. ¶¶ 4, 6; NCIL Dec. ¶ 6; NDY Dec. ¶¶ 4, 6; IPR Dec. ¶¶ 4, 6; RCIL Dec. ¶¶ 3, 8; SILO Dec. ¶¶ 3, 8; ILCHV Dec. ¶¶ 3, 8. *See also* Compl. ¶¶ 17-65.

New York has initiated suicide prevention programs and initiatives. New York was the first state in the nation to put in place the Attempted Suicide Short Intervention Program (ASSIP), which has been shown to reduce new suicide attempts by previous attempt-survivors. *See Suicide Prevention*, Office of Mental Health, https://tinyurl.com/3c3c6kfd (last visited June 2, 2026). New York also implements the Zero Suicide Initiative, the CARES UP initiative, and Capital Connect to reduce suicide risk for New Yorkers. *Id.*[2]

The Act, by contrast, puts the imprimatur of the State on suicide, and even provides immediate access to the lethal means, but only for persons with disabilities as long as those disabilities fit into the Act's broad definition of "terminal illness." The Act undermines the assumptions, concepts, values, and practices of New York's suicide prevention scheme and replaces it with an alternative and inherently discriminatory scheme where persons with a "terminal illness" under the Act can be steered toward assisted suicide. Once a person is labeled as "terminal" (even if the pathology or condition is self-caused, treatable, or later discovered to not be terminal), the Act removes the safeguards surrounding New York's suicide prevention programs. Instead of protecting such individuals, the Act automatically removes all the usual

[2] New York law also provides for the involuntary commitment of persons who are suicidal for up to seventy-two hours without judicial process and potentially indefinitely with regular hearings. *See* N.Y. Mental Hygiene Law § 9.37. Plaintiffs support voluntary mental health treatment and services that are comprehensive, community-based, recovery-oriented, and culturally and linguistically competent. Nothing in this motion should be construed as recommending or supporting involuntary treatment of any kind.

protections for everyone else by effectively providing liability immunity—criminal, civil, and professional—for medical professionals who assist with suicide.

In short, a "terminal illness," as defined in the Act, is itself a qualified disability, and is the only distinguishing factor between persons whose self-inflicted death the State tries to prevent and persons who are statutorily permitted to acquire professional help to kill themselves. Because Plaintiffs Hernandez and Cameron and Plaintiff organizations' constituent members are being discriminated against by virtue of their disability, the Act violates the ADA, the Rehabilitation Act, and the ACA.[3]

**2. The Act Violates the Equal Protection Clauses and the Due Process Clauses of the United States Constitution and the New York State Constitution.**

The Equal Protection Clause of the Fourteenth Amendment provides that no State may deny any person within its jurisdiction the equal protection of its laws. Article I, Section 11 of the New York State Constitution similarly provides, "No person shall be denied the equal protection of the laws of this state or any subdivision thereof." *Under 21 v. City of New York*, 482 N.E.2d 1, 8 (N.Y. 1985) ("We have held that the State constitutional equal protection clause … is no broader in coverage than the Federal provision…."). The Equal Protection Clause requires "persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). A "classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational" is improper. *Id.* at 446.

[3] New York's suicide prevention system is supported by federal funding. New York has received $650,000 from the federal government by way of New York's E-Connect: Enhancing Behavioral Health Referral and Treatment for Family Court Youth in Suffolk County project, which aims to address the critical issue of suicidal behavior and behavioral health needs among justice-involved youth. *See Unified Court System of New York State*, HigherGov, https://tinyurl.com/ms3c8epy.

When a law implicates a fundamental right, such as the right to life, the law is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest. *Heller v. Doe by Doe*, 509 U.S. 312 (1993) ("Classifications neither involving fundamental rights nor proceeding along suspect lines do not run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and a legitimate governmental purpose."). Otherwise, the law must be rationally related to a legitimate interest. It passes neither standard.

The Act discriminates between those who have a "terminal illness," *i.e.*, people with life-threatening disabilities, and those who do not have a "terminal illness." This two-tier scheme is particularly suspect because the definition of "terminal illness" under the Act is so broad as to have no limiting factor. Under the Act, "terminal illness" is "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided." N.Y. Public Health Law § 2899-d(17). Plaintiffs Hernandez and Cameron, and Plaintiff organizations' members—because of their disabilities—fit squarely within the definition of persons with a "terminal illness." *See, e.g.*, BCID Dec. ¶¶ 3, 8; Hernandez Dec. ¶ 5; Cameron Dec. ¶ 2; United Spinal Dec. ¶¶ 4, 6; NCIL Dec. ¶ 8; NDY Dec. ¶¶ 4, 6; IPR Dec. ¶¶ 4, 6; RCIL Dec. ¶¶ 3, 8; SILO Dec. ¶¶ 3, 8; ILCHV Dec. ¶¶ 3, 8.

