IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, *et al.*,

*Plaintiffs*,

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, *et al.*,

*Defendants*.

Case No. ____________

**DECLARATION OF MATTHEW P. VALLIÈRE, EXECUTIVE DIRECTOR OF INSTITUTE FOR PATIENTS' RIGHTS, IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

MATTHEW P. VALLIÈRE, pursuant to 28 U.S.C. § 1746 hereby declares as follows:

1. I am over 18 years of age and am otherwise competent to make this Declaration. I am submitting this Declaration in Support of Plaintiffs' Motion for Temporary Restraining Order in the above-captioned litigation. The evidence set out in the following Declaration is based on my own personal knowledge.

2. I am the Executive Director of the Institute for Patients' Rights ("IPR"), a Plaintiff in the above-captioned matter.

3. IPR is a national, 501(c)(3) organization that conducts and supports research and public education on healthcare disparities in the context of end-of-life issues. IPR is based in the State of New York.

4. IPR advocates to protect individuals' rights in numerous healthcare contexts, including by providing information about the discriminatory effects of assisted suicide laws and the dangers those laws pose to vulnerable individuals; opposing discriminatory crisis standards of

care put in place during the COVID-19 pandemic that placed people with disabilities at risk of harm; advocating against the use of the Quality Adjusted Life Year ("QALY") metric, which discriminates against and diminishes the value of the lives of people with disabilities; educating the public about disparities in healthcare access and outcomes, including those based on race, age, and/or disability; and advocating for improvements to the quality of hospice and palliative care services, as well as for expanded access to these key services.

5. IPR staff and board members regularly give presentations on these issues and engage with the press to raise awareness and educate the public on these topics.

6. IPR's core business activities include helping persons with disabilities get the care they need from the medical care system without the discriminatory barriers described above. The passage of the Medical Aid in Dying Act (the "Act") is already harming IPR's ability to engage in its core business activities because the Act adds a new barrier by licensing medical providers to facilitate premature death in lieu of treatment. To address the harms of this new barrier, IPR has to develop new courses and materials to address the ways in which the scheme steers its constituents away from quality health care, and toward early death through the prescription of lethal medications. By expending resources on these and other Act-specific activities, IPR is unable to devote these resources to its other critical programs addressing the impact of discriminatory healthcare policies. IPR is currently preparing informational materials and webinar programming for New York-based constituents to advise them of the discrimination some of them face as a consequence of the forthcoming implementation of the Act and resources to equip them to face that discrimination and the dangers of the Act, once implemented.

7. There are systemic barriers to access and pervasive biases against people with disabilities and other historically underrepresented groups. The Act makes assisted suicide readily

available to those persons, essentially funneling them to suicide. While proponents of assisted suicide claim that the Act will provide for more autonomy, the realities are that the Act is more akin to eugenics, offering death to a devalued group. Again and again, IPR has heard from those on whose behalf they advocate that assisted suicide laws inherently discriminates against people with disabilities. The Act does precisely the same thing here in New York.

8. In California, the late Lonnie Van Hook described how he had made a plan to die by assisted suicide, since he qualified at all times, but medical professionals at the ER, since they had opted out, instead offered to admit him to the hospital so he could die by suicide via starvation. Several days in, one nurse said, "What's taking you so long [to die], we have better patients to take care of."

9. IPR is a sister organization of non-party Patients' Rights Action Fund ("PRAF"), a national, non-partisan single-issue 501(c)(4) organization that protects the rights of patients, people with disabilities, older adults, and economically disadvantaged people from public policies and practices in medicine that devalue some people to death, including the deadly harm and discrimination inherent in assisted suicide laws. PRAF lobbies and advocates in state legislatures and Congress for patient access to high-quality multidisciplinary end-of-life care and works against efforts that devalue and deprioritize healthcare for vulnerable people, such as QALY and assisted suicide.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2026.

M P Vallière

Matthew P. Vallière
Executive Director, Institute for Patients' Rights