**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS, <br><br> *Plaintiffs,* <br><br> v. <br><br> THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health, <br><br> *Defendants.* | Case No. 1:26-cv-03492-OEM-JAM |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS OF JEREMY BOAL, IRIS DUDMAN, STACEY GIBSON, ANNE GURNETT BANDER, <u>NANCY MURPHY, AND BENNY POLLAK</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

    I.    New York's Medical Aid In Dying Act............................................................... 2

    II.   Proposed Intervenors ...................................................................................... 4

    III.  Procedural History ........................................................................................... 9

ARGUMENT .................................................................................................................... 9

    I.    Proposed Intervenors May Intervene As Of Right ............................................. 9

        A.      Proposed Intervenors' Motion Is Timely................................................. 9

        B.      Proposed Intervenors Have Protectable Interests In This Matter, Which Will Be Impaired Absent Intervention ................................................................. 11

        C.      Proposed Intervenors' Interests May Not Be Adequately Represented................ 13

    II.   The Court Should Allow Proposed Intervenors To Intervene Permissively..................... 15

    III.  All Parties Are On Notice Of Proposed Intervenors' Positions, Justifying Flexibility With Rule 24(c)'s Requirements ................................................................................. 16

CONCLUSION.................................................................................................................. 18

i

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Accelerant Specialty Insurance Co. v. Big Apple Designers, Inc.*,
2025 WL 2238226 (E.D.N.Y. Aug. 6, 2025)................................................................ 13

*Accelerant Specialty Insurance Co. v. Big Apple Designers, Inc.*,
2026 WL 205905 (E.D.N.Y. Jan. 27, 2026) ................................................................ 10

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
2021 WL 2646349 (E.D.N.Y. June 28, 2021) ...................................................... 17, 18

*Berger v. North Carolina State Conference of the NAACP*,
597 U.S. 179 (2022)..................................................................................................... 13

*Brennan v. New York City Board of Education*,
260 F.3d 123 (2d Cir. 2001)......................................................................................... 11

*Cameron* v. *EMW Women's Surgical Center, P. S. C.*,
595 U.S. 267 (2022)..................................................................................................... 14

*Commack Self-Serv. Kosher Meats, Inc. v. Rubin*,
170 F.R.D. 93 (E.D.N.Y. 1996).................................................................................... 16

*Curran v. Meyer*,
2025 WL 3763413 (D. Del. Dec. 30, 2025)................................................................. 12

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)..................................................................................................... 12

*Hiscox Insurance Co. Inc. v. Cmnt LLC*,
2026 WL 1072023 (E.D.N.Y. Feb. 12, 2026).............................................................. 10

*In re New York City Policing During Summer 2020 Demonstrations*,
27 F.4th 792 (2d Cir. 2022) ...................................................................................... 9, 13

*Jones v. Butz*,
374 F. Supp. 1284 (S.D.N.Y. 1974).......................................................................... 13, 15

*Jones v. Stanford*,
525 F. Supp. 3d 420 (E.D.N.Y. 2021) .......................................................................... 15

*Long Island Trucking, Inc. v. Brooks Pharmacy*,
219 F.R.D. 53 (E.D.N.Y. 2003)..................................................................................... 11

*New York Public Interest Research Group, Inc. v. Regents of the University of the State of New York*, 516 F.2d 350 (2d Cir. 1975)........................................................................... 11, 15

ii

*Pennsylvania v. President of the United States*,
    888 F.3d 52 (3d Cir. 2018)................................................................................... 14, 15

*R Best Produce, Inc. v. Shulman-Rabin Marketing Corp.*,
    467 F.3d 238 (2d Cir. 2006)..................................................................................... 9, 16

*Republic of the Philippines v. Abaya*,
    312 F.R.D. 119 (S.D.N.Y. 2015) ..................................................................... 10, 11, 13

*Sea Tow Services International, Inc. v. Tampa Bay Marine Recovery, Inc.*,
    2021 WL 327653 (E.D.N.Y. Feb. 1, 2021).............................................................. 10

*Stutts v. De Dietrich Group*,
    2005 WL 3158038 (E.D.N.Y. Nov. 28, 2005).......................................................... 10

*Tachiona ex rel. Tachiona v. Mugabe*,
    186 F. Supp. 2d 383 (S.D.N.Y. 2002)..................................................................... 17

*Trbovich v. United Mine Workers of America*,
    404 U.S. 528 (1972)................................................................................................ 13

*United States v. Country Club Garden Owners Ass'n, Inc.*,
    159 F.R.D. 400 (E.D.N.Y. 1995) ............................................................................ 10

*United States v. Pitney Bowes, Inc.*,
    25 F.3d 66 (2d Cir. 1994)......................................................................................... 10

*Utica Mutual Insurance Co. v. Munich Reinsurance America, Inc.*,
    2017 WL 9400673 (N.D.N.Y. Jan. 6, 2017)............................................................ 17

