**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

Case No. 1:26-cv-03492

**DECLARATION OF JEREMY BOAL, M.D.**

I, Jeremy Boal, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained herein and, if called as a witness, could and would competently testify to each of the following facts.

2. I am 59 years old, a New York resident, and I was diagnosed with amyotrophic lateral sclerosis ("ALS") in November of 2023. ALS is a progressive neuro-degenerative disease that affects nerve cells in the brain and spinal cord. The muscle weakness will eventually impact my ability to speak, swallow, and breathe. Currently, there is no cure for ALS. ALS is universally fatal.

3. I identify as a person with a disability.

4. Until my retirement in 2023 as a result of my ALS diagnosis, I was the Chief Clinical Officer of the Mount Sinai Medical Center in New York. Prior to retirement, I spent a decade of my career working with home-bound patients with late-stage illnesses who received palliative care in their homes through the Mount Sinai Medical Center.

5. My initial ALS symptoms occurred while I was doing global health work in Nepal in August of 2023. Since ALS is a diagnosis of exclusion, it took several months to determine what was causing my symptoms.

6. Before my symptoms began, I was in good physical health and thought I had a long life ahead of me. Both of my parents are still alive, and I believed I would enjoy a long life like theirs. After my diagnosis, I realized that I am on a much shorter timeline. The vast majority of ALS patients die within three to five years of diagnosis. Based on the current progression of my disease, I expect to have 1 to 3 years of life remaining.

7. I am constantly adapting to the progressive nature of ALS. Every few months a new muscle group is impacted.

8. While I am currently able to walk short distances around my home with the assistance of a rolling walker, I require a motorized wheelchair for any activity outside my home. I have limited energy, so I must decide what is most important on any given day and conserve my energy for that.

9. Receiving my diagnosis was incredibly challenging for me, not least because during my medical career, I had treated many patients with late-stage ALS and witnessed end-stage ALS multiple times. As a result, I was very familiar with the impact ALS has on patients and their loved ones and I knew what was in store for me. For some ALS patients, the degree of suffering they and their caregivers experience at the end of the patient's life is beyond measure. It was hard to imagine myself and my family in the situations I had observed as a physician.

10. Once I was able to process my diagnosis, and knowing the difficult end-of-life experience that many ALS patients face, I began making plans to ensure that I could access medical aid in dying in either in Vermont or New Jersey, since the option was not yet legal in New York. As soon as I had plans in place to ensure that I would not have to suffer through the end stages of ALS, my outlook on my diagnosis and the time I have remaining completely changed. I was able to focus on living instead of worrying about dying.

11. Since my retirement, I have spent my time doing the things I love and are meaningful to me: gardening and tending to my goats, chickens, and dogs; spending quality time with my wife, our two daughters, and our friends; meditating and studying Buddhism; and advocating for the passage of New York's Medical Aid in Dying Act ("MAID Act").

12. Ensuring medical aid in dying is available in my home state of New York for myself and others facing terminal illnesses is very important to me. I became involved in my advocacy work for New York's MAID Act because from my experience working with terminally ill New Yorkers, I had concerns that the vast majority of New Yorkers would not have the resources or ability to go to another state for access to medical aid in dying. No one should have to needlessly suffer at the end of life because of lack of resources.

13. I became aware of medical aid in dying when Oregon passed the Death with Dignity Act in 1997 because I cared for many patients in their late stages of illness – including through their dying and death. In my work, I saw patients with access to world-class care and significant resources nevertheless suffering through the end of their lives. I carry those patients' experiences with me to this day and think about them often.

14. My professional experience demonstrates that we cannot always eliminate suffering for terminally-ill people. However, based on my personal and professional experiences with terminal illness, I believe that mentally competent adults in New York with a terminal prognosis and the ability to self-ingest medication should have the option to access medical aid in dying to avoid suffering at the end of life.

15. With my illness, as with many other life-shortening diagnoses, I cannot know how soon my time will come. I do not want the MAID Act to be enjoined and to deprive me of this important healthcare option if and when I am eligible.

16. I understand that medical aid in dying as set out in the MAID Act is one of several end-of-life healthcare options that a terminally-ill person who meets the Act's criteria for eligibility can utilize in conjunction with other end-of-life options, such as hospice and palliative care. When my ALS progresses to its final stages and my death is imminent, I want medical aid

in dying available as one of my healthcare options in my home state of New York. Otherwise, my family and I would be forced to spend time and resources seeking this care in another state.

17. Based on my understanding of the MAID Act, my disability does not automatically or presumptively qualify me for medical aid in dying. I know that I will need to have a terminal prognosis of six months in order to access medical aid in dying. The Act contains explicit language that prevents an individual from qualifying for medical aid in dying based solely on age or disability.

18. I do not fear that I will be coerced into obtaining a prescription from my trusted healthcare provider. Because I am a doctor who specialized in caring for people at the end of life, I have been watching the implementation and impact of medical aid in dying in other states for almost thirty years. I was concerned at first that there was going to be a disproportionate use of medical aid in dying in poor communities because of lack of access to quality care; because people would feel a duty to die in order to not be a burden to their family or other caregivers; because people would feel pressured by insurance companies; or because the law would be expanded to include people who did not have a terminal prognosis. None of these fears have materialized. I have seen thirty years of data from Oregon and other states that shows that medical aid in dying laws like the MAID Act contain robust safeguards that prevent its abuse.

19. My decision to pursue medical aid in dying in the final months of my life, or not, is entirely voluntary and my decision alone. I have experienced an incredible peace of mind since the MAID Act was signed into law in February 2026, knowing that I will be able to access this healthcare option and have the medication available to me, even if I ultimately decide not to use it. The knowledge that the Act empowers me to have control over the manner and timing of my

inevitable death from ALS has made this otherwise difficult part of my life a little easier and given me the freedom to fully live my life without fear of death and the dying process.

20. I have reviewed the complaint in this case, and am deeply concerned that this important healthcare option may be taken away from me.

21. If the MAID Act does not go into effect as planned in August 2026, the thoughtful and emotional end-of-life planning I have engaged in with my medical team and my family will be compromised. I will again become more focused on the uncertainties of my death than the joy of living whatever time I have left to the fullest. I am worried the option of medical aid in dying will not be available for me if or when I choose to use it.

22. Terminally ill New Yorkers should not have to feel powerless and without access to a full range of safe healthcare options. Blocking access to medical aid in dying will deprive me and many like me of our autonomy and ability to make our own end-of-life decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 19 day of June, 2026.

Jeremy Boal, M.D.