**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs,*

v.

Case No. 1:26-cv-03492

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants.*

**DECLARATION OF DR. ANNE GURNETT BANDER**

I, Dr. Anne Gurnett Bander, declare and state:

1. I am over 18 years of age and am otherwise competent to make this declaration based on my personal knowledge of the subject matter contained here. If called as a witness, I could and would competently testify to each of the following facts.

2. I am 72 years old and a New York state resident. I moved to New York from the United Kingdom in 1985 to work in the pharmaceutical industry after completing my doctorate in biochemistry at Cambridge. I planned to stay for two years, but have lived in New York for over 40 years. In 1996, I married my husband, Jonathan ("Jon"), and we enjoyed an active and exciting life traveling the world, skiing, hiking, and scuba diving. On one of our many trips, Jon dropped his ski pole which, while seemingly minor, was our first indication that something was wrong.

3. In 2017, Jon was diagnosed with amyotrophic lateral sclerosis (ALS). ALS is a progressive nervous system disease that affects a person's mobility, speech, and body functions, eventually causing death. Jon was very familiar with ALS because it is the disease that had ended his father's life years before. There is currently no cure for ALS.

4. Jon did not let his ALS diagnosis slow him down or keep him away from the world. We traveled as much as we possibly could, scuba diving three separate times in 2018, and traveling to India, Japan, and Europe. Even as his legs weakened, Jon was able to continue skiing by using adaptive ski braces. We enjoyed as much of life as we could before ALS prevented Jon from traveling and adventuring. In May 2021, Jon died at home, where I cared for him with the help of a professional caregiver who is now one of my closest friends.

5. Jon's death—just a month before our twenty-fifth wedding anniversary, and four days after his sixty-sixth birthday—was a huge and tragic event in my life, but I refused to let grief consume me. I continued to travel on my own and with friends, often spending a few

months in Colorado to ski during the winter. During one of my trips back to the U.K., I fell unexpectedly. While I initially blamed my bad knee, the unexpected falls continued, and I began to realize there was something wrong.

6. In August 2025, after nearly two years of working with my doctors to determine the cause of my falls, I was diagnosed with ALS. The diagnosis took so long in part because it is extraordinarily rare for both people in a marriage to have ALS.

7. Being diagnosed with ALS was overwhelming, confusing, and frightening because I was with Jon through his ALS and knew what was coming.

8. Jon was aware of all his end-of-life healthcare options, including relocating to a state where medical aid in dying was available, but decided against it. Jon chose the end-of-life path that worked best for him and I supported his decision, although it was devastating for me to experience his death so closely. When Jon died, he had been unable to speak for over a year. He was bedridden and unable to move his limbs or his hands.

9. Knowing firsthand what the end of life with ALS looks like, the autonomy to choose the manner and timing of my death gives me immense peace of mind and solace. Because medical aid in dying will be an available healthcare option for me in New York under the Medical Aid in Dying Act (“MAID Act” or the “Act”), I am able to focus on living, rather than dying.

10. I have a good support system of friends and caregivers in New York, and want to die in the place I have called home for the last 40 years—not in Switzerland, Oregon, or Vermont. Since my diagnosis, I have continued to travel the world, seeing Berlin, Paris, Florence, Rome, and Vietnam, and I plan to continue traveling for as long as I can, though I have

also had to cancel some plans due to my illness. Despite needing a walker, I am determined to enjoy life while I still can.

11. I go to an ALS clinic in New York every three months, which helps prepare me for my symptom progression over the next three months, and I am able to call my neurologist directly. I do everything I can to slow down the progression of my ALS: prescription drugs, injections, physical therapy, and occupational therapy. I am able to use a walker to move through the world right now, but I am very wobbly and am getting an electric wheelchair in the next few months.

12. Not everyone in my situation will choose medical aid in dying, and that is an important part of the Act—voluntary choice. I was raised in a very religious family. My brother, a preacher, supports my decision even though he would not make it for himself. People like me, who are facing certain death from an incurable and irreversible disease, should be allowed to choose the end-of-life healthcare option that fits best with their values and beliefs, even if others disagree.

13. I do not fear that I will be coerced into obtaining a prescription for medical aid in dying from my trusted healthcare provider. I understand the MAID Act requires at least three independent physicians to agree in order to confirm eligibility, and that the process can take time. My decision to pursue medical aid in dying in the final months of my life, if and when I ever qualify for the MAID Act, would be entirely voluntary and my decision alone.

14. My care team is focused on ensuring I have the best quality of life possible for as long as possible, while also respecting my personal healthcare decisions, including if and when I choose to use medical aid in dying.

15. I am a strong and vocal advocate for the option of medical aid in dying and volunteered with the Compassion & Choices campaign to pass the MAID Act. I have shared my story at demonstrations, and directly with Governor Hochul's staff, in order to do all that I could to ensure the MAID Act passed and is an available option for me if and when I qualify.

16. If the MAID Act does not go into effect as planned in August 2026, I am worried that the option of medical aid in dying will not be an available healthcare option for me if and when I qualify. Forcing people with six months or less to live to travel to another state or country to access the end-of-life healthcare option they need is cruel, unrealistic, and nearly impossible for most people. I want to stay in my home, surrounded by friends and caregivers I know and love at the end of my life.

17. Having the option of medical aid in dying available to me gives me space to live. It frightens me that this right could be taken away.

18. All New Yorkers deserve access to a full range of healthcare options. Denying access to medical aid in dying to qualified individuals will deprive people with an ALS diagnosis like me of our autonomy and ability to make our own end-of-life healthcare decisions in accordance with our values, morals, and beliefs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed by me on this 17 day of June, 2026.

Anne Gett Bander

Dr. Anne Gurnett Bander