# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, JOSÉ HERNANDEZ, ANITA CAMERON, SELF-INITIATED LIVING OPTIONS, INC., INDEPENDENT LIVING CENTER OF HUDSON VALLEY, REGIONAL CENTER FOR INDEPENDENT LIVING, UNITED SPINAL ASSOCIATION, NOT DEAD YET, NATIONAL COUNCIL ON INDEPENDENT LIVING, and INSTITUTE FOR PATIENTS' RIGHTS,

*Plaintiffs*,

v.

THE HONORABLE KATHY HOCHUL, in her official capacity as Governor of the State of New York, NEW YORK STATE DEPARTMENT OF HEALTH, THE HONORABLE JAMES V. MCDONALD, M.D. in his official capacity as Commissioner of the New York State Department of Health, NEW YORK STATE BOARD FOR MEDICINE, THE HONORABLE AMIT M. SHELAT, D.O. in his official capacity as Chair of the New York State Board for Medicine, NEW YORK STATE OFFICE OF MENTAL HEALTH, THE HONORABLE ANN MARIE T. SULLIVAN, M.D. in her official capacity as Commissioner of the New York State Office of Mental Health,

*Defendants*.

Case No. 1:26-cv-03492-OEM-JAM

**[PROPOSED] BRIEF OF INTERVENORS IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................... 1

STATEMENT OF FACTS ..................... 2

I. New York's Medical Aid In Dying Act ..................... 2

II. Intervenors ..................... 5

III. Procedural History ..................... 9

LEGAL STANDARD ..................... 10

ARGUMENT ..................... 10

I. Plaintiffs Are Not Likely To Succeed On The Merits ..................... 10

A. Plaintiffs' Disability Discrimination Claims Are Unlikely To Succeed ..................... 10

B. Plaintiffs' Equal Protection Claim Is Unlikely To Succeed ..................... 13

C. Plaintiffs' Due Process Claims Are Unlikely To Succeed ..................... 16

II. Plaintiffs Will Not Suffer Irreparable Harm Absent Injunctive Relief ..................... 20

III. The Balance Of Equities And Public Interest Strongly Weigh Against Injunctive Relief ..................... 22

CONCLUSION ..................... 23

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Best v. Craivan*,
2025 WL 2822301 (E.D.N.Y. Oct. 5, 2025) ........ 1, 10

*City of Cleburne, Texas v. Cleburne Living Center*,
473 U.S. 432 (1985) ........ 15

*Connecticut State Police Union v. Rovella*,
36 F.4th 54 (2d Cir. 2022) ........ 10

*Copeland v. Vance*,
893 F.3d 101 (2d Cir. 2018) ........ 16

*Corporation for Public Broadcasting v. Federal Emergency Management Agency*,
792 F. Supp. 3d 67 (D.D.C. 2025) ........ 22

*Curran v. Meyer*,
2025 WL 3763413 (D. Del. Dec. 30, 2025) ........ *passim*

*Dean v. Town of Hempstead*,
2024 WL 3849688 (E.D.N.Y. Aug. 16, 2024) ........ 13

*Deide v. Day*,
676 F. Supp. 3d 196 (S.D.N.Y. 2023) ........ 14, 15

*Faiveley Transportation Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ........ 20

*FCC v. Beach Communications, Inc.*,
508 U.S. 307 (1993) ........ 15

*Goe v. Zucker*,
43 F.4th 19 (2d Cir. 2022) ........ 16

*Harlen Associates. v. Incorporated Village of Mineola*,
273 F.3d 494 (2d Cir. 2001) ........ 13

*Henrietta D. v. Bloomberg*,
331 F.3d 261 (2d Cir. 2003) ........ 10

*Hudson Shore Associates Limited Partnership v. New York*,
139 F.4th 99 (2d Cir. 2025) ........ 13, 16

*Javino v. Pergament*,
2013 WL 1952639 (E.D.N.Y. May 10, 2013) ..... 20

*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002) ..... 21

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003) ..... 16

*Marino v. City University of New York*,
18 F. Supp. 3d 320 (E.D.N.Y. 2014) ..... 15

*McElwee v. County of Orange*,
700 F.3d 635 (2d Cir. 2012) ..... 10

*Mendoza-Lebron v. Adams*,
2025 WL 1920365 (E.D.N.Y. July 11, 2025) ..... 10, 13

*National Association for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025) ..... 21, 22

*Odums v. Niblack*,
2024 WL 4665268 (E.D.N.Y. Nov. 4, 2024) ..... 13

*Purgess v. Parauda*,
2021 WL 2269540 (S.D.N.Y. June 3, 2021) ..... 21

*Siguencia-Romero v. Joyce*,
2025 WL 3090887 (S.D.N.Y. Nov. 5, 2025) ..... 21

*Squirewell v. City of New York*,
2026 WL 1284249 (S.D.N.Y. May 11, 2026) ..... 20

*Tooly v. Schwaller*,
919 F.3d 165 (2d Cir. 2019) ..... 18

*United Spinal Association v. California*,
2024 WL 1671167 (C.D. Cal. Mar. 27, 2024) ..... 12, 14, 19, 20

*United States v. Skrmetti*,
605 U.S. 495 (2025) ..... 15

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ..... 17

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) .................................................................................... 22

*Wright v. City of New York*,
2010 WL 167951 (E.D.N.Y. Jan. 6, 2010) ................................................................... 10

**Statutes**

N.Y. Pub. Health Law § 2899-d *et seq.* ......................................................................... *passim*

**Other Authorities**

Compassion & Choices, *Medical Aid-in-Dying Utilization Report* (Mar. 31, 2026), https://compassionandchoices.org/wp-content/uploads/2024/02/final_utilization-report-3.31.26.pdf ............................................................................................ 4, 19

Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Retraction Note: Regardless of Inequities in Care, Terminal Anorexia Nervosa Exists: A Response to Sharpe et al.*, J. EATING DISORDERS (Jul. 17, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10353152/ ................................. 21

Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal Anorexia Nervosa: Three Cases and Proposed Clinical Characteristics*, J. EATING DISORDERS (Feb. 15, 2022), https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3)........................ 21

Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-state-law (last visited June 22, 2026)................................................................ 3

Sponsor's Mem., N.Y. Senate Bill S138 .................................................................... 15, 18

## PRELIMINARY STATEMENT

Plaintiffs—two individuals and eight organizations—seek a preliminary injunction enjoining New York's Medical Aid in Dying Act (the "Act") from going into effect on August 5, 2026.[1] The Act that Plaintiffs ask this Court to enjoin has a narrow, singular purpose: to give terminally ill New Yorkers an additional end-of-life healthcare option—medical aid in dying ("MAID"). The Act makes MAID accessible only to mentally capable adults with a terminal illness and prognosis of six months or less to live who voluntarily request the medication from their trusted physician. Those who make a request for the medication must follow the Act's stringent procedural requirements, which are designed to ensure that any decision to obtain and use MAID is informed, voluntary, and free from coercion. The Act does not require anyone to request or use the medication provided for under the Act, nor does it require any healthcare provider to prescribe this medication to a patient.

Plaintiffs fall far short of the demanding standard for the extraordinary remedy of a preliminary injunction for multiple reasons.

*First*, Plaintiffs' claims are not likely to succeed on the merits. Plaintiffs' disability discrimination claims are unlikely to succeed because the Act does not target people living with disabilities—in fact, it expressly prohibits qualifying for MAID based solely on disability—and does not exclude Plaintiffs (or anyone else) from participating in or receiving benefits from any government program. Plaintiffs' constitutional claims fare no better. The Act does not violate equal protection, because it does not treat similarly situated people differently and is rationally

---

[1] Plaintiffs initially moved for a temporary restraining order ("TRO"), Dkt. 2, which the Court denied on June 15, 2026, *see* O.S.C., June 15, 2026. The Court further ordered that Plaintiffs' motion would be treated as a request for a preliminary injunction, *see id.*, which is governed by the same standard as a request for a TRO, *see, e.g.*, *Best v. Craivan*, 2025 WL 2822301, at *1 (E.D.N.Y. Oct. 5, 2025).

related to New York State's legitimate interest in allowing mentally competent, terminally ill adults the option to obtain a prescription for medication that will bring about a peaceful death if the qualified patient chooses to self-administer it. Nor does the Act violate due process, as it does not implicate a fundamental right and does not deprive anyone of anything at all, let alone without due process.

*Second*, Plaintiffs cannot show irreparable harm. The individual Plaintiffs are adamant in their desire not to use MAID, and nothing in the Act compels them to. The organizational Plaintiffs remain free to pursue their core business activities as they currently do. Plaintiffs' asserted injuries are thus remote and speculative, not actual and imminent.

*Third*, the balance of equities and the public interest weigh decisively against preliminary injunctive relief. A ruling for Plaintiffs would deprive qualified patients of access to MAID, denying them autonomy over their end-of-life healthcare decisions and the peace of mind from being able to control the manner and timing of their death from a terminal illness if they so choose. It would also upend the extensive and well-thought-out end-of-life plans of people like Intervenors, who have relied on the passage of the Act in planning their treatment and care. Plaintiffs face no comparable consequences.

For these reasons, Plaintiffs' motion for a preliminary injunction should be denied.

## STATEMENT OF FACTS

### I. New York's Medical Aid In Dying Act

After more than a decade of advocacy by New Yorkers living with terminal illnesses, grieving families, clinicians, and supporters across the state, Governor Kathy Hochul signed New York's Medical Aid in Dying ("MAID") Act into law on February 6, 2026. *See* Press Release, Governor Hochul Signs Medical Aid in Dying Act into New York State Law (Feb. 6, 2026), https://www.governor.ny.gov/news/governor-hochul-signs-medical-aid-dying-act-new-york-

state-law (last visited June 22, 2026). The Act goes into effect on August 5, 2026. *Id.* The Act provides terminally ill, mentally capable adults who have a prognosis of six months or less to live with the option to request, obtain, and decide to ingest aid-in-dying medication. *See* N.Y. Pub. Health Law § 2899-d *et seq.* To be eligible, the patient must be an adult, aged 18 or older; have a medically confirmed terminal illness that is incurable, irreversible, and will likely cause death within six months; be mentally capable of making an informed health care decision; and ultimately ingest the MAID medication by themselves. *See* N.Y. Pub. Health Law § 2899-d (defining key terms as used in the Act); *id.* § 2899-f(4) (providing that the patient "may self-administer the medication to themselves" and that a "health care professional or other person shall not administer the medication"). The Act expressly provides that "[n]o person shall qualify for medical aid in dying ... solely because of age or disability." *Id.* § 2899-e(4).

In addition to these eligibility criteria, the Act incorporates numerous requirements to ensure that every patient exercising rights under the Act makes a completely voluntary choice to do so.

*First*, the patient wishing to obtain a prescription under the Act must provide the attending physician with both an oral and a written request. N.Y. Pub. Health Law § 2899-e(1). The written request must be witnessed by two people—neither of whom can be a relative, someone who stands to benefit from the person's estate, or anyone who may benefit financially from the person's death, among other restrictions—while the oral request must be recorded by audio or video and permanently stored in the patient's medical record. *Id.* § 2899-e(1)-(3).

*Second*, the patient can rescind a request for MAID medication at any time. N.Y. Pub. Health Law § 2899-g(1). This option exists without regard to the patient's decision-making

capacity. *Id.* § 2899-g(2). Moreover, there is no requirement that a patient who qualifies for, requests, and receives the medication must administer it—ever.[2]

*Third*, the patient's attending physician must conduct an initial evaluation of the patient in person, unless the attending physician determines that an in-person visit would result in extraordinary hardship, in order to confirm that a patient has a terminal illness, has decision-making capacity, and has made the request voluntarily and without coercion. N.Y. Pub. Health Law § 2899-f(1). The attending physician must discuss with the patient all available end-of-life care options, including hospice and palliative care.[3] *Id.* § 2899-f(1)(e)-(g). The attending physician must also document diagnoses, determinations, and requests of the patient as part of the patient's medical records. *Id.* § 2899-j.

