**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED; JOSÉ HERNANDEZ; ANITA CAMERON; SELF-INITIATED LIVING OPTIONS, INC.; INDEPENDENT LIVING CENTER OF THE HUDSON VALLEY; REGIONAL CENTER FOR INDEPENDENT LIVING; UNITED SPINAL ASSOCIATION; NOT DEAD YET; NATIONAL COUNCIL ON INDEPENDENT LIVING; and INSTITUTE FOR PATIENT RIGHTS,<br>*Plaintiffs*,<br>- against -<br>KATHY HOCHUL, in her official capacity as Governor of the State of New York; NEW YORK STATE DEPARTMENT OF HEALTH; JAMES V. MCDONALD, M.D., M.P.H., in his official capacity as Commissioner of the New York State Department of Health; NEW YORK STATE BOARD OF MEDICINE; AMIT M. SHELAT, D.O., in his official capacity as Chair of the New York State Board for Medicine; NEW YORK STATE OFFICE OF MENTAL HEALTH; and ANN MARIE T. SULLIVAN, in her official capacity as Commissioner of the New York State Office of Mental Health,<br>*Defendants*. | Civ. Action No. 26-CV-3492 (OEM) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*
28 Liberty Street
New York, New York 10005
Tel: (212) 416-8771

HALEY L. HAWKINS
Assistant Attorney General
*Of Counsel*

**TABLE OF CONTENTS**


SUMMARY OF ARGUMENT ........ 1

STATEMENT OF FACTS ........ 2

STANDARD OF REVIEW ........ 5

ARGUMENT ........ 5

I. PLAINTIFFS FAIL TO ESTABLISH A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS ........ 5

A. Multiple District Courts Have Already Wholly Rejected Nearly Identical Challenges to Medical Aid in Dying Statutes in Three Other Jurisdictions ........ 5

B. Plaintiffs Fail to Establish Standing ........ 7

1. The Individual Plaintiffs Do Not Have Standing ........ 7

2. The Organizational Plaintiffs Do Not Have Organizational or Associational Standing ........ 10

a. Organizational Standing ........ 11

b. Associational Standing ........ 13

C. Plaintiffs Fail to State a Claim Under the ADA, the Rehabilitation Act, or the Affordable Care Act ........ 14

D. Plaintiffs Fail to State an Equal Protection Claim ........ 17

E. Plaintiffs Fail to State a Due Process Claim ........ 21

1. Substantive Due Process ........ 21

2. Procedural Due Process ........ 21

II. PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM ........ 23

III. THE PROPOSED INJUNCTION IS NOT IN THE PUBLIC INTEREST ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*,
176 F.4th 163 (2d Cir. 2026) .......... 10

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) .......... 8

*Bryman v. Murphy*,
No. 24-CV-2947, 2025 WL 3493889 (3d Cir. Dec. 5, 2025) .......... 21

*Camarillo v. Carrols Corp.*,
518 F.3d 153 (2d Cir. 2008) .......... 15

*Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) .......... 18

*Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
167 F.4th 605 (2d Cir. 2026) .......... 6, 12–13

*Curran v. Meyer*,
No. 25-CV-1475, 2025 WL 3763413 (D. Del. Dec. 30, 2025) .......... *passim*

*Ex parte Young*,
209 U.S. 123 (1908) .......... 18

*Food and Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 6, 8, 12–13

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
841 F.3d 133 (2d Cir. 2016) .......... 5

*Goldstein v. Hochul*,
680 F. Supp. 3d 370 (S.D.N.Y. 2023) .......... 18

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......... 20

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) .................... 23–24

*Grant v. Lamont*,
No. 22-CV-1223, 2023 WL 5435941 (D. Conn. Aug. 23, 2023) .................... 18–19

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .................... 11

*Hunt v. Wash. St. Apple Advert. Comm'n*,
432 U.S. 333 (1977) .................... 13

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998) .................... 11

*Jeannot v. New York State*,
762 F. Supp. 3d 217 (E.D.N.Y. 2025) .................... 18

*Keles v. Davalos*,
642 F. Supp. 3d 339 (E.D.N.Y. 2022) .................... 18

*Knife Rights, Inc. v. Vance*,
802 F.3d 377 (2d Cir. 2015) .................... 12

*Landau v. Good Samaritan Hosp., Bon Secours Charity Health Sys. Inc.*,
No. 23-CV-7227, 2026 WL 880540 (S.D.N.Y. Mar. 31, 2026) .................... 15

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .................... 8

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .................... 22

*Monserrate v. N.Y. St. Senate*,
599 F.3d 148 (2d Cir. 2010) .................... 5

*Murray v. Cuomo*,
No. 20-CV-3571, 2020 WL 2521449 (S.D.N.Y. May 18, 2020) .................... 5

*Nelson v. Colorado*,
581 U.S. 128, 135 (2017)……………………………………………………………...22

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................ 23–24

*Nordlinger v. Hahn*,
505 U.S. 1 (1992)........................................................................................ 18, 20

*Otoe-Missouria Tribe of Indians v. N.Y. St. Dep't of Fin. Servs.*,
769 F.3d 105 (2d Cir. 2014) .................................................................................. 24

*Phillips v. Girdich*,
408 F.3d 124 (2d Cir. 2005) .................................................................................. 18

Recommendation of Magistrate Judge, *United Spinal Ass'n v. Colorado*,
No. 25-CV-2014 (D. Colo. Mar. 31, 2026), ECF No. 57 ............................................ 7, 10, 14

*Rodriguez v. Winski*,
444 F. Supp. 3d 488 (S.D.N.Y. 2020) ......................................................................11

*Shibeshi v. City Univ. of N.Y.*,
531 F. App'x 135 (2d Cir. 2013) ............................................................................ 18

*Siani v. St. Univ. of N.Y. at Farmingdale*,
7 F. Supp. 3d 304 (E.D.N.Y. 2014) ........................................................................ 18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................... 8

*Steel Co. v. Citizens for Better Environment*,
523 U.S. 83 (1998)................................................................................................. 8

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)........................................................................................ 13–14

*United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996)............................................................................................. 13

*United Spinal Ass'n v. California*,
No. 23-CV-3107, 2024 WL 1671167 (C.D. Cal. Mar. 27, 2024)....................................*passim*

*United States v. Dauray*,
215 F.3d 257 (2d Cir. 2000)........................................................................................ 9

*Warth v. Seldin*,
422 U.S. 490 (1975)........................................................................................................11

*Washington v. Glucksberg*,
521 U.S. 702 (1997)........................................................................................... 18, 20

**Constitutional Provisions**

U.S. Const. amend. XIV……………………………………………………………………17

U.S. Const. amend. XIV, § 2…………………………………………………………..22

**Statutes**

<u>Federal Statutes</u>

42 U.S.C. § 12182(a)………………………………………………………………………14

<u>New York State Statutes & Legislation</u>

N.Y. Public Health Law § 2899-d, *et seq*..………………………………………………*passim*

S.B. 138, N.Y. St. Senate,
https://www.nysenate.gov/legislation/bills/2025/S138....................................…………..21

<u>Other State Statutes & Legislation</u>

16 Del. C. ch. 2501C *et seq.* ........................................................................................ 2

18 V.S.A. § 5281 *et seq.* ................................................................................................ 2

Cal. Health and Safety Code § 443 .................................................................................. 2

Colo. Rev. Stat. §§ 25-48-101 *et seq.* .......... 2

D.C. Code §§ 7-661.01 *et seq.* .......... 2

Haw. Rev. Stat. §§ 327L-1 *et seq.* .......... 2

ILSB 1950 .......... 2

Me. Rev. Stat. tit. 22 § 2140 .......... 2

Mont. Code Ann.§ 50-9-101 .......... 2

N.J. Stat. Ann. § 26:16 .......... 2

N.M. Stat. Ann. §§ 24-7c-1 *et seq.* .......... 2

Or. Rev. Stat. §§ 127.805–.995 .......... 2

Rev. Code Wash. § 70.245.030 .......... 2

**Other Authorities**

Medical Aid in Dying,
End of Life Choices New York, https://endoflifechoicesny.org/medical-aid-in-dying/ .......... 25

Medical assistance in dying: Overview,
Government of Canada, https://www.canada.ca/en/health-canada/services/health-services-benefits/medical-assistance-dying.html#a2 .......... 24

*New York Physicians Support Medical Aid in Dying*,
Compassion & Choices, https://www.compassionandchoices.org/wpcontent/uploads/2024/05/nyphysiciansurveyreportfinal.pdf .......... 25

*Siena Poll: New York Voters Continue to Support Medical Aid in Dying by Nearly 2-to-1 Margin*,
Compassion & Choices, https://compassionandchoices.org/news/ny-voters-2-1-support/ .......... 25

Defendants, by their attorney, Letitia James, Attorney General of the State of New York, respectfully submit this memorandum of law in opposition to Plaintiffs' motion for a preliminary injunction, filed June 11, 2026 (ECF No. 2) ("Pls.' MOL").[1]

## SUMMARY OF ARGUMENT

New York's Medical Aid in Dying Act (the "Act") permits New Yorkers who have a terminal illness that will result in their death within six months whether or not treatment is provided to receive medical aid in dying. The Act offers individuals with the appropriate decision-making capacity who are suffering under these specific, difficult circumstances the choice—subject to robust safeguards and under the care of their physicians—to self-administer medication to end their life with dignity and on their own terms. Plaintiffs in this case are not impacted by the Act, as they do not have terminal illnesses, but are ideologically opposed to the Act. Plaintiffs nevertheless filed this motion, asking the Court to overturn the will of New York's elected officials and prevent New Yorkers facing terminal illnesses from accessing the process made possible by the Act. The Court should reject this request for the reasons described herein.

First, this Court lacks subject matter jurisdiction, as neither individual nor organizational Plaintiffs have suffered an injury-in-fact sufficient to confer Article III standing. Accordingly, Defendants' respectfully request that the Court dismiss the case for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

Furthermore, even if the Court determines that some or all of Plaintiffs have standing, the Court must deny Plaintiffs' motion for a preliminary injunction because they fail to meet their

---

[1] Plaintiffs' motion was originally filed as a motion for a temporary restraining order. However, on June 15, 2026, the Court denied the motion for a temporary restraining order and ordered Defendants to respond to Plaintiffs' request for preliminary injunctive relief.

burden to show (1) a likelihood of success on the merits, (2) that irreparable harm will result absent an injunction, and (3) that the requested injunction is in the public interest.

## STATEMENT OF FACTS

On February 6, 2026, Governor Kathy Hochul signed into law the Medical Aid in Dying Act, N.Y. Public Health Law § 2899-d, *et seq.* The Act, which will go into effect on August 5, 2026, represents the culmination of significant and lengthy research and deliberation by the New York State Legislature, in conjunction with advocacy organizations and members of the public. The Act allows terminally ill adults with decision-making capacity to request, be prescribed, and self-administer medication to end their life, under certain circumstances and within the robust safeguards of the Act. With the new law, New York becomes the fourteenth jurisdiction in the country to provide an avenue for those suffering from terminal illnesses to die with dignity and self-determination.[2]

The Act sets out detailed procedures and restrictions to safeguard individuals. To constitute a "qualified individual" under the Act and be eligible to receive medication for self-administration, an individual must be an adult who resides in New York. § 2899-d(13). The patient must have a terminal illness or condition, possess decision-making capacity, and have made an informed decision regarding self-administration of medication to end their life. § 2899-d(15). A terminal illness or condition is defined as "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six

---

[2] Oregon, Washington, Montana, Vermont, California, Colorado, the District of Columbia, Hawaii, Maine, New Jersey, New Mexico, Delaware, and Illinois also have statutes providing for medical aid in dying. *See* Or. Rev. Stat. §§ 127.805–.995; Rev. Code Wash. § 70.245.030; Mont. Code Ann.§ 50-9-101; 18 V.S.A. § 5281 *et seq.*; Cal. Health and Safety Code § 443; Colo. Rev. Stat. §§ 25-48-101 *et seq.*; D.C. Code §§ 7-661.01 *et seq.*; Haw. Rev. Stat. §§ 327L-1 *et seq.*; Me. Rev. Stat. tit. 22 § 2140; N.J. Stat. Ann. § 26:16; N.M. Stat. Ann. §§ 24-7c-1 *et seq.*; 16 Del. C. ch. 2501C *et seq.*; ILSB 1950 (effective Sept. 12, 2026).

months *whether or not treatment is provided*." § 2899-d(17) (emphasis added). Decision-making capacity is defined as "the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, including medical aid in dying, and to reach an informed decision." § 2899-d(3). An informed decision is defined as a decision that is made "voluntarily, of the patient's own volition and without coercion" after being informed of the patient's medical diagnosis and prognosis; risks of the medication; probable results of the medication; the patient's ability to rescind the request or not self-administer the medication; and feasible alternatives and treatment options. § 2899-d(7).

Under the law, an individual seeking to self-administer medication in order to end their life must make an oral request, which must be recorded by an audio or video device, and then submit a written request to the individual's attending physician, § 2899-e(1). The patient must execute the written request in the presence of two witnesses who are not financially tied in any way to the patient, § 2899-e(3) (excluding, *inter alia*, relatives and domestic partners, individuals who stand to benefit financially from the patient's death, and agents acting as the patient's health care proxy or power of attorney from serving as witnesses), and in accordance with the relevant form provided in the Act, § 2899-k. The attending physician must examine the patient in person,[3] review their medical records, and in relevant part: (1) determine whether the patient has a terminal illness, has decision-making capacity, has made an informed decision, and has made the request voluntarily; (2) inform the patient that confirmations by a second consulting physician and a mental health

---

[3] Although the Act does provide an exception to the requirement that the evaluation be conducted in person, the in-person evaluation may only be waived if the attending physician determines "that requiring an in-person visit would result in extraordinary hardship to the patient." § 2899-f(1). Extraordinary hardship is defined as "circumstances in which an in-person examination would cause the patient undue pain or suffering, or would necessitate extraordinary expense or logistical burden for medically-necessary transportation." *Id.*

professional are required, and make referrals to such medical professionals;[4] (3) provide information and counseling regarding palliative care options; (4) ensure the patient is making an informed decision by engaging in a detailed discussion regarding, *inter alia*, the risks, probable results, and alternatives associated with the decision; (5) offer the patient referral to other treatment options; (6) provide educational material regarding hospice and palliative care; (7) discuss with the patient the importance of certain procedures in the self-administration of the medication; and (8) inform the patient that they may rescind the request at any time. § 2899-f(1)(a)–(k).

The Act requires the evaluation, input, and independent confirmation of three different medical professionals before medication can be prescribed. Specifically, only once the attending physician has received confirmation from a consulting physician and a mental health professional can the attending physician prescribe the medication. § 2899-f(2). The consulting physician must examine the patient and their medical records and confirm in writing that the patient has a terminal illness, is making an informed decision, has decision-making capacity, and is acting voluntarily. § 2899-h(1)–(2). The mental health professional must evaluate the patient and provide a written report to the attending physician and consulting physician regarding whether the patient has decision-making capacity to make an informed decision. § 2899-i(1). Once the attending physician, consulting physician, and mental health professional sign off, the attending physician may prescribe the medication, but the prescription cannot be filled until five days after it has been written, so that the patient must undergo a waiting period before self-administering the medication. § 2899-f(3) (requiring the five-day waiting period, unless the attending physician determines that

[4] A "consulting physician" is defined as "a physician who is qualified by specialty or experience to make a professional diagnosis and prognosis regarding a patient's terminal illness or condition." § 2899-d(4). The "mental health professional" must be a psychiatrist or psychologist with certain defined credentials. § 2899-d(11).

the patient will die before the expiration of the waiting period). If the patient chooses to use the prescribed medication, they must administer the medication themselves; a health care professional or other individual is not permitted to administer the medication. § 2899-f(4). A patient may rescind their request for medication under the Act at any time and in any manner. § 2899-g(1)–(2).

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Monserrate v. N.Y. St. Senate*, 599 F.3d 148, 154 (2d Cir. 2010). When the preliminary injunction would affect government action taken in the public interest pursuant to a statute or regulation, the moving party must demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016). Where a plaintiff "seeks a mandatory injunction against the government that would change the status quo existing when the case was filed," a heightened standard applies in which the plaintiff "must show a clear or substantial likelihood of success on the merits." *Murray v. Cuomo*, No. 20-CV-3571, 2020 WL 2521449, at *8 (S.D.N.Y. May 18, 2020).

## ARGUMENT

### I. PLAINTIFFS FAIL TO ESTABLISH A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. Multiple District Courts Have Already Wholly Rejected Nearly Identical Challenges to Medical Aid in Dying Statutes in Three Other Jurisdictions

As a growing number of jurisdictions pass legislation providing for medical aid in dying, nearly identical challenges to these laws have been lodged in three other jurisdictions by many of the same Plaintiffs in this case. All have been roundly rejected by the courts and the same result should issue in this matter.

Plaintiffs Not Dead Yet, United Spinal Association, National Council on Independent Living, and Institute for Patients' Rights, along with others, filed an action challenging Delaware's medical aid in dying law, which went into effect in January 2026, on nearly identical grounds as those asserted in this case. *See Curran v. Meyer*, No. 25-CV-1475, 2025 WL 3763413, at *1 (D. Del. Dec. 30, 2025). The court in *Curran* dismissed the case for lack of subject matter jurisdiction, finding that all plaintiffs—individual and organizational—lacked standing. *Id.* at *1, *6–8. The court also found that, "even if there were standing, . . . Plaintiffs' TRO motion . . . fails on the merits and is denied[,]" *id.* at *1, because plaintiffs failed to establish a likelihood of success on the merits as to their claims under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, the Affordable Care Act ("ACA"), and the Equal Protection and Due Process Clauses of the United States and Delaware Constitutions, *id.* at *8–13.

Similarly, in March 2024, Plaintiffs Not Dead Yet, United Spinal Association, and Institute for Patients' Rights, among others, brought an action challenging California's medical aid in dying statute in the Central District of California. *See United Spinal Ass'n v. California*, No. 23-CV-3107, 2024 WL 1671167, at *1 (C.D. Cal. Mar. 27, 2024). The court found that organizational plaintiffs established direct standing based on a now-rejected "frustration of purpose" rationale,[5] *see id.* at *3–4, but nevertheless dismissed the case, finding the individual plaintiffs lacked standing and plaintiffs failed to state claims under the ADA, the Rehabilitation Act, or the Equal Protection or Due Process Clauses of the United States Constitution, *see id.* at *5–7.

---

[5] The decision in *United Spinal Association* was issued two months prior to the Supreme Court's decision in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which rejected the "frustration of purpose" theory as a basis for organizational standing. *See Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (noting that, in *Alliance for Hippocratic Medicine*, the Supreme Court "rejected th[e] proposition" that "standing exists when an organization diverts its resources in response to a defendant's actions" (internal quotation marks omitted); *see also infra* Section I.B.2.a.

Most recently, the same three plaintiffs, along with others, filed an action challenging Colorado's medical aid in dying statute. *See* Recommendation of Magistrate Judge at 1, *United Spinal Ass'n v. Colorado*, No. 25-CV-2014 (D. Colo. Mar. 31, 2026), ECF No. 57. Consistent with Delaware and California, the Colorado magistrate judge has issued a report and recommendation, recommending that the case be dismissed for lack of standing as to all plaintiffs, organizational and individual. *See id.* at 14–29.

Finally, Plaintiffs here have not provided—and Defendants have been unable to locate—any cases in which plaintiffs were successful in challenging a medical aid in dying statute based upon any of the grounds Plaintiffs assert in this case.

## B. Plaintiffs Fail to Establish Standing

### 1. The Individual Plaintiffs Do Not Have Standing

Plaintiffs' action is brought on behalf of two individual plaintiffs, José Hernandez and Anita Cameron. Compl. ¶¶ 22, 27. Plaintiffs allege that Mr. Hernandez is paralyzed from the neck down due to a C5 spinal cord injury. *Id.* ¶ 23. Plaintiffs allege that Ms. Cameron lives with multiple sclerosis and congenital cerebellar ataxia, uses a wheelchair, is almost completely blind, and has high blood pressure, type 2 diabetes, high cholesterol, depression, dysthymia, and seasonal affective disorder. *Id.* ¶¶ 29, 33. Plaintiffs allege that Ms. Cameron "fears that with the passage of the Act, she will go to the doctor or hospital during a low point and will be steered into [medical aid in dying]." *Id.* ¶ 33. Plaintiffs allege that both Mr. Hernandez and Ms. Cameron "ha[ve] been injured as a direct result of Defendants' actions" because, "as [] seriously disabled person[s], [they are] at imminent risk of harm of being placed into an inferior tier of medical care due to the passage of the Act." *Id.* ¶¶ 26, 35. Plaintiffs contend that both Mr. Hernandez and Ms. Cameron "qualif[y] and [are] eligible for [medical aid in dying] pursuant to the Act because [they] would die within

six months *without medical support*." *Id.* ¶¶ 25, 32 (emphasis added). Both Mr. Hernandez and Ms. Cameron fail to allege an injury-in-fact and therefore lack standing because (1) they are categorically ineligible for medical aid in dying under the Act, and (2) even if they were eligible, their alleged injuries are far too hypothetical and attenuated to constitute injuries-in-fact.

To establish Article III standing, "a plaintiff must demonstrate (i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Injury-in-fact "is the 'first and foremost' of standing's three elements[,]" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)), and works to "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action[,]" *All. for Hippocratic Med.*, 602 U.S. at 381. "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical.'" *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Here, individual Plaintiffs are categorically ineligible for medical aid in dying under the Act based on the descriptions of their conditions. The Act is clear—to qualify for medical aid in dying, an individual must have a terminal illness or condition, which means "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, *produce death within six months whether or not treatment is provided*." § 2899-d(17) (emphasis added). Thus, under the Act, it is not enough that an illness or condition would be terminal if medical treatment were withdrawn; it must produce death within six months *even if treatment were provided*.

Plaintiffs do not allege that Mr. Hernandez's or Ms. Cameron's conditions will produce death within six months; indeed, Mr. Hernandez, with the assistance of others to complete his activities of daily living, has lived for thirty years with his spinal cord injury, and Ms. Cameron lives in her own home with the assistance of her wife. Compl. ¶¶ 23, 30; *see Curran*, 2025 WL 3763413, at *6 (noting that the individual plaintiff's quadriplegia "does not, without more, plausibly constitute the required 'medical probability' or 'death within 6 months' as a matter of law" and "[i]n fact, [p]laintiffs acknowledge that [plaintiff] has 'lived a full life' since becoming quadriplegic 36 years ago"). Moreover, Plaintiffs affirmatively state that Mr. Hernandez and Ms. Cameron believe that they qualify for medical aid in dying because they "would die within six months *without* medical support." Compl. ¶¶ 25, 32 (emphasis added). However, as was true in the nearly identical Delaware case, New York's Medical Aid in Dying Act "does not broadly confer eligibility to anyone with a condition that would, as a medical probability, die within six months without medical intervention." *Curran*, 2025 WL 3763413, at *6. Indeed, "[u]nder Plaintiffs' expansive interpretation . . . , absurd results would arise, such as rendering eligible for [medical aid in dying] those with medical ailments that can live long and vigorous lives with regular medical assistance, like type I diabetics that require regular insulin injections." *Id.*; *see United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) ("A statute should be interpreted in a way that avoids absurd results."). The plain text of the New York statute directly contradicts Plaintiffs' interpretation.[6]

---

[6] Indeed, Plaintiffs appear to completely misapprehend the requirements of the statute, contending that "[p]eople who would otherwise survive beyond six months if provided treatment or other supportive services are eligible for [medical aid in dying] regardless of whether those treatments or supports are denied by their insurance company, refused, or are not available." Pls.' MOL at 6. The statute is clear: if either the attending physician or the consulting physician determines that an individual will live for more than six months with medical treatment, that individual is not eligible to receive medical aid in dying. *See* § 2899-d(17).

Additionally, even if individual Plaintiffs were eligible under the Act, their alleged injuries are inherently hypothetical and therefore do not constitute injuries-in-fact. The individual Plaintiffs claim vaguely that they fear being "steered" toward the use of medical aid in dying due to "depression" or "den[ial] of care by [their] insurance[.]" Pls.' MOL at 2. But Plaintiffs' "alleged eligibility for aid-in-dying medication based on death without, or as a result of a decision to refuse, treatment and subsequent fear of being steered towards involuntary death by medical professionals, presents an attenuated and hypothetical harm that is insufficient to confer standing." *United Spinal Ass'n*, 2024 WL 1671167, at *4; *see Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 176 F.4th 163, 184 (2d Cir. 2026) ("If the alleged injury results from the independent decisions of a third party, that would break the chain of causation between the plaintiffs' injury and the challenged Government action for purposes of establishing standing.") (cleaned up).

Finally, in all three cases where courts have already considered the same concerns asserted by Plaintiffs in this case, the courts found that the individual plaintiffs did not have standing, either because they were not eligible for medical aid in dying under the relevant statute, because their alleged harm was too attenuated, or both. *See Curran*, 2025 WL 3763413, at *6; *United Spinal Ass'n*, 2024 WL 1671167, at *4–5; Recommendation of Magistrate Judge at 14–17, *United Spinal Ass'n*, No. 25-CV-2014. Accordingly, the individual Plaintiffs fail to establish standing because they are categorically ineligible for medical aid in dying under the Act and their alleged injury is far too hypothetical and attenuated to constitute an injury-in-fact.

2. The Organizational Plaintiffs Do Not Have Organizational or Associational Standing

Plaintiffs also bring this action on behalf of eight organizational Plaintiffs. An organizational plaintiff may satisfy its burden of establishing standing by asserting two types of

standing: organizational standing and associational standing. For the following reasons, organizational Plaintiffs fail to establish standing under either theory.

***a. <u>Organizational Standing</u>***

"'[A]n association may have standing in its own right to seek judicial relief to itself and to vindicate whatever rights and immunities the association itself may enjoy' under the organizational standing theory." *Rodriguez v. Winski*, 444 F. Supp. 3d 488, 492 (S.D.N.Y. 2020) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To establish organizational standing, a plaintiff "must meet the same standing test that applies to individuals[,]" *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998), and therefore must show: "(1) a distinct and palpable injury in fact to itself as an organization; (2) that is fairly traceable to the challenged action; and (3) that a favorable decision would redress its injuries." *Rodriguez*, 444 F. Supp. 3d at 492.

Here, organizational Plaintiffs allege that they have been injured directly as a result of Defendants' actions based upon harm to and interference with their "core business activities." *See* Compl. ¶¶ 21, 38–39, 42–43, 47, 54, 58, 62, 64. Specifically, they allege that "[t]he passage of the Act directly conflicts with [their] mission[s,]" *id.* ¶¶ 38, 42; *see id.* ¶ 54 (alleging that the Act has "injured [United Spinal Association's] core business activity of empowering and advocating for people with spinal cord injuries"), and will require them to expend significant resources, including time, money, and staff, in order to combat what they see as the Act's potential detrimental effects, *see id.* ¶¶ 20–21, 39, 43, 47, 54, 60, 64.

First, to the extent that Plaintiffs claim injury based upon a conflict or interference with their organizational missions, "such concerns and abstract opposition are insufficient to confer standing." *Curran*, 2025 WL 3763413, at *7 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (noting that organizational plaintiffs are required to show "far more than simply

a setback to the organization's abstract social interests" to establish standing)). "Like an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct no matter how longstanding the interest and no matter how qualified the organization." *All. for Hippocratic Med.*, 602 U.S. at 394.

Second, as to Plaintiffs' alleged economic and resource-based injuries, to the extent that they allege certain expenditures or resource allocation they have already made, these allegations concern past injury, which "might admit standing to sue for compensatory damages[, b]ut [] is not an injury that can be redressed through the prospective declaratory and injunctive relief sought in this action." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015). Plaintiffs *only* request declaratory and injunctive, not compensatory, relief. *See* Compl. at 78–79. And to the extent that Plaintiffs allege prospective expenditures, the causal link between the Act and those alleged injuries is too speculative and attenuated to confer standing.

The Supreme Court's holding in *Alliance for Hippocratic Medicine* is instructive on this point. In that case, plaintiffs claimed "various monetary and related injuries that they allegedly [would] suffer as a result of [the] FDA's actions—in particular, diverting resources and time from other patients to treat patients with mifepristone complications; increasing risk of liability suits from treating those patients; and potentially increasing insurance costs." *All. for Hippocratic Med.*, 602 U.S. at 390. The Court, in rejecting the legal theory that standing may be based on frustration of mission and diversion of resources, *see Conn. Fair Housing Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (discussing *Alliance for Hippocratic Medicine*), concluded that the "causal link between [the relevant law] and those alleged injuries"—namely, "various monetary and related injuries"—"is too speculative or otherwise attenuated to establish standing[,]" *All. for Hippocratic Med.*, 602 U.S. at 390. These are exactly the type of injuries

Plaintiffs allege in this case, *i.e.*, increasing time, money, and staff resources to advocate, educate, and provide services in response to the Act. "Such alleged impairment[s], however, do[] not confer standing in this action under the present circumstances as a matter of law" and "[w]ithout any plausible allegations of actual injury, [o]rganizational Plaintiffs' complaints amount to nothing more than a legal objection to the law, fueled by their strong moral, ideological, and policy beliefs, which does not satisfy the injury requirement." *Curran*, 2025 WL 3763413, at *7 (internal quotation marks omitted). Moreover, "[t]he choice of [Plaintiffs] to focus [their] resources on [the Act] 'to the detriment of other spending priorities' does not qualify as an injury in fact that confers standing under Article III." *Conn. Fair Housing Ctr.*, 167 F.4th at 618 (quoting *All. for Hippocratic Med.*, 602 U.S. at 370). Accordingly, Plaintiffs fail to establish organizational standing.

### ***b. Associational Standing***

To establish associational standing, an organization must show that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This requires, *inter alia*, that "an organization suing as a representative [ ] include at least one member with standing to present, in his or her own right, the claim (or type of claim) pleaded by the association." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). The organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, Plaintiffs do not clear this first hurdle.

As a preliminary matter, to the extent that organizational Plaintiffs claim association with the named individual Plaintiffs in this case, Plaintiffs fail to establish standing as to either Mr. Hernandez or Ms. Cameron for the reasons stated above. *See supra* Section I.B.1. Therefore,

because neither individual named Plaintiff has standing in their own right, organizational Plaintiffs cannot establish standing based on an association with either.

Other than the individual named Plaintiffs, the Complaint does not include any "identified member" of the organizational Plaintiffs' associations, much less articulate "specific allegations that . . . [one] ha[s] suffered or w[ill] suffer harm." *Summers*, 555 U.S. at 498; *see generally* Compl. Rather, at most, Plaintiffs make vague allusions to, for example, "many [ ] members [being] afraid that they will be denied necessary medical care and instead steered towards [medical aid in dying,]" Compl. ¶ 38, and the possibility that "members who are frustrated with lack of medical support may express to health care professionals that they rather not be alive[,]" *id.* ¶ 46, which are insufficient as a matter of law to confer associational standing. *See Curran*, 2025 WL 3763413, at *8 (finding that Plaintiffs failed to establish associational standing where they identified one association member, but that member was not eligible for medical aid in dying under the Delaware law and therefore did not have standing in her own right); Recommendation of Magistrate Judge at 17–20, *United Spinal Ass'n*, No. 25-CV-2014 (plaintiffs failed to identify any members that had standing to sue in their own right, despite the fact that they "could have easily surveyed their own members to determine whether any of them were facing an impending terminal diagnosis").

Accordingly, Plaintiffs lack standing, and Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction and dismiss the case for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

### C. Plaintiffs Fail to State a Claim Under the ADA, the Rehabilitation Act, or the Affordable Care Act

Under Title III of the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]" 42 U.S.C. § 12182(a). To state a

claim under Title III of the ADA, a plaintiff must allege "(1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her full and equal opportunity to enjoy the services defendants provide." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008). "Title III of the ADA, the [Rehabilitation Act], [and] the ACA . . . impose nearly identical requirements" so "[c]ourts in the Second Circuit routinely analyze [these] . . . claims coextensively[.]" *Landau v. Good Samaritan Hosp., Bon Secours Charity Health Sys. Inc.*, No. 23-CV-7227, 2026 WL 880540, at *4 (S.D.N.Y. Mar. 31, 2026); *see* Pls.' MOL at 10 (conceding that all three statutory claims are analyzed identically).

Here, Plaintiffs argue that because they "are being discriminated against by virtue of their disability, the Act violates the ADA, the Rehabilitation Act, and the ACA." *Id.* at 12. Specifically, they argue that "[t]he Act undermines the assumptions, concepts, values, and practices of New York's suicide prevention scheme and replaces it with an alternative and inherently discriminatory scheme where persons with a 'terminal illness' under the Act can be steered toward suicide." *Id.* at 11. But as two other courts that have considered these identical arguments concluded, Plaintiffs' argument falls apart because, among other reasons, the medical aid in dying contemplated by the Act is *voluntary* and thus cannot possibly be construed as denying anybody, much less Plaintiffs here, equal access to a public accommodation within the meaning of the ADA. *See Curran*, 2025 WL 3763413, at *9; *United Spinal Ass'n*, 2024 WL 1671167, at *6.

Plaintiffs themselves tout New York State's robust suicide prevention resources, programs, and initiatives, *see* Pls.' MOL at 11, but cannot plausibly allege that they have been denied access

to these services or that these services have been reduced, *see generally id.* at 9–12.[7] *See Curran*, 2025 WL 3763413, at *9 ("[N]othing in [the medical aid in dying statute] could reasonably be read to deny people with disabilities under the ADA with access to suicide prevention services."). Indeed, "Plaintiffs fail to provide . . . a case where discrimination under the ADA (or Rehabilitation Act or ACA) was found by virtue of a person being granted *more* options than their non-disabled counterparts." *Id.* Medical aid in dying is another alternative offered to qualifying individuals with terminal illnesses, under very specific circumstances and according to stringent protocols, not a mechanism that denies access in any way to suicide prevention or other disability-related services. *See United Spinal Ass'n*, 2024 WL 1671167, at *6 (noting that the medical aid in dying statute "does not preclude, prohibit, or otherwise bar disabled individuals from availing themselves of the benefits of any behavioral health services and suicide prevention programs").

Moreover, "a terminally ill patient's decision to request aid-in-dying medication—and accordingly, to not participate in or seek the benefits of other public health services—is voluntary." *Id.* This necessarily defeats Plaintiffs' claims. "[D]iscrimination occurs when an individual is excluded from participation in or denied the benefits of a service . . . —not when he or she chooses not to participate in or receive the benefits of a service." *Id.*

To the extent Plaintiffs argue that the Act somehow "steers" individuals with disabilities toward suicide, this contention is belied by the extensive safeguards included in the Act. The Act contains provisions to ensure that only individuals with decision-making capacity make informed

[7] Plaintiffs argue that "the Act removes the safeguards surrounding New York's suicide prevention programs" and that "a 'terminal illness,' as defined by the Act, is itself a qualified disability, and is the only distinguishing factor between persons whose self-inflicted death the State tries to prevent and persons who are statutorily permitted to acquire professional help to kill themselves." Pls.' MOL at 11–12. However, the Act itself specifies that "[a] patient who requests medication under [the Act] shall not, because of this request, be considered . . . suicidal, and self-administering medication under [the Act] shall not be deemed suicide, for any purpose." § 2899-n(1)(a).

choices that involve many medical professionals. *See supra* Statement of Facts. Moreover, under the Act, "[n]o person shall qualify for medical aid in dying . . . solely because of age or disability." § 2899-e(4). Furthermore, there are numerous points throughout the process of requesting and receiving medical aid in dying where, by law, patients must be advised of alternative health care options, given chances to rescind their request, and undergo a waiting period before the prescription is filled. *See* § 2899-f(1)(d), (e)(v), (f)–(g) (attending physician must offer to provide referrals for palliative and hospice care, or other treatment options); § 2899-f(1)(e)(iv) (patient may choose to obtain the medication but not take it); §§ 2899-f(1)(i), 2899-g (patient may rescind request at any time); § 2899-f(3) (five-day waiting period). As the courts in *Curran* and *United Spinal Association* reasoned, after reviewing statutes that are substantially similar in these respects, the medical aid in dying law "includes multiple safeguards to ensure people with terminal illnesses who request end of life medication understand the consequences of their request *and the potential alternatives*[,]" *Curran*, 2025 WL 3763413, at *9 (emphasis in original), and "these procedural safeguards are sufficient to ensure a requesting patient is not relegated or forced to forego alternatives to assisted suicide for aid-in-dying medication, as Plaintiffs argue[,]" *United Spinal Ass'n*, 2024 WL 1671167, at *6 (cleaned up). *Compare* § 2899-d(7)(e) (providing that an "informed decision" by definition must include being informed of alternative treatment options), *with* 16 Del. C. § 2502C(b) (same), *and* Cal. Health and Safety Code § 443.5(j)(5) (same).

**D. <u>Plaintiffs Fail to State an Equal Protection Claim</u>**

Under the Equal Protection Clause of the United States Constitution, no state may "deny to any person within its jurisdiction the equal protection of the laws."[8] U.S. Const. amend. XIV.

---

[8] Plaintiffs also assert claims for injunctive and declaratory relief under the Equal Protection Clause of the New York State Constitution, but those claims are barred by the Eleventh Amendment. *See*

(continued . . . )

To state an equal protection claim, "'a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" *Keles v. Davalos*, 642 F. Supp. 3d 339, 365 (E.D.N.Y. 2022) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)). "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest," *i.e.*, rational basis review. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439–41 (1985)).

Plaintiffs argue that "[t]he Act discriminates between those who have a 'terminal illness,' *i.e.*, people with life-threatening disabilities, and those who do not have a 'terminal illness.'" Pls.' MOL at 13. They further argue that "[b]ecause the Act implicates the fundamental right to life, it is subject to strict scrutiny and must be 'narrowly tailored to serve a compelling state interest.'" *Id.* at 14 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Plaintiffs fail to state an equal protection claim because (1) they fail to identify two groups that are similarly situated in "all relevant respects[,]" *Nordlinger*, 505 U.S. at 10, (2) they do not plausibly allege that either a protected class or fundamental right is implicated, and (3) the Act satisfies rational basis review.[9]

---

*Siani v. St. Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 316 (E.D.N.Y. 2014) (citing *Shibeshi v. City Univ. of N.Y.*, 531 F. App'x 135, 135–36 (2d Cir. 2013)).

[9] As a preliminary matter, with respect to Defendant Governor Kathy Hochul, "Plaintiffs do not identify any particular duty [she] holds with respect to [the Act] based on either the law itself or the general law of the state." *Jeannot v. New York State*, 762 F. Supp. 3d 217, 234 (E.D.N.Y. 2025) (collecting cases). Instead, they state generally that she "see[s] that the State's laws are faithfully executed[,]" "supervise[s] and assign[s] functions among executive officers and agencies[,]" and "signed into law the Act[.]" Compl. ¶ 66. However, neither a governor's general duty to execute laws nor her support for the challenged law constitute sufficient connection between the governor and the challenged law under *Ex parte Young*, 209 U.S. 123 (1908). *See Goldstein v. Hochul*, 680 F. Supp. 3d 370, 384 (S.D.N.Y. 2023) (general duty to execute laws); *Grant v. Lamont*, No. 22-

(continued . . . )

First, Plaintiffs appear to assert that people with terminal illnesses who qualify for medical aid in dying under the Act, and people *without* terminal illnesses are similarly situated. *See* Pls.' MOL at 13. However, the definition of a person in the former group is specific: it is a person with "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months with or without treatment." § 2899-d(17). And, "[t]hat the latter group does not face the imminent possibility of death . . . is sufficiently dispositive to render the two groups fundamentally dissimilar." *United Spinal Ass'n*, 2024 WL 1671167, at *7. Thus, the Court's analysis may stop there, given that Plaintiffs fail to identify two groups that are similarly situated.

However, even if Plaintiffs had met this initial requirement, the Act nonetheless satisfies applicable equal-protection review. At the outset, heightened scrutiny does not apply. Plaintiffs point to no Supreme Court or Second Circuit precedent which identifies individuals living with a terminal illness as defined by the Act as a protected class within the meaning of the Equal Protection Clause sufficient to trigger heightened scrutiny. *See generally* Pls.' MOL at 12–18. Plaintiffs argue that strict scrutiny applies because the Act implicates "the fundamental right to life," *id.* at 14, but Supreme Court precedent regarding questions similar to those presented here construes the relevant asserted liberty interest at a much narrower level of generality. As the court in *Curran* reasoned, "Plaintiffs' broad framing of the asserted liberty interest harkens back to that of the respondents in *Glucksberg*," in which the respondents "broadly asserted a protected interest in their 'liberty to choose how to die' or the 'liberty to shape death[,]'" and which the Supreme

CV-1223, 2023 WL 5435941, at *2 (D. Conn. Aug. 23, 2023) (general support for the challenged law). Accordingly, Plaintiffs' claims against Governor Hochul should be dismissed.

Court rejected in favor of a narrower construction of the asserted liberty interest.[10] *Curran*, 2025 WL 3763413, at *10 (quoting *Glucksberg*, 521 U.S. at 723 (identifying the liberty interest as "a right to commit suicide which itself includes a right to assistance in doing so")). The court in *Curran* approached the question by identifying the specific constitutional right Plaintiffs must be advocating for if their claim were to succeed: the right for "informed, uncoerced individuals, living with a terminal illness and a prognosis of less than six months to live, to be free from living within a jurisdiction that permits them—but does not require them—to request medicine that will end their life from a licensed medical professional." *Id.* As that court concluded, no such right exists. *Id.* Indeed, in sustaining an Oregon medical-aid-in-dying statute against preemption challenge, the Supreme Court stressed the "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons[,]" concluding "Congress did not have th[e] far-reaching intent to alter the federal-state balance" when adopting the federal law asserted to preempt Oregon's statute. *Gonzales v. Oregon*, 546 U.S. 243, 270, 275 (2006). The States thus have great latitude to adopt statutes such as the one at issue here, and individuals have no fundamental right to be free from living in a jurisdiction that decides to do so.

Accordingly, rational basis review applies, and the Court must determine whether "the classification rationally further[s] a legitimate state interest." *Nordlinger*, 505 U.S. at 10. The stated purpose of Senate Bill 138 articulates legitimate state interests, including "provid[ing] that a mentally competent, terminally ill patient may request medication to be self-administered for the purpose of hastening the patient's death," subject to the requirements of the Act and "provid[ing]

[10] In *Glucksberg*, plaintiffs brought an action claiming that Washington's statute banning medical aid in dying, which is no longer in place, violated the Due Process Clause. The Court, finding for defendants, concluded that the right to medical aid in dying was not a fundamental liberty interest and that Washington's ban on medical aid in dying satisfied rational basis review. *See* 521 U.S. at 722–23, 728, 735.

certain protections and immunities to health care providers and other persons, including a physician who prescribes medication in compliance with" the Act. S.B. 138, N.Y. St. Senate, https://www.nysenate.gov/legislation/bills/2025/S138 (last visited June 18, 2026). The language of the Act itself also articulates legitimate state interests in, for example, preventing hasty decisions made due to depression, *see* § 2899-f(3), ensuring a correct diagnosis, *see* §§ 2899-f(1)(a), 2899-h, and ensuring patients make fully informed decisions, *see* § 2899-f(1)(e). These are not only facially legitimate state interests which are rationally related to the Act, but they are also interests which other courts have found to satisfy rational basis review. *See Bryman v. Murphy*, No. 24-CV-2947, 2025 WL 3493889, at *5 (3d Cir. Dec. 5, 2025) (finding New Jersey's medical aid in dying statute satisfied rational basis review); *Curran*, 2025 WL 3763413, at *10.

**E. <u>Plaintiffs Fail to State a Due Process Claim</u>**

1. <u>Substantive Due Process</u>

Plaintiffs argue that the Act violates substantive due process, again citing *Glucksberg* and asserting that it burdens the "fundamental right of life" and must withstand strict scrutiny. Pls.' MOL at 16–17. However, as stated in more detail above, Plaintiffs misapprehend *Glucksberg* and misconstrue their true asserted constitutional right in this case, which does not amount to a fundamental right requiring heightened scrutiny. *See supra* Section I.D. Therefore, rational basis review applies. Defendants have articulated facially legitimate state interests which are rationally related to the Act and therefore, Plaintiffs fail to state a substantive due process claim. *See id.*

2. <u>Procedural Due Process</u>

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."[11] U.S. Const.

[11] Plaintiffs' claims pursuant to the Due Process Clause of the New York State Constitution are barred by the Eleventh Amendment. *See supra* footnote 8.

amend. XIV, § 2. Under *Mathews v. Eldridge*, a court must determine whether there has been a violation of procedural due process by evaluating (1) "the private interest affected;" (2) "the risk of erroneous deprivation of that interest through the procedures used;" and (3) "the governmental interest at stake[.]" *Nelson v. Colorado*, 581 U.S. 128, 135 (2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Plaintiffs argue that the Act violates procedural due process because there is a high risk of erroneous deprivation and inadequate safeguards to protect against such deprivation. *See* Pls.' MOL at 17–18. This argument fails at the threshold: what is allowed by the Act is a voluntary, informed choice by an individual within numerous safeguards. Simply stated, the individual, not the government, is making the choice. Accordingly, there is no *governmental* deprivation of any interest protected by the due process clause. To the extent plaintiffs' argument is that all of the safeguards in the statutory process would result in involuntary or coerced death, their argument (speculative as it is) hinges on the second factor of the *Mathews* balancing test. However, "[t]he stringent hurdles a requesting patient must overcome before receiving aid-in-dying medication is incompatible" with a finding that the Act violates procedural due process. *United Spinal Ass'n*, 2024 WL 1671167, at *7; *see supra* Statement of Facts (detailing the Act's numerous safeguards).

> [F]or a patient to relinquish involuntarily his or her right to life, . . . the following would have to occur: (1) a terminally ill patient, mistakenly or under coercion, makes [an] oral request[] and a written request on a specific legislative form for aid-in-dying medication; (2) two witnesses to the patient's signing of the written form fail to recognize that the patient is incapable of making a voluntary and informed decision; (3) the patient's attending and consulting physicians both misdiagnose him or her as being capable of making an informed decision; and (4) after receiving the life-ending medication, the patient self-administers it against his or her own free will.

*United Spinal Ass'n*, 2024 WL 1671167, at *7. Thus, Plaintiffs' contentions regarding a high risk of erroneous deprivation and inadequate safeguards are simply untenable given that the "plain text

of the statute evidences an intent to afford patients with ample process to avoid the danger of involuntary death." *Id.* Accordingly, Plaintiffs have no likelihood of success on the merits as to their substantive or procedural due process claims.

## II. PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Plaintiffs argue that they will face irreparable harm if the Act goes into effect because their "constituent members would be permitted under the Act to kill themselves with State-endorsed lethal drugs, without the benefit of New York's robust anti-suicide programs" and "are at risk of being removed from consideration for New York's anti-suicide programs." Pls.' MOL at 19. With respect to the organizational Plaintiffs, they argue that they will face a "risk of irreparable harm to core business activities," namely, the way they allocate resources. *Id.* at 19–22. However, none of Plaintiffs' contentions are sufficient to establish irreparable harm.

First, as to the individual Plaintiffs, there is no allegation that either intends to request medical aid in dying. *See generally* Pls.' MOL at 18–22. And as discussed *supra* at Section I.B.1, even if they did, their request would be denied because they do not meet the eligibility requirements set out in the statute. There is also absolutely no reason—and indeed, Plaintiffs do not even suggest one—that they would be "removed from consideration for New York's anti-suicide programs." Pls.' MOL at 19. Thus, they have not alleged an "actual and imminent" injury. At best, Plaintiffs speculate about a hypothetical injury that is unlikely to ever occur. *See Nken v. Holder*, 556 U.S. 418, 434–35 (2009) (noting that "simply showing some possibility of irreparable

injury fails to satisfy the [irreparable harm] factor" because the "possibility standard is too lenient") (internal quotation marks and citations omitted)).

Plaintiffs' contentions with respect to the organizational Plaintiffs are similarly unavailing. In support of their contention that these Plaintiffs face imminent irreparable harm, they allude to vague "concerns" and suppositions that their members will seek out medical aid in dying in numbers sufficient to significantly alter their resource allocations. However, they provide no concrete basis for these concerns and instead rely on speculation regarding the actions of unnamed third parties—the definition of a "remote [and] speculative" injury, which does not establish irreparable harm.[12] *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66.

## III. <u>THE PROPOSED INJUNCTION IS NOT IN THE PUBLIC INTEREST</u>

"[A] plaintiff seeking a preliminary injunction must demonstrate not just that they have some likelihood of success on the merits and will suffer irreparable harm absent an injunction, but also that the balance of equities tips in his favor[ ] and . . . an injunction is in the public interest." *Otoe-Missouria Tribe of Indians v. N.Y. St. Dep't of Fin. Servs.*, 769 F.3d 105, 112 n.4 (2d Cir. 2014) (internal quotations omitted). When the Government is the opposing party, as it is here, the "balancing of equities" and "public interest" factors merge into one. *Nken,* 556 U.S. at 435.

Plaintiffs barely attempt to address why New York's medical aid in dying statute is not in the public interest, especially in light of the Act's compelling purpose. As discussed above, *see*

[12] Plaintiffs rely heavily on statistics from Canada. *See* Pls.' MOL at 19. It is telling, though, that Plaintiffs make no attempt to compare Canada's medical aid in dying law to New York's , or to provide statistics regarding the effects of any of the thirteen other medical aid in dying statutes adopted by United States jurisdictions. Even a cursory examination of Canada's statute reveals that the eligibility requirements are far broader than New York's, providing most notably that an individual "do[es] not need to have a fatal or terminal condition to be eligible for medical assistance in dying." Medical assistance in dying: Overview, Government of Canada, https://www.canada.ca/en/health-canada/services/health-services-benefits/medical-assistance-dying.html#a2 (last visited June 19, 2026).

*supra* Statement of Facts, the narrow segment of the New York State population that will be eligible for medical aid in dying under the Act is limited to people with terminal illnesses who will die within six months with or without treatment. Thus, the core purpose and benefit of the Act is to alleviate human suffering and allow these individuals to die with dignity, on their own terms, avoiding the additional emotional and physical anguish of a prolonged death. In states where medical aid in dying is already legal, it is rarely used. *See* Medical Aid in Dying, End of Life Choices New York, https://endoflifechoicesny.org/medical-aid-in-dying/ (last visited June 19, 2026) ("Only about one in three hundred deaths occur in this manner in states where the practice is legal. And about one third of patients who obtain the medications do not take them."). But, for those who do avail themselves of these provisions, it is a way to lessen the negative impacts of the dying process for them and their families. By contrast, the Act does not harm or affect Plaintiffs in any way. Moreover, New York voters support medical aid in dying by a nearly 2-to-1 margin,[13] and 67% of New York physicians support New York's medical aid in dying statute.[14] Thus, New Yorkers' support for the Act, and the compelling aid it can provide to terminally ill patients, demonstrate that a preliminary injunction would not be in the public interest.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction in its entirety, together with such other relief as the Court may award including dismissal for lack of standing.

---

[13] *See Siena Poll: New York Voters Continue to Support Medical Aid in Dying by Nearly 2-to-1 Margin*, Compassion & Choices, https://compassionandchoices.org/news/ny-voters-2-1-support/ (last visited June 19, 2026).

[14] *See New York Physicians Support Medical Aid in Dying*, Compassion & Choices, https://www.compassionandchoices.org/wpcontent/uploads/2024/05/nyphysiciansurveyreportfinal.pdf (last visited June 19, 2026).

Dated: New York, New York
June 23, 2026

Respectfully submitted,
LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

By: ______________________

Haley Hawkins
Assistant Attorney General
28 Liberty Street
New York, New York 10005
Tel.: (212) 416-8771
Email: Haley.Hawkins@ag.ny.gov

**WORD COUNT CERTIFICATE**
**PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

The undersigned hereby certifies that this Memorandum of Law contains 8,575 words. This brief complies with the Court's Individual Rule III.F, which imposes a 25-page limit for memoranda of law in opposition to motions.

Dated: New York, New York
June 23, 2026

Haley Hawkins