UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x

26-CV-3492(OEM)

BROOKLYN CENTER FOR
INDEPENDENCE OF THE
DISABLED, et al.,

United States Courthouse
Plaintiffs,                Brooklyn, New York

- versus -                June 25, 2026
11:30 a.m.

HOCHUL, et al.,

Defendants.

------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE ORELIA E. MERCHANT
UNITED STATES DISTRICT JUDGE


APPEARANCES

Attorney for Plaintiff:   HALLORAN FARKAS & KITTILA LLP
600 Third Avenue, 2nd Floor
New York, New York 10016
BY:   THEODORE ALLAN KITTILA, ESQ.
JEFFREY M. GREILSHEIMER, ESQ.

Attorney for Defendant:   STATE OF NEW YORK
Hon. Kathy Hochul         OFFICE OF THE ATTORNEY GENERAL
28 Liberty Street - 15th Floor
New York, New York 10005
BY:   HALEY HAWKINS, ESQ.
OWEN THOMAS CONROY, ESQ.

Attorney for Proposed Intervenors:
RYAN CHABOT, ESQ.
VERONICA DARLING, ESQ.

Court Reporter:           AVERY N. ARMSTRONG, RPR, NYRCR
Phone:   718-613-2419
Fax:     718-613-2639
Email:   Aarm.edny@gmail.com

Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.

(In open court.)

THE COURTROOM DEPUTY: All rise. The Honorable Orelia E. Merchant presiding.

THE COURT: Please be seated.

You can please call the case.

THE COURTROOM DEPUTY: This is a civil cause for preliminary injunction hearing in the matter of Brooklyn Center for Independence of the Disabled et al. versus Hochul, et al., docket number 26-CV-3492.

Counsel, please state your appearance for the record, starting with the plaintiff.

MR. KITTILA: Good morning, Your Honor. I think we're still morning. Yes, good morning, Your Honor.

Ted Kittila on behalf of the plaintiffs in the case. I'm with the law fir of Halloran Farkas & Kittila. I have with me, my colleague, Jeff Greilsheimer.

MR. GREILSHEIMER: Good morning, Your Honor.

THE COURT: Good morning.

MR. KITTILA: We also have several of the plaintiffs and plaintiffs' representatives. I could run through them, Your Honor, if you wish, but it's up to you. Let me just do a little introduction of them, if you would.

THE COURT: Certainly. That's fine.

MR. KITTILA: Thank you, Your Honor.

We have back there, for the Institute for Patients'

Rights, Matt Vallière, we have Mr. Jose Hernandez, we have Joe Rappaport and Evan Yankee from the Brooklyn center for Independent Living, we have Max Rodriguez and Brian O'Malley from the Regional Center for Independent Living, Your Honor.

THE COURT: Good morning.

Counsel.

MS. HAWKINS: Haley Hawkins with the New York State Office of the Attorney General on behalf of the defendants.

Good morning, Your Honor.

THE COURT: Good morning.

MR. CONROY: Owen Conroy from the New York State Office of the Attorney General on behalf of the defendants.

Good morning, Your Honor.

THE COURT: Good morning.

And is there an Intervenor Defendant counsel present?

MR. CHABOT: Good morning, Your Honor.

This is Ryan Chabot from WilmerHale for the proposed Intervenors.

MS. DARLING: Veronica Darling with Compassion Legal on behalf of the proposed Intervenors.

MR. CHABOT: We're happy to join defense table, if you'd like.

THE COURT: Good morning.

You may join at the table, if you'd like.

So we're here today on plaintiff's motion for a preliminary injunction, and I will also briefly take up the matter with regard to the motion for intervention or just hear argument with respect to that. I'd like to go over the procedural history at this point before getting to hearing from the parties directly on the issues.

On June 11th, 2026, the plaintiffs commenced this action by filing a complaint found at Docket Entry Number 1, and simultaneously, plaintiffs filed a motion for a temporary restraining order found at Docket Entry 2. The Court issued an order to show cause on June 15th, 2026. As an initial matter, it denied the motion for a temporary retraining order, that is, an ex parte restraining order, directed the plaintiff to serve a copy of the Court's order, the plaintiffs' summons and complaint and papers on the defendants by June 17th, 2026, and that the defendants file and serve answering papers to the plaintiffs' request for preliminary injunction by June 23rd, 2026, and ordered that a preliminary injunction hearing be held today as to why the preliminary order should not issue enjoining defendants from implementing and enforcing New York's Medical Aid in dying Act.

On June 22nd, 2026, there was a motion from several individuals seeking to intervene as defendants. That was filed and that is at Docket Entry 20. And the Court ordered the parties to respond to said motion by June 24th.

On June 23rd, 2026, defendants filed their opposition to plaintiff's motion, and that is found at Docket Entry 23.

On June 24th, 2026, plaintiffs filed their reply. No. There was no reply filed. Did you?

MR. KITTILA: No there was no reply.

THE COURT: I'm looking to make sure I have the most updated docket sheet.

As of this morning, there was no reply.

MR. KITTILA: Yeah, Your Honor did not allow for a reply on that.

THE COURT: Thank you.

And in terms of the motions to intervene, I want to start with that, the parties' position with regard to the intervention motion.

MR. KITTILA: Your Honor, we did file an opposition to the motion to intervene and we filed that yesterday at around 4:15 p.m.

THE COURT: And your argument with regard to that, I'd like to hear from you as to the issues you raise.

MR. KITTILA: Yes, Your Honor. Thank you so much.

Do you want me to argue from here or --

THE COURT: That's fine.

MR. KITTILA: Okay. Your Honor, the opposition to the motion to intervene is really based upon the fact that the

State has more than has this covered. There is a strong presumption when the State is actually appearing in a case, that the State has the ability to handle this without the intervention of others. In fact, our friends on the other side have tried to intervene in the Third Circuit, they've tried to intervene in the District of Delaware, they've tried to intervene in California with respect to other cases that are similar and faced similar issues. Each and every time, it's either been mooted by the fact the case has moved forward without them, or in the Third Circuit, it was actually denied.

So our view on this is that --

THE COURT: In the Third Circuit, though, was it denied and the case ceased?

MR. KITTILA: No, the Third Circuit is still moving forward.

THE COURT: They're still moving forward. The other Circuits, they ceased?

MR. KITTILA: That's correct, Your Honor. In the District of Delaware case, it is actually -- that's what ended up in the Third Circuit.

So the presumption that they have to overcome when the State is actually representing the interests at issue, they do not satisfy the intervention standards, and that's probably the biggest point on this.

Secondly, there's other factors considered which is

timeliness, the interest at stake. This case is about discrimination. We're making an argument that the States' law discriminates against persons with disabilities. Our friends on the other side are not interested in that issue. They're interested in the policy debates. The policy debate relates to whether or not the law is a good law or a bad law. That's -- this is a discrimination case. So we have brought a case against the State of New York saying that this law discriminates and violates the due process laws and the Equal Protection Clause of the U.S. and New York State Constitution.

So our view on that is that there really is no place for the Intervenors to come in. The State has already demonstrated and demonstrated well that they will fight this case very very seriously. They've taken this seriously. Within no time flat, Your Honor, they put a very solid brief in. We're going to have our hands full going against the State of New York. We do not need Intervenors coming in distracting you from the main issue.

So that's our argument on there. The rest of it is in on your brief. If you have any questions or anything else, I'm happy to respond to that.

THE COURT: Okay. I'll hear from counsel as to anything that they'd like to amplify or address with regard to the arguments that have been made.

MR. CHABOT: Thank you, Your Honor. Ryan Chabot

from WilmerHale for the proposed Intervenors.

So on the adequacy of representation --

THE COURT:  I'm sorry, if you can maybe one or two things, either you can be seated closer to the microphone or you can approach and argue from here.  But something is not being picked up.

MR. CHABOT:  Is this any better?

THE COURT:  That's much better.

MR. CHABOT:  If you're okay with it, I'll say it from here.

THE COURT:  Okay.

MR. CHABOT:  So on the adequacy of representation, there are a lot of context in which parties seek to intervene on the same side as the Government entity and like intervention generally it is a fact-specific context.  We've offered cases in our briefing that arise in the same context here where individuals seek to move to intervene on the same side as the Government as defendants in a challenge to the constitutionality or statutorily permissiveness of a law.  And the cases I would point Your Honor there are *New York Public Interest Research Group versus Regents*, which is from the Second Circuit, and *Pennsylvania versus President*, from the Third Circuit.

In both of those cases, the circumstances were the same as they are here, where plaintiffs filed a lawsuit

challenging Government regulations or Government statutes. And both the Third Circuit and the Second Circuit reversed the District Court's decision not to allow intervention because they determined that there was not sufficient adequate representation from the Government. Though, in the *New York Public Interest Research* case, there was a case about whether or not you can publish pharmaceutical pricing. And pharmacists and a pharmaceutical group moved to intervene to defend the law, along side the Government. And the Second Circuit held that they did both have both an interest and had shown an adequate representation, because the validity of the regulation from which they benefited was being challenged, and the Court said that they were satisfied that there's a likelihood that the pharmacist would make a more vigorous presentation of the economic side of the argument than would regents. The Third Circuit in *Pennsylvania versus President* was dealing with a religious organization seeking to intervene to defend religious exemptions in the Affordable Care Act. And they said similarly that where an agency's views are necessarily covered by its view of the public interest, not the parochial views of a personal Intervenor with a personal interest, the adequacy of representation was not sufficient.

There is a bit of a tension in Rule 24(a) between the timeliness requirement and the adequacy of representation requirement. We don't dispute that the New York Attorneys

General Office is going to do a capable job of defending the interest of the State defendants in this case. And part of the reason why the Supreme Court only requires a possibility of inadequate representation is that we have to move to intervene early on. We could come up with hypotheticals where our interests, my Intervenor's individual interest would be distinct and contrary to the State's, but at this stage, the cases that we have pointed to that are most factually appositive show that it is enough to say that we have a distinct individual personal interest that the State's broader interest in defending this law does not have.

My friends on the other side's cases arise in a different cases on other side arise in a different context which is a parens patriae suit. This is the case of *Hooker* that they cite, and there, it was the federal government and the state government bringing an environmental enforcement action as a plaintiff against a chemical manufacturer. An environmental group sought to intervene on the side of the plaintiff with the Government. And there, the Second Circuit said when the State is acting in its parens patriatic capacity, it is advancing the interest of its citizens as a plaintiff, and so you don't need an additional group of citizen plaintiffs to intervene on the exact same side. That is a factually distinct circumstance than what we here, and I think we have pointed to the cases that arise in the situation

that is most like the ones here where Courts have allowed intervention.

The last thing I'll say on that, Your Honor, is if there's any question there, whether or not the adequacy of representation at this stage is sufficient, I would point Your Honor to the *Commack* decision that we cited where the Court there found all the first three factors of Rule 24(a) met, it said in a close call that the final factor of adequacy of representation had not been met. So how it handled the issue was to say, I'll grant perspective intervention into Rule 24(b) because the Intervenors will still bring a different perspective to the case and will contribute relevant factual variations that may assist the Court. We'd argue that's the same circumstance where our Intervenors are the ones who are directly affected by the law at this stage because of their adequacy for it and because of the circumstances that they are living in.

THE COURT: And I just want to pause there.

And with regard to the state defendants, your position?

MS. HAWKINS: Your Honor, defendants take no position on the motion to intervene.

THE COURT: Right.

So the one question I do want to ask is, if the Court were to dismiss the case for lack of standing or deny

the preliminary injunction, would it then necessarily moot the motion for intervention?

MR. CHABOT: So, Your Honor, this is the circumstance that my friend on the other side was referring to in several of the other cases where individuals have sought to intervene. And if in an order in which the Court dismisses the case it also resolves the motion to intervene second, then what the Courts have done is dismiss that case as moot. We disagree that that is the right procedural posture because a live of dispute still exists between us and the plaintiffs. So we don't think that our motion to intervene would be moot under those circumstances.

THE COURT: When you say a live dispute, if there is no case, your dispute is something that maybe you can take up in -- you would establish your basis for such a suit. But I don't understand why that would moot you being a defendant in that case. You're asking to intervene as a defendant, not to bring a counterclaim.

So why wouldn't that be moot?

MR. CHABOT: So from a practical perspective, Your Honor, what it ends up doing is it means that we can't participate in the appeal as a defendant. And so -- the other Courts that have reached this issue have decided that the motion to intervene was moot at that stage.

We think that there's a different question as

between the live controversy between us and the plaintiffs, that our motion should be decided on the merits as part of the preliminary injunction decision, and so it's not that the motion should be held open or in abeyance after the case is dismissed as moot, but rather, the preliminary injunction motion, it's a question of sequencing, Your Honor. So what the Courts have done is they've denied the motion for preliminary injunction and then in the same order said that the motion to intervene is moot.

THE COURT: Let me ask you this, though: Even on appeal, though, would you not be able to move to intervene on appeal? Isn't there a mechanism to do that?

MR. CHABOT: We did, Your Honor. So that's exactly what happened in Delaware. So in Delaware, there was a group of individuals and an organizational plaintiff that moved to intervene. The Court denied the motion for preliminary injunction as the other Court have that have addressed this issue.

THE COURT: Because are you rapid, and I just want you to take a breath between every word, if you don't mind.

MR. CHABOT: Absolutely.

So the individuals and organizational plaintiff in Delaware where their motion to intervene was also denied as moot at the end of the preliminary injunction decision. And so the alternatives at that stage would have been separately

appeal the denial of the motion to intervene or file a separate motion to intervene in the Court of Appeals. And those Intervenors moved to intervene in the Court of Appeals separately. But at the sort of advance stage of the appellate process, that motion was denied. That's the only motion to intervene under these circumstances in these cases that has been addressed on the merits, and it was just you would expect from the Court of Appeals, just a one-line denial of the order.

THE COURT: So I guess it's not that procedural there is -- it's not been deemed improper, nor has it been the case that in a circumstance where one does not intervene below, that there's not the opportunity to make an application and to argue to the Circuit that you should have -- you have a right to intervene. I'm not cutting that off and would not be cutting that off at the district court if it were that I were to find that there was no standing and dismiss the case, that is, lack of jurisdiction, we're done, and that moots the motion for intervention. And, again, hypothetically, if that's what the Court were to do, I don't cut off the opportunity that the potential Intervenors have to still appeal, that is, make their request or application to the Circuit to intervene in that case. That is, to the extent that there is an appeal of a decision on standing or something else with regard and other issues with regard to the

preliminary injunction, that is, the denial of it, the same arguments could be made to the Circuit even if not addressed by this Court below.

Isn't that correct?

MR. CHABOT:  Yes.  Yes.  That's certainly correct.

THE COURT:  So I don't cut off your ability to do that in not reaching the substance of the motion below. That's not the case.

MR. CHABOT:  Correct.  Correct.  However -- I'm sorry.

THE COURT:  I mean, certainly for you, I would understand that necessarily being part of the case below, that if someone appeals that you then get to take the ride up, right?

MR. CHABOT:  Right.

THE COURT:  So it's a strategical advantage.  But in terms of the legal import, it does not cut off your ability to make that application later.

MR. CHABOT:  I agree that with that completely, Your Honor.  So we would still -- if you were to deny our motion as moot now and the case were to then go to the Second Circuit, we would retain the ability to move to intervene with the Second Circuit.  Our preference --

THE COURT:  Of course, your preference is to be apart of the case so you can be along for the ride.  But the

Court's preference may be that if it's mooted and doesn't need to get to that issue, then why would I do more than what the Court would need to resolve the case below.

MR. CHABOT: Understood, Your Honor.

THE COURT: If it is that that's what I found.

MR. CHABOT: Understood. Our request -- my pitch to you, Your Honor, would be, having had briefing and argument on the motion before you here and with the possibility that even if the case is dismissed before Your Honor and goes to the Circuit and may return, in resolving the parties and determining which the parties can participate in the appeal at this stage would benefit the efficient resolution of the litigation in the long run.

THE COURT: Or I can let the Court of Appeals decide which parties participate in the appeal.

MR. CHABOT: Certainly, Your Honor. Yes. Absolutely.

THE COURT: Right. Okay. So let's get to the preliminary injunction and the threshold standing issue that's raised by the defendants. And specifically, that plaintiffs lack individual and organizational standing.

I'd like to first address the individual standing. To establish standing, individual plaintiffs must demonstrate that they have suffered or likely will suffer an injury, in fact, that the injury likely was caused or will be caused by

the defendants, and that the injury likely would be redressed by the requested judicial relief.

I'd like to hear first from the plaintiffs with regard to the injury, in fact.

MR. KITTILA:  Thank you, Your Honor.

Your Honor, I'm going to sit, if that's okay.

THE COURT:  That's fine.  Thank you.

MR. KITTILA:  Thank you.  All right.  And it probably will allow my voice to carry to that microphone.

THE COURT:  Perfect.  You're right there, so you carry well either way, so whatever makes you comfortable.

MR. KITTILA:  Thank you so much.

All right.  Well, Your Honor is correct.  The standard here for the individual really is the *Lujan* case. And we really have to have a concrete and particularized harm. So the question really comes down to injury, in fact, and causation and will the Court's intervention, the Court's ordering of a remedy really make them whole.  It's as Justice Scalia once said, What's it to you?  So we asked that when the clients come to us.  What's it to you?  What does this mean to you?  And the individuals here, Mr. Hernandez and Ms. Cameron, both of them have put in statements with respect to the complaint.  They've also put in affidavits or declarations, Your Honor.

THE COURT:  Just specifically point to me what the

individual plaintiffs allege are the facts that establish that they will be eligible for the Medical Aid in Dying procedure --

MR. KITTILA: Absolutely, Your Honor.

So in the complaint at paragraph 26 for Mr. Hernandez he says, The Act devalues people like me. The Act tells people like me that we qualify for suicide assistance, not suicide prevention.

So what is the harm that we're alleging here? The harm is discrimination. That is the harm that we --

THE COURT: But what specifically in the Act does that?

MR. KITTILA: So the Act defines a terminal illness as meaning an irreversible -- incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months, whether or not treatment is provided.

If you have a terminal illness, you have access to Medical Aid in Dying under New York Law.

THE COURT: And does Plaintiff Hernandez have a terminal illness?

MR. KITTILA: We contend, yes, that he does.

THE COURT: What is his terminal illness?

MR. KITTILA: He is, as we describe in the complaint, he has a -- conditions that basically say that if

he were to stop his treatments, he would then at that point die.

THE COURT: Well, I mean, would a diabetic, if they didn't take their insulin, die?

MR. KITTILA: Correct. Yes, Your Honor.

THE COURT: But they're not medically termed with a terminal illness.

So what is his terminal illness?

MR. KITTILA: That is the terminal illness, Your Honor. The fact is the way New York has defined this, a person can self-select to move forward and basically say I am going to refuse treatment and therefore, make themselves terminal under the Act.

THE COURT: I don't believe that's -- I think that's a mischaracterization. Walk me through how that is.

MR. KITTILA: Sure. Sure.

And the reason why on that, Your Honor, is because of the fact that they have added in there, "Whether or not treatment is provided".

The test is sort of like this: If death will result whether or not treatment is provided, that is terminal. That whether or not clause, that's the key here. That means that death will result if treatment is provided or death will result if treatment is not provided. That's the issue there by virtue of the whether or not, that addition right there

means that a person such as Mr. Hernandez is terminal under the Act.

THE COURT: Let's pause because I think you're cherrypicking some language there.

I want to just stop right there and allow defendants to address that.

MS. HAWKINS: Thank you, Your Honor.

And with the Court's permission, I'll also sit.

THE COURT: That's fine. Thank you.

MS. HAWKINS: Thank you. Your Honor, plaintiffs completely mischaracterize the language regarding the definition of a terminal illness in the statute. And I do agree that that with or without treatment clause is very important. The language is clear, to be eligible for Medical Aid in Dying, an individual must have an incurable or irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months, with or without treatments. Plaintiffs are categorically ineligible under this definition just based on their allegations concerning their conditions. They state that they will die within six months without medical support. But that is not enough for eligibility under the statute. An individual with would have to be facing death within six months, even if treatment were provided.

So in either case, if treatment is provided, they

will die within six months, or if treatment is not provided, they will die within six months.

And plaintiffs, by their own allegations, do not fit into that narrow definition.

THE COURT: And your response to that would be?

MR. KITTILA: Absolutely, Your Honor.

And that is, if you look at McKinney's Section 98, with respect to interpretation of statutes under New York Law, all parts of a statute must be harmonized with each other as well as with the general intent of the whole statute. An effect and meaning must, if possible, be given to the entire statute and every part and word thereof.

If the New York legislature had said as my friend over there has said, even if treatment is provided, that would eliminate the concept there of being able to self-select for terminal illness. That is not what the legislature said. They said, whether or not treatment is provided. And if you look at that, that places you in a universe of two possibilities, a person can be in a terminal -- have a terminal illness if treatment is provided, or if treatment is not provided.

And as Mr. Hernandez says, he said, "Without assistance with these tasks, I would not be able to do any of these things, and I would die from starvation". By definition, he has a terminal illness under New York Law.

That right there is the key necessary to access Medical Aid in Dying. And that probably the most important thing on this, is that because a person qualifies as terminal, you have two qualifications of people, people who are terminal which are the category of people that I represent which are people that have disabilities that -- and these would be life threatening disabilities -- because they have that, that turns the key for access to Medical Aid in Dying.

If there was no terminal illness qualification, if the Court said -- if they said in the State of New York, any person, regardless of who they are, could walk up and say, I want to be -- I want to have Medical Aid in Dying, at that point, I would not have a discrimination case. I might have a due process case. But I would not have a discrimination case. It is the categorization of people as terminal that creates discriminatory effects here in the State of New York. And that's what's key on this thing.

The State did not want to go all the way with Medical Aid in Dying. They wanted to go part of the way, and by doing that, they created a category of individual who they said qualifies for Medical Aid in Dying. That's people like Mr. Hernandez. That's people like Ms. Cameron. Those people qualify. And at that point in time, because they qualify, that's their concern. That's the discriminatory effect. That's the harm.

THE COURT: And again, you would say that they qualify because?

MR. KITTILA: They qualify because of the fact that they have an incurable disease, and if treatment is stopped, whether it be by their choice or by somebody else' choice, at that point in time, they will not live six months. That is the key to unlocking the assisted suicide here in the State of New York.

THE COURT: But it's a terminal illness that they must have.

MR. KITTILA: Correct. And I know what Your Honor -- I don't know what Your Honor is thinking. But I suspect that Your Honor is thinking, it's a person with cancer that has been told that they have six months to live, it's a person that -- first of all, that concept right there, doctors who tell you that person has six months to live, that's what we would like to be able to come forward with and show that that's bogus, that that concept right there, there is no medical certainty, one way or the other. But the terminal illness definition, which is what the general -- excuse me, the New York legislature put forward, that is what we have to turn this on. Unfortunately, that catches people like Ms. Cameron and Mr. Hernandez.

MS. HAWKINS: Your Honor, if I could speak to this.

THE COURT: You may.

MS. HAWKINS: Really, the question that needs to be asked regarding the individual plaintiffs to determine whether they would fit under the definition in the statute is will plaintiffs die in the next six months whether or not treatment is provided. If treatment is provided, will they die in the next six months. And the answer based on plaintiff's allegations is no. And therefore, they do not qualify under the plain text of the definition in the statute.

And I would also just point Your Honor to both the Delaware and California cases that have considered this exact issue involving many of the same plaintiffs. In both of those cases, those states Medical Aid in Dying statutes also included a clause to the effect of whether or not treatment is provided and they determined that plaintiffs categorically did not qualify.

THE COURT: It is incurable and irreversible.

MR. KITTILA: That's correct, Your Honor.

THE COURT: And so your argument as to Mr. Hernandez is --

MR. KITTILA: He has an incurable and irreversible condition that will result in death if he does not receive treatment. That's the key right here.

By the way, the Delaware statute --

THE COURT: That has been medically confirmed and will.

MR. KITTILA:  Exactly, Your Honor.

THE COURT:  Within reasonable medical and judgment produce death.

MR. KITTILA:  That's correct.  Within six months if treatment is not provided.  And that's the key right here.

Delaware did not have the whether or not treatment is provided.  The Court inferred something in there.  I think the Court -- respectfully, Judge Williams, who I love very much, he got it wrongs.  But my point here is the whether or not treatment is provided, New York put that in, most likely they put it in after the Delaware case was argued to try to fix this.  Unfortunately, they made it worse, because -- and this is the issue that I think that's key on this, Your Honor.  Your Honor is looking at the statute right now and you're thinking what would a sensible person do, a person that is looking at this from, you know, I don't want to see this abused.

The problem is we are seeing this abused in other jurisdictions.  So people with anorexia are being told that they can stop eating and they can force themselves into a situation that's called terminal anorexia.  That right there is a real concern.  The problem that you have is that we now are seeing these statutes, and in Canada alone, five percent of the country is dying from assisted suicide.  Five percent.  That means those numbers are astounding.  And the issue is

that's the expansion that you have.

If New York had wanted to correct this, if they wanted to fix it, I would still probably be in here arguing that people are terminal, but they have made the case right now that this statute can be broadened and read out to cover people like Mr. Hernandez. It covers people like Ms. Cameron, it covers people that are members of the various organizational plaintiffs that are in this case. They are very very concerned. They are feel feeling the discrimination.

And Your Honor, just to get to the point, I guess, with respect to, you know, we get hung up on standing, the main issue that we're here on, Your Honor, is we would like the opportunity to put on a case regarding these things and the abuses that could be experienced on this and why we think that this is wrong. The idea here is that -- and there is a case called *Bost versus State of Illinois*, which is a U.S. Supreme Court case that said we're making standing too difficult. We're making it too hard for people to understand. These people have standing because they believe that they are being discriminated against by the State of New York.

People that have come in today like Mr. Hernandez, it's very difficult for him to role in here on these things, but that's the point, is that these people feel that they're being discriminated against. They have lived in a system that

has discriminated against them and unfortunately, people have told them at certain points in time that I don't understand why you have a life that's worth living. I mean, that's the main issue that we have with the Medical Aid in Dying. It's easy to take the narrow approach and say, well, it's really just meant for people that we know are going to die after six months -- before -- in the next six months. That's actually -- that's a problem, as well. I don't want to leave those people out. That's also way discrimination. I don't want to be walking into a doctor's office having cancer and the doctor says, well, you know, the choice is really clear here, you should just get Medical Aid in Dying. Why are you burdening your family with that? That's the arguments that we're here to try to present on this thing.

So Mr. Hernandez, Ms. Cameron as individuals, they qualify, Your Honor. That's why we're here.

THE COURT: So before I move from the injury, I want to move to causation. But I'll hear -- does the Government have any responses that they'd like to make to the argument just made?

MS. HAWKINS: Just briefly, Your Honor.

The reason we have to be so hung up on standing is because this act will not impact the individual plaintiffs in any way. That is not a viable case. Under the definition in the statute, if they were to seek out Medical Aid in Dying

based on their allegations, they would be denied that request, because they don't fit the definition.  It simply does not impact them.

And just to briefly address the characterization of the Delaware case and the California case, I just wanted to note that even if that were true that those statutes didn't include that limiting clause of whether or not treatment is provided, the Court still found that those plaintiffs did not meet the definition under the Act.  So if the clause was not included, that just means that plaintiffs failed on standing in those cases under an even more inclusive standard.

And so we would submit that there is -- that the Act does not impact individual plaintiffs in any way.

MR. KITTILA:  One clarification, Your Honor.  We actually did have standing for the organizational plaintiffs in California.

THE COURT:  I'm actually -- I'm speaking, though --

MR. KITTILA:  -- on the individual.

THE COURT:  Not on the individual plaintiffs right now.

MR. KITTILA:  Okay.  Yes.

THE COURT:  So not relevant to the individual plaintiffs, that's where we are right now.

So with regard to the issue of causation, how does the action here -- how is injury, in fact --

MR. KITTILA: Yes. Yes, Your Honor. The injury, in fact, that has occurred -- the injury, in fact, that has occurred is actually because the law is being implemented and enforced by the State actors involved, there is a cause of discrimination. That's the causation there. By enjoining the law, the issue will be remedied, and that's really the test, is whether or not the issue will be remedied through an injunction. So the discriminatory system will not be permitted to go forward. So that's really the key on this. If the Court were to enjoin the law, then the causation issue is -- that's sort of our test right here. So sorry I'm repeating myself on that.

It's pretty straightforward from my standpoint to argue that the discrimination is a result of a law that violates the Americans with Disabilities Act, that violation the Rehabilitation Act of 1973, it violates the Affordable Care Act. And then with respect to the unconstitutional nature of the law, it also violates the Due Process Clauses and the Equal Protection Clause. So that's the key right here. That's why the causation element, we believe, is satisfied.

THE COURT: I'll hear from the respondents.

MS. HAWKINS: Yes, Your Honor.

So in terms of the causal mechanism that plaintiffs allege, they're essentially alleging that they will be steered

toward Medical Aid in Dying, and they reference, perhaps, being steered towards requesting Medical Aid in Dying due to being at a low point, due to depression, or something like denial of their insurance coverage for their conditions. That is the actual causation in terms of the standing requirements that they're alleging.

But they don't allege that they intend to request Medical Aid in Dying, and the reliance on being steered toward Medical Aid in Dying by medical professionals or denial of insurance coverage or the like involves actions of third parties which would break any chain of causation between the Government's action and the alleged injury. And it's also just completely hypothetical.

THE COURT: It is speculative, isn't it, counsel?

MR. KITTILA: Oh, sorry, Your Honor. I was engrossed in her argument.

THE COURT: I do -- I mean --

MR. KITTILA: I don't see it as speculative.

THE COURT: The causation requirement precludes speculative links, and the crux of your argument is speculative.

MR. KITTILA: I don't think it is, Your Honor.

THE COURT: How is it not?

MR. KITTILA: Well, because the system itself --

THE COURT: The allegations that you have to the

point of counsel do not assert the individual plaintiffs being in that universe that's impacted, no?

MR. KITTILA: So respectfully, Your Honor, the reason why I don't think it's speculative is because the discrimination that occurs, that's different from what she is saying. She's saying that the person is basically being steered into a category. We think that that's a harm that could result. But the harm that actually occurs and gives us the cause of action that we're here on is the discrimination. And the reason why is because the law facially creates a two-tiered system. One is a person that is considered to be -- have a terminal illness, and one where the system creates -- one where the person does not have a terminal illness.

So it is that discrimination -- the harm that results from it, we think, yes, there is an argument there, you know, if people are rolling into offices and doctors are telling them, you know, we think you should get Medical Aid in Dying and that sort of thing, that's a different harm. This harm right here that we've alleged in the complaint is a discrimination harm which is you've created two categories right now and you're going to have to defend the two categories that you've created. Why have you created one category that says that persons who have a terminal illness go through one set of doorways and a person who doesn't have a

terminal illnesses goes into a second set of doorways. That's the issue. That's discrimination right here. So I think key for this, Your Honor -- go ahead.

THE COURT: Can you please address that.

MS. HAWKINS: Yes, Your Honor.

Plaintiff's arguments in terms of the standing requirements are entirely conclusory. They cannot establish standing simply based on an allegation of discrimination. The injury still needs to be concrete and particularized.

THE COURT: Give me the authority for that.

And can you give me the authority for this speculative -- what it is that you're asserting, because I'm struggling.

MR. KITTILA: It's *Lujan*, Your Honor. It's the *Lujan* case that really provides -- it's the idea that it's concrete and particularized, that's where that comes from.

THE COURT: But you're now extending *Lujan* in a different way, though, and that's what I'm not -- I'll hear from respondents first. And I'll come back to you.

MS. HAWKINS: Yes, Your Honor. In terms of a citation for the concrete and particularized and actual or imminent length, that can be found in *Baur v. Veneman*, 352 F.3d 625, and that's a Second Circuit case, and it is citing *Lujan*.

THE COURT: And I'm looking for in the context of

the claims that you're asserting. And that is, with regard to the standing issues.

MR. KITTILA: Yes. So if you create a system which creates a discriminatory effect, you have a cause of action at that point in time. And that's the issue here, Your Honor. It's actually pretty straightforward in that sense. Because you have created a system which discriminates against people, then you have standing to challenge that. You have standing to challenge discrimination, you have standing to -- if an unconstitutional law affects you, you have the right to challenge that constitutionality. And that is the argument here, is that this has an impact on us.

THE COURT: Do you have any final thoughts on this point?

MS. HAWKINS: No, Your Honor. Just that we -- you know, we intend to argue with respect to the merits that there is no discrimination occurring here, and, again, the arguments that plaintiffs are making are insufficient to establish standing specifically.

THE COURT: With regard organizational standing.

MR. KITTILA: Yes, Your Honor. May it please the Court on that point.

The main case on this is the *Alliance* case. And let me very quickly go to the *Alliance* factors here. Our main goal in -- pursuant to *Alliance*, it doesn't really change that

much from individual standing with the exception that we have to sort of allege that the core business activities have been impacted by virtue of the law that's come into place. And we're here on a pleading. We're pleading this argument here at this point in time.

With respect to each one of our plaintiffs, BCID, the complaint at paragraph 21, the law impedes BCID's core business activities of insuring the independence of its participants and disabled people in Brooklyn and beyond. BCID will need to devote considerable resources to help its members counter the systematic pressure to take the easy route. Silo paragraph -- I'm using the terms that I used in the brief, Your Honor. I hope that's helpful. But silo, once again core business activities. They're finding themselves having to hire additional individuals to navigate the new complexities caused by the law.

Independent Living Center of Hudson Valley, it harms ICHV's ability to engage in its core business activities because people must be alive to live in the community. Their concerns are that this is going after their people.

RCIL. RCIL's core business activities have been derailed because RCIL must address and counteract concerns about assisted suicide by producing education materials, supporting peer counseling, and they've had to establish what's called the Live On campaign at a cost of more than

$100,000 to them.  That's in the complaint at paragraph 46.

Not Dead Yet.  This harms Not Dead Yet's core business activities by exposing persons with disabilities to State-sponsored systems of premature death by suicide.

United Spinal.  It harms its core activities. They've had to counteract concerns with assisted suicide and they have to advocate for member and constituents placed at imminent risk of harm.  That's a complaint at paragraph 54.

MCIL, once again, core business activities that's in the complaint at paragraph 54.

Institute for Patients' Rights, this is harming IPR's ability to engage in its core business activities because it adds a new barrier by licensing medical providers to facilitate premature death in lieu of treatment.  IPR has had to develop new course.  Each one of these organizations has had to spend money, spend resources.  This is not simply advocacy, this is not somebody sitting down and saying I'm opposed to assisted suicide, therefore, I want to come into federal court and argue this.  These are people who are saying, no, we actually have to sort of shift the focus of what we're doing as an organization to now combat what is going on.  It's a direct result.  This is not advocacy.  This is people basically saying assisted suicide has created this system of harm, we now must shift our focus.

And it's essentially a lot of these organizations

have identified this as an existential threat to them because they now need to be on guard and aware of what's going on. They need to keep a watch for their people. So again and again and again we've identified core business activities.

The State of California -- in the California case *United Spinal versus California*, the Court concluded that there was standing with the organizations. I jumped ahead in my argument before about that, Your Honor. I apologize. But that was important. That ended up coming up in that case. The individuals did not have standing, but the persons did.

The law is different, of course, in California and in Delaware. New York did something different in how they qualified. But this test is the same. It's the *Alliance* test. My friend on the other side will probably say, well, they weren't facing the *Alliance* factors, the *Alliance* test wasn't in place when California's case, that was decided. It didn't matter. They still qualified under the authority at that point in time, and I think they still qualify today.

We were well aware of what the *Alliance* test was and we're very very careful too when people came to us to try to make sure that they did have standing. These organizations are hurting by virtue of what's happening in the State of New York with the change in this law.

THE COURT: Counsel.

MS. HAWKINS: Your Honor, I agree that *FDA v.*

*Alliance for Hippocratic Medicine* and that test applies. But the Court in that case actually rejected the same type of core business activities that plaintiffs are alleging here, namely, monetary and related injuries and diversion of resources. So plaintiffs by relying on core business activities to establish standing are essentially articulating a frustration of mission or diversion of resources theory, and *Alliance* did explicitly reject that theory in very similar -- regarding very similar allegations in terms of diversion of resources. And the Supreme Court found that the causal link between the law and those injuries was too speculative or otherwise attenuated.

And it is true that the California decision in the nearly identical case to this one is the only one of those three cases we highlight in our briefing where the Court found organizational standing, and that was decided two months before *Alliance* was issued by the Supreme Court. So it is notable that they -- that that Court was not considering what would be the Supreme Court's rejection of that legal theory at the time that the California court issued that decision.

And the Delaware Court in *Curran* also considered *Alliance* and concluded that organizational plaintiffs lacked direct standing for these reasons and added that without any articulation of actual injury, their allegations amount to nothing more than a legal objection to the law fueled by their strong moral ideological and policy beliefs, and this just

simply does not satisfy the standing requirement for organizational plaintiffs.

THE COURT:  Do you wish to respond?

MR. KITTILA:  Yes, Your Honor, I would.

If you take a look at the case the *Alliance* case and it's very interesting on that one, it was a group of doctors who said that they were not going to be prescribing the medication that they were opposed to.  They stated that what they were trying to do was they just had ideological objections for the most part.  Once they kind of got called out for that, then they tried to back in and shift into that.  That's not the case here.

This is a case where it's actually directly impacting the core business activities of what these people do on a daily basis.  These organizations are out there, basically, helping individuals with disabilities who would qualify for terminal illness.  So this is a complete shift in what their mission is.  We did use that word at one point.  But it's also their business activities, what their business activities are.

The *Alliance* case, I think the doctors, I think when you do a close read on that, Your Honor, the *Alliance* case is on point in the sense that that's the test.  But I think we have more than satisfied the *Alliance* factors.

THE COURT:  I will reserve decision on the

intervention motion. But for purposes of efficiency, I will permit, if there are any responses or remarks that counsel wishes to make at this time, I would permit you to do so.

MR. CHABOT: Thank you very much, Your Honor. I'll add just one thing which is in the *United Spinal versus California* case as being discussed on organizational standing, it's my understanding that the Ninth Circuit appeal of that case is stayed pending the Ninth Circuit on bond decision about organizational standing.

THE COURT: Anything counsel of either other party wishes to add in that record or speak to?

MR. KITTILA: No, Your Honor. Thank you.

MS. HAWKINS: No, Your Honor.

THE COURT: Moving to the motion for preliminary injunctive relief, and that is, moving away from the standing -- that threshold question, and now moving more generally to the motion. I understand that there's some intersection, but I'd like to speak to irreparable harm and then walk through those factors and hear from the parties if there's anything they'd like to amplify or underscore with regard to their arguments in their papers.

And so I can start with plaintiffs' counsel.

MR. KITTILA: Yes, Your Honor. If you'd like to irreparable harm factor.

THE COURT: I would first, yes.

MR. KITTILA: And I think Your Honor -- I think it's very very helpful, there is a -- wonderful case called *Murray versus Cuomo* and I believe it's cited by opposing counsel, 460 F. Supp. 3d 430, and that's a Southern District of New York case -- Your Honor you can follow that if you wish -- that's the mere allegation of a constitutional violation appears to constitute irreparable harm under this Circuit's binding precedent. That could not be more clear to me at this point. It is the constitutional violation that we have alleged at this point that satisfies that category.

The fact is that we've also stated other basis for irreparable harm, Your Honor, in the brief. We have serious concerns about the impact of the law going forward, discrimination that starts, it starts automatically the moment the law comes into place. We believe that that is irreparable harm right there, that that discrimination has an impact. We think that having the opportunity to, at least, address these concerns and address the concerns of whether or not this violates the Americans with Disabilities Act before it starts to impact people who are under the Americans with Disabilities Act, before it starts to impact people that are on the Rehabilitation Act, we think that that's key.

So anything more on that, Your Honor, I'm happy to address the other factors on the arguments regarding the preliminary injunction which is likelihood of success, and

then --

THE COURT:  Well, can I just ask, though, with regard to the injury being actual and imminent, is participation in the Medical Aid in Dying Act voluntary completely?

MR. KITTILA:  Participation is -- I would say there's a question of what is voluntary.  I would say --

THE COURT:  Parse that out then.

MR. KITTILA:  My friends on the other side would say of course it's voluntary.

THE COURT:  And if you're telling me it's not, then tell me why it's not.

MR. KITTILA:  My view is that a person that comes into an office and says, Doctor, I would like to get medical aid in dying, there might be a person who comes in who is suicidal at that point.  Is that person acting in a voluntary manner?

THE COURT:  Aren't there checkpoints on this?

Maybe I'll allow respondents to speak more directly to this scheme.  But the way I read the interplay and the Act, it's really not that simple, right?

MR. KITTILA:  Your Honor, I think --

THE COURT:  I think you've oversimplified the process.

MR. KITTILA:  Look, that's probably a fault just of

me trying to dumb it down a little bit for myself even.

THE COURT:  I'm beyond the dumbed down version, and I don't need a dumbed down version.  I need you to speak directly to the Act and the provisions of the Act, the various checkpoints that it provides, the definitions, the forms that need to be completed, the medical sign-offs that are required.

I'll start with, I'm no dummy, don't need the dumb down; I need you to interact with the law.

MR. KITTILA:  You've got it, Your Honor, and no offense.  It's for me, sometimes it's easier to get my words out.  But no offense to you, and I know you're studied law.

The idea here is really a person comes into a doctor's office, they express a desire to die, they have to be fit into the category of having a terminal illness.

THE COURT:  And walk me through the steps as you understand --

MR. KITTILA:  My understanding is that if that persons walks into the office or roles into the office or is pushed into the office, they have to come in there and say, I would like to die.

THE COURT:  And they'd go into the office of who?

MR. KITTILA:  They would go into their physician's office.

THE COURT:  And then what happens?

MR. KITTILA:  At which point in time, it's two

different points.  So the first point is that if a person satisfies the category of having a terminal illness, that person can then --

THE COURT:  And to satisfy that category, what has to occur?

MR. KITTILA:  So that person has to be able to -- what is it says here is medically confirm and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided.

So that person needs --

THE COURT:  And who has to confirm that?

MR. KITTILA:  So that is the doctor.

THE COURT:  So the doctor confirms that?

MR. KITTILA:  The doctor confirms that.

THE COURT:  And then what happens?

MR. KITTILA:  The doctor then refers that to a referral doctor.  That doctor then basically confirms that decision.

THE COURT:  And how does that referral doctor do that?

MR. KITTILA:  The doctor is supposed to evaluate the person, the personal can be evaluated by Zoom, they can be evaluated in-person.  Doesn't have to be, you know --

THE COURT:  But what is it that they evaluate and confirm?

MR. KITTILA:  They are confirming whether or not the person is going to -- has a terminal illness, whether or not that person has a condition irreversible illness well within a reasonable medical judgment and will produce death in six months whether or not treatment is provided.

THE COURT:  And then what happens?

MR. KITTILA:  That person then is also referred to a medical mental health professional who makes a very simple judgment.

THE COURT:  In what way?  How does the act indicate -- when you say simple, what does the law provide?

MR. KITTILA:  The person is -- under the law, the person needs to make -- a medical mental health professional makes a determination whether or not the person has consent, the ability to consent.

THE COURT:  And what is involved?  What does that mean, an ability to consent?

MR. KITTILA:  The law is vague on that.  But it's whether or not the person has the ability to consent to the -- basically, to effect the taking of medication that will end their life.

THE COURT:  And if you're unclear, I'll allow the State to interject there with what's required for consent or the evaluation for consent.

MS. HAWKINS:  Absolutely, Your Honor.

So I assume consent is sort of being used interchangeably with informed decision. So the definition of informed decision under the Act is the decision by a patient who is suffering from a terminal illness or condition to request and obtain a prescription for medication, that the patient may self-administer to end the patient's life, that is based on an understanding and acknowledgment of the relevant facts, and that is made voluntarily of the patient's own volition and without coercion after being fully informed of multiple things, Your Honor.

So the patient's diagnosis and prognosis, the potential risks associated with the medication to be prescribed, the probably results of the medication, the possibility that the patient may choose to obtain the medication but then not take it, and the feasible alternatives and appropriate treatment options, including, but not limited to, palliative and hospice care.

THE COURT: And that's provided by what type of health care provider?

MS. HAWKINS: So, Your Honor, whether the patient is making an informed decision needs to be determined and confirmed independently by both the attending physician and the consulting physician. And I'll also add that both of those physicians have to come to the conclusion, not only that there's been an informed decision, but that the patient has

decision-making capacity, and that the decision itself is voluntary.

THE COURT: And these are physicians?

MS. HAWKINS: Yes. Those are physicians.

And then the mental health professional confirms the decision-making capacity portion of that, of those requirements.

THE COURT: Are we on the same page there or do you have a disagreement as to that reading of the Act?

MR. KITTILA: We are on the same page with the mechanism.

And we have concerns with how that would be implemented, but we are on the same page with how she described the mechanism.

THE COURT: Okay. And that's what's provided, and if you can give me the citation, please.

MS. HAWKINS: Absolutely. So the definition of informed decision is at Section 2899-D7. And then what I detailed in terms of the different medical professionals' responsibilities, the attending physician's responsibilities are detailed in Section 2899-F, the consulting physician's responsibilities are 2899-H, and the mental health professionals' responsibilities are 2899-I.

THE COURT: Are these the procedures that you characterize as quote, simple, or something else?

MR. KITTILA: Well, my concern is, with this -- let me answer your question directly.

THE COURT: Let me say this: I don't want to you talking over me because that can't work.

Very directly, you were saying there's a simple consent.

Is it this process or something else that you were referring to?

MR. KITTILA: 2899-I is the simple consent. That's the issue that I characterized as simple because that is the mental health professional, what they have to do. It is very very simple, Your Honor.

THE COURT: So again, I'll ask the Government to respond to that, please.

MS. HAWKINS: Your Honor, the determination that the mental health professional makes is whether the patient has decision-making capacity. And that is also determined independently by two other medical professionals, the attending and the consulting physician. And in terms of the -- I don't know if Your Honor is interested in the definition of decision-making capacity.

THE COURT: Certainly, you can, for the record.

MS. HAWKINS: It's the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of an alternatives

to any proposed health care, including medical aid in dying and to reach an informed decision.

THE COURT:  Okay.  So that's one portion.  And then there's the physicians that also have assessments and evaluations.

So there's the mental health, there are the multiple physicians, and then what else?

MR. KITTILA:  At which point in time, Your Honor, if they are passed on two physicians, the mental health professional, then at that point in time, the person is prescribed the medication.  And that's my understanding, as the person's prescribed the medication, they have to take it on their own, it's self-administer, or they can choose not to administer the medicine, they can choose not to take it.  And we have concerns about those who choose not to take it, as well, what happens with the medication at that point in time.

There is no time limit on when the person can make that decision regarding that.  But there is a five-day waiting period before the person is prescribed medication.  I hope I have stated that correctly.

MS. HAWKINS:  As to the five-day waiting period, yes.

So the attending physician, after all three of those medical professionals have signed off, can prescribe the medication and must include a note in the prescription

indicating that it cannot be filled until five days later, which provides for a waiting period for the person who intends to self-administer it. And then once the prescription is filled, the patient must self-administer the medication by ingesting it, and no one, including a health professional, may administer the medication other than the patient, and the attending physician has to, at multiple points I believe, inform the patient of their right to rescind the request at any time and in any manner.

And I will just add, because I don't think plaintiffs mentioned this part of it, but it goes sort of back to the beginning of the request process, there is both an oral and a written request involved. So the patient first makes an oral request to their attending physician, who, by definition is the physician who has primary responsibility over treating their condition. And that oral request has to be recorded using an audio or video device. And then after that oral request is made, and the attending physician conducts an examination, the patient also has to make a written request on a form that is provided in the statute, and that has to be in the presence of two witnesses who are not financially tied or stand to benefit anything from the patient's death. And the statute lists a long list of individuals who are not qualified.

THE COURT: That are excluded.

MS. HAWKINS:  Right.

So I just wanted to add that even that initial request process is much more detailed than plaintiffs described.

THE COURT:  Any disagreement with the way that's been recounted?

MR. KITTILA:  No disagreement with what the law says, Your Honor.

THE COURT:  Okay.  Let me just ask, in moving to -- and I'll ask if you are able, with regard to the issue of irreparable harm, if you're able to point me to a case where the Court found that plaintiff would suffer irreparable harm based on an outcome that was voluntary.

MR. KITTILA:  If you'll give me one moment, Your Honor.

THE COURT:  Sure.  And that is, one of plaintiff's voluntary choice.

MR. KITTILA:  Not sitting here right now, Your Honor, I wouldn't be able to do that.  I can't remember exactly the *Murray versus Cuomo* facts, and I'm having a little bit of trouble remembering that.  But I do know there was that provision in there stating a constitutional violation does constitute irreparable harm.

So that's where my mind is going right now, Your Honor.

THE COURT: Okay. With regard to likelihood of success, I can hear from defense counsel, but I do want to hear from plaintiffs, and I think you've been suggestive of languages in acts from other states, but there have been similar challenges to Acts of this type in other states, and I would like to hear from you how you would distinguish the cases.

But let me hear first from the State with regard to the likelihood of success.

MS. HAWKINS: Yes, Your Honor. So with respect to plaintiffs' statutory claims under the ADA, the Rehabilitation Act, and the ACA, plaintiffs essentially argue that the Act undermines New York robust suicide prevention scheme and replaces it with an alternative discriminatory scheme where persons with terminal illnesses will be steered toward medical aid in dying. And as Your Honor has noted in the irreparable harm context, the key point to keep in mind that takes the Act completely out of this equation is that medical aid in dying is wholly voluntary. It can't be construed as denying anything to anyone, as is required under these discrimination statutes.

And as the Central District of California noted in *United Spinal Association*, discrimination occurs when an individual is excluded from or denied the benefits of a service, not when that individual chooses not to participate

in or receive the benefits of the service. And as the Delaware Court said in *Curran*, plaintiffs failed to provide a case with your discrimination was found by virtue of a person being granted more options than their non-disabled counterparts. Plaintiffs still retain the same access to New York suicide prevention resources and they're not denied those resources in any way.

And to the extent that they allege that they will be steered toward medical aid in dying, this is belied by the extensive safeguards that were outlined to Your Honor just a moment ago, including, the multiple requirements regarding, particularly, the attending physician's responsibilities to advise the patient of alternative health care options and end-of-life options, including palliative and hospice care and other treatment that may be appropriate depending on the person's specific condition. And so given the inherently voluntary nature of the medical aid in dying process, the fact that plaintiffs are not being denied access to any Government service and the robust safeguards in place to make ensure patients are making informed decisions and not being steered towards any particular choice, plaintiffs have no likelihood of success on the merits as to their statutory claims.

THE COURT: With regard to my prior question, there was a reference to *Murray v. Cuomo*, and I don't know if you were able to speak to what, perhaps, may be suggested there

that counsel may be referencing.

MS. HAWKINS: I am not sure, Your Honor. I would need to locate --

THE COURT: And that's okay if not. I just wanted to give an opportunity, if you did have a sense of where that was going, to respond.

I would like to hear from plaintiffs' counsel specifically with regard to argument that the act denies people with disabilities access to suicide prevention issues -- or services, and to the extent that those services, as I understand them, were voluntary, as well.

Can you speak to your argument or just kind of maybe amplify it in some ways.

MR. KITTILA: Sure, Your Honor. Happy to do.

This is a violation of the Americans with Disabilities Act, and the reason why, Your Honor, is because the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs of a public entity or be subjected to discrimination. And it's really -- that's the focus of where my argument is. It's that they are subjected to discrimination.

THE COURT: In what way is what I'm asking.

MR. KITTILA: Yes. Sure. They are being labeled as

terminal, and by being labeled as terminal under the law --
now if the law had said that any person in the State of New
York, regardless of their condition, could ask for suicide,
that would be one thing.  I would not have an ADA claim.  But
because the fact they say people with terminal illnesses which
we say is synonymous with having a disability, that violates
the Americans with Disabilities Act.  That allows them the
potential to be steered.

Now, the standard of care which is what we are
arguing is that if a person comes into a doctor's office in
the State of New York and they express a desire to die, they
would be directed towards suicide prevention programs.  The
State of New York has a robust suicide prevention program in
place.  That would be the standard of care.  If a person with
a disability comes into an office and says that they have --
express a desire to die, they would be directed towards
medical aid in dying.  They do not have to be directed towards
suicide prevention.  That's discrimination, plain and simple.

The State of New York could --

THE COURT:  Let me pause right there.  And let me
allow respondents to speak to that assertion.

MS. HAWKINS:  With respect to whether these
individuals would be directed to suicide prevention services,
so the Act only applies to a very narrow group of people, as
we've already defined.  And the Act, by its own terms, says

that no person shall qualify for medical aid in dying simply by virtue of disability.  The act itself does not consider medical aid in dying suicide as a legal matter, because it is a specific process that the legislature after much deliberation decided that this particular group of people should be able to decide whether to end their life in this very specific circumstance.

Again, there is no denial of access to suicide intervention resources that is at issue here.  And as I've already outlined, there are numerous safeguards included in the act to ensure that this decision is made by someone with decision-making capacity, that it's an informed decision, and that it's entirely voluntary.

THE COURT:  I'll allow you to speak to that.

MR. KITTILA:  Yes, Your Honor.

That is the concern right there, is that somebody who comes into the office that can be labeled as terminal is given a pathway which other people who would come in, who do not have a terminal illness, they are given a pathway which we think is not a benefit, we think it's actually a lesser approach to treatment.  We think --

THE COURT:  Well, they're given options and then they are presented with options and they have to voluntarily make decisions, right?

MR. KITTILA:  That's kind of the case with almost

any argument in favor of discrimination, Your Honor, in the sense that that person is given something that somebody else is not. And that's the problem that we have.

THE COURT: I feel like -- when you're saying that person is given something that a person is not, that person being the person that, by definition, meets the category of being terminally ill and then the rest of that provision is provided more options than someone who is not.

MR. KITTILA: My -- the case that I'm thinking of, Your Honor, is *Washington versus Glucksberg* which is a Supreme Court case.

THE COURT: Yes.

MR. KITTILA: In *Glucksberg*, one of the dangers that was noted by the Court is that there is a risk of subtle coercion towards suicide. To say that that --

THE COURT: Look, understanding *Glucksberg* right in front of me right now, that's not my question though.

My question is whether or not there are options provided here to people that are classified as such, that is, in this terminally ill category, meeting the rest of the requirements that are otherwise not provided to others.

MR. KITTILA: I would agree with you. That is an option that's not provided. But that puts a value, a positive value on what's being provided. If I tell a person that they have a choice between suicide -- and not suicide. If the

standard of care -- which is why I think we want to be in front of you present when the standard of care is -- in a medical situation where somebody expresses a suicidality, the standard of care is not to suggest go out and commit suicide.

THE COURT: Well, but the Act does not -- it's not denying suicide prevention services.

MR. KITTILA: I would say it does by virtue of the fact suicide prevention services -- and I think we could present evidence on that -- suicide prevention services does not mean suggesting suicide in any which way. It is a very life-oriented, you have value, you're needed here, and that's what's key. If a person comes in who has a terminal illness and they're basically presented, you know, suicidality and they say, I --

THE COURT: It's not suicidality, though. Because I believe that the State is going to tell you that now you're mis-utilizing terminology that has -- that is medical acceptable import and also within the Act has different imports that are carried over from the medical terminology that follows from certain criteria, certain definitions. And I think that you're oversimplifying things in a way that's now conflating certain options and then terming them something else is what I'm finding.

Let me ask the State to please address that.

MS. HAWKINS: Yes, Your Honor. I would agree that

plaintiffs conflate medical aid in dying with suicide. As has already been addressed with respect to the definition of a qualifying individual for medical aid in dying, that is a very narrow set of people, and, again, subject to robust confines and safeguards in the Act.

And I would just agree that far from denying a benefit, it actually is an additive benefit for those -- that very specific group of people. It is a way to alleviate suffering and make an impending death that one knows will occur, less prolonged and less painful. So it is an additional benefit provided to those individuals. And that is not -- that's not a situation where courts have found discrimination. You know, I quoted the Delaware court earlier, but there just is no case where discrimination has been found by virtue of a person being granted more options.

THE COURT: I'll hear from the proposed Intervenors if they have anything they'd like to add in this area.

MR. CHABOT: Thank you very much, Your Honor.

The only thing that I would add is we made the point on Page 4 in 19 of our brief that over a third of the people who are prescribed medical aid in dying medication in other jurisdictions don't take the medication which further underscores that this is a voluntary choice up until even after the medication itself is prescribed, I think undercuts both the discrimination claims on the likelihood of their

success and the irreparable harm.

THE COURT: Moving to the Equal Protection claim, if plaintiffs can address how in terms of the similar-situated analysis, those without terminal illnesses being similarly situated to those that have terminal illnesses. I think I'm understanding your argument that the plaintiffs necessarily, that is, the individual plaintiffs, that they necessarily fall into the terminal illness definition and maybe that's -- that's your argument, essentially?

MR. KITTILA: Correct, Your Honor. Yes, you nailed it. And I think I'm understanding that the defendants' position to be that that's just not the case.

MS. HAWKINS: That is correct, Your Honor.

THE COURT: And turning to the balance of the equities and the public interest. I'll hear from plaintiffs' counsel if there's anything you'd like to amplify.

MR. KITTILA: Nothing more than what was basically put into the briefing, Your Honor. And that's essentially that where you have a law that is unconstitutional, the balance of the equities and the public interest -- public interest, the Courts have collapsed those two prongs there together to say, well, there is no benefit that can be had by an unconstitutional law. So our argument really goes to the fact that the law as we have pled it, is unconstitutional at this point in time.

THE COURT: Do you have anything that you'd like to add in response?

MS. HAWKINS: Yes, Your Honor.

Well, we would argue that the law is constitutional, and here, a preliminary injunction would not be in the public interest. As stated previously, the narrow segment of the population who will be eligible for medical aid in dying under the act are those with terminal illnesses who will die within six month, with or without treatment. So ultimately, the core purpose of the Act is to alleviate human suffering.

As counsel for the Intervenor stated, in states where medical aid is dying is already legal, it is rarely used, but for those who choose to obtain medical aid in dying, it allows them the opportunity to die with dignity, on their own terms, and avoid the emotional and physical anguish of a prolonged death. And what's more, New York voters support medical aid in dying by a two-to-one margin, and 67 percent of New York physicians support New York's Medical Aid in Dying statute, and conversely, plaintiffs have failed to show that this Act impacts them in any direct way.

So thus, given New Yorkers' support for the act, the compelling aid it can provide to people with qualifying terminal illness, a preliminary injunction will not be in the public interest.

THE COURT: I'll hear from counsel.

MR. CHABOT: Your Honor, I would just underscore the point made in the declarations by the proposed Intervenors that even for folks who wouldn't qualify as terminally ill under the Act today and who wouldn't qualify to obtain the medical aid in dying prescription today, the act has incredibly positive effects as they make their end-of-life plans and gives them the peace of mind today, all of which tilts of balance of the equities in favor of denying preliminary injunctive relief when the plaintiffs and plaintiff organization today don't face any imminent risk of harm because any use of -- even obtaining the prescription is voluntary.

THE COURT: Plaintiffs.

MR. KITTILA: Your Honor, the Court never takes a poll of the people of the State of New York when it makes a decision. The Court has to act on its own decision and what is the law on this. The fact that the law, it's being pitched, it's been pitched as a way to provide a peaceful means of death, we think it's anything but peaceful. We think that the law has been misdescribed. We think that in some respects --

THE COURT: Well, let me just say, but you're not here -- on the one hand I'm with you that I'm not doing this on percentage, but then you seem to be now making it about your belief about the law.

So can we speak to the plaintiffs and their position because it may serve you better to focus there.

MR. KITTILA:  Your Honor is spot on.

Your Honor, this is discrimination, plain and simple.  The law categorizes people and that right there is the key to the focus.

And by the way, I am to so appreciative as an attorney to be able to make this argument right here right now because in Delaware, I didn't have this opportunity.  So this is the first time that I've had a debate on this law, this type of law.

And so it is discrimination.  The fact is that what the people are experiencing and what will happen when the law comes into place, the organizations that we have, have thousands and thousands of people, and their board of directors have voted in favor of going forward with these lawsuits to challenge them because the concern over discrimination.

New York had a choice when they did medical aid in dying.  I do believe it is called suicide because it is a person that is self-administering death to themselves and that's what's key.  I think we have had a position in this country for so many years supporting life.  New York still criminalizes suicide.  This is not a decision right now that --

THE COURT: So then I would not be following your belief on what suicide is, though, to your point I would be looking at what the law and how the law defines suicide, correct?

MR. KITTILA: I think that that's probably right.

THE COURT: You think that's probably right?

MR. KITTILA: I wouldn't get too lost in the words on this, Your Honor, because I think that the words are --

THE COURT: Well, the words being that I am going to have to make my decision based on the definitions provided by law, not your feeling of what you believe suicide is.

MR. KITTILA: You're exactly right, Your Honor.

THE COURT: Okay.

MR. KITTILA: You have to follow the law. Regardless of how you may feel about these issues, you have to follow the law. And I think that we have made a legal argument why this is discrimination, because I do think that based upon what is written in the statute right now, what is written in the statute will lead to -- is discrimination, plain and simple. That's the argument that I'm putting before this Court.

And my colleague has passed me a note. He's smarter than me. So this is going to cause people to deviate from the standard of care. It's going to cause doctors to deviate from the standard of care in the medical offices, and that's what

this law does. It allows that deviation.

THE COURT: Well, the doctors take an oath, that again, in following the law in keeping their licenses. There is nothing about this Act that will cause a deviation in what it is that they're called to do as doctors, though.

MR. KITTILA: I would disagree with that, Your Honor, respectfully. I disagree because what that does --

THE COURT: So when you say that it would cause them to deviate from the standard of care, I mean, that is something that is developed and then established, and in some ways, I wouldn't even say it's necessarily fixed. Standard of care can change, no?

MR. KITTILA: Standard of care does shift over time. Like, we don't use leaches anymore, Your Honor.

THE COURT: Well, this is my point, right. When we have a medical expert and there's an accepted standard of care, it might look different in qualifying an expert in -- I'm sorry, in establishing a standard of care in some particular area 10 years ago is not necessarily fixed, that is. And so I'm just careful when you say a quote, unquote, deviation from the standard of care.

What exactly are you meaning? And you can tap your colleague and ask him.

MR. KITTILA: In fact, I'm going to tap my colleague.

THE COURT: Because I'm not looking for just passing soundbite notes. I'm really trying to engage with this as, what are you actually meaning here?

MR. KITTILA: I so appreciate it. And I believe --

THE COURT: Because standard of care and deviations have a very specific -- there's terms of art, law, and medical terms to me, right. So...

MR. KITTILA: In fact, would you mind if my colleague spoke for one second with me? Is that okay, Your Honor?

THE COURT: You can speak with your colleague for a moment.

MR. KITTILA: Yes, thank you.

(Pause in the proceedings.)

MR. KITTILA: Your Honor, Your Honor, my colleague is -- that's why we work together.

Two groups of people. One group comes into the doctor's office. They fit within what the law describes as having a terminal illness. They receive one standard of care if they express a desire to end their life. That person can be talked into or talked to about medical aid in dying. The other group, a person that maybe doesn't have a terminal illness or a person that's -- that maybe doesn't have a wheelchair or looks like a person that does not --

THE COURT: This is already not set up as a good

hypothetical. I didn't mean to invite confusion here because I think you're reaching right now. In terms of where -- you've got two groups as opposed to two people, they're in an office and terminal and not terminal with a wheelchair or not. I think that this is not getting anywhere directly and it's probably not the best -- I'm not finding it helpful to the Court right now.

MR. KITTILA: Okay. If I may.

When we talk about deviation of care, it's just essentially that what can be advised to a patient based upon whether or not they are classified as terminal versus not terminal. That's a straightforward approach to the analysis on this. And that's where we're concerned about the deviation and standard of care.

THE COURT: So, again -- and we may be talking past each other because medically, a standard of care, it has its -- there's a term, scientifically not just medical. Scientifically. And maybe it's my science background, too, that's informing. That is a term, right. And a deviation, deviation is something that's very specific scientifically, right. So when you start throwing that out there, it's the soundbites I'm trying to relate them in a way, because we've walked through process and procedure, that is fixed in terms of -- and there are always places -- you've got a physician that's making an assessment, okay. But the standard that's

set within the medical community is something else.  And I'm not sure if you're asking me to consider how the medical community receives this Act in terms of how they consult or something else.  But I find it to be not straightforward.

MR. KITTILA:  Let me be very plain about this:  We have scientific studies that we have clipped into our complaint that we have pled in there that doctors do discriminate based upon whether or not a person has a disability or not.  There are medical studies that have been done by this.  I'm not trying to soundbite it.  I really am trying to get to the core issue here which is that doctors discriminate.  And that is the key thing.  When we say that it deviates from the standard of care, we think that there is one standard of care, that if a person expresses suicidality -- and I think we could bring you medical doctors that would say that if a person expresses a desire to end their life, they should receive medical -- they should receive suicide prevention.

THE COURT:  But I think that in the way that we're now ending, and I didn't -- me, steer some another place, but it seems to be conflating issue of what you perceive to be discrimination against people for disabilities and an Act with regard to people that are terminally ill and meet this other criteria, and you're throwing them all together and asking me to merge them in some way, and that's where we've now ended.

I mean, that's where we are now because the example you just gave me or the sentiment you just expressed has to do with doctors' perceptions, as you perceive it and experience, with people with disabilities, and the intersection here is intersecting that with made, right.

I feel like I then have to toss this back to allow -- rather than me do this, to allow defendants to speak to the argument that you've just left off with because it's somewhere else than -- it's bringing it as to something else other than simply a challenge to the actual Act at this issue. It's otherwise a sentiment and a feeling about perception that's different and not completely -- not directly engaged in what the argument was about.

But I will allow the respondents, that is, the defendants, to respond.

MS. HAWKINS: Yes, Your Honor.

So I'll just say I want to be careful about how we're phrasing how this actually even works. Plaintiffs in their hypothetical regarding some sort of deviation of the standard of care say things like, the doctor will talk a suicidal person into medical aid in dying, they will affirmatively advise them of medical aid in dying. This is a voluntary request under the statute. It's an affirmative voluntary request that the individual, assuming they meet all of the criteria for the definition of a qualifying individual

under the statute, this is an affirmative voluntary request by that person.  The statute does not produce a deviation in the standard of care.  It simply makes it legal for doctors to prescribe medication for end of life in very narrow circumstances as set out in the Act.

THE COURT:  Counsel.

MR. CHABOT:  Your Honor, I have nothing to add to that.  Thank you.

THE COURT:  Okay.  I will just say I have the submissions and the caselaw.  At this juncture, I'm going to take the motion under advisement and reserving decision on whether to have further evidentiary hearing on the motion, that is, if a hearing is necessary, I'll issue an order with further requirements.  I am not telegraphing that I believe that there will be one, but I know that that's something that can occur when a preliminary injunction is requested.  This is an argument.  It was a hearing, but it was not an evidentiary hearing.  I have not at this point did not deem one to be necessary.  But this is under advisement.  If I do, in working through the issues here, deem that that one is necessary, I will order that one occur.  But otherwise, in general, this motion is under advisement as is the motion for intervention.  But again, in the interest of efficiency, I've allowed the prospective Intervenors to participate in the arguments so that they could be heard and their papers are

obviously -- their proposed papers are part of the record, as well.

And is there anything else that the Court needs to take up at this time?

MR. KITTILA: Your Honor, we're just really appreciative. iPhone very generous with your time. We know you have other things going on. But thank you very much for this.

MS. HAWKINS: Nothing else, Your Honor. Thank you.

MR. CHABOT: Nothing further, Your Honor. Thank you very much.

THE COURT: Okay then. With that, then we stand adjourned. Thank you, everyone.

(Whereupon, the matter was concluded.)

*    *    *    *    *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/ Avery N. Armstrong                    July 11, 2026

AVERY N. ARMSTRONG                    DATE