

HALLORAN
FARKAS +
KITTILA LLP

**Theodore A. Kittila**
Halloran Farkas + Kittila LLP
5722 Kennett Pike
Wilmington, Delaware 19807

p: (302) 252-7498
e: tk@hfk.law

**By ECF**
Hon. Orelia E. Merchant
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11215

July 23, 2026

Re: ***Brooklyn Center for Independence of the Disabled, et al. v. Hochul, et al.,*
Civil Action No. 26-cv-3492**

Dear Judge Merchant:

We represent Plaintiffs and write pursuant to Your Honor's July 16 Order allowing Plaintiffs to submit opposing arguments to Defendants' claim that this case should be dismissed because Plaintiffs lack standing to pursue the claims.

"To establish standing, a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("*Alliance*") (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009)). Moreover, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Likewise, "on a motion to dismiss [the Court] 'presum[es] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). A plaintiff may secure relief from a threatened injury where there is a substantial risk that the harm will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

**Individual Plaintiff Standing**

For the Individual Plaintiffs (Mr. Hernandez and Ms. Cameron), the test for standing is whether they have pled a "concrete and particularized" injury. *Lujan*, 504 U.S. at 561. "This does not mean, however, that a party must wait until he sustains an actual injury before filing suit." *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 517 (2d Cir. 2024). Here, each Plaintiff has pled a concrete and particularized harm resulting from the Defendants' implementation of the New York Medical Aid in Dying Act (the "Act").

Defendants cannot dispute that the Act has created a two-tiered scheme, separating persons who qualify for assisted suicide from those who do not. The Individual Plaintiffs automatically qualify under the Act because of their life-threatening disabilities. Both Mr. Hernandez and Ms. Cameron pled in detail how the Act will harm them. Both Mr. Hernandez and Ms. Cameron require ongoing medical support to keep living. Mr. Hernandez is:

> paralyzed from the neck down with limited movement in his arms and no movement below his shoulders. As a result of this disability, he requires assistance with dressing, showering, brushing [his] teeth, toileting, cooking, and eating. Without assistance with these tasks, he would not be able to do any of these things and would die from starvation.

Complt. ¶ 23; ECF #2-4 ("Hernandez Dec.") at ¶ 5. As Mr. Hernandez stated in his accompanying declaration submitted in support of the preliminary injunction motion, "I have no control of my diaphragm, so coughing is very difficult. Given my condition, when I am congested, it can make me feel like I am drowning." Hernandez Dec. at ¶ 4.

Mr. Hernandez declared that he has "experienced discrimination over the course of my disability." *Id.* at ¶ 6. As he noted in his declaration, "[t]he Act devalues people like me. The Act tells people like me that we qualify for suicide assistance, not suicide prevention." *See id.* at *¶* 9; *see also* Complt. ¶ 26 ("As a result of the Act, Mr. Hernandez, as a seriously disabled person, is at imminent risk of harm of being placed into an inferior tier of medical care due to the passage of the Act.").

Ms. Cameron pled in the Complaint that she would die within six months without medical support. Complt. ¶¶ 29, 32. In her accompanying declaration in support of the preliminary injunction, Ms. Cameron stated, "… I fear I will be denied care by my insurance or steered into physician-assisted suicide because it is cheaper or more efficient for me to simply not receive adequate care." ECF #2-5 ("Cameron Dec.") at ¶ 8. Ms. Cameron pled in the Complaint, that she:

> is worried that as her health declines and she continues to lose treatment and support, she will be hospitalized or placed in a nursing facility. If this happens, she is concerned that doctors will tell her there is nothing more they can do for her, which could leave her vulnerable to feeling like she has no other choice than to take assisted suicide.

Complt. ¶ 34. Ms. Cameron further pled in her declaration that the Act treats her as a "second-class citizen" because of her disability. Cameron Dec ¶ 4.

These allegations of discrimination satisfy the requirements of a "concrete and particularized injury." The injury—specifically, the discrimination—is directly traceable to the Act, and the enjoining of the implementation and enforcement of the Act will remedy the alleged harm. The Individual Plaintiffs have satisfied their pleading obligation for purposes of allowing the case to move forward.

Defendants have argued that the Individual Plaintiffs currently do not qualify for assisted suicide under the Act because, according to the Defendants, they do not have a "terminal illness." ECF #23 at 8-9. Under the Act, a "terminal illness" is defined as "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided." N.Y. Public Health Law § 2899-d(17). Defendants argue that the "[I]ndividual Plaintiffs are categorically ineligible for medical aid in dying under the Act based on the description of their conditions…. [U]nder the act, it is not enough that an illness or condition would be terminal if medical treatment were withdrawn; it must produce death with six months *even if treatment were provided*." ECF #23 at 8 (emphasis in the original).

In the alternative, even if Defendants' saving construction of the Act's language were correct—and it is not—Defendants' definition of "terminal illness" would not deprive Mr. Hernandez and Ms. Cameron of standing. While the Individual Plaintiffs have pled and provided declarations stating that they have a terminal illness—and such pleadings and evidence remain unrebutted—each of the Individual Plaintiffs has pled and testified to medical conditions so severe that any disruption in care would likely result in death within six months—making them terminal even by Defendants' crabbed definition. And they have pled and testified to the ways the Act will aggravate medical discrimination against the disabled and thereby increase the substantial risk of such interruptions to their care.

But Defendants' saving construction is wrong in any event. Defendants are rewriting the definition of "terminal illness." A terminal illness is not limited to an illness that will result in death "*even if*" treatment is provided. The New York legislature broadly defined "terminal illness" as an illness that will produce death in six months "whether or not treatment is provided." § 2899-d(17). This means that for persons like Mr. Hernandez and Ms. Cameron—who both pled that they would die without treatment (Complt. ¶¶ 23, 32)—both qualify as terminal under the Act. The use of the language "whether or not treatment is provided" provides for two scenarios: a scenario where treatment is provided and a scenario where treatment is not provided. *See American Heritage Dictionary* (Second College ed.) (noting that the term "Whether" is "Used to introduce alternative possibilities," *e.g.*, "Whether he wins or (whether he) loses, this is his last fight," and as synonymous with "Either" or "Which"). Moreover, it has long been understood that when a statute uses the word "or" someone is qualified under either option, and is not required to fulfill both options. *Campos-Chaves v. Garland*, 602 U.S. 447, 457 (2024) ("The word 'or' is almost always disjunctive, and is generally used to indicate an alternative." (cleaned-up)).

The Act must be read to give effect to the plain meaning of the words. The term "whether or not" cannot be interpreted to create a single scenario; *i.e.*, only labeling one as terminal when death will result with treatment. The definition "introduce[s] alternative possibilities," one that will produce death within six months where treatment is provided, and one that will produce death where treatment is not provided. The Court cannot read the "whether or not" language out of the Act. *See* N.Y. Statutes § 98 ("All parts of a statute must be harmonized with each other as well as with the general intent of the whole statute, and effect and meaning must, if possible, be given to the entire statute and every part and word thereof.").

Defendants argue that reading the statute broadly would lead to an absurd result. ECF #23 at 9. Quoting the Delaware case, Defendants argue, "[i]ndeed, '[u]nder Plaintiffs' expansive interpretation …, absurd results would arise, such as rendering eligible for [medical aid in dying] those with medical ailments that can live long and vigorous lives with regular medical assistance, like type I diabetics that require regular insulin injections.'" *Id.* (quoting *Curran v. Meyer*, 2025 WL 3763413, at \*6 (D. Del. Dec. 30, 2025)). Unfortunately, the language of the Act leads to these results. Moreover, the argument that certain diseases such as diabetes could never be deemed a terminal illness under the Act does not match with what has occurred in other states with much longer experience in the realm of assisted suicide.[1] Nor does the argument take into account the practice of specialists in physician assisted dying who have developed "bridges" such as stopping eating and drinking in order to make a patient terminal. *See* Complt. ¶ 92.

"That being said, a statute is not 'absurd' merely because it produces results that a court or litigant finds anomalous or perhaps unwise. To the contrary, courts should look beyond a statute's text under the canon against absurdity 'only where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone.'" *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705-6 (2d Cir. 2019) (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 517 (2d Cir. 2017)) (cleaned-up).

Finally, with respect to the argument that the Individual Plaintiffs do not qualify under the Act because they have not requested assisted suicide, meaning that there is no harm, the fact that the Individual Plaintiffs have not sought to utilize the Act does not deprive them of standing. Plaintiffs are harmed by the Act because the Act removes protections that the Individual Plaintiffs would have received but for the Act.

First, the act removes the physician's duty to do no harm, and does so only for persons with life-threatening disabilities or illnesses. The individual plaintiffs now benefit from the duty to do no harm, owed to them by the entire medical profession. After the Act goes into effect, Plaintiffs will lose this benefit solely because they have life-threatening disabilities. The new law will consign them to an inferior system of medical care in which physicians are authorized to bring about their patients' death. Those without life-threatening disabilities or illnesses will continue under the older and superior fiduciary relationship with their physicians.

Second, under N.Y. Penal Law § 125.15, "[a] person is guilty of manslaughter in the second degree when: … 3. He intentionally causes or aids another person to commit suicide." Violation of § 125.15 is a second-degree class C felony. New York State has defined the offer of suicide assistance to be manslaughter. However, by virtue of the Individual Plaintiffs' terminal illness, they have had the protection of this law eliminated.

---

[1] *See* Oregon Health Authority's Death with Dignity Act Annual Reports, *available at* https://tinyurl.com/4r52742h, listing "diabetes" as one of the "underlying illnesses" in assisted suicide cases every year from 2003 through 2024 (with exception of 2018). The Court may take judicial notice of this public document. Fed. R. Evid. 201(b)(2).

Third, the Act immediately creates a two-tiered system of suicide prevention, one for people with life-threatening disabilities and one for people without such disabilities. The Act directs physicians to refrain from using any of the State's suicide prevention tools, all the way up to involuntary commitment, and it does so only for persons with life-threatening disabilities or illnesses. Complt. ¶¶ 116, 123-126.

Therein lies the discrimination. But for the Individual Plaintiffs' condition, they would have enjoyed the same benefits that others who are not terminal have under New York law in their day-to-day relationships with their doctors, in the protections of the criminal law, and in New York's suicide prevention programs. For the Individual Plaintiffs, the choice to lose this protection law is not voluntary. It is automatic as a result of a discriminatory statute. This same discrimination is suffered by the Organizational Plaintiffs' constituent members. Plaintiffs have standing.

**Organizational and Associational Standing**

The Organizational Plaintiffs can establish either direct organizational standing or associational standing. To assert direct standing, an organization must meet the same three requirements as individual direct standing: injury in fact, traceability, and redressability. *Alliance*, 602 U.S. at 393-94. An organization meets the injury requirement if it suffers an actual and concrete harm that affects the organization's "core business activities," not merely its "abstract social interests." *Id.* at 394-95.

For associational standing, an organizational plaintiff must specifically allege "that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498. The test for associational standing is whether "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

First, with respect to organizational standing, each of the Organizational Plaintiffs satisfies the requirements to have plead that Defendants' implementation of the Act will cause the Organizational Plaintiffs to suffer an actual and concrete harm that affects the organization's "core business activities." Specifically:

- Plaintiff Brooklyn Center for Independence of the Disabled ("BCID") stated that the Act "impedes BCID's core business activities of ensuring the independence of its participants and disabled people in Brooklyn and beyond…. BCID will need to devote considerable resources to help its members counter the systematic pressure to 'take the easy route.'" ECF #2-3 (BCID Declaration) ¶ 6. *See also* Complt. ¶¶ 19-21 (pleading impact on core business activities).

- With respect to Plaintiff Self-Initiated Living Options, Inc. ("SILO"), SILO stated that the Act "will harm SILO's ability to engage in its core business activities because passage impedes SILO's core mission of protecting persons with disabilities from involuntary withholding of life-sustaining medical treatment and medical rationing … hire additional

individuals to navigate the new complexities caused by the Act." ECF #2-6 (SILO Declaration) ¶ 6; *see also* Complt. ¶ 38 (pleading impact on core business activities).

- Plaintiff Independent Living Center of Hudson Valley ("ILCHV") pled that it "is required to divert time, money, and resources to educate its members about the Act and their rights to health care services as a result of the Act. When the Act goes into effect, ILCHV staff will also be required to spend time and resources that could be used on other critical services to advocate for and assist people in obtaining alternatives to assisted suicide…. ILCHV is further harmed because it is required to increase its budget and staffing to provide these additional services but it is also put in a difficult position where it is unable to foresee the scope of these services." Complt. ¶ 43.

- Plaintiff Regional Center for Independent Living ("RCIL") stated that the Act "derailed" RCIL's "core business activities." "RCIL must address and counteract concerns about assisted suicide … by producing educational materials, supporting peer counseling and helping establish the Live On Campaign" which "costs more than $100,000." ECF #2-8 (RCIL Declaration) ¶ 6.

- Plaintiff Not Dead Yet ("NDY") alleged that "Defendants' actions impede [NDY's] core business activities of protecting persons with disabilities from involuntary withholding of life-sustaining medical treatment and medical rationing based on policies such as Quality Adjusted Life Years ('QALY'), ensuring that persons with disabilities receive equal protection of the law in cases of homicides of disabled persons, and protecting persons with disabilities from the expansion of assisted suicide schemes to additional jurisdictions and the removal of the few safeguards provided in existing schemes." Complt. ¶ 58.

- Plaintiff United Spinal Association—an organization based in New York—was found to have standing to challenge California's assisted suicide law (*see United Spinal Association v. California*, 2024 WL 1671167, at *3-4 (C.D. Cal. Mar. 27, 2024)). United Spinal's core business activity is to help people with spinal injuries survive the loss of independence, depression, isolation, loss of self-confidence and anxiety about the future. Complt. ¶ 50. These challenges are very pressing when persons with spinal injuries face discrimination and indifference in medical care, often tied to misconceptions that people with spinal injuries have a low quality of life, and would be better off foregoing expensive and complex medical care. *Id.* ¶ 51. United Spinal operates programs to combat these misconceptions about the value of medical care for persons with disabilities. Complt ¶¶ 53, 54. Those programs are directly threatened by the new law's grafting of physician assisted suicide onto a medical care system that is already plagued with prejudice against the disabled. The state's endorsement of medicalized suicide makes United Spinal's programs more difficult and expensive to operate. Complt. ¶ 54. With 70,000 members nationwide (*id.* at ¶ 49), United Spinal now has "had to expend resources on education and outreach campaigns targeted at addressing assisted suicide." *Id.* at ¶ 54. Because of the Act, it must shift its resources away from other critical areas.

- National Council on Independent Living ("NCIL") pled that it had a "personal stake in challenging the Act as it must expend significant time, money, volunteers, and other resources to avoid imminent risk of harm for its members and other people who it serves …." Complt. ¶ 60. NCIL has pled that the Act's label of "terminal" "squarely implicates and stigmatizes persons with life-threatening disabilities" (*id.* at ¶ 62), and that NCIL has fought for years to have people with disabilities to be treated with "the same human dignity and civil rights afforded to everyone else." *Id.* at ¶ 61. NCIL views the passage of the Act as a denial of equal access to NCIL's members to necessary medical care as a result of being steered towards assisted suicide. *Id.* at ¶ 62.

- Finally, Plaintiff Institute for Patients' Rights ("IPR") stated that the Act harms IPR's ability to engage in its core business activities. "IPR has to develop new courses … to address the ways in which the scheme steers its constituents away from quality health care, and toward early death through the prescription of lethal medications." ECF #2-12 ("IPR Declaration") ¶ 6; *see also* Complt. ¶ 64 (pleading impact on core business activities).

Each of these Organizational Plaintiffs has pled a direct harm to its "core business activities." In contrast to *Alliance* (602 U.S. at 394), the harm to the Organizational Plaintiffs does not merely arise from diverting resources to challenge Defendants' conduct; instead, ***each*** Organizational Plaintiff pled that it provides services that the Act would harm. The harm is not an attenuated "risk" or the "potential" for harm. *Alliance*, 602 U.S. at 390. The discriminatory effect of the Act is not an abstract social interest.

Nor are the Organizational Plaintiffs' diversion of resources to mitigate the Act's harmful effects on their constituents an exercise of voluntary discretion for the purpose of creating standing. The Organizational Plaintiffs seek to improve the lives of people with disabilities and help them overcome the obstacles they face—to include financial insecurity and discrimination—associated with securing both the care and accommodations they need to survive and thrive. In response to the Act, the Organizational Plaintiffs must now divert their resources to combat the negative discriminatory impacts of the Act on constituencies they serve. These are concrete injuries directly traceable to the Act.

With respect to associational standing, "[i]t has long been settled that even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (cleaned-up). Defendants contend that the complaint must fail because it does not identify specific members who suffer harm. ECF #23 at 14. The Second Circuit, however, does not require names of specific members to establish associational standing at the pleading stage. *See Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006); *see also Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 122 n.7 (2d Cir. 2025).

Defendants further attempt to bootstrap the associational standing to its attack on the standing of Mr. Hernandez and Ms. Cameron. As previously noted, that attack fails given that both have individual standing. *See* pp. 1-5, *supra.*

The members of the Organizational Plaintiffs are not "mere bystanders" to the discrimination caused by the implementation of the Act. *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 78-79 (2026) (quoting *Diamond Alternative Energy, LLC v. Envtl. Prot. Agency*, 606 U.S. 100, 110 (2025)). The Act directly impacts the members of the Organizational Plaintiffs, because the harm caused—discrimination—is a concrete injury.

Plaintiffs have more than satisfied their pleading burden to establish standing.

Respectfully submitted,

*/s/ Theodore A. Kittila*