UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
BROOKLYN CENTER FOR INDEPENDENCE OF
THE DISABLED *et al.*,

          Plaintiffs,

      -against-

KATHY HOCHUL, *in her official capacity as*
*Governor of the State of New York, et al.*,

          Defendants.
-------------------------------------------------------------------x

**<u>MEMORANDUM AND ORDER</u>**
26-CV-03492 (OEM) (JAM)

ORELIA E. MERCHANT, United States District Judge:

On June 11, 2026, Plaintiffs Brooklyn Center for Independence of the Disabled ("BCID"),

Self-Initiated Living Options, Inc. ("SILO"), Independent Living Center of the Hudson Valley

("ILC"), Regional Center for Independent Living ("RCIL"), United Spinal Association ("United

Spinal"), Not Dead Yet ("NDY"), National Council on Independent Living ("NCIL"), Institute for

Patients' Rights ("IPR"), Jose Hernandez ("Hernandez"), and Anita Cameron ("Cameron")

(collectively, "Plaintiffs") brought this action against Defendants Governor Kathy Hochul, in her

official capacity as Governor of New York, the New York State Department of Health, James V.

McDonald, M.D., M.P.H., in his official capacity as Commissioner of the Department of Health,

the New York State Board for Medicine ("Medical Board for Licensure"), Amit M. Shelat, D.O.,

in his official capacity as Chair of the Medical Board for Licensure, the New York State Office of

Mental Health, and Ann Marie T. Sullivan, M.D., in her official capacity as Commissioner of the

Office of Mental Health (collectively, "Defendants"), challenging the implementation of New

York's Medical Aid in Dying Act, N.Y. PUB. HEALTH LAW §§ 2899-d *et seq.* ("Act"), which is

scheduled to go into effect on August 5, 2026. *See generally* Complaint, Dkt. 1 ("Complaint" or

"Compl.").

Before the Court is Plaintiffs' motion for a preliminary injunction, *see* Plaintiffs' Opening Brief in Support of Their Motion for Temporary Restraining Order, Dkt. 2-1 ("Plaintiffs' Preliminary Injunction Memorandum" or "Pls.' PI Mem."),[1] and Defendants' opposition, seeking denial of Plaintiffs' motion for a preliminary injunction and dismissal for lack of standing under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), *see generally* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Dkt. 23 ("Defendants' Preliminary Injunction Opposition" or "Defs.' PI Opp'n"). For the following reasons, Plaintiffs' Complaint is dismissed without prejudice for lack of subject-matter jurisdiction.

## BACKGROUND

### A. The Act

On February 6, 2026, Governor Kathy Hochul signed the Act into law. Compl. ¶ 88. The Act permits eligible terminally ill adults with decision-making capacity to request, be prescribed, and self-administer medication to end their life under certain circumstances. *See generally* N.Y. PUB. HEALTH LAW §§ 2899-d *et seq.*

---

[1] Plaintiffs also attached declarations. *See* Declaration of Joseph G. Rappaport, Executive Director of Brooklyn Center For Independence of the Disabled, in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-3 ("Rappaport Decl."); Declaration of Plaintiff Jose Hernandez in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-4 ("Hernandez Decl."); Declaration of Plaintiff Anita Cameron in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-5 ("Cameron Decl."); Declaration of Joseph Delgado, Chief Executive Officer of Self-Initiated Living Options, Inc. in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-6 ("Delgado Decl."); Declaration of Denise A. Figueroa, Executive Director of Independent Living Center of Hudson Valley, in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-7 ("Figueroa Decl."); Declaration of Bruce Darling, President and Chief Executive Officer of Regional Center for Independent Living, in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-8 ("Darling Decl."); Declaration of Ian McIntosh, Executive Director of Plaintiff Not Dead Yet, in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-9 ("McIntosh Decl."); Declaration of Stephen Lieberman, Senior Director, Advocacy & Policy, Plaintiff United Spinal Association, in Support of Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2-10 ("Lieberman Decl."); Declaration of Jessica Podesva, J.D., Director of Advocacy and Public Policy of Plaintiff National Council on Independent Living, in Support of Plaintiffs' Motion For Temporary Restraining Order, Dkt. 2-11 ("Podesva Decl."); Declaration of Matthew P. Valliere, Executive Director of Institute for Patients' Rights, in Support of Plaintiffs' Motion For Temporary Restraining Order, Dkt. 2-12 ("Valliere Decl.") (collectively, "Plaintiffs' Declarations" or "Pls.' Decls.").

To be eligible to receive the medication, an individual must be a "patient," which is defined as "a resident of New York state who is 18 years or older under the care of a physician." *See id.* §§ 2899-d(13), (15). The individual must also be a "qualified individual." *Id.* § 2899-d(13). A qualified individual is defined as a patient with a terminal illness or condition, possessing decision-making capacity, having made an informed decision to self-administer medication to end their life, and having satisfied the requirements under the Act to receive a prescription. *Id.* § 2899-d(15). A "terminal illness or condition" is defined as "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months *whether or not* treatment is provided." *Id.* § 2899-d(17) (emphasis added). "Decision-making capacity" is defined as "the ability to understand and appreciate the nature and consequences of health care decisions, including the benefits and risks of and alternatives to any proposed health care, including medical aid in dying, and to reach an informed decision." *Id.* § 2899-d(3). An "informed decision" is defined as a decision that is made "voluntarily, of the patient's own volition and without coercion after being fully informed of" their medical diagnosis and prognosis, risks of the medication, probable results of the medication, the patient's ability to not obtain or not self-administer the medication, and feasible alternatives and appropriate treatment options. *Id.* § 2899-d(7).

Under the Act, a patient seeking to self-administer medication to end their life must make an oral request, which must be recorded by an audio or video device, or by alternative means if the patient is incapable of making an oral request, and submit a written request to the patient's attending physician. *Id.* § 2899-e(1). The patient must execute their written request in the presence of two witnesses who are not financially tied to the patient, *see id.* § 2899-e(3) (excluding from serving as witnesses, *inter alia*, relatives and domestic partners, individuals who stand to benefit

financially from the patient's death, and agents acting as the patient's health care proxy or power of attorney), and in accordance with a template form for written request and witness attestation set forth in the Act, *see id.* § 2899-k. The attending physician must examine the patient in person, review their medical records, and, in relevant part: (1) determine whether the patient has a terminal illness or condition, has decision-making capacity, has made an informed decision, and has made the request voluntarily; (2) inform the patient that confirmations by a second consulting physician and a mental-health professional are required and refer the patient to such medical professionals upon request; (3) provide information and counseling regarding palliative care options or refer them to someone able to provide such information and counseling; (4) ensure the patient is making an informed decision by engaging in a detailed discussion regarding, *inter alia*, the risks, probable results, and alternatives associated with the decision; (5) offer referral to other treatment options; (6) provide educational material regarding hospice and palliative care; (7) discuss the importance of certain procedures in the self-administration of the medication; and (8) inform the patient that they may rescind the request at any time. *Id.* § 2899-f(1)(a)-(k).

The Act requires the evaluation, input, and independent confirmation of three different medical professionals before medication can be prescribed. *See id.* § 2899-f(2). Specifically, only after the attending physician has received confirmation from a consulting physician and a mental-health professional can the attending physician prescribe the medication. *Id.* The consulting physician must examine the patient and their medical records and confirm in writing that the patient has a terminal illness, is making an informed decision, has decision-making capacity, and is acting voluntarily. *Id.* § 2899-h(1)-(2). The mental-health professional must evaluate the patient and provide a written report to the attending physician and consulting physician regarding whether the patient has decision-making capacity to make an informed decision. *Id.* § 2899-i(1). If the

4

mental-health professional determines that the patient lacks decision-making capacity to make an informed decision, the patient is not deemed qualified, and the attending physician shall not prescribe the medication. *Id.*

Once the consulting physician and mental-health professional provide confirmation that the patient is qualified, the attending physician may prescribe or order the appropriate medication. *Id.* § 2899-f(2). The prescription cannot be filled until five days after it has been written so that the patient undergoes a waiting period before self-administering the medication. *Id.* § 2899-f(3).[2] If the patient chooses to use the prescribed medication, they must administer the medication themselves; a health-care professional or other individual is not permitted to administer the medication. *Id.* § 2899-f(4). A patient may rescind their request for medication under the Act at any time and in any manner. *Id.* § 2899-g(1)-(2).

### B. Plaintiffs

Plaintiffs Hernandez and Cameron (collectively, "Individual Plaintiffs") are two individuals with "life-threatening disabilities." Compl. ¶ 2. Plaintiff Hernandez has a spinal cord injury and is paralyzed from the neck down, and Plaintiff Cameron has numerous disabilities, including degenerative multiple sclerosis and degenerative congenital cerebellar ataxia. *Id.* ¶¶ 23, 29. BCID, SILO, ILC, RCIL, United Spinal, NDY, NCIL, and IPR (collectively, "Organizational Plaintiffs") are eight organizations that "represent and advocate for people with life-threatening disabilities." *Id.* ¶ 2.

---

[2] If the attending physician medically confirms "that the qualified individual may, within reasonable medical judgment, die before the expiration of the waiting period," the prescription may be filled without the five-day waiting period. N.Y. PUB. HEALTH LAW § 2899-f(3).

**PROCEDURAL HISTORY**

On June 11, 2026, Plaintiffs commenced this action by filing a complaint seeking declaratory and injunctive relief under the Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12203 ("ADA"); Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"); Affordable Care Act, 42 U.S.C. § 18116 ("ACA"); Due Process and Equal Protection Clauses of the Fourteenth Amendment of the U.S. Constitution ("Equal Protection Clause" and "Due Process Clause," respectively); and Article I, Sections 6 and 11, of the New York State Constitution. Compl. ¶¶ 168-221.

Plaintiffs additionally moved for a temporary restraining order and preliminary injunction without notice to Defendants. *See* Plaintiffs' Motion for Temporary Restraining Order, Dkt. 2; Pls.' PI Mem. The Court denied Plaintiffs' request for a temporary restraining order and directed that: Plaintiffs serve the order, summons, and Complaint on Defendants by June 17, 2026; Defendants file and serve answering papers to Plaintiffs' request for preliminary injunctive relief by June 23, 2026; and the parties appear for a preliminary injunction hearing be held on June 25, 2026. Order, dated June 15, 2026.

On June 22, 2026, Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak (collectively, "Proposed Intervenors") filed a motion to intervene as defendants. *See* Motion to Intervene as Defendants of Jeremy Boal, Iris Dudman, Stacey Gibson, Anne Gurnett Bander, Nancy Murphy, and Benny Pollak, Dkt. 20 ("Motion to Intervene" or "Mot. to Intervene").

On June 23, 2026, Defendants filed their opposition to Plaintiffs' request for a preliminary injunction, requesting that the Court deny Plaintiffs' motion for a preliminary injunction and seeking dismissal for lack of standing under Rule 12(b)(1). *See generally* Defs.' PI Opp'n.

On June 25, 2026, the Court held a hearing on Plaintiffs' motion, at which Plaintiffs, Defendants, and Proposed Intervenors were present ("Hearing"). *See* Minute Entry, dated June 25, 2026. The parties were heard on their arguments as to standing and the preliminary injunction, and the Court reserved its decision on Plaintiffs' motion for preliminary injunction and Proposed Intervenors' Motion to Intervene. *See* Minute Entry, dated June 25, 2026.

On July 6, 2026, Defendants filed a motion for a pre-motion conference in anticipation of a motion to dismiss, *see* Defendants' Request for Pre-Motion Conference on Motion to Dismiss, Dkt. 27 ("PMC Motion"), and on July 23, 2026, Plaintiffs filed their response in opposition to Defendants' PMC Motion, *see* Letter from Plaintiffs to the Court (July 13, 2026), Dkt. 31. The Court construed Defendants' PMC Motion as a motion seeking dismissal of the action for lack of subject-matter jurisdiction due to Plaintiffs' lack of standing under Rule 12(b)(1), as previously asserted in Defendants' Preliminary Injunction Opposition, and ordered that Plaintiffs submit any additional arguments in opposition by July 23, 2023. *See* Order, dated July 16, 2026. On July 23, 2026, Plaintiffs filed a letter asserting that this case should not be dismissed for lack of subject-matter jurisdiction. *See* Letter from Plaintiffs to the Court (July 23, 2026), Dkt. 32 ("Plaintiffs' Motion to Dismiss Memorandum" or "Pls.' MTD Mem.").

**LEGAL STANDARD**

The Court must first satisfy itself that it has subject-matter jurisdiction. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A Rule 12(b)(1) motion "may be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

7

Where the Rule 12(b)(1) motion is solely based on the allegations in the complaint and exhibits attached thereto, the motion to dismiss is treated as a facial challenge. *Id.* "Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading." *Id.* at 57. In resolving a facial challenge, a court must "determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" *Id.* at 56 (alterations in original) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)); *see also Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014); *Knife Rts. v. Vance*, 802 F.3d 337, 383 (2d Cir. 2015). Here, Defendants do not offer contradictory extrinsic evidence, thus, the Court takes all uncontroverted facts in the Complaint as true and draws all reasonable inferences in favor of Plaintiffs.

Additionally, "a district court has 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *Harty v. West Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)); *see also Cortlandt Street Recovery Corp. v. Hellas Telecomm., S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015) ("In deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint."). Plaintiffs attach declarations from Individual Plaintiffs and the directors and officers of Organizational Plaintiffs to their Motion, *see* Pls.' Decls., which the Court considers to the extent that relevant facts are raised therein to assist in resolving whether the Plaintiffs have plausibly asserted standing, *see Jeannot v. New York State*, 762 F. Supp. 3d 217, 226 (E.D.N.Y. 2025) (considering declarations submitted with the motion for a preliminary injunction in consideration of a Rule 12(b)(1) motion to dismiss).

**DISCUSSION**

**A. Plaintiffs Have Not Plausibly Alleged Standing to Survive Rule 12(b)(1) Dismissal.**

Defendants argue that the Court should dismiss this case for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1). Defs.' PI Opp'n at 1, 14. Plaintiffs respond that they have satisfied their pleading burden to establish standing. Pls.' MTD Mem. at 1.

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). To establish a case or controversy under Article III, a plaintiff must have standing, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021), and specifically demonstrate "standing for each claim and form of relief sought," *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).

**1. Individual Plaintiffs Fail to Allege an Injury in Fact.**

Individual Plaintiffs allege that they are "injured as a direct result of Defendants' actions" because as "seriously disabled person[s], [they are] at imminent risk of harm of being placed into an inferior tier of medical care due to the passage of the Act." Compl. ¶¶ 26, 35. Furthermore, Plaintiff Cameron fears that "she will go to the doctor or hospital during a low point and will be steered into physician-assisted suicide." *Id.* ¶ 33. Defendants argue that Individual Plaintiffs lack standing because they are "categorically ineligible for medical aid in dying under the Act," and "even if they were eligible, their alleged injuries are far too hypothetical and attenuated to constitute injuries-in-fact." Defs.' PI Opp'n at 8. Individual Plaintiffs respond that they have each "pled a concrete and particularized harm resulting from the Defendants' implementation of the [Act]." Pls.' MTD Mem. at 1.

To establish individual standing under Article III, "a plaintiff must demonstrate (i) that [he or she] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380 (first citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); and then citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Injury in fact is the "'first and foremost' element of standing." *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 193 (2d Cir. 2023) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). To satisfy this element, a plaintiff must show "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). Such an injury must affect the plaintiff in a "personal and individual way." *Lujan*, 504 at 560 n.1. "An anticipated future injury may suffice if the threatened injury is 'imminent,'" that is, "certainly impending." *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 517 (2d Cir. 2024) (quoting *Lujan*, 504 U.S. at 564 n.2). Nonetheless, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). The injury in fact requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 381; *see also id.* at 382 ("An Article III court is not a legislative assembly, a town square, or a faculty lounge. Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law.").

Individual Plaintiffs chiefly fail to allege an injury in fact because their alleged conditions do not establish a realistic danger of sustaining a direct injury. Only a patient with a "terminal

illness or condition" may request and self-administer life-ending medication under the Act, and the Act defines a "terminal illness or condition" as "an incurable and irreversible illness or condition that has been medically confirmed and will, within reasonable medical judgment, produce death within six months whether or not treatment is provided." N.Y. PUB. HEALTH LAW § 2899-d(17). Plaintiff Hernandez has a spinal cord injury and is paralyzed from the neck down, and Plaintiff Cameron has numerous disabilities, including degenerative multiple sclerosis and degenerative congenital cerebellar ataxia. Compl. ¶¶ 23, 29. Individual Plaintiffs assert that their conditions will result in death in six months if they do not receive medical support. *Id.* ¶¶ 25, 32. Individual Plaintiffs read the language "whether or not" in the Act to mean that a "terminal illness or condition" includes patients who would die within six months without medical treatment. *See* Pls.' PI Mem. at 13; Pls.' MTD Mem. at 3. However, "[a] statute should be interpreted in a way that avoids absurd results." *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000). As Defendants point out, Plaintiffs' interpretation would lead to absurd results, providing eligibility to patients with illnesses or conditions that could otherwise live long lives with medical treatment. *See* Defs.' PI Opp'n at 9. Furthermore, the Act contains language directly contradicting Individual Plaintiffs' argument. It states that "[n]o person shall qualify for medical aid in dying . . . solely because of age or disability." N.Y. PUB. HEALTH LAW § 2899-e(4).

Therefore, interpreting the statute to avoid absurd results, the Act requires that the illness or condition produce death within six months *even if* treatment is provided. Individual Plaintiffs do not allege any condition of theirs that will result in their death within six months even if they receive medical treatment. Thus, there is no realistic danger that Individual Plaintiffs would be subject to discrimination under the Act because they fail to show that the Act pertains to them. *See Babbitt*, 442 U.S. at 298.

Individual Plaintiffs' arguments to the contrary are unavailing. Individual Plaintiffs argue that the conditions that they allege are "so severe that any disruption in care would likely result in death within six months" and they would therefore qualify under the Act even by the above interpretation. Pls.' MTD Mem. at 3. The use of "disruption in care" as applied to the Court's interpretation above is imprecise. The Act pertains to patients with an illness or condition that would result in death within six months even if treatment were provided. The definition of qualified individual therefore contemplates a scenario in which a patient was to receive continuous care and still faced a terminal diagnosis, not a scenario in which an interruption in care would result in a terminal diagnosis.

Similarly unpersuasive is the Individual Plaintiffs' response to the absurd consequences of their statutory interpretation. *See* Pls.' MTD Mem. at 4. Individual Plaintiffs urge the Court to parse through the meaning of the term "whether or not" to create two scenarios instead of one and, under their proposed interpretation, conclude that the Act seeks to hasten the death of individuals that would live vigorous lives with medical assistance. *Id.* at 3. However, this is precisely what the canon against absurdity discourages. The Court must "look beyond" literal terms of a statute where adherence to such language would subvert the purpose of the statute. *United States v. Hendrickson*, 26 F.3d 321, 336 (1994) (collecting cases), *abrogated on other grounds by United States v. Camara*, 196 F. App'x 48 (2d Cir. 2006). The purpose of the Act is to hasten a mentally competent, terminally ill patient's death provided that the requirements in the Act are met, S.B. 138, N.Y. St. Senate, Reg. Sess. (N.Y. 2025), not hasten the death of individuals who are otherwise capable of living long, vigorous lives with medical assistance.

Accordingly, Individual Plaintiffs fail to allege that they have standing to challenge the Act.

**2. Organizational Plaintiffs Fail to Allege an Injury in Fact.**

Organizational Plaintiffs' arguments fare no better. An organization may establish Article III standing in two ways: organizational or associational standing. *See N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). Defendants argue that "Plaintiffs fail to establish standing under either theory." Defs.' PI Opp'n at 10-11. Organizational Plaintiffs respond that they plausibly allege both organizational and associational standing. Pls.' MTD Mem. at 5.

**a. Organizational Plaintiffs Fail to Allege Organizational Standing.**

Organizational Plaintiffs allege that the Act affects their "core business activit[ies]." *See* Compl. ¶¶ 19, 38, 42, 46, 48 54, 58, 62, 64. Defendants argue that conflict or interference with organizational missions does not establish organizational standing, and that Organizational Plaintiffs' alleged economic and resource-based injuries are either not redressable as past injuries or are too speculative as prospective expenditures. Defs.' PI Opp'n at 11-12. Organizational Plaintiffs respond that they meet the injury requirement because they each plead that they provide services that the Act would harm. Pls.' MTD Mem. at 5-7.

Organizational Plaintiffs do not allege an injury in fact, primarily because they do not plausibly allege that the Act interferes with their core business activities. Under organizational standing, organizations may "sue on their own behalf for injuries they have sustained," but they still "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393-94 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)). To establish a personal stake in the litigation, an organization must show "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379 (citing *Sierra Club v. Morton*, 405 U.S. 727, 738-39 (1972)).

Here, Organizational Plaintiffs allege that they have "personal stake[s]" in challenging the Act via the risk of harm to and interference with their "core business activit[ies]." *See* Compl. ¶¶ 19, 38, 42, 46, 48, 54, 58, 62, 64. Organizational Plaintiffs SILO and ILC allege that "[t]he passage of the Act directly conflicts with [their] mission[s]." *Id.* ¶¶ 38, 42. Further, Organizational Plaintiffs allege that they have organizational missions of supporting disabled persons to obtain greater quality of life, assisting disabled persons to live independently, discouraging disabled persons from committing suicide, and "protecting persons with disabilities from involuntary withholding of life-sustaining medical treatment." *Id.* ¶ 58; *see, e.g.*, *id.* ¶¶ 19, 38, 42, 46, 48, 54, 62, 64.

Frustration of an organization's mission does not confer Article III standing. *See All. for Hippocratic Med.*, 602 U.S. at 394. The Supreme Court has declined to find standing "simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct, 'no matter how longstanding the interest and no matter how qualified the organization.'" *Id.* (first quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982); and then quoting *Morton*, 405 U.S. at 739); *see also Farm Sanctuary v. U.S. Dep't of Agric.*, 24-382-cv, 2026 WL 1030616, at *2 (2d Cir. Apr. 16, 2026) (explaining that the organizational plaintiffs' claims that the adoption by rule of a new system frustrated their missions was insufficient to establish injury); *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 618 (2d Cir. 2026) (rejecting standing argument based in part on the organizational plaintiff's claim that its mission was frustrated).

Organizational Plaintiffs also fail to allege standing based upon their alleged expenditure of resources on educating members and the public about the Act. "The choice of [a plaintiff] to focus its resources on [the defendant] 'to the detriment of other spending priorities' does not

qualify as an injury in fact that confers standing under Article III." *Conn. Fair Housing Ctr.*, 167 F.4th at 618 (quoting *All. for Hippocratic Med.*, 602 U.S. at 394); *see All. for Hippocratic Med.*, 602 U.S. at 395 (rejecting the proposition that standing exists when an organization diverts resources to respond to a defendant's actions and determining that the associational plaintiffs failed to show injury because the defendants' relaxation of regulations did not impede on the plaintiffs' advocacy business).

In *Havens Realty Corporation v. Coleman*, the Supreme Court held that the plaintiff organization had standing "in its own right," 455 U.S. at 379, where its core business activities included not only advocacy but also counseling and referral services, and the Supreme Court found that those latter two services were impaired by the defendant's racial steering practices, *id.* at 368-379. However, the Supreme Court has since cautioned that "*Havens* was an unusual case." *All. for Hippocratic Med.*, 602 U.S. at 396. Indeed, in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, the Supreme Court held that medical associations lacked organizational standing to oppose the Food and Drug Administration's ("FDA") modifications to the conditions of use for mifepristone. *Id.* at 393-94. The medical associations asserted injuries resulting from costs incurred to oppose FDA's actions and better inform their members and the public about mifepristone's risks such as "conduct[ing] their own studies on mifepristone," "drafting citizen petitions," and "engaging in public advocacy and public education" to "inform their members and the public about mifepristone's risks." *Id.* at 394. The Supreme Court reasoned that the FDA's relaxed regulations of mifepristone did not impede on the medical associations' advocacy business and that organizations could not manufacture standing by expending money to advocate against the defendant's conduct. *Id.* at 394-95. Similarly, in *Connecticut Fair Housing*, the Second Circuit declined to find organizational standing where the organizational plaintiff allegedly expended

15

resources to investigate the defendant's conduct, assist individuals suspected to have been impacted by the defendant's actions, and develop educational programs. 167 F.4th at 618.

Here, Organizational Plaintiffs allege injury by way of additional resources that they have had to expend on "Act-specific activities." Compl. ¶ 64; *see, e.g.*, *id.* ¶¶ 19-21, 39, 43, 47, 54, 60, 62. Much like the organizational plaintiffs in *Alliance*, Organizational Plaintiffs allege that they have had to "expend significant time, money, volunteers, and other resources," to combat the perceived "imminent risk[s] of harm" for their clients, including by educating members and disabled persons about the Act and their "options besides assisted suicide," and to "counter systematic pressure to 'take the easy route.'"[3] *See id.* ¶¶ 19-21, 39, 43, 47, 54, 60, 62; *see also* Rappaport Decl. ¶ 6; Darling Decl. ¶ 6; Podesva Decl. ¶ 9; Valliere Decl. ¶ 6; Lieberman Decl. ¶ 12 (explaining that United Spinal's core business activities have been derailed because it must "address and counteract concerns about assisted suicide in New York" by counseling members, publishing position statements, holding information discussions, and publishing articles). Organizational Plaintiffs' claimed injuries mirror those alleged by the medical associations, and rejected by the Court, in *Alliance*. *See* 603 U.S. at 394. They assert injury resulting from their need to divert resources towards advocacy and informational efforts regarding the Act. *Compare, e.g.*, Compl. ¶ 64 ("IPR has to develop new courses and materials to address the ways in which the scheme stigmatizes people with disabilities . . . [and] is unable to devote these resources to its other critical programs addressing the impact of discriminatory healthcare policies."), *with All. for Hippocratic Med.*, 602 U.S. at 394 ("[The medical associations] contend that FDA has 'forced' the

---

[3] Organizational Plaintiff SILO alleges on information and belief that its "clientele will continue to increase as people with life-threatening disabilities are not provided with necessary medical care for their disabilities, further straining SILO's financial and human resources." Compl. ¶ 39. These facts fail to plausibly indicate how disabled persons will not receive medical care after passage of the Act and thus, such argument as to injury is speculative. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (explaining that the injury must not be "conjectural" or hypothetical").

associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education."). *See also Conn. Fair Hous. Ctr.*, 167 F.4th at 518-19; *Farm Sanctuary*, 2026 WL 1030616, at *2. Organizational Plaintiffs' advocacy efforts are not plausible injuries in fact. *See All. for Hippocratic Med.*, 602 U.S. at 394 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.").

Furthermore, to the extent that Organizational Plaintiffs try to categorize their education or counseling about assisted suicide to disabled people as core business activities, *see, e.g.*, Compl. ¶¶ 39, 43, 47; *see* Pls.' MTD Mem. at 5-7, such theory also fails to establish organizational standing. Unlike the organization in *Havens*, Organizational Plaintiffs' core business activities as alleged are not counseling and referral services but advocacy: they include "advanc[ing] opportunities, social equity, and disability rights," Compl. ¶ 48, protecting disabled individuals "from the expansion of assisted suicide schemes," *id.* ¶ 58, and "help[ing] people with disabilities live independently," *id.* ¶ 21. *See id.* ¶¶ 38, 42, 61; *see also Conn. Fair Hous. Ctr.*, 167 F.4th at 618 (distinguishing *Havens* from the organizational plaintiff's engagement in "advocacy and informational programming").

Accordingly, Organizational Plaintiffs fail to allege organizational standing.

**b. Organizational Plaintiffs Fail to Allege Associational Standing.**

Organizational Plaintiffs assert that implementation of the Act will cause their members harm through discrimination. *See* Compl. ¶¶ 53-54, 62; Delgado Decl. ¶ 8; Figueroa Decl. ¶ 8; Darling Decl. ¶ 8; Lieberman Decl. ¶ 10. Defendants argue that Organizational Plaintiffs' associational standing fails because the Organizational Plaintiffs do not allege that at least one

identified member has or would suffer harm. Defs.' PI Opp'n at 14. Organizational Plaintiffs respond that they adequately allege associational standing because Individual Plaintiffs have individual standing and the members of Organizational Plaintiffs are not "mere bystanders" either. Pls.' MTD Mem. at 7-8.

Organizational Plaintiffs fail to plausibly allege associational standing. To establish associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)).

To the extent that United Spinal, RCIL, and NCIL rely on their association with Individual Plaintiffs to establish standing, such approach fails. United Spinal is the only Organizational Plaintiff to claim association with both Individual Plaintiffs. *See* Lieberman Decl. ¶ 10. RCIL also asserts that Cameron is a member, Darling Decl. ¶ 8, and she is, by proxy, a member of NCIL, *see* Podesva Decl. ¶¶ 3-4. The remaining Organizational Plaintiffs do not plausibly allege association with either Plaintiffs Hernandez or Cameron and thus cannot rely on Individual Plaintiffs to meet the requirement that their members would have standing in their own right to sue. *See Bldg. & Const. Trades Council*, 448 F.3d at 144. Even so, United Spinal, RCIL, and NCIL do not plausibly allege the first requirement of associational standing, that Individual Plaintiffs "would otherwise have standing to sue in their own right," *Bldg. & Const. Trades Council*, 448 F.3d at 144 (quoting *Hunt*, 432 U.S. at 343), because Individual Plaintiffs fail to plausibly allege an injury in fact, *see supra* Section A.1.

To the extent that Organizational Plaintiffs rely on their association with other unnamed members to allege standing, such approach similarly fails. United Spinal is the only organization to specifically bring this action on behalf of its members. Compl. ¶ 53. It alleges they are directly injured because the Act places them "at risk of both discrimination and premature death by assisted suicide." *Id.* ¶¶ 53-54. The remaining Organizational Plaintiffs, BCID, SILO, ILC, RCIL, NDY, IPR, and NCIL, broadly claim that their members or constituents face imminent risk of harm because the Act will discriminate against them. *See id.* ¶¶ 19, 38, 42, 47, 57, 60, 64; Pls.' MTD Mem. at 8. Plaintiffs' legal theory of injury to individuals with disabilities also dooms Organizational Plaintiffs' claims to associational standing. For example, United Spinal alleges that "[a]s a result of being perceived and labeled as terminally ill by their medical care providers, some of United Spinal's members will qualify for assisted suicide under the Act." Compl. ¶ 53. "Being perceived and labeled as terminally ill" does not equate to eligibility as a qualified individual under the Act's definitions. Further, to the extent that Organizational Plaintiffs seek to apply the same injury-in-fact theory to their members as they apply to Individual Plaintiffs, *see* Pls.' MTD Mem. at 7, it fails for identical reasons, *see supra* Section A.1.

United Spinal also alleges that "[u]pon information and belief, United Spinal members in New York have discussed and considered accessing lethal medications and/or committing suicide by means of the Act." Compl. ¶ 53. However, these facts do not plausibly support an argument that any of United Spinal's members are eligible as qualified individuals under the Act and thus fail to suggest that these members would have standing to sue in their own right.

Accordingly, Organizational Plaintiffs fail to allege associational standing.[4]

---

[4] The Court finds that Organizational Plaintiffs' legal theory does not plausibly support an argument that any of their members are eligible as qualified individuals under the Act. Thus, the Court does not reach Defendants' premature argument that the Complaint "does not include any 'identified member'" that faces harm, Defs.' PI Opp'n at 14. *See Bldg. & Const. Trades Council*, 448 F.3d at 145 (noting that the argument that persons allegedly injured must be

### B. Plaintiffs' Motion for a Preliminary Injunction is Denied as Moot.

If the fact that "[t]he plaintiff's legal theory itself, rather than the insufficiency of the plaintiff's evidence, may doom the plaintiff's standing . . . becomes apparent to the district court upon review of the of the plaintiff's motion for preliminary injunction, the court cannot consider the merits of the preliminary injunction motion and should dismiss the claim altogether." *Do No Harm v. Pfizer*, 126 F.4th 109, 121 (2d Cir. 2025) (first citing *Munaf v. Geren*, 553 U.S. 674, 691 (2008); then citing *Citizens for a Better Env't*, 523 U.S. at 101; and then citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)); *cf. Cent. States Se. & Sw. Areas Health & Welfare v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."). As discussed above, Plaintiffs' legal theories as to how Plaintiffs face an injury in fact based on their interpretation of the Act doom their claim to Article III standing. Accordingly, Plaintiffs' claims are dismissed, and Plaintiffs' motion for a preliminary injunction is denied as moot. *See Wachter v. James*, 1:25-cv-01718 (AMN/CBF), 2026 WL 1649135, at *12 (N.D.N.Y. June 8, 2026) (collecting cases and denying preliminary injunction as moot after dismissing the plaintiffs' claims for lack of standing).

### CONCLUSION

For the foregoing reasons, Plaintiffs fail to plausibly allege standing and thus, the Court lacks subject-matter jurisdiction and must dismiss this action without prejudice.[5] Accordingly,

---

identified by name may have some validity at the summary judgment stage, but was "unpersuasive on a motion to dismiss"); *see also Do No Harm v. Pfizer*, 126 F.4th 109, 122, 122 n.7 (2d Cir. 2025); *cf. Summers*, 555 U.S. at 498 (explaining on a final adjudication on the merits that a plaintiff asserting associational standing must "make specific allegations establishing that at least one identified member had suffered or would suffer harm")

[5] "[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 n.2 (2d Cir. 2020) (quoting *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999)).

Defendants' motion to dismiss pursuant to Rule 12(b)(1) is granted. Plaintiffs' motion for a preliminary injunction and Proposed Intervenors' Motion to Intervene are denied as moot.

The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

                                          _/s/_____

                                          ORELIA E. MERCHANT
                                          United States District Judge

July 30, 2026
Brooklyn, New York