Even if the law were not facially discriminatory as written, the law suffers from a further pernicious effect: the definition of "terminal" is at best amorphous. In fact, despite struggling to define what constitutes a terminal illness, some medical literature has steadily sought to expand the definition. For example, in a 2022 article, Jennifer L. Gaudiani and colleagues argued there should be a new category of anorexia called "terminal anorexia" because, according to Dr. Gaudiani, the refusal of food by certain people with anorexia will eventually cause death by

malnutrition.[4] The Act's definition of terminal illness includes illnesses that, if left untreated, will cause death, even if treatment makes the disease no longer deadly. This is because a condition can be incurable, such as certain spinal cord injuries, but still treatable to be made non-fatal. Under the Act, those conditions, and many others that can be treated and managed, are encompassed by the definition of "terminal illnesses."

Because the Act implicates the fundamental right to life, it is subject to strict scrutiny and must be "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). New York has no state interest in assisting suicide. Although the state interest purportedly touted by New York is the ability for terminally ill persons "to endure less suffering, not by shortening their lives, but by shortening their deaths,"[5] the U.S. Supreme Court rejected this as a state interest:

> [O]ur laws have consistently condemned, and continue to prohibit, assisting suicide. Despite changes in medical technology and notwithstanding an increased emphasis on the importance of end-of-life decisionmaking, we have not retreated from this prohibition.

*Washington v. Glucksberg*, 521 U.S. at 720. Moreover, in reviewing the similarly described state interest ("whether there is a liberty interest in determining the time and manner of one's death,"

[4] Jennifer L. Gaudiani *et al.*, *Terminal Anorexia Nervosa: Three Cases and Proposed Clinical Characteristics*, 10 J. of Eating Disorders 23 (2022), https://tinyurl.com/yyhb9axf. Dr. Gaudiani in a later article defended her position and recognized that "[t]he vast majority of patients with eating disorders recover" and those that do not recover are those that do not recover are those that "consistently refuse treatment." Jennifer L. Gaudiani, *Listening and Learning: The Need for a Compassionate and Patient-Centered Approach for Longstanding AN*, 13 J. of Eating Disorders 81 (2025), https://tinyurl.com/4fyd6ekh. Notably, even Dr. Gaudiani, one of the leading voices in the assisted suicide movement, recognizes "[d]ecision-making capacity … must be considered throughout this process [and] [e]xperts in decision-making capacity should conduct competency assessments …." and recognizes that, unless those experts are versed in the specific class of illness, they "might miss specific evidence of incapacitation." *Id.* at 3.

[5] *Governor Hochul Signs Medical Aid in Dying Act into New York State Law*, New York State (February 6, 2026), https://tinyurl.com/yke27cp9.

"the right to choose a humane, dignified death," or "a right to die," *id.* at 722), the Supreme Court held:

> we are confronted with a consistent and almost universal tradition that has long rejected the asserted right, and continues explicitly to reject it today, even for terminally ill, mentally competent adults. To hold for respondents, we would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State.

*Id.* at 723. Ironically, even the State of New York still criminalizes the act of assisting suicide. *See* NY Penal Law § 120.30. There is no right to die. Instead, the contrary is true: there is an unqualified interest in the preservation of life. Even if the State of New York had a cognizable interest in assisting suicide—which it does not—the Act is not narrowly tailored to this interest. The Act classifies anyone with a "terminal illness" as capable of requesting assisted suicide, sweeping in persons with long-term disabilities who would be stable with continued medical support, but will die quickly without it. While supporters of assisted suicide assert a state interest in relieving pain and suffering at the end of life, it does nothing to assist in true palliative care—sweeping far more broadly than this narrowly asserted interest.

In *Glucksberg*, the Supreme Court noted, "[T]he State has an interest in protecting vulnerable groups—including the poor, the elderly, and disabled persons—from abuse, neglect, and mistakes." *Glucksberg*, 521 U.S. at 731. Despite efforts by some to label concerns about "disadvantaged persons" being "pressured into physician-assisted suicide as 'ludicrous on its face,'" the Supreme Court "recognized … the real risk of subtle coercion and undue influence in end-of-life situations." *Id.* at 731-32 (citing *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 281 (1990)). The Supreme Court further held, "The State's interest here goes beyond protecting the vulnerable from coercion; it extends to protecting disabled and terminally ill people from prejudice, negative and inaccurate stereotypes, and 'societal indifference.'"

*Glucksberg*, 521 U.S. at 732. *See also Vacco v. Quill*, 521 U.S. 793 (1997) (refusing to find that New York prohibition on assisting suicide violates the Equal Protection Clause).

The Act also violates the Due Process Clauses of the U.S. Constitution and the New York State Constitution for the same reason. The Due Process Clause of the Fourteenth Amendment provides "[n]o State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The New York State Constitution's Due Process Clause (Art. I, § 6) is "construed … to provide greater protection than its federal counterpart." *People v. LaValle*, 817 N.E.2d 341, 364 (N.Y. 2004).

The Due Process Clause of the Fourteenth Amendment contains both substantive and procedural rights. The Supreme Court stated the substantive protection of the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720. First, the Court must determine whether the burdened right is fundamental. These are "rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720-21 (citation omitted). "The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights." *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015). If the asserted interest is "fundamental," the challenged legislation is subject to strict scrutiny. *Glucksberg*, 521 U.S. at 721.

To pass strict scrutiny, legislation must be "narrowly tailored to serve a compelling state interest." *Id.* (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). Not all state interests are compelling. *See, e.g.*, *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) (holding the State has an important interest in raising revenue through taxation but did not have a compelling state interest in selective taxation of the press). If the Court finds a fundamental right is not implicated, there must be a rational relationship to a legitimate government interest. The Act

violates the Due Process Clause because it burdens the fundamental right of life. As the Supreme Court in *Glucksberg* held, "[O]ur decisions lead us to conclude that the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause." 521 U.S. at 728. Without a compelling state interest, the Act violates the Due Process Clause of the Fourteenth Amendment.[6]

The Act also violates procedural due process. The Due Process Clause of the Fourteenth Amendment and the New York Constitution require laws to include safeguards to protect people with life-threatening disabilities from self-inflicted death caused by impaired judgment, depression, and undue influence by others. *See Glucksberg*, 521 U.S. at 731-32. The procedural due process analysis considers (1) the private interest affected by the state action; (2) "the risk of an erroneous deprivation" of the interest through the current procedures and any value of additional safeguards; and (3) the government's interest and the burden of additional safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

How much process must be afforded depends on "the extent to which [the plaintiff] may be condemned to suffer grievous loss … and depends upon whether the [plaintiff's] interest in avoiding that loss outweighs the governmental interest in summary adjudication." *Goldberg v. Kelly*, 397 U.S. 254, 262-63 (1970) (internal citations omitted). The private interest affected by the Act is the life of disabled individuals who qualify as having a "terminal illness" under the Act.

---

[6] Even if the Court were to apply a rational basis scrutiny, the Act would not pass muster. To satisfy rational basis review, Defendants would need to demonstrate "rationally related to furthering a legitimate state interest." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Here, there is no legitimate state interest to assisted suicide, and the Act does not advance this purpose. The state's asserted interest in improving end-of-life care is not served by providing lethal medications.

The Act has a high risk of erroneous deprivation. Under the Act, lethal drugs may be dispensed to a patient who makes one oral request and one written request to the patient's attending physician.

There is a high risk of error when, after only one oral request and a written request, a physician is permitted to find a patient terminal and prescribe lethal medications. Additional safeguards such as oversight to ensure patients are not impaired at the time of injection, and placing ***all*** persons who are suicidal in the already-established anti-suicide programs to prevent those with mental illnesses or temporary suicidal ideation from killing themselves—especially when the Act permits those who are not truly terminal to kill themselves—would decrease the risk of erroneous deprivation.

The public interest factor favors Plaintiffs because "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). Thus, the State has no countervailing interest. Further, the burden of additional safeguards is low. New York already has robust anti-suicide programs that it effectively offers to all suicidal persons who are deemed to be a harm to themselves. The Act seeks to change that system and carve out a subsection of the population. New York, since it already operates this program effectively, reinserting the population the Act seeks to remove would not be a substantial burden.

### B. Plaintiffs Will Suffer Irreparable Harm if the Act Goes Into Effect.

Death is irreparable harm. After a patient has taken his own life under the Act, there is no opportunity to cure any procedural misstep in the provision of the lethal drugs, and the assisted suicide, by statutory definition, "does not, for any purpose, constitute elder abuse, suicide, assisted-suicide, homicide, or euthanasia." Plaintiffs Hernadez and Cameron and Plaintiff organizations' constituent members face the threat of irreparable harm under the Act. *See, e.g.*, BCID Dec. ¶ 8;

Hernandez Dec. ¶ 6; Cameron Dec. ¶ 5; United Spinal Dec.¶ 10; NCIL Dec. ¶ 8; NDY Dec. ¶ 6; IPR Dec. ¶ 8; RCIL Dec. ¶ 8; SILO Dec. ¶ 8; ILCHV Dec. ¶ 8

The rapid expansion of government-sponsored suicide in other jurisdictions shows what will happen in New York if this law is allowed to take effect. In Canada, for example, where 5% of all deaths are now caused by physician-assisted suicide (8% in some provinces), patients with conditions such as quadriplegia, multiple sclerosis, blindness, and chronic back pain have been found eligible and died under Canada's assisted suicide law. Canada's law was originally similar to the Act in that it required terminal illness with a reasonably foreseeable likelihood of death in the near future. The inexorable logic of such laws, however, is that the requirement of imminent death is found to be unrelated to the purported interest in avoiding pain and discomfort, and Canada removed the imminent death requirement in 2021. Among the recent deaths under Canada's law are people who cited poverty and lack of social supports as the reasons for wanting to die. *See* Elaina Plott Calabro, *Canada is Killing Itself*, THE ATLANTIC, Aug. 11, 2025, at 28.

Plaintiffs' constituent members would be permitted under the Act to kill themselves with State-endorsed lethal drugs, without the benefit of New York's robust anti-suicide programs. Plaintiffs' constituent members are at risk of being removed from consideration for New York's anti-suicide programs. As the U.S. Supreme Court recognized in *Glucksberg*, there is a "real risk of subtle coercion and undue influence in end-of-life situations." 521 U.S. at 732. The threat is real and "a seriously disabled person's suicidal impulses should be interpreted and treated the same way as anyone else's." *Id.*

Each of the organizational Plaintiffs faces the risk of irreparable harm to core business activities, as attested to in the attached declarations. BCID—a Brooklyn based cross-diability, grassroots organization run by and for people with disabilities—the effect of the Act is profound

on the approximately 1,300 participants whom it advises and works with. BCID Dec. ¶ 3. BCID has been in business since 1956 offering independent living skills training, transitional support, housing support services, all with the goal of helping disabled people in Brooklyn (and beyond) live independently in the community. *Id.* at ¶ 5. The Act threatens this, forcing BCID to "devote considerable resources to help its members counter the systematic pressure to 'take the easy route.'" *Id.* at ¶ 6. The threat here "is not a mere diversion of resources; it is an existential threat to BCID's participants." *Id.* at ¶ 7. "As a result of being perceived and labeled as terminally ill by their medical care providers, some of BCID's members will qualify for assisted suicide under the Act and are particularly vulnerable to being steered towards assisted suicide in a state of despair or depression." *Id.* at ¶ 8. Particularly pertinent is the fact that "[u]pon information and belief, BCID participants in New York have discussed and considered accessing lethal medications and/or committing suicide by means of the Act. The Act places BCID's members at risk of dying by offering the option of assisted suicide during a period of treatable depression and difficulty." *Id.*

RCIL is a non-profit with offices in Geneva and Rochester, New York, founded in 1966 that provides services by and for people with disabilities and which has over 5,000 active members. *See* Complt. ¶ 44; RCIL Dec. ¶¶ 3-4. Co-Plaintiff Anita Cameron is an RCIL member who would qualify for assisted suicide under the Act. RCIL Dec. ¶ 8. RCIL has stated that the Act is "already harming RCIL's ability to engage in its core business activities," which include protecting people with disabilities from the involuntary withholding of life-sustaining medical treatment and medical rationing. *See* Complt. ¶ 46; RCIL Dec. ¶ 6. RCIL will spend over $100,000 establishing the Live On Campaign, which counteracts the insidious message that disabled people should simply "give up." *See* Complt. ¶ 47; RCIL Dec. ¶ 6. Similar to BCID, RCIL is aware on information and belief that certain RCIL members in New York have discussed and considered accessing assisted suicide

under the Act. RCIL Dec. ¶ 8.

Plaintiff SILO is a non-profit, cross-disability, grassroots organization based in Suffolk County, New York, that provides services by and for people with disabilities and has around 20,000 active clients. *See* Complt. ¶ 36; SILO Dec. ¶¶ 3-4. Silo noted that it "faces daily challenges with serving its clientele.… A system that steers people towards assisted suicide is a danger to SILO and its clientele." SILO Dec. ¶ 7. The Act undermines the effectiveness of the programs and services SILO provides. *See* Complt. ¶ 37; SILO Dec. ¶ 6. This harms SILO's core business activities because SILO will need to hire additional individuals to navigate the complexities of the Act when counseling SILO's clients. *See* Complt. ¶¶ 38-39; SILO Dec. ¶ 6. SILO is aware that some of its clients "will qualify for assisted suicide under the Act and are particularly vulnerable to being steered towards assisted suicide in a state of despair or depression." SILO Dec. ¶ 8. Moreover, SILO is aware that certain of its clients "have discussed and considered accessing lethal medications and/or committing suicide by means of the Act." *Id.*

Plaintiff ILCHV is a non-profit based in New York's Hudson Valley since 1987, that provides services by and for people with disabilities and has around 1,000 active clients. *See* Complt. ¶ 40; ILCHV Dec. ¶¶ 3-4. As ILCHV notes, "When scarce community resources that enable people with disabilities to live in the community are increasingly more difficult to access, as they are now, people with disabilities suffer, become despondent and more amenable to the 'choice' of assisted suicide." *See* Complt. ¶ 42; ILCHV Dec. ¶ 6. This harms ILCHV's core business activities because ILCHV needs to spend additional time and resources to navigate the complexities of the Act when counseling clients. *See* Complt. ¶ 43; ILCHV Dec. ¶ 6. ILCHV noted that they "have a close relationship with our members," and that they have "serious concerns that certain ILCHV members will be steered towards suicide help (and not suicide prevention)

based on their disability once the Act comes into effect." ILCHV Dec. ¶ 8.

As to United Spinal, NCIL, NDY, and IPR, they are national disability rights organizations that advance the rights of people with disabilities to live free from pressure from a medical care system grounded in the misconception that people with disabilities are leading lives not worth living. *See* Complt. at ¶¶ 48-65. The Act harms the mission of these Plaintiff organizations by exposing persons with disabilities to a State-sponsored system of premature death by suicide, exclusively for persons with disabilities, in the case of so-called "terminal" disabilities, including treatable problems such as eating disorders. *See id.*

Again and again for these organizational Plaintiffs, the Act represents not a mere diversion of resources, but also an existential threat. *See, e.g.*, ILCHV Dec. ¶ 7; RCIL Dec. ¶ 7; BCIL Dec. ¶ 7.

### C. Public Interest and Balance of Hardships Strongly Favor Plaintiffs.

The remaining two factors also strongly favor injunctive relief. The public interest favors Plaintiffs, because "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020).

The balance of hardships also strongly favors Plaintiffs. Plaintiffs have demonstrated they are suffering a deprivation of their statutory and constitutionally protected rights. Plaintiffs and their constituent members are being immediately classified as "terminal" under the terms of the Act, placing them at undue risk. Enjoining enforcement of the Act while the Court reviews the pernicious impact of the legal changes has little to no impact on the Defendants.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request the Court exercise its equitable power by granting the relief requested in the accompanying motion and proposed order.

Date: June 11, 2026


*Of Counsel:*

Ernest J. Galvan*
Michael W. Bien*
**ROSEN BIEN GALVAN & GRUNFELD LLP**
101 Mission Street, Sixth Floor
San Francisco, CA 94105
Tel: (415) 433-6830
Fax: (415) 433-7104
Email: egalvan@rbgg.com
mbien@rbgg.com

*Motion *pro hac vice* forthcoming

*/s/ Theodore A. Kittila*
Theodore A. Kittila
Jeffrey M. Greilsheimer
**HALLORAN FARKAS + KITTILA LLP**
600 Third Avenue, 2d Floor
New York, New York 10016
Phone: (302) 257-2025
Fax: (302) 257-2019
Email: tk@hfk.law | jg@hfk.law

-and-

William E. Green, Jr.*
Timothy S. Spangler, III*
5722 Kennett Pike
Wilmington, Delaware 19807
Tel: (302) 257-2011
Fax: (302) 257-2019
Email: wg@hfk.law | ts@hfk.law

*Counsel for Plaintiffs*

**CERTIFICATION OF WORD COUNT COMPLIANCE**

I hereby certify pursuant to Local Civil Rule 7.1(c) that the foregoing Memorandum of Law contains 7,287 words (excluding the caption, table of contents, table of authorities, and signature block), and that I have relied upon Microsoft Word's word count for purposes of this certification.

*/s/ Theodore A. Kittila*
Theodore A. Kittila