*Windsor v. United States*,
    797 F. Supp. 2d 320 (S.D.N.Y. 2011)................................................................ 17, 18

**Statutes**

N.Y. Pub. Health Law § 2899-d *et seq.* ............................................................... *passim*

**Other Authorities**

Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law
    (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-state-law ...................................................................................... 2

**Rules**

Fed. R. Civ. P. 24(a) ........................................................................................... 9, 11
Fed. R. Civ. P. 24(b) ............................................................................................... 15
Fed. R. Civ. P. 24(c) ............................................................................................... 17

**INTRODUCTION**

Proposed Intervenors Dr. Jeremy Boal, Iris Dudman, Stacey Gibson, Dr. Anne Gurnett Bander, Nancy Murphy, and Benny Pollak submit this memorandum of law in support of their Motion for Leave to Intervene as Defendants pursuant to Federal Rule of Civil Procedure 24.

On June 11, 2026, Plaintiffs filed suit against Governor Kathy Hochul, in her official capacity as Governor of the State of New York; the New York State Department of Health; James V. McDonald, M.D., in his official capacity as Commissioner of the New York State Department of Health; the New York State Board for Medicine; Amit M. Shelat, D.O., in his official capacity as Chair of the New York State Board for Medicine; the New York State Office of Mental Health; and Ann Marie T. Sullivan, M.D., in her official capacity as Commissioner of the New York State Office of Mental Health (collectively, the "State Defendants"), seeking to permanently enjoin the New York Medical Aid in Dying Act, N.Y. Pub. Health Law § 2899-d *et seq.* (the "Act"), which is scheduled to go into effect on August 5, 2026. Compl., Dkt. 1. Plaintiffs moved for a temporary restraining order against the Act ("TRO Motion") the same day. Dkt. 2.

The Act gives New Yorkers who are terminally ill with less than six months to live the right to control how and when they die, in alignment with their personal values and beliefs. The Act is fully voluntary for patients and medical providers alike. It gives a terminally ill patient the right to request a prescription from their trusted medical provider for medication that the patient may choose to self-ingest to bring about a peaceful death. Their medical provider may approve the request only after complying with numerous requirements to ensure that the patient meets the Act's eligibility criteria, including confirming that the request is voluntarily made and well informed. Proposed Intervenors are six individuals who have significant interests in ensuring that

eligible New Yorkers will have access to the option of medical aid-in-dying ("MAID") as provided for by the Act, starting August 5, 2026.

Proposed Intervenors readily meet the requirements for intervention as of right under Rule 24(a). *First*, this request for intervention is timely. *Second*, Proposed Intervenors will be adversely affected if the Act is enjoined. Proposed Intervenors seek to ensure that they can exercise autonomy over their end-of-life circumstances and can enjoy peace of mind knowing that they will be able to access MAID if and when they so choose. *Third*, because the State Defendants are differently positioned and lack a personal stake in the Act's enactment, they may not adequately represent Proposed Intervenors' interests in defending the Act. For these reasons, Proposed Intervenors respectfully request that the Court grant their motion for intervention as of right. At a minimum, permissive intervention under Rule 24(b) should be allowed.

Proposed Intervenors also respectfully request that the Court allow the filing of their opposition to Plaintiffs' motion for a preliminary injunction, filed with this motion to intervene, pursuant to Rule 24(c); and that Proposed Intervenors be granted leave to respond to the Complaint further pursuant to Rule 24(c) by the same deadline as the State Defendants or three business days after intervention is granted, whichever is later.

## BACKGROUND

### I.  New York's Medical Aid In Dying Act

After more than a decade of advocacy from New Yorkers living with terminal illnesses, grieving families, clinicians, and supporters across the state, Governor Kathy Hochul signed New York's Medical Aid in Dying Act into law on February 6, 2026. *See* Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-state-law (last visited June 22, 2026). The Act is set to go into effect on August 5, 2026. *Id.* The

2

Act provides a terminally ill, mentally capable adult who has a prognosis of six months or less to live with the option to request, obtain, and decide to ingest (or not) aid-in-dying medication. *Id.* To be eligible, a patient must be an adult, aged 18 or older; be a resident of New York State; have a medically confirmed terminal illness that is incurable, irreversible, and will likely cause death within six months; be mentally capable of making an informed healthcare decision; and ingest the medication by themselves. *See* N.Y. Pub. Health Law § 2899-d (defining key terms as used in the Act); *id.* § 2899-f(4) (providing that the patient "may self-administer the medication to themselves" and that a "health care professional or other person shall not administer the medication").

In addition, the Act incorporates numerous requirements to qualify for access to MAID, including the following.

*First*, a patient wishing to obtain MAID must provide their attending physician with both an oral and a written request for the medication. N.Y. Pub. Health Law § 2899-e(1). The written request must be witnessed by two people—neither of whom can be a relative, someone who stands to benefit from the person's estate, or anyone who may benefit financially from the person's death—while the oral request must be recorded by audio or video and permanently stored in the patient's medical record. *Id.* § 2899-e(1)-(3).

*Second*, a patient can withdraw their request for the medication at any time. N.Y. Pub. Health Law § 2899-g(1).

*Third*, the patient's attending physician must conduct an initial evaluation of the patient in person, unless the attending physician determines that an in-person visit would result in extraordinary hardship, in order to confirm that a patient has a terminal illness, has decision-making capacity, and has made the request voluntarily and without coercion. N.Y. Pub. Health

3

Law § 2899-f(1).  The attending physician must inform the patient about all of their end-of-life care options, including hospice and palliative care.  *Id.* § 2899-f(1)(e)-(g).  The attending physician must also document diagnoses, determinations, and requests of the patient as part of the patient's medical records.  *Id.* § 2899-j.

*Fourth*, the patient must also have a second, consulting physician confirm that the patient is terminally ill, is making an informed decision, has decision-making capacity, and is not being coerced.  N.Y. Pub. Health Law § 2899-h.

*Fifth*, a neurologist, psychiatrist, or psychologist must conduct a mental health evaluation to confirm that the patient has the capacity to make an informed healthcare decision.  N.Y. Pub. Health Law § 2899-i(1).

*Sixth*, the Act imposes a mandatory five-day waiting period between when the medication prescription is written and when it can be filled, unless the attending physician determines that the patient is not expected to survive that period.  N.Y. Pub. Health Law § 2899-f(3).

*Seventh*, prescribing the medication under the Act is entirely voluntary for healthcare providers.  N.Y. Pub. Health Law § 2899-m(1).

## II.    Proposed Intervenors

The Act is of critical importance to New Yorkers like Proposed Intervenors.

Dr. Jeremy Boal is a 59-year-old New York resident with amyotrophic lateral sclerosis ("ALS").  Boal Decl. ¶ 2.  ALS is a progressive neuro-degenerative disease that affects nerve cells in the brain and spinal cord.  *Id.*  The muscle weakness caused by ALS will eventually impact Dr. Boal's ability to breathe, speak, and swallow.  *Id.*  There is no cure for ALS, and based on the current progression of his disease, Dr. Boal's doctors believe that he has one to three years left to live.  *Id.* ¶¶ 2, 6.  Until his retirement in 2023 as a result of his ALS diagnosis, Dr. Boal was the Chief Clinical Officer of the Mount Sinai Medical Center in New York and spent a decade of his

4

career working with home-bound patients with late-stage illnesses. *Id.* ¶ 4. From his experience as a practitioner, Dr. Boal knows that for some patients, "the degree of suffering they and their caregivers experience at the end of the patient's life is beyond measure." *Id.* ¶ 9. The passage of the Act has already benefited Dr. Boal, as he has "experienced an incredible peace of mind since the MAID Act was signed into law": knowing that he will eventually be able "to have control over the manner and timing of [his] inevitable death from ALS has made this otherwise difficult part of [his] life a little easier and given [him] the freedom to fully live [his] life without fear of death and the dying process." *Id.* ¶ 19. If the Act does not go into effect as expected, "the thoughtful and emotional end-of-life planning" that Dr. Boal has engaged in with his family and providers "will be compromised," and he "will again become more focused on the uncertainties of [his] death than the joy of living whatever time [he has] left to the fullest." *Id.* ¶ 21.

The Act has similar significance for Proposed Intervenor Benny Pollak. Mr. Pollak is a 67-year-old New York resident. Pollak Decl. ¶ 2. Mr. Pollak lives with quadriplegia as a result of a car accident that caused a C5-C6 spinal cord injury in 1980. *Id.* ¶ 3. Mr. Pollak "want[s] autonomy, independence, and the ability to decide what end-of-life care works best for [him], and that is what the MAID Act provides." *Id.* ¶ 13. Mr. Pollak wishes "to protect the MAID Act, to preserve [his] end-of-life autonomy, and to contradict and challenge the paternalistic perspective that [he] cannot make [his] own informed decisions because [he] live[s] with a disability and use[s] a wheelchair." *Id.* Mr. Pollak is angered by the premise underlying Plaintiffs' suit—that all people with disabilities "think, feel, and believe the same thing." *Id.* ¶ 11. The related belief that "people with disabilities are 'weaker' or need more protection than others" is insulting to Mr. Pollak, who does "not need anybody—other than [himself] in collaboration with [his] healthcare providers— deciding what medical care [he] should or should not use." *Id.* ¶¶ 11-12. Mr. Pollak is also

5

offended by the idea that he is "more susceptible to coercion because [he] live[s] with a disability." *Id.* ¶ 15. Mr. Pollak "need[s] autonomy and agency, not to be patronized." *Id.* ¶ 16. The Act offers Mr. Pollak "space to live [his] life without thinking about some future with unbearable suffering from a terminal illness." *Id.* ¶ 17. If the Act did not take effect, Mr. Pollak would be stripped of his "right to decide what is best for [him] based on [his] individual circumstances." *Id.*

Dr. Anne Gurnett Bander is a 72-year-old New York resident whose husband, Jon, was diagnosed with ALS in 2017. Bander Decl. ¶¶ 2-3. In 2021, four days after his sixty-sixth birthday and just a month before his twenty-fifth wedding anniversary, Mr. Bander died at home. *Id.* ¶¶ 4-5. At the time of his death, Mr. Bander was bedridden, could not move his hands or limbs, and had been unable to speak for over a year. *Id.* ¶ 8. Two years later, Dr. Gurnett Bander began having unexpected falls, and in 2025 she, too, was diagnosed with ALS. *See id.* ¶¶ 5-6. "Knowing firsthand what the end of life with ALS looks like," Dr. Gurnett Bander feels "immense … solace" from the Act's passage. *Id.* ¶ 9. Dr. Gurnett Bander believes that "[a]ll New Yorkers deserve access to a full range of healthcare options" and that people like herself "should be allowed to choose the end-of-life healthcare option that fits best with their values and beliefs, even if others disagree." *Id.* ¶¶ 12, 18. When she faces her own death, Dr. Gurnett Bander wants "to stay in [her] home, surrounded by friends and caregivers [she] know[s] and love[s] at the end of [her] life." *Id.* ¶ 16.

The Act is likewise crucial for Proposed Intervenor Iris Dudman. Ms. Dudman is a 76-year-old New York resident who was diagnosed with a recurrence of glioblastoma in November 2025. Dudman Decl. ¶ 2. Glioblastoma is a highly aggressive, incurable brain cancer, and Ms. Dudman "likely only ha[s] months, not years, left to live." *Id.* Ms. Dudman witnessed both of her parents suffer drawn-out deaths, whereas her uncle had a peaceful death in Oregon via

6

MAID many years ago. *Id.* ¶ 8. Because of her uncle's positive experience with MAID, and to avoid the suffering that her parents experienced, Ms. Dudman has spent the last three years advocating for the Act. *Id.* ¶¶ 9, 13. Ms. Dudman believes that qualified New Yorkers should have access to MAID as a healthcare option and wants to be able to access it when her glioblastoma progresses to its final stages and her death is imminent. *Id.* ¶ 15. Since the Act was passed, Ms. Dudman has "experienced an increased sense of peace," knowing that she "will be able to access this healthcare option and have the medication available to [her], even if [she] ultimately decide[s] not to use it." *Id.* ¶ 17. Were the Act to be enjoined, Ms. Dudman would be deprived of her "autonomy and ability to make [her] own end-of-life decisions in accordance with [her] values, morals, and beliefs." *Id.* ¶ 20.

Proposed Intervenor Stacey Gibson is a 74-year-old New York resident who has been diagnosed with multiple cancers, including breast cancer, lung cancer, and B-cell lymphoma. Gibson Decl. ¶ 2. While Ms. Gibson's breast and lung cancers are thankfully in remission, unfortunately, her lymphoma is incurable. *Id.* Ms. Gibson was inspired to begin advocating for the Act by her experience with the death of her beloved husband, Sid, who died of spinocerebellar ataxia, a terminal progressively degenerative neurological disease similar to ALS. *Id.* ¶¶ 6-7. Spinocerebellar ataxia caused Mr. Gibson to lose much of his ability to breathe, speak, and swallow, and he would gag frequently, causing a great deal of suffering ahead of his death in 2014. *Id.* ¶¶ 9-10. Because MAID was not a healthcare option that was available to Mr. Gibson, it is important to Ms. Gibson that qualified New Yorkers have the option of MAID, "so they can choose not to endure the kind of suffering that Sid did at the end of his life." *Id.* ¶ 13. Additionally, Ms. Gibson "want[s] the option to choose medical aid in dying if" she qualifies. *Id.* ¶ 14. Ms. Gibson is not certain that she would use MAID, "but its existence as an option is a comfort to

7

[her] now." *Id.* ¶ 15.  Should the Act not take effect, Ms. Gibson and terminally ill New Yorkers would be "without access to a full range of safe healthcare options" and made "to feel powerless." *Id.* ¶ 21.

Nancy Murphy is an 87-year-old New York resident who is currently in remission from triple-negative breast cancer ("TNBC").  Murphy Decl. ¶ 2.  TNBC is extremely aggressive, with a greater than 25% chance of recurrence.  *Id.* ¶ 5.  Ms. Murphy has been a hospice volunteer for many years and has "witnessed death and dying."  *Id.* ¶ 9.  As such, Ms. Murphy "understand[s] the suffering of a long, lingering death and want[s] to avoid that."  *Id.*  Ms. Murphy became passionate about advocating for MAID after experiencing her sister Joan's death from terminal ovarian cancer.  *Id.* ¶ 10.  After receiving a prognosis of mere months to live, and because she lived in Vermont, where MAID is available, Joan began the process of obtaining a MAID prescription, wanting it on hand even if she never used it.  *Id.*  Joan eventually used her MAID prescription, passing peacefully at her home in Vermont.  *Id.*  This was "a profound, beautiful, and meaningful experience for [Ms. Murphy] and [her] family."  *Id.*  Ms. Murphy firmly believes that "[e]veryone should have the option to die the way Joan did."  *Id.*  Just like her sister, Ms. Murphy "want[s] to be in charge of when [she] die[s], where [she] die[s], and with whom [she] die[s]."  *Id.* ¶ 11.  And "[m]edical aid in dying gives [Ms. Murphy] that choice."  *Id.*  Ms. Murphy is acutely aware that the choice to use MAID or not is a personal decision and believes that "[t]hose who do not want to use the option" of MAID should not be able to "prevent other people from accessing it."  *Id.* ¶ 12.

The Act is the culmination of yearslong efforts to improve and expand end-of-life care for New Yorkers like Proposed Intervenors.  Plaintiffs' request to delay and eventually invalidate the

8

option to access MAID threatens these individuals with a loss of control over the healthcare decisions that should reflect their values, priorities, and dignity.

### III.    Procedural History

On June 11, 2026, after waiting four months after the Act was signed, Plaintiffs filed suit, Dkt. 1, and simultaneously moved for a temporary restraining order ("TRO") seeking to bar the statute's implementation, Dkt. 2.  On June 15, 2026, the Court denied Plaintiffs' request for a TRO but ordered Defendants to respond to "Plaintiffs' request for preliminary injunctive relief by June 23, 2026," ahead of a preliminary injunction hearing to be held on June 25, 2026.  Order to Show Cause ("O.S.C."), June 15, 2026.  If Plaintiffs were to succeed, individuals like the Proposed Intervenors would be deprived of the Act's benefits, including the peace of mind that they presently enjoy from knowing that they will be able to access MAID if their conditions worsen.

## ARGUMENT

### I.    PROPOSED INTERVENORS MAY INTERVENE AS OF RIGHT

Under Rule 24(a)(2), the Court must permit anyone to intervene who "(1) timely file[s] an application, (2) show[s] an interest in the action, (3) demonstrate[s] that the interest may be impaired by the disposition of the action, and (4) show[s] that the interest is not protected adequately by the parties to the action." *In re New York City Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 799 (2d Cir. 2022) (quoting *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006)).  Proposed Intervenors satisfy each requirement.

### A.  Proposed Intervenors' Motion Is Timely

Proposed Intervenors' request for intervention is plainly timely.  "Relevant considerations" when assessing timeliness "include '(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating

9

for or against a finding of timeliness.'" *Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*, 2026 WL 205905, at *2 (E.D.N.Y. Jan. 27, 2026) (quoting *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994)). Each factor weighs in Proposed Intervenors' favor.

*First*, Proposed Intervenors filed this motion to intervene only 11 days after Plaintiffs filed their Complaint. *See, e.g.*, *Hiscox Ins. Co. Inc. v. Cmnt LLC*, 2026 WL 1072023, at *5 (E.D.N.Y. Feb. 12, 2026) (noting that a delay of "between four and seven months … is not egregious either in the broad scheme of federal litigation or the specific context of this case" and that "a court in this District has granted a motion to intervene as of right after a delay of 'approximately two years' when other factors weighed in favor of intervention" (quoting *United States v. Country Club Garden Owners Ass'n, Inc.*, 159 F.R.D. 400, 402-404 (E.D.N.Y. 1995)), *report and recommendation adopted*, 2026 WL 873013 (E.D.N.Y. Mar. 30, 2026); *Stutts v. De Dietrich Grp.*, 2005 WL 3158038, at *1 (E.D.N.Y. Nov. 28, 2005) (finding motion to intervene timely even though it was filed "almost two years after plaintiffs commenced th[e] action").

*Second*, given the early stages of these proceedings, "neither the existing parties nor the progress of this case would be prejudiced by [the proposed] intervention." *Sea Tow Servs. Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*, 2021 WL 327653, at *3 (E.D.N.Y. Feb. 1, 2021) (citation omitted). "[D]iscovery has not yet commenced" and "intervention will not prejudice [Plaintiffs] by unnecessarily complicating the case or generating costly or duplicative discovery." *Id.* at *3-4. Moreover, "the parties have not engaged in dispositive motion practice." *Republic of the Philippines v. Abaya*, 312 F.R.D. 119, 123 (S.D.N.Y. 2015).

*Third*, by contrast, Proposed Intervenors will be prejudiced if their motion is denied, as they would lose the opportunity to vigorously defend their interests in this litigation and in the Act, as discussed in detail in the following section.

*Fourth*, there are no "unusual circumstances militating for or against a finding of timeliness." *Long Island Trucking, Inc. v. Brooks Pharmacy*, 219 F.R.D. 53, 55 (E.D.N.Y. 2003).

**B. Proposed Intervenors Have Protectable Interests In This Matter, Which Will Be Impaired Absent Intervention**

"The Second Circuit has explained that for purposes of Rule 24(a)(2), an intervenor must have a 'direct, substantial, and legally protectable' interest in the property or transaction that is the subject of the underlying action." *Republic of the Philippines*, 312 F.R.D. at 123 (quoting *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001)) (cleaned up). The Second Circuit has also found that such interests justify intervention where "the disposition of the action may as a practical matter impair or impede [proposed intervenors'] ability to protect their interests." *New York Pub. Int. Rsch. Grp., Inc. v. Regents of Univ. of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975).

Proposed Intervenors have significant protectable interests that could be impaired by this action's disposition.

Proposed Intervenors each has an interest in being able to obtain MAID as an end-of-life healthcare option in New York—which is directly threatened by Plaintiffs' attempt to deny them that ability. *See supra*, at 4-8. As discussed above, Proposed Intervenors want to have MAID available to them as an option at the end of their lives, which for some is approaching as their terminal illnesses continue to advance and their prognoses become increasingly shorter. By contrast, Plaintiffs have no interest in ever utilizing MAID, which is purely voluntary under the Act. Plaintiffs do not stand to lose *anything* if the Act becomes effective. Plaintiffs' Complaint and TRO Motion both emphasize Plaintiffs' desire never to use MAID, at any point in time. *See, e.g.*, Compl. ¶ 34 (Ms. Cameron "would never request assisted suicide in a right state of mind"); Dkt. 2-4, ¶ 10 (Hernandez Decl.) ("I want the Court to block the Act from going into effect[.]"); Dkt. 2-5, ¶ 10 (Cameron Decl.) ("I want the Court to block the Act from going into effect.").

11

Plaintiffs cannot manufacture an interest in the Act by stating, without any support, that they "are automatically qualified" for MAID, TRO Mot. at 3, particularly when the Act expressly disclaims any "automatic" qualification based on age or disability, *see* N.Y. Pub. Health Law § 2899-e(4) ("No person shall qualify for medical aid in dying under this article solely because of age or disability."). On the other hand, a healthcare option that is very important to Proposed Intervenors will be taken away if the Act is enjoined.

Proposed Intervenors have more at stake in this lawsuit than the organizational Plaintiffs too. Because the Act does not threaten to take any rights away from disabled persons, its implementation does not threaten the constituencies or missions of the organizational Plaintiffs. *Cf. Curran v. Meyer*, 2025 WL 3763413, at *7 (D. Del. Dec. 30, 2025) (holding that organizational plaintiffs lacked Article III standing to challenge Delaware MAID statute because they lacked "any plausible allegations of actual injury"), *appeal docketed*, No. 26-1001 (3d Cir. Jan. 2, 2026). Plaintiffs' own Complaint lacks any allegation that the Act itself will prevent the organizational Plaintiffs from offering the same services they already offer. To the extent that the organizational Plaintiffs allege that they *might* need to devote additional resources to efforts to advocate against using MAID, *see, e.g.*, Compl. ¶¶ 39, 43, 47, 54, these costs would not be enough to even establish standing for these organizations, let alone sustain a claim. *See, e.g.*, *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (explaining that it is "incorrect" to suggest that "standing exists when an organization diverts its resources in response to a defendant's actions"); *Curran*, 2025 WL 3763413, at *7 (rejecting organizational plaintiffs' argument that they had standing to challenge Delaware MAID law because of "some purported and minimal harm to their 'core business activities,' such as now having to spend time 'to ease the anxiety and fears regarding

12

members' end of life decisions'"). Proposed Intervenors, in contrast, have the direct and personal interests in the Act described in detail above, which Plaintiffs seek to impair with this lawsuit.

Because of the direct, imminent effect that the Act would have on Proposed Intervenors' lives, they "have an undoubted interest in the legislation under consideration," sufficient to justify intervention. *Jones v. Butz*, 374 F. Supp. 1284, 1287 (S.D.N.Y. 1974), *aff'd*, 419 U.S. 806 (1974); *see also In re New York City Policing*, 27 F.4th at 800 (proposed intervenors had interest in litigation that may be impaired because the "merits question before the district court is whether certain [] policies are permissible" and "[t]he answer to that question may require a change in those policies," affecting proposed intervenors' conduct and safety).

## C. Proposed Intervenors' Interests May Not Be Adequately Represented

"The intervenor's burden of demonstrating inadequacy of representation is generally speaking minimal." *Republic of the Philippines*, 312 F.R.D. at 124 (cleaned up). "This requirement 'is satisfied if the applicant shows that representation of his interest *may be* inadequate.'" *In re New York City Policing*, 27 F.4th at 803 (emphasis in original) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Indeed, "the fact that Intervenors and [the State Defendants] desire the same *outcome* ... does not mean that [the State Defendants] adequately represents Intervenors' *interests*." *Accelerant Specialty Ins. Co. v. Big Apple Designers, Inc.*, 2025 WL 2238226, at *5 (E.D.N.Y. Aug. 6, 2025) (emphasis in original). Proposed Intervenors have distinct interests that the State Defendants may not pursue, or pursue as zealously as Proposed Intervenors themselves would.

The State Defendants seek to defend the Act because they have an interest in ensuring that statutes passed through the democratic, legislative process are upheld. *See, e.g., Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022) ("No one questions that States possess 'a legitimate interest in the continued enforce[ment] of [their] own statutes.'" (quoting *Cameron* v.

13

*EMW Women's Surgical Ctr., P. S. C.*, 595 U.S. 267, 277 (2022)) (alterations in original)).  The State Defendants do not otherwise stand to lose anything, such as the personal ability to access MAID, if Plaintiffs are successful here.  By contrast, if Plaintiffs are successful, Proposed Intervenors would immediately be deprived of autonomy over their end-of-life care and denied access to a healthcare option that the Act made available.  Courts have recognized that this type of personal stake necessarily differentiates the interests of intervenors from those of government defendants.  For example, the Third Circuit has held that an intervenor's burden to show inadequate representation is "comparatively light" when a government entity defendant's "views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Pennsylvania v. President U.S.*, 888 F.3d 52, 60-61 (3d Cir. 2018) (internal citations omitted).  Because the State Defendants do not face the immediate, personal deprivation of rights that Proposed Intervenors face, the State Defendants may also not need to prioritize urgency in their defense of this action in the way that Proposed Intervenors would, given the immediate harm to Proposed Intervenors that would result in, for example, setting a lengthy briefing or discovery schedule if the Act is even temporarily enjoined.  By contrast, Proposed Intervenors, several of whom face unquestionably terminal diagnoses that will lead to their death and the accompanying decision of whether to use MAID or not, have a strong interest in ensuring that this case is handled with the sense of urgency that, from their standpoint, it demands.

Moreover, Proposed Intervenors each have deeply personal perspectives on the importance of the Act that they can draw on to defend against Plaintiffs' effort to invalidate it.  *See supra*, at 4-8.  By contrast, the State Defendants are relative newcomers to this policy area only from New York's recent legislative effort.

14

In short, the State Defendants may not be able to adequately defend Proposed Intervenors' interests because the State Defendants do not face the urgent, personal deprivation that Proposed Intervenors face. *Cf. New York Pub. Int. Rsch. Grp., Inc.*, 516 F.2d at 352 (granting intervention as of right where "there is a likelihood that the [intervenors] will make a more vigorous presentation of the economic side of the argument than would the" state regulatory body that issued the challenged regulation); *Butz*, 374 F. Supp. at 1287 (concluding that intervenors had a "different and distinct [interest] from the interest of the federal officials who have been named as defendants in this action and whose responsibility it is to administer the provisions of the [Humane Slaughter] Act" but who did not face the deprivation of rights that the intervenors faced if the act was invalidated). Simply put, Proposed Intervenors' "interest is personal," *Pennsylvania*, 888 F.3d at 60-61, while the State Defendants' interest is not.

## II.    THE COURT SHOULD ALLOW PROPOSED INTERVENORS TO INTERVENE PERMISSIVELY

In the alternative, the Court should let Proposed Intervenors intervene under Rule 24(b). Whether to grant permissive intervention is within the "broad discretion" of the trial court. *Jones v. Stanford*, 525 F. Supp. 3d 420, 423 (E.D.N.Y. 2021). Permissive intervention is available to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). There can also be no question that Proposed Intervenors—who have an interest in accessing MAID, which would be denied if Plaintiffs are successful—have defenses that present common questions of law and fact with the main action.

Moreover, Proposed Intervenors "will bring a different perspective to the case and will contribute relevant factual variations that may assist the court in addressing the ... issue[s] raised." *Commack Self-Serv. Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996). Proposed Intervenors offer unique perspectives that will be invaluable for the adjudication of Plaintiffs'

15

claims, including because they will be able to vigorously defend the interests underlying the MAID Act. Ms. Dudman, Ms. Gibson, Ms. Murphy, and Dr. Gurnett Bander have each experienced a family member's death from late-stage terminal illnesses—in Ms. Dudman's and Ms. Murphy's cases, their family members were able to access MAID and end their lives peacefully, on their own terms. Dr. Boal spent a decade of his medical career working with home-bound patients with late-stage illnesses and is intimately familiar with the suffering inherent in the end of many terminal conditions, including his own ALS. Mr. Pollak has dedicated his time and energy to challenging narratives (like those advanced by Plaintiffs) that people living with disabilities cannot make their own informed decisions and live full lives. "Considerations of fairness weigh in favor of the intervenors in light of their knowledge and strong interest in the subject matter of this action." *Id.*

When considering if Rule 24(b)'s "common question" requirement is met, courts also take into account "substantially the same factors" as under Rule 24(a). *R Best Produce, Inc.*, 467 F.3d at 240. As discussed above, this motion is timely, and "intervention will not unduly delay or prejudice adjudication," as this case is in its earliest stages, no scheduling order has been issued, and there has been no discovery. *See supra* Part I.A. Permissive intervention is warranted.

## III. ALL PARTIES ARE ON NOTICE OF PROPOSED INTERVENORS' POSITIONS, JUSTIFYING FLEXIBILITY WITH RULE 24(c)'S REQUIREMENTS

To provide the Court and parties with a comprehensive understanding of Proposed Intervenors' positions relating to the underlying matter, attached to this Motion is Proposed Intervenors' proposed brief in opposition to Plaintiffs' request for a preliminary injunction. *See* Chabot Decl., Ex. A. If the Court grants Proposed Intervenors' motion to intervene, whether as of right or permissively, Proposed Intervenors respectfully request that the Court accept the filing of Proposed Intervenors' Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

In addition, Proposed Intervenors respectfully request that they be granted leave to respond to the Complaint on the same deadline as the State Defendants or three business days after intervention is granted, whichever is later.

In general, Rule 24(c) requires interveners to submit a pleading setting out "the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). "Where, however, the position of the movant is apparent from other filings and where the opposing party will not be prejudiced, Rule 24(c) permits a degree of flexibility with technical requirements," such as waiver of intervenor's obligation to file an answer. *Windsor v. United States*, 797 F. Supp. 2d 320, 325 (S.D.N.Y. 2011) (quoting *Tachiona ex rel. Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393 n.8 (S.D.N.Y. 2002)); *see also Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2021 WL 2646349, at *13 (E.D.N.Y. June 28, 2021) ("Courts within the Second Circuit have held that Rule 24(c) permits a 'degree of flexibility with technical requirements' and have dispensed with the pleading requirement when the proposed intervenor[']s position is 'clearly articulated' in its motion papers." (quoting *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 2017 WL 9400673, at *8 n.4 (N.D.N.Y. Jan. 6, 2017))).

There is no prejudice to Plaintiffs here because Proposed Intervenors' "position on the subject matter of the litigation"—namely Proposed Intervenors' intent to defend the Act against each of Plaintiffs' allegations, including based on Proposed Intervenors' personal experience and expertise—"is clearly articulated" above and in the attached opposition to Plaintiffs' request for a preliminary injunction. *Windsor*, 797 F. Supp. 2d at 326.

Accordingly, Plaintiffs respectfully submit that "[w]aiver of the pleading requirement is justified here." *Windsor*, 797 F. Supp. 2d at 326; *see also Barry's Cut Rate Stores Inc.*, 2021 WL 2646349, at *14 ("The Court waives the pleading requirement for Proposed Intervenors …because

17

their position on this litigation is clearly articulated in their motion papers, which include copies of their proposed briefing ….").

## **CONCLUSION**

The Court should grant Proposed Intervenors' motion to intervene as of right under Rule 24(a) or, in the alternative, permit Proposed Intervenors to intervene under Rule 24(b). Proposed Intervenors also respectfully request that the Court accept the filing of Proposed Intervenors' Brief in Opposition to Plaintiffs' Motion for a Preliminary Injunction, attached to this Motion, and that Proposed Intervenors be granted leave to respond to the Complaint on the same date as the State Defendants or three business days after intervention is granted, whichever is later.

Dated: June 22, 2026

Respectfully submitted,

/s/ Ryan Chabot
WILMER CUTLER PICKERING
  HALE AND DORR LLP
Ryan Chabot
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6513
ryan.chabot@wilmerhale.com

COMPASSION LEGAL
THE END-OF-LIFE JUSTICE CENTER AT
  COMPASSION & CHOICES
Veronica Darling, Esq. (She/Her/They)*
Jessica Pezley, Esq. (She/Her)*
8156 S. Wadsworth Blvd. E162
Littleton, CO 80128
(800) 247-7421
vdarling@compassionandchoices.org
jpezley@compassionandchoices.org

*Pro hac vice* forthcoming

*Attorneys for Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak*

18