*Fourth*, the patient must also have a second, consulting physician confirm in writing to the attending physician and the patient that the patient requesting MAID is terminally ill, is making an informed decision, has decision-making capacity, and is acting voluntarily, without coercion. N.Y. Pub. Health Law § 2899-h.

*Fifth*, a mental health professional must evaluate the patient requesting MAID and provide a report in writing that assesses the patient's capacity to make an informed health care decision to the attending and consulting physicians. N.Y. Pub. Health Law § 2899-i(1).

---

[2] Data reported by nine of the 14 jurisdictions where MAID is authorized show that, since the first MAID law was enacted in Oregon nearly 30 years ago, over a third of individuals (up to 39%) who qualified for and obtained a MAID prescription may have never taken the medication. *See* Compassion & Choices, *Medical Aid-in-Dying Utilization Report*, 3 (Mar. 31, 2026) [hereinafter MAID Utilization Report], https://compassionandchoices.org/wp-content/uploads/2024/02/final_utilization-report-3.31.26.pdf.

[3] Most terminally ill adults who utilize MAID (89%) are enrolled in hospice or palliative care services at the time of their deaths, demonstrating MAID's compatibility with other supports. *See* MAID Utilization Report at 1.

*Sixth*, the Act imposes a mandatory five-day waiting period between when the prescription is written and when it can be filled, unless the attending physician determines that the patient is not expected to survive that period. N.Y. Pub. Health Law § 2899-f(3).

*Seventh*, healthcare providers are not required to prescribe the medication provided for by the Act. N.Y. Pub. Health Law § 2899-m(1).

## II. Intervenors

The Act is of critical importance to New Yorkers like Dr. Jeremy Boal, Iris Dudman, Stacey Gibson, Dr. Anne Gurnett Bander, Benny Pollak, and Nancy Murphy ("Intervenors").

Dr. Jeremy Boal is a 59-year-old New York resident with amyotrophic lateral sclerosis ("ALS"). Boal Decl. ¶ 2. ALS is a progressive neuro-degenerative disease that affects nerve cells in the brain and spinal cord. *Id.* The muscle weakness caused by ALS will eventually affect Dr. Boal's ability to breathe, speak, and swallow. *Id.* There is no cure for ALS, and based on the current progression of his disease, Dr. Boal's doctors believe that he has two to three years left to live. *Id.* ¶¶ 2, 6. Until his retirement in 2023 as a result of his ALS diagnosis, Dr. Boal was the Chief Clinical Officer of the Mount Sinai Medical Center in New York and spent a decade of his career working with home-bound patients with late-stage illnesses. *Id.* ¶ 4. From his experience as a practitioner, Dr. Boal knows that for some patients, "the degree of suffering they and their caregivers experience at the end of the patient's life is beyond measure." *Id.* ¶ 9. The passage of the Act has already benefited Dr. Boal, as he has "experienced an incredible peace of mind since the MAID Act was signed into law": knowing that he will eventually be able "to have control over the manner and timing of [his] inevitable death from ALS has made this otherwise difficult part of [his] life a little easier and given [him] the freedom to fully live [his] life without fear of death and the dying process." *Id.* ¶ 19. If the Act does not go into effect as expected, "the thoughtful and emotional end-of-life planning" that Dr. Boal has engaged in with his family and providers "will

be compromised," and he "will again become more focused on the uncertainties of [his] death than the joy of living whatever time [he has] left to the fullest." *Id.* ¶ 21.

The Act has similar significance for Intervenor Benny Pollak. Mr. Pollak is a 67-year-old New York resident. Pollak Decl. ¶ 2. Mr. Pollak lives with quadriplegia as a result of a car accident that caused a C5-C6 spinal cord injury in 1980. *Id.* ¶ 3. Mr. Pollak "want[s] autonomy, independence, and the ability to decide what end-of-life care works best for [him], and that is what the MAID Act provides." *Id.* ¶ 13. Mr. Pollak wishes "to protect the MAID Act, to preserve [his] end-of-life autonomy, and to contradict and challenge the paternalistic perspective that [he] cannot make [his] own informed decisions because [he] live[s] with a disability and use[s] a wheelchair." *Id.* Mr. Pollak is angered by the premise underlying Plaintiffs' suit—that all people with disabilities "think, feel, and believe the same thing." *Id.* ¶ 11. The related belief that "people with disabilities are 'weaker' or need more protection than others" is insulting to Mr. Pollak, who does "not need anybody—other than [himself] in collaboration with [his] healthcare providers—deciding what medical care [he] should or should not use." *Id.* ¶¶ 11-12. Mr. Pollak is also offended by the idea that he is "more susceptible to coercion because [he] live[s] with a disability." *Id.* ¶ 15. Mr. Pollak "need[s] autonomy and agency, not to be patronized." *Id.* ¶ 16. The Act offers Mr. Pollak "space to live [his] life without thinking about some future with unbearable suffering from a terminal illness." *Id.* ¶ 17. If the Act did not take effect, Mr. Pollak would be stripped of his "right to decide what is best for [him] based on [his] individual circumstances." *Id.*

Dr. Anne Gurnett Bander is a 72-year-old New York resident whose husband, Jon, was diagnosed with ALS in 2017. Bander Decl. ¶ 3. In 2021, four days after his sixty-sixth birthday and just a month before their twenty-fifth wedding anniversary, Mr. Bander died at home. *Id.* ¶¶ 4-5. At the time of his death, Mr. Bander was bedridden, could not move his hands or limbs, and

had been unable to speak for over a year. *Id.* ¶ 8. Two years later, Dr. Gurnett Bander began having unexpected falls, and in 2025 she too was diagnosed with ALS. *See id.* ¶¶ 5-6. "Knowing firsthand what the end of life with ALS looks like," Dr. Gurnett Bander feels "immense … solace" from the Act's passage. *Id.* ¶ 9. Dr. Gurnett Bander believes that "[a]ll New Yorkers deserve access to a full range of healthcare options" and that people like herself "should be allowed to choose the end-of-life healthcare option that fits best with their values and beliefs, even if others disagree." *Id.* ¶¶ 12, 18. If the Act were enjoined, "people with six months or less to live" would be forced "to travel to another state or country to access the end-of-life healthcare option they need," which is "cruel, unrealistic, and nearly impossible for most people." *Id.* ¶ 16. When she faces her own death, Dr. Gurnett Bander does not want to go elsewhere, but wishes "to stay in [her] home, surrounded by friends and caregivers [she] know[s] and love[s] at the end of [her] life." *Id.*

The Act is likewise crucial for Intervenor Iris Dudman. Ms. Dudman is a 76-year-old New York resident who was diagnosed with a recurrence of glioblastoma in November 2025. Dudman Decl. ¶ 2. Glioblastoma is a highly aggressive, incurable brain cancer, and Ms. Dudman "likely only ha[s] months, not years, left to live." *Id.* Ms. Dudman witnessed both of her parents suffer drawn-out deaths, whereas her uncle had a peaceful death in Oregon via MAID many years ago. *Id.* ¶ 8. Because of her uncle's positive experience with MAID, and her desire to avoid the suffering that her parents experienced, Ms. Dudman has spent the last three years advocating for the Act. *Id.* ¶¶ 9, 13. Ms. Dudman believes that qualified New Yorkers should have access to MAID as a healthcare option and wants to be able to access it when her glioblastoma progresses to its final stages and her death is imminent. *Id.* ¶ 15. Since the Act was passed, Ms. Dudman has "experienced an increased sense of peace," knowing that she "will be able to access this healthcare

option and have the medication available to [her], even if [she] ultimately decide[s] not to use it." *Id.* ¶ 17. Were the Act to be enjoined, Ms. Dudman would be deprived of her "autonomy and ability to make [her] own end-of-life decisions in accordance with [her] values, morals, and beliefs." *Id.* ¶ 20.

Stacey Gibson is a 74-year-old New York resident who has been diagnosed with multiple cancers, including breast cancer, lung cancer, and B-cell lymphoma. Gibson Decl. ¶ 2. While Ms. Gibson's breast and lung cancers are thankfully in remission, unfortunately, her lymphoma is incurable. *Id.* Ms. Gibson was inspired to begin advocating for the Act by her experience with the death of her beloved husband, Sid, who died of spinocerebellar ataxia, a terminal progressively degenerative neurological disease similar to ALS. *Id.* ¶¶ 6-7. Spinocerebellar ataxia caused Mr. Gibson to lose much of his ability to breathe, speak, and swallow, and he would gag frequently, causing a great deal of suffering before his death in 2014. *Id.* ¶¶ 9-10. Because MAID was not a healthcare option that was available to Mr. Gibson, it is important to Ms. Gibson that qualified New Yorkers have the option of MAID, "so they can choose not to endure the kind of suffering that Sid did at the end of his life." *Id.* ¶ 13. Additionally, Ms. Gibson "want[s] the option to choose medical aid in dying if" she qualifies. *Id.* ¶ 14. Ms. Gibson is not certain that she would use MAID, "but its existence as an option is a comfort to [her] now." *Id.* ¶ 15. Should the Act not take effect, Ms. Gibson and terminally ill New Yorkers would be "without access to a full range of safe healthcare options" and made "to feel powerless." *Id.* ¶ 21.

Nancy Murphy is an 87-year-old New York resident who is currently in remission from triple-negative breast cancer ("TNBC"). Murphy Decl. ¶ 2. TNBC is extremely aggressive, with a greater than 25% chance of recurrence. *Id.* ¶ 5. Ms. Murphy has been a hospice volunteer for many years and has "witnessed death and dying." *Id.* ¶ 9. As such, Ms. Murphy "understand[s]

the suffering of a long, lingering death and want[s] to avoid that." *Id.* Ms. Murphy became passionate about advocating for MAID after experiencing her sister Joan's death from terminal ovarian cancer. *Id.* ¶ 10. After receiving a prognosis of months to live, and because she lived in Vermont where MAID is available, Joan began the process of obtaining MAID medication, wanting it on hand even if she never decided to use it. *Id.* Joan became weaker and weaker, "until she was in a hospital bed in her living room, unable to move or help herself in any way," and eventually "decided on her final day." *Id.* She ingested her medication at home "surrounded by her loved ones." *Id.* This was "a profound, beautiful, and meaningful experience for [Ms. Murphy] and [her] family." *Id.* Ms. Murphy firmly believes that "[e]veryone should have the option to die the way Joan did." *Id.* Just like her sister, Ms. Murphy "want[s] to be in charge of when [she] die[s], where [she] die[s], and with whom [she] die[s]." *Id.* ¶ 11. Ms. Murphy "want[s] to be surrounded by [her] loved ones when [she] die[s], just like Joan was surrounded by people who loved her." *Id.* "Medical aid in dying gives [Ms. Murphy] that choice." *Id.* Ms. Murphy's view is that the choice to use MAID or not is a personal decision, and she believes that "[t]hose who do not want to use the option" of MAID should not be able to "prevent other people from accessing it." *Id.* ¶ 12.

## III. Procedural History

On June 11, 2026, after waiting four months after the Act was signed, Plaintiffs filed suit, Dkt. 1 ("Complaint"), and simultaneously moved for a TRO seeking to bar the Act's implementation, Dkt. 2 ("TRO Motion"). On June 15, 2026, the Court denied Plaintiffs' request for a TRO but ordered Defendants to respond to "Plaintiffs' request for preliminary injunctive relief by June 23, 2026," ahead of a preliminary injunction hearing to be held on June 25, 2026, "as to why a preliminary order should not issue enjoining Defendants from implementing and

enforcing New York's Medical Aid in Dying Act." Order to Show Cause ("O.S.C."), June 15, 2026.

## LEGAL STANDARD

"The standard for granting a TRO is the same as the standard governing preliminary injunctions." *Best v. Craivan*, 2025 WL 2822301, at *1 (E.D.N.Y. Oct. 5, 2025). Either "is a drastic remedy that will not be granted lightly." *Wright v. City of New York*, 2010 WL 167951, at *1 (E.D.N.Y. Jan. 6, 2010). "A party seeking injunctive relief through either a temporary restraining order or a preliminary injunction must 'establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest.'" *Craivan*, 2025 WL 2822301, at *1 (quoting *Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022)).

## ARGUMENT

### I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Plaintiffs fail to meet the standard for a preliminary injunction because they are not likely to succeed on the merits of any of their claims.

#### A. Plaintiffs' Disability Discrimination Claims Are Unlikely To Succeed

The Act does not discriminate against anyone for any reason, including people with disabilities. To show a likelihood of success on any of their disability discrimination claims under Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act ("ADA"), and Section 1557 of the Affordable Care Act ("ACA"), Plaintiffs must establish, among other things, that they were "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or [were] otherwise discriminated against by [defendants]

because of [their] disabilit[ies]." *Mendoza-Lebron v. Adams*, 2025 WL 1920365, at *7 (E.D.N.Y. July 11, 2025) (quoting *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (explaining that "unless one of those subtle distinctions [between the ADA and the Rehabilitation Act] is pertinent to a particular case, we treat claims under the two statutes identically"). Plaintiffs cannot demonstrate either of these elements.

*First*, the Act does not exclude Plaintiffs from participating in or receiving benefits from any government program. Rather, the statute allows qualified patients the right to access the full spectrum of end-of-life care, including medical aid in dying as one of many healthcare options. *See supra*, at 3-5. When analyzing a similar challenge to Delaware's MAID law, a Delaware district court relied on this distinction in concluding "that Plaintiffs are not likely to succeed on their claims under the ADA, Rehabilitation Act, and/or Affordable Care Act." *Curran v. Meyer*, 2025 WL 3763413, at *9 (D. Del. Dec. 30, 2025), *appeal docketed*, No. 26-1001 (3d Cir. Jan. 2, 2026). In that case, an individual plaintiff with quadriplegia because of a severe spinal cord injury and six organizations sought a TRO enjoining the implementation and enforcement of Delaware's End of Life Options Act ("EOLOA"), 16 Del. C. § 2501C *et seq*. In analyzing the merits of the plaintiffs' disability discrimination claims, the court observed that the EOLOA did not remove access to any existing suicide prevention programs, but rather added an additional healthcare option also available to terminally ill Delawareans, regardless of disability, and that there is no "case where discrimination under the ADA (or Rehabilitation Act or ACA) was found by virtue of a person with disabilities being granted *more* options than their non-disabled counterparts." *Id.* (emphasis in original). Similarly, a California federal district court analyzing a challenge to that state's MAID law, Cal. Health & Safety Code § 443, *et seq.*, concluded that "discrimination occurs

when an individual is excluded from participation in or denied the benefits of a service … not when he or she chooses *not* to participate in or receive the benefits of the service." *United Spinal Ass'n v. California*, 2024 WL 1671167, at *6 (C.D. Cal. Mar. 27, 2024) (emphasis added), *appeal docketed*, No. 24-2751 (9th Cir. Apr. 30, 2024).

Also as in *Curran*, Plaintiffs here present no evidence to contradict the plain fact that the Act leaves preexisting government services intact, including those related to suicide prevention discussed in Plaintiffs' motion, *see* TRO Mot. at 11, allowing Plaintiffs to continue accessing them regardless of the Act's implementation. *See Curran*, 2025 WL 3763413, at *9 ("Contrary to Plaintiffs' suggestion, nothing in Delaware's EOLOA could reasonably be read to deny people with disabilities under the ADA with access to suicide prevention services."). Even if any of the individual Plaintiffs decided to decline these other government services because they one day became eligible and decided to pursue MAID—which may never happen—that would not be enough to succeed on their discrimination claims. As the court concluded in *United Spinal*, "[f]atal to Plaintiffs' claims … is that a terminally ill patient's decision to request aid-in-dying medication—and accordingly, to not participate in or seek the benefits of other public health services—is voluntary." 2024 WL 1671167, at *6.

*Second*, even assuming that Plaintiffs showed that the Act denied them a government benefit (it does not), Plaintiffs are unlikely to succeed on their disability discrimination claims because the Act does not distinguish based on disability and contains express protections to ensure that a terminal illness with a six-month-or-less prognosis is the key eligibility factor—not the existence of a disability. Despite conspicuously omitting any reference to § 2899-e(4) from their Complaint and motion, Plaintiffs cannot deny that this provision of the Act explicitly provides that disability on its own does not qualify someone for MAID. *See* N.Y. Pub. Health Law § 2899-e(4)

("No person shall qualify for medical aid in dying under this article solely because of age or disability."). If a patient has a qualifying terminal illness and prognosis and complies with the Act's procedural requirements, they would be eligible to request MAID regardless of whether they *also* have a disability. Moreover, nothing in the Act precludes patients who decide to pursue MAID from accessing any other government services "because of [their] disabilit[ies]." *Mendoza-Lebron*, 2025 WL 1920365, at *7.

At bottom, because the Act "does not deny people with disabilities the right to suicide prevention services" or any other government benefit, and because it does not "contain any provisions encouraging or steering patients toward" MAID, the Act "does not amount to discrimination or otherwise violate the ADA, Rehabilitation Act, or Affordable Care Act." *Curran*, 2025 WL 3763413, at *9. "Accordingly, Plaintiffs' request for a [preliminary injunction] under [these] counts [should be] denied on the merits." *Id.*

**B. Plaintiffs' Equal Protection Claim Is Unlikely To Succeed**

Plaintiffs' equal protection claim fares no better. To show a likelihood of success on a facial challenge under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 11 of the New York State Constitution, a plaintiff must demonstrate that in all cases, the government failed to "treat all similarly situated people alike." *Odums v. Niblack*, 2024 WL 4665268, at *3 (E.D.N.Y. Nov. 4, 2024) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)); *see also Hudson Shore Assocs. Ltd. P'ship v. New York*, 139 F.4th 99, 107 (2d Cir. 2025) (explaining that "the Supreme Court has made facial claims the most difficult challenge to mount successfully" and that such challenges require plaintiffs to show "that the law is unconstitutional in all of its applications" (cleaned up)); *Dean v. Town of Hempstead*, 2024 WL 3849688, at *43 (E.D.N.Y. Aug. 16, 2024) ("New York State

Courts apply the same analysis for equal protection claims under the Fourteenth Amendment of the United States Constitution and Article 1 § 11 of the New York State Constitution."). Plaintiffs cannot make this showing because, as discussed below, patients with a terminal illness are not a suspect class, *see, e.g.*, *Deide v. Day*, 676 F. Supp. 3d 196, 220 (S.D.N.Y. 2023), because the Act treats all people alike for purposes of determining eligibility for MAID (whether they also have disabilities or not), and because the Act is rationally related to a legitimate state interest.

Here, Plaintiffs allege that the Act makes two classifications: (1) terminally ill individuals (who qualify for MAID under the Act) and (2) non-terminally ill individuals. *See* Compl. ¶¶ 141-142; TRO Mot. at 13. As an initial matter, Plaintiffs' equal protection claim fails because they cannot show that the Act treats "similarly situated" parties differently in all circumstances. As discussed above, the Act expressly prohibits anyone from qualifying for access to MAID based solely on their disability, *see* N.Y. Pub. Health Law § 2899-e(4), thereby treating all people alike for purposes of evaluating MAID eligibility regardless of disabilities. That is, the Act still requires anyone living with a disability to have a terminal illness, a prognosis of six months or less to live, and to comply with the Act's procedural requirements to be eligible to receive a MAID prescription, which are the same requirements the Act imposes on individuals without disabilities. Additionally, as the *United Spinal* court observed, to the extent the Act treats terminally ill patients differently, a fundamental difference between terminally ill patients who qualify for MAID and those who are ineligible for MAID is that the former group—that is, those with "an incurable and irreversible illness or condition" who will die within six months, N.Y. Pub. Health Law § 2899-d(17)—"face a distinctive prospect of pain and suffering associated with the dying process, along with heightened emotional anxiety related to that process" that those without such a prognosis do not face. *United Spinal Ass'n*, 2024 WL 1671167, at *7 (internal quotation marks omitted); *see*

*also supra*, at 5-9. "That the latter group does not face the imminent possibility of death … is sufficiently dispositive to render the two groups fundamentally dissimilar" and doom Plaintiffs' equal protection claims. *United Spinal Ass'n*, 2024 WL 1671167, at *7.

Even assuming that these groups are similarly situated, Plaintiffs' equal protection claim still fails. Because neither terminally ill individuals nor individuals with a disability are a suspect class, the Act is subject to rational basis review. *See, e.g.*, *Deide*, 676 F. Supp. 3d at 220 (identifying "race, national origin, or alienage" as the classifications warranting strict scrutiny) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)); *Marino v. City Univ. of New York*, 18 F. Supp. 3d 320, 340 (E.D.N.Y. 2014) ("Persons with disabilities are not a suspect class and review of their equal protection claims are subject to rational basis review." (citing *City of Cleburne*, 473 U.S. at 442-447)); *Curran*, 2025 WL 3763413, at *13 (concluding that Delaware's MAID law "is subject to rational basis review" because it does not "involve a classification based on a suspect or quasi-suspect class"). Under that standard, courts "will uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *United States v. Skrmetti*, 605 U.S. 495, 522 (2025) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

The Act easily survives rational basis review. The New York State Legislature's stated interests in enacting the Act include a desire to "enable mentally competent, terminally ill patients to choose to self-administer medication to bring about a peaceful death" and to "provide[] their physician, when acting in good faith in accordance with the provisions of the Act, protections from civil and criminal liability and professional disciplinary action." Sponsor's Mem., N.Y. Senate Bill S138, https://www.nysenate.gov/legislation/bills/2025/S138. Just as the *Curran* court concluded that similar reasons justified the classifications in the Delaware EOLOA, New York

legislators' stated interests supporting a finding that the Act's classifications are "rationally related to a legitimate governmental purpose" and pass rational basis review. *Curran*, 2025 WL 3763413, at *11, 13.

**C. Plaintiffs' Due Process Claims Are Unlikely To Succeed**

Plaintiffs' due process claims are likewise destined to fail. Plaintiffs assert both substantive and procedural due process claims under the Fourteenth Amendment of the United States Constitution and Article I, Section 6 of the New York State Constitution. *See* Compl. ¶¶ 212-221. However, the Act does not abridge any fundamental right, is justified by legitimate governmental interests, and does not involve any deprivation by the state. Plaintiffs have not established otherwise, particularly under the heightened requirements for a facial challenge, which require Plaintiffs to "go further" than the baseline showing for a due process claim and "show[] that the challenged statute 'cannot constitutionally be applied to anyone' because due process will be deprived in all circumstances." *Hudson Shore Assocs. Ltd. P'ship*, 139 F.4th at 113 (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)). Accordingly, both of Plaintiffs' due process claims fail.

*First*, Plaintiffs will fail on their substantive due process claim. In assessing a facial substantive due process challenge, courts consider two questions: "first, whether a fundamental right is implicated … and, second, once the appropriate level of judicial scrutiny is determined, whether the challenged regulations pass muster." *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022). "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Id.* (quoting *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003)). If the infringed right is fundamental, the court applies strict scrutiny; if not, it applies rational basis review. *Id.*

Plaintiffs allege that the Act infringes on their "right to live." *See, e.g.*, Compl. ¶ 145. But Plaintiffs provide no support for their conclusory assertion that "the Act implicates the fundamental right to life." TRO Mot. at 14. To the extent Plaintiffs seek to rely on *Washington v. Glucksberg*, 521 U.S. 702 (1997), this reliance is misplaced. In *Glucksberg*, the Supreme Court was confronted with the question of "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance." 521 U.S. at 723. Although the Supreme Court concluded that "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause," *id.* at 728, it did not say that there was conversely a "right to live" that would forever foreclose the constitutionality of MAID laws. In fact, the Supreme Court was careful to note that its holding in *Glucksberg* did not preclude the possibility that states could enact laws allowing for MAID, explaining that "Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide," and that the *Glucksberg* "holding permits this debate to continue, as it should in a democratic society." *Id.* at 735-736.

Plaintiffs' conclusory argument also fails because implicit in their overbroad framing of the implicated "right" is a claim that terminally ill individuals have a fundamental right "to be free from living within a jurisdiction that *permits* them—but does not require them—to [pursue MAID]." *Curran*, 2025 WL 3763413, at *11. Yet as in *Curran*, Plaintiffs have not cited to any "historical tradition" showing that such a "right" is "implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Zucker*, 43 F.4th at 30. Accordingly, the Court should find, as the *Curran* court did, that MAID statutes like the Act do not implicate a fundamental right. *See* 2025 WL 3763413, at *10.

Because the Act "does not implicate a fundamental right, the Act is subject to a rational basis review." *Curran*, 2025 WL 3763413, at *11. As discussed above, *see supra*, at 15-16, New York has articulated multiple state interests, including an interest in "enabl[ing] mentally competent, terminally ill patients to choose to self-administer medication to bring about a peaceful death" and "provid[ing] their physician, when acting in good faith in accordance with the provisions of the Act, protections from civil and criminal liability and professional disciplinary action," Sponsor's Mem., N.Y. Senate Bill S138, https://www.nysenate.gov/legislation/bills/2025/S138. These "are all legitimate governmental interests that pass rational basis review." *Curran*, 2025 WL 3763413, at *10.

*Second*, Plaintiffs' procedural due process claim is also unlikely to succeed because pursuing MAID is entirely voluntary under the Act. "A procedural due process claim requires the plaintiff to establish (1) possession by the plaintiff of a protected liberty or property interest, and (2) deprivation of that interest without constitutionally adequate process." *Tooly v. Schwaller*, 919 F.3d 165, 173 (2d Cir. 2019). Neither element is met.

The Act does not deprive anyone of anything, let alone "a protected liberty or property interest." The Act functions by expanding healthcare options available to qualified patients that they otherwise would not have, without taking away eligibility or access to any benefit, service, property, or right from any individuals. *See supra*, at 11-12.

Moreover, MAID is entirely voluntary. Only a patient whose attending physician (and several others) have determined that the patient is making the request for MAID "voluntarily, of the patient's own volition and without coercion" is permitted to submit a "request for and consent to self-administer" MAID medication. N.Y. Pub. Health Law §§ 2899-e(2)-(3). The Act also guarantees that patients who request the medication have a right to rescind their request "at any

time … without regard to the patient's decision-making capacity." *Id.* § 2899-g; *see also id.* § 2899-f(1)(i) (requiring the attending physician to "inform the patient that such patient may rescind the request for medication at any time and in any manner"). And prior to the patient receiving the medication, multiple individuals must confirm that the patient "has decision-making capacity, has made an informed decision and has made the request voluntarily of the patient's own volition and without coercion." *Id.* § 2899-f(1)(a) (attending physician's responsibilities); *see also id.* § 2899-e(3) (same for at least two qualifying witnesses); *id.* § 2899-h(2) (same for consulting physician); *id.* § 2899-i (mental health professional's responsibilities). The Act also expressly prohibits anyone except the patient who requested and was prescribed the medication from administering it. *Id.* § 2899-f(4) ("A health care professional or other person shall not administer the medication to the patient."). Data from jurisdictions where MAID is authorized shows that over a third of individuals prescribed MAID do not end up taking the medication, further underscoring its voluntary nature. *See* MAID Utilization Report at 3.

In short, Plaintiffs have not presented any evidence showing that the Act would require them to do anything, instead relying on a baseless assumption that multiple individuals will disregard the requirements imposed by the plain language of the Act that are designed to facilitate a voluntary decision to pursue MAID. Nor have Plaintiffs pointed to any evidence to show that the Act's multiple eligibility requirements will be disregarded in a way that facilitates coercion, let alone any actual evidence that the *state* would be the one acting maliciously. The "voluntary nature" of the Act is thus "[f]atal to Plaintiffs' procedural due process claim." *Curran*, 2025 WL 3763413, at *12.

Further dooming Plaintiffs' procedural due process claim is Plaintiffs' failure to "establish[] why the [Act's] safeguards … do not constitute sufficient 'process.'" *United Spinal*

*Ass'n*, 2024 WL 1671167, at *7. In *United Spinal*, the court observed that the California MAID law's "stringent hurdles a requesting patient must overcome before receiving aid-in-dying medication … were presumably included to avoid the otherwise foreseeable danger of involuntary death." *Id.* The court further noted that

> for a patient to relinquish involuntarily his or her right to life, in violation of the Due Process Clause, the following would have to occur: (1) a terminally ill patient, mistakenly or under coercion, makes two oral requests and a written request on a specific legislative form for aid-in-dying medication; (2) two witnesses to the patient's signing of the written form fail to recognize that the patient is incapable of making a voluntary and informed decision; (3) the patient's attending and consulting physicians both misdiagnose him or her as being capable of making an informed decision; and (4) after receiving the life-ending medication, the patient self-administers it against his or her own free will.

*Id.* The court in *United Spinal* concluded that "[t]his speculative chain of contingencies is far too implausible and unforeseeable to amount to a deprivation of process." *Id.* The New York MAID Act not only contains the same procedural "hurdles" to individuals seeking MAID medication but adds additional requirements. *See* N.Y. Pub. Health Law §§ 2899-d to 2899-k. Accordingly, this Court should reach the same conclusion as in *United Spinal* and find that Plaintiffs' procedural due process claim fails.

## II. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Plaintiffs fail to establish that they will suffer irreparable harm, which "is the single most important prerequisite" to a preliminary injunction. *Javino v. Pergament*, 2013 WL 1952639, at *1 (E.D.N.Y. May 10, 2013) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). "To establish irreparable harm, the alleged harm 'must be shown to be actual and imminent, not remote or speculative' and 'cannot be adequately redressed by final relief on the merits.'" *Squirewell v. City of New York*, 2026 WL 1284249, at *1 (S.D.N.Y. May 11, 2026)

(quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). "If the movant does not carry his burden to establish that he will suffer irreparable harm absent the issuance of an injunction, a court need not consider the other factors, such as likelihood of success on the merits." *Purgess v. Parauda*, 2021 WL 2269540, at *3 (S.D.N.Y. June 3, 2021).

The individual Plaintiffs have failed to establish that they will suffer any harm (let alone death, *see* TRO Mot. at 18) as a result of the Act, given that none of them has any desire to pursue MAID as an option. Moreover, "it is 'incorrect' that 'a violation of constitutional rights per se constitutes irreparable injury.'" *Siguencia-Romero v. Joyce*, 2025 WL 3090887, at *5 (S.D.N.Y. Nov. 5, 2025) (quoting *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 248 (2d Cir. 2025)).

Plaintiffs' attempt to manufacture an injury based on a purported threat to individuals with certain conditions also fails because these allegations are based on pure speculation or misrepresentations of the evidence. For example, Plaintiffs claim that the Act could harm people who are prescribed MAID medication based on a "terminal anorexia" diagnosis, Compl. ¶ 114, which they explain is a concept that "first emerged in a journal article in 2022," *id.* ¶ 111 (citing Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Terminal anorexia nervosa: three cases and proposed clinical characteristics*, J. EATING DISORDERS, at 1 (Feb. 15, 2022), https://jeatdisord.biomedcentral.com/articles/10.1186/s40337-022-00548-3). That article's authors, however, then retracted it and "apologi[zed] for the distress and the unintended negative impact of th[e] piece." Jennifer L. Gaudiani, Alyssa Bogetz & Joel Yager, *Retraction Note: Regardless of inequities in care, terminal anorexia nervosa exists: a response to Sharpe et al.*, J. EATING DISORDERS (Jul. 17, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10353152/. Plaintiffs have no evidence that, with this context, any providers would rely on such a disputed diagnosis as a basis for prescribing MAID.

Because the only purported harm that the individual Plaintiffs have alleged is "remote or speculative" rather than "actual and imminent," *Nat'l Ass'n for Gun Rts.*, 153 F.4th at 248, the individual Plaintiffs have not established that they will suffer irreparable harm if the preliminary injunction is denied.

The organizational Plaintiffs likewise fail to establish irreparable harm. Although they claim that the Act goes against their "core business activities," TRO Mot. at 19, "invoking harm to an organizational mission is no end-run around the demanding test for irreparable harm," *Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, 792 F. Supp. 3d 67, 76 (D.D.C. 2025) (finding no irreparable harm). Plaintiffs' abstract assertions aside, the Act does not deprive anyone, let alone disabled individuals, of any existing benefits, *see supra*, at 11, nor does it prevent the organizational Plaintiffs from continuing to provide any of the advocacy, counseling, or other support services that they currently do, *see supra*, at 12. Rather, it offers eligible individuals an additional benefit, in the form of an end-of-life healthcare option, that they can choose to utilize or not. The organizational Plaintiffs thus remain free to pursue their missions even without a preliminary injunction.

In short, Plaintiffs have failed to show that they will suffer irreparable harm absent injunctive relief.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY WEIGH AGAINST INJUNCTIVE RELIEF

These remaining factors strongly weigh against a preliminary injunction. *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) ("When the government is a party to the suit, [the court's] inquiries into the public interest and the balance of the equities merge."), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021). There is a compelling interest in both ensuring that New Yorkers, including Intervenors, are able to access MAID if they are eligible, and preventing

unnecessary pain and suffering. Enjoining the Act would prevent terminally ill New Yorkers who meet the Act's stringent eligibility criteria from obtaining and, if they then choose, utilizing MAID. Not only would this deny qualified patients autonomy over their healthcare decisions, including the manner and timing of their deaths, but it would also force them to die in a manner contrary to their personal morals, beliefs, and values, and in spite of their physicians' medical judgment that MAID is a suitable healthcare option. Enjoining the Act would specifically disrupt the expectations of individuals like Intervenors, who have relied on the passage of the Act in planning their end-of-life care and who would be plunged into a state of uncertainty and fear if the Act is even preliminarily enjoined. No countervailing factors weigh in Plaintiffs' favor, given that, as discussed above, the Act does not require the individual Plaintiffs to do anything, and it does not interfere with the organizational Plaintiffs' ability to continue providing the services that they already do.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

Dated: June 22, 2026

Respectfully submitted,

/s/ Ryan Chabot
WILMER CUTLER PICKERING
HALE AND DORR LLP
Ryan Chabot
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 295-6513
ryan.chabot@wilmerhale.com

COMPASSION LEGAL
THE END-OF-LIFE JUSTICE CENTER AT
COMPASSION & CHOICES
Veronica Darling, Esq. (She/Her/They)*

Jessica Pezley, Esq. (She/Her)*
8156 S. Wadsworth Blvd. E162
Littleton, CO 80128
(800) 247-7421
vdarling@compassionandchoices.org
jpezley@compassionandchoices.org

**Pro hac vice* forthcoming

*Attorneys for Